# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| HEADWATER RESEARCH LLC, § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | CIVIL ACTION NO. 2:22-CV-00422-JRG-RSP |
| § | |
| SAMSUNG ELECTRONICS CO., LTD. § | |
| and SAMSUNG ELECTRONICS § | |
| AMERICA, INC., § | |
| § | |
| *Defendants*. § | |

## REPORT AND RECOMENDATION

Before the Court is Defendants' Motion to Dismiss for Lack of Standing (Dkt. No. 236), Plaintiff's Motion for Partial Summary Judgment as to Defendant Samsung's Standing Defense (Dkt. No. 241), and Defendants' Second Motion for Sanctions. (Dkt. No. 366)[1]. The issue of standing is one for the Court, not the jury. *See DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1291 (Fed. Cir. 2008). As such, the Court held an evidentiary hearing on the matter on July 25, 2024 and heard testimony from Dr. Raleigh and argument from both parties. Having considered the motions, the evidence presented, and the parties' oral arguments, the Court finds that Headwater **HAS** standing.

**I.    BACKGROUND**

Plaintiff asserts a series of patents all identifying the same three inventors: Gregory Raleigh, James Lavine, and Alireza Raissinia. Drs. Raleigh and Raissinia were previously employed by Qualcomm and in the course of that employment signed an assignment agreement.

---

[1] The Court finds this last motion should be denied. The Court finds Headwater's explanation for having not timely found emails more than a decade ago convincing. Further, as provided below, the Court is convinced that neither the subject matter of the material Headwater produced late, nor the documents themselves materially alter the analysis on standing. As such the Court finds there is insufficient grounds to grant Samsung's requested terminating sanctions. The Defendants' Second Motion For Sanctions (Dkt. No. 366) is therefor **DENIED**.

The Assignment Agreements provide all Inventions are assigned to Qualcomm and defines "Inventions" as:

> "All inventions, discoveries, developments, formulae, processes, improvements, ideas and innovations, whether patentable or not … made, conceived, reduced to practice, authored, or fixed in a tangible medium of expression by me, … whether or not made, conceived, reduced to practice, authored, or fixed in a tangible medium of expression during working hours, which results from my work or association with the Company, or which results from or is aided by the use of the Company's equipment, supplies, facilities or trade secret information, or which is related to or coming within the scope of the Company's business, or related to the Company's products or any research, design, experimental or production work carried on by the Company." (Dkt. No. 236-13.)

The Assignment Agreements additionally provides:

> "I agree that an Invention disclosed by me to a third person or described in a patent application filed by me or in my behalf within one year following termination of my employment with the Company shall be presumed to be an Invention subject to the terms of this Agreement unless proved by me to have been conceived and first reduced to practice by me following the termination of my employment with the Company." (*Id*. at ¶1.4.)

Dr. Raleigh left Qualcomm on September 19, 2008 and filed a provisional '354 application on January 28, 2009 within one year of his departure. Plaintiff initially asserted that all patents claimed priority to this provisional but has since agreed that the priority date is May 25, 2010. Dr. Raissinia left Qualcomm in November 2009 and was listed as an inventor on the '022 application filed May 25, 2010 within one year of his departure.

## II. APPLICABLE LAW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any evidence must be viewed in the light most favorable to the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when there is no genuine dispute of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the

2

mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute] of material fact." *Anderson*, 477 U.S. at 247–48. The substantive law identifies the material facts, and disputes over facts that are irrelevant or unnecessary will not defeat a motion for summary judgment. *Id.* at 248. A dispute about a material fact is "genuine" when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"Where one co-owner possesses an undivided part of the entire patent, that joint owner must join all the other co-owners to establish standing. . . . Absent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing." *Israel Bio-Engineering Project v. Amgen Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2005). A plaintiff's failure to join a co-owner forestalls the plaintiff's "ability to satisfy the statutory prerequisites for bringing an infringement suit." *AntennaSys, Inc. v. AQYR Techs., Inc.*, 976 F.3d 1374, 1378–79 (Fed. Cir. 2020). Further, "a non-consenting co-owner or coinventor can never be involuntarily joined in an infringement action . . . because 'the right of a patent co-owner to impede an infringement suit brought by another co-owner is a substantive right.'" *Id.* at 1378 (citing *STC.UNM v. Intel Corp.*, 754 F.3d 940, 946 (Fed. Cir. 2014)). "The party bringing the action has the burden of establishing that it has standing to sue for infringement." *MHL TEK, LLC v. Nissan Motor Co.*, 655 F.3d 1266, 1274 (Fed. Cir. 2011).

### III. ANALYSIS

Defendants contend, and Plaintiff contests, that Drs. Raleigh and Raissinia assigned their interest in the asserted patents to Qualcomm making Qualcomm a co-owner of each of the Asserted Patents. Defendants contend that by filing provisional applications within the one-year period after their employment with Qualcomm, Raleigh and Raissinia triggered the assignment agreement as to all the patents. Plaintiff contends that the one-year provision violates California law, that Dr. Raleigh conceived of the invention after leaving Qualcomm, and the patents are not within the

3

scope of Qualcomm's business.

### A. ONE-YEAR PROVISION

California Labor Code §2870(a) provides:

Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:
   (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or
   (2) Result from any work performed by the employee for the employer.

California Business and Professions Code §16600 provides "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

Plaintiff contends under these provisions, the one-year provision is void. (Dkt. No. 287 at 13-15.) Plaintiff points to *Whitewater W. Indus., Ltd. v. Alleshouse*, 981 F.3d 1045, 1051 (Fed. Cir. 2020), where it contends the Federal Circuit recently voided a similar provision. (*Id.*)

Defendants contend first that Plaintiff lacks standing to challenge the validity of the agreement and second that the one-year provision is valid as it only creates a rebuttable presumption. (Dkt. No. 289 at 4-10.) Defendants contend because neither Qualcomm nor Drs. Raleigh and Raissinia are parties to this lawsuit, the agreement between those parties cannot be voided. (*Id.* at 4-6.) Defendants contend the parties to the agreement are indispensable parties when seeking to void an agreement. (*Id.* at 5-6.) Second, Defendants contend Federal Circuit case law actually supports the validity of the provision as it is only a rebuttable presumption. (*Id.* at 7-10.)

In applying §16600, the Ninth Circuit explained the crux of the statute was to determine whether the concerned language "imposes a restraint of a substantial character regardless of the form in which it is cast." *Golden v. California Emergency Physicians Med. Grp.*, 782 F.3d 1083,

4

1091 (9th Cir. 2015). The Federal Circuit applied this precedent to find that §16600 and §2870(a) invalidated an assignment provision that purported to "survive the discontinuance or termination of this Agreement for any reason." *Whitewater W. Indus., Ltd. v. Alleshouse*, 981 F.3d 1045, 1048 (Fed. Cir. 2020). In addition to *Golden*, the Federal Circuit cited *Applied Materials, Inc. v. Advanced Micro-Fabrication Equip. (Shanghai) Co.*, 630 F. Supp. 2d 1084, 1086 (N.D. Cal. 2009), which Defendants contend is particularly relevant. Therein, the Northern District of California invalidated a similar one-year presumption provision in part because it was an un-rebuttable presumption. *Applied Materials*, 630 F. Supp. 2d at 1089 ("Notably, there is no express creation of the rebuttable presumption for which Plaintiff advocates.").

The Court finds that the one-year provision does not run afoul of either California statute. The provision does not create "restraint of a substantial character" as it is only a *rebuttable* presumption. §2870(a) inherently endorses an assignment provision wherein the invention was "developed … using the employer's equipment … [or r]elate[d] … to the employer's business … or [r]esult[ed] from any work performed by the employee for the employer," much like the Assignment Agreement here. As such, the effect of the one-year provision is to place the burden of proof on the employee, not to materially alter their positions. The Court cannot find the provision is a "restraint of a substantial character" on an employee's engagement in lawful trade. Indeed, the Northern District of California[2] gave particular weight to whether a similar provision was rebuttable or not.

As such, the Court finds that the burden here shifts between the parties before landing with

---

[2] The Court gives particular weight to California federal courts when applying California statutes. *See Whitewater W. Indus., Ltd. v. Alleshouse*, 981 F.3d 1045, 1051 (Fed. Cir. 2020). "We give weight to decisions of federal courts that are 'better schooled in' the law of the particular State involved."

5

Headwater. First, "[t]he party bringing the action bears the burden of establishing that it has standing." *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005). As the assignment to Headwater was appropriately recorded with the Patent Office, "this creates a presumption of validity as to the assignment and places the burden to rebut such a showing on [Samsung]." *Mobile Equity Corp. v. Walmart Inc.*, No. 2:21-cv-0126-JRG-RSP, 2022 WL 4112237, at *2 (E.D. Tex. Aug. 23, 2022), Report and Recommendation adopted, No. 2022 WL 4111857 (E.D. Tex. Sept. 8, 2022) (citing *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1328 (Fed. Cir. 2010).) To rebut this showing, Samsung points to the one-year presumption discussed above. This presumption places the burden back on Headwater.

That presumption, and thus Headwater's burden to disprove, is that any invention disclosed by Dr. Raleigh in a patent application filed within one year of his departure is subject to the assignment agreement. As such, it is on Headwater to show either the disclosed invention is not "within the scope of the company's business," and thus not an "Invention" under the agreement, or that the invention was conceived and reduced to practice after Dr. Raleigh's employment.

### B. "WITHIN THE SCOPE OF THE COMPANY'S BUSINESS"

Defendants contend that the invention is within the scope of Qualcomm's business. Defendant points to Dr. Raleigh's deposition testimony that "Qualcomm had been working in that area" and Qualcomm had "similar technologies" to Headwater. (Dkt. No. 236 at 13-14.) Defendants identify several patent filings by Qualcomm relating to saving power during wireless communications by selectively disabling functionality including one listing Dr. Raissinia as an inventor, similar to Headwater. (*Id*. at 14-15.) Defendants argue that all their contentions here are buttressed by the fact that Qualcomm has asserted ownership of the Asserted Patents. (*Id*. at 15-16.)

Plaintiff criticizes Defendants' contentions that the patents are within the scope of

6

Qualcomm's business in that it amounts to covering anything related to operating systems or connecting applications. (Dkt. No. 287.)

The Court finds the invention is within the scope of Qualcomm's business. Dr. Raleigh as an inventor and prior employee of Qualcomm is well positioned to understand Qualcomm's business and compare it to the invention. Dr. Raleigh testified Qualcomm had been working in the area and had similar technologies. (Dkt. No. 236-20 at 44:4-20, 88:12-20.) Further, Dr. Raleigh seemed to believe at the time that an idea at least related to his invention was sufficiently related to Qualcomm's business to pitch it to the CEO. While this was apparently unsuccessful, it demonstrates that Qualcomm's business is not unrelated. Dr. Raissinia's testimony is likewise highly material and supportive of the Court's finding. He testified that he did work in power saving mechanisms for wireless communications at Qualcomm and was a named inventor on such a patent application while at Qualcomm. (Dkt. No. 236-11 at 34:10-38:5.) From this evidence, the Court finds that the invention is within the scope of Qualcomm's business.

### C. TIMING OF THE INVENTION

Headwater contends the invention was conceived and reduced to practice after Dr. Raleigh's and Rassinia's employment at Qualcomm.

Chiefly, Dr. Raleigh points to a particular moment of conception, an "ah-ha moment," where he alleges he shifted his thinking from managing network use from the network side to the device side. Dr. Raleigh testified that as he was departing Qualcomm, he was preparing for his next endeavor, ItsOn. Dr. Raleigh testified that he had been courted by Best Buy to support an upcoming MVNO endeavor, though ItsOn's precise role was not yet determined prior to Dr. Raleigh's departure. Dr. Raleigh testified that he met with Best Buy and several vendors that Best Buy was evaluating around September 25, 2008. It was on the plane home that Dr. Raleigh contends he conceived of the idea to shift from a network-side to a device-side solution. Dr.

7

Raleigh testified that hearing from the various different vendors inspired him to find a better solution.

As part of Dr. Raleigh's discussions with Best Buy, several slide presentations were exchanged detailing the evolving idea for ItsOn's involvement with Best Buy's MVNO. The first of these presentations was prepared by Best Buy some time before September 9, 2008 and reflects the discussions Dr. Raleigh and Best Buy had previously. The presentation reflects the intention that Best Buy would hire ItsOn to provide MVNE support for Best Buy's MVNO [3]. The presentation does not detail the role of ItsOn but suggests ItsOn would work with Best Buy, the carriers, and device OEMs to provide effective MVNE services. The precise strategy for this was expressly yet to be determined.

The next presentation is dated September 24, 2008 and was given by Dr. Raleigh to Best Buy at the same meeting with vendors that Dr. Raleigh alleges inspired his conception. This presentation reiterates many of the points from the first presentation describing at a high-level Dr. Raleigh and the proposed role of ItsOn. However, the second presentation includes more detail. For instance, the second presentation describes a need for "vertical consumer solutions" pointing to Kindle's network connectivity and the iPhone. The presentation describes the role of ItsOn as providing "low cost devices with stackable, cool, low cost consumer services to basic carrier contract plans" and improving the basic services for its customers. An "End to End Service Platform" is described to support many services, wireless operators, payment models, and device types as well as providing "Bandwidth utilization efficiency" including "Authentication, Authorization, [and] Access Control." The "Service Platform Components" are described including "Device Design and Supply Chain Management" including collaborations with carriers,

---

[3] Broadly, an MVNO subcontracts from the carriers to provide network access to its own customers and an MVNE provides the customer service and other infrastructure to enable an MVNO to service its customers.

chipset suppliers, and OEMs and providing multiple OS support for ItsOn CM, UIs, and portals and device management. Regarding the supply chain, the presentation describes a service developers kit that would be provided to OEMs to implement an ItsOn service platform including a UI, connection manager, and an undescribed bandwidth management solution as well as several other features.

By the third presentation given about a month later on October 23, 2008, Dr. Raleigh had solidified his plan for ItsOn. While ItsOn was still intended to provide MVNE services, the unique focus of ItsOn was to "[t]ransform every device into a flexible WWAN service offering platform" including "[t]raffic control and billing flexibility necessary for less expensive device specific service plans." Dr. Raleigh's inventive concept was so solidified by this point as to include a description of "Protectable IP" described as "[d]evice side service implementation (traffic shaping, billing event collection, real time adaptive bandwidth control and traffic reporting filters) in a manner that is tamper proof."

As to Qualcomm's claim of ownership over the patents in suit, Dr. Raleigh testified, and several emails confirmed, that Qualcomm made several claims but did little to pursue them. During the early development of ItsOn, Dr. Raleigh sought various investments including from Qualcomm. During those discussions, Qualcomm suggested that to settle its claim, Qualcomm should be given additional equity in ItsOn in exchange for a release of its claim against Headwater. Dr. Raleigh testified that he responded to this suggestion very negatively and demanded that for any discussion to go forward, Qualcomm would need to drop its claim. Dr. Raleigh proposed and drafted a release agreement but it was never agreed to.

Dr. Raleigh testified later that Qualcomm sought to purchase the patents outright and in the course of those negotiations told Dr. Raleigh that it had let the statute of limitations run on its

9

claim to ownership.[4] Dr. Raleigh further testified that this deal ultimately fell through because he insisted on a higher price than offered.

Years later, Dr. Raleigh gave an interview in 2021 where he said "At Qualcomm … I had this idea that … the next step is operating systems technology to manage the way applications connect on these new smartphones ... I took it to the then CEO of Qualcomm, again too far afield, Qualcomm is a chipset company, too risky, too disruptive … So I left Qualcomm to start Headwater, we developed that operating system technology, we distributed it to carriers, pitched it to OEMs, and its now in every smartphone on the planet." (Dkt. No. 236 at 11-12.) At the hearing, Dr. Raleigh testified that these statements passing remarks and that he did not have the time to fully explain what occurred as he was merely a panel member and instructed to keep his statements brief.

For his part, Dr. Raissinia, who returned to Qualcomm before this case was filed, did not testify at the hearing. Rather the parties submitted his deposition testimony on this issue. At his deposition, Dr. Raissinia testified he left Qualcomm more than a year after Dr. Raleigh, on December 1, 2009. He testified that once at Headwater he worked with Dr. Raleigh to refine the concepts in the patents collaboratively but could not provide greater specificity as to his contributions. He also testified that he never worked on this invention at Qualcomm, and never even collaborated or research with Dr. Raleigh at Qualcomm.

Samsung argues that that Headwater has failed to meet its burden of showing it owns the full rights to the Asserted Patents and thus has standing. Samsung contends this requires an exacting showing of conception and that Dr. Raleigh's testimony that he did not conceive of the invention at Qualcomm lacks corroboration. Beyond an insufficient showing, Samsung argues Dr.

---

[4] Headwater does not contend that its standing dispute is resolved by any statute of limitations having run. As such, the Court does not evaluate such and only considers this testimony to go to Qualcomm's understanding.

Raleigh's testimony should not be trusted. Samsung points to Dr. Raleigh's 2021 interview where it contends he was providing an honest, disinterested, retelling of events whereas his current testimony is unreliable as influenced by his multi-million dollar interest in this action.

Plaintiff contends that even if it applied, the rebuttable presumption of the one-year provision is rebutted here. Plaintiff points to testimony of Drs. Raleigh and Raissinia that they did not conceive of the invention at Qualcomm, and Defendants' interrogatory responses that they have no evidence otherwise. (Dkt. No. 241 at 4-6.) Plaintiff further highlights Samsung's lack of evidence from Qualcomm, either that Qualcomm alleges an ownership interest or an affirmative showing that the invention was conceived at Qualcomm.

Plaintiff contends that the exclusion provision of paragraph 1.5 applies here because "no equipment, supplies, facilities, or trade-secret information" from Qualcomm were used, the invention "was developed entirely on [the inventors] own time," and "d[id] not result from any work performed [] for the [Qualcomm.]" (*Id*. at 8.) Plaintiff points to the 2021 interview that Qualcomm was not interested in the idea Dr. Raleigh had because it was too far afield and not close enough to the technology they were involved with. (*Id*. at 9.) Plaintiff further contends there is no evidence the invention was the result of work performed for Qualcomm. (*Id*.)

The Court finds that the operative question is whether Dr. Raleigh conceived of the invention underlying the patents while at Qualcomm. No party has focused on Dr. Raissinia and there does not seem to be any identifiable portion of the invention that can readily be attributed back to his work at Qualcomm. Further, the Court finds Dr. Raissinia's testimony that he did not conceive of the invention while at Qualcomm believable. As such, the Court's analysis shall focus on Dr. Raleigh.

As an initial matter, the Court is not convinced that Headwater needs to make the exacting

11

conception showing with corroboration that Samsung claims. In *Preston v. Marathon Oil Co.*, 684 F.3d 1276 (Fed. Cir. 2012), the Federal Circuit explained that the same conception and corroboration requirements apply whether it is raised by contract or statute. However, there the employee sought to demonstrate that he conceived of his invention *prior* to his employment, not after as here. *See id*. The corroboration requirement simply does not mechanically work in the situation where the party without the burden is the one trying to prove an earlier conception date. Here, Headwater has no need to corroborate its latest conception date, the one supported by prosecution history filing, as it relies on no testimony. What Samsung wants Headwater to provide corroboration for is the lack of conception. Headwater would have to provide documentation that something novel was expressly not conceived of while Dr. Raleigh worked at Qualcomm. This is impractical, and the Court will not hold Headwater to such a standard.

However, the importance of some corroboration of an inventor's conception testimony is well established in the jurisprudence. The Court will require Dr. Raleigh's testimony regarding his "ah-ha moment" to be corroborated, but the Court does not expect this corroboration to demonstrate his exact moment of conception or a lack of prior conception.

Second, the Court finds that the key event to examine is when Dr. Raleigh shifted his thinking from a network side solution to a device side solution. Dr. Raleigh calls this his "ah-ha moment." At the hearing Samsung did not contest the focus on this event and from the Court's review of the patent documents this does appear to be the relevant point of novelty, or at least one description of it.

With that groundwork, the Court finds the broad strokes of Dr. Raleigh's story is corroborated and credible. The Best Buy presentations demonstrate he was in talks with Best Buy prior to departing Qualcomm and that his role was initially vague but that it solidified over time.

12

What is less clear from the documents, and even from Dr. Raleigh himself, is precisely when his thinking shifted from a network side solution. It is clear from the presentations that Dr. Raleigh had his "ah-ha moment" some time before October 23, 2008. That presentation specifically described "protectable IP" for a "device side service implementation" including "real time adaptive bandwidth control." The Court finds this closely tracks what Dr. Raleigh calls his innovative shift.

What is less clear, is the showing around the two earlier presentations. Both presentations are allegedly before the "ah-ha moment" which Dr. Raleigh testified was he came back from the September 24-25, 2008 meeting. These presentations neither demonstrate that Dr. Raleigh was initially focused on a network side solution or that he had already shifted to a device side solution. However, while they do not expressly describe a device side implementation, they do reference work on devices. For instance, the September 24, 2008 presentation references developing an SDK for OEMs that would include a bandwidth management solution. This, in combination with Dr. Raleigh's interview testimony that he brought his operating system solution to Qualcomm, raises the question whether Dr. Raleigh really had his "ah-ha moment" after the September 24-25, 2008 meeting. As neither party effectively explored this point, the Court is left to weigh these questions against Dr. Raleigh's credibility.

The Court finds him credible on this point. While a certain reading of Dr. Raleigh's interview testimony is inconsistent with his current testimony, the Court finds this is explainable as bluster. In context, Dr. Raleigh sought to make the point that large corporations were fundamentally not innovative. The Court does not find it hard to believe that when given only a minute or two to make his point, Dr. Raleigh glossed over the details of precisely what he brought to Qualcomm's CEO in order to make his larger point. Similarly, the Court does not find that the

13

September 24, 2008 presentation referencing an SDK involved with some unknown bandwidth management solution renders Dr. Raleigh's testimony unworthy of belief. First, September 24, 2008 was still after Dr. Raleigh left Qualcomm, though very shortly. Second, it is not clear what was meant by "a bandwidth management solution" in this instance. There is no doubt that a bandwidth management solution was needed, the question was where the fundamental discrimination decisions should be made. It is unclear from this short and unexplained reference what was meant and the testimony elicited at the evidentiary hearing did not elucidate the issue. As such, the Court falls back to the most credible and only testimony on the issue, that of Dr. Raleigh.

As such the Court finds that Drs. Raleigh and Raissinia conceived of the relevant inventions after they left Qualcomm.

## IV. CONCLUSION

For the reasons provided above, the Court finds that Headwater has standing to bring this action and thus recommends that Headwater's motion be **GRANTED** and Samsung's motion be **DENIED**.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this report within 14 days bars that party from *de novo* review by the District Judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. FED. R. CIV. P. 72(b)(2); *see also Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc). Any objection to this Report and Recommendation must be filed in ECF under the event "Objection to Report and Recommendation

[cv, respoth]" or it may not be considered by the District Judge.

**SIGNED this 1st day of August, 2024.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE