# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4  HEADWATER RESEARCH, LLC,      )(
         PLAINTIFF,               )(    CIVIL ACTION NO.
 5                                )(    2:23-CV-352-JRG-RSP
    VS.                           )(    MARSHALL, TEXAS
 6                                )(
    VERIZON COMMUNICATIONS INC., )(    MAY 30, 2025
 7  INC., ET AL.,                 )(
         DEFENDANTS.              )(    9:00 A.M.
 8  _____

 9
    HEADWATER RESEARCH, LLC,      )(
10       PLAINTIFF,               )(    CIVIL ACTION NO.
                                  )(    2:23-CV-379-JRG-RSP
11  VS.                           )(    MARSHALL, TEXAS
                                  )(
12  T-MOBILE US, INC., ET AL.,    )(    MAY 30, 2025
         DEFENDANTS.              )(    9:00 A.M.
13

14                      PRETRIAL HEARING

15             BEFORE THE HONORABLE ROY S. PAYNE

16             UNITED STATES MAGISTRATE JUDGE

17

18  FOR THE PLAINTIFF:       Mr. Marc Fenster
                             Mr. Reza Mirzaie
19                           Mr. Kristopher R. Davis
                             Mr. Adam S. Hoffman
20                           Mr. Jason Wietholter
                             Mr. Philip X. Wang
21                           Mr. Dale Chang
                             Russ August & Kabat
22                           12424 Wilshire Boulevard
                             12th Floor
23                           Los Angeles, CA 90025

24                           Ms. Andrea L. Fair
                             Miller Fair Henry PLLC
25                           1507 Bill Owens Parkway
                             Longview, TX 75604
```

```
 1   FOR DEFENDANTS:          Mr. Josh A. Krevitt
                              Mr. Brian A. Rosenthal
 2                            Ms. Katherine Dominguez
                              Mr. Charlie Sim
 3                            Gibson Dunn & Crutcher, LLP
                              200 Park Avenue
 4                            48th Floor
                              New York, NY 10166
 5
                              Mr. Robert Vincent
 6                            Gibson, Dunn & Crutcher LLP
                              2001 Ross Avenue
 7                            Suite 2100
                              Dallas, TX 75201
 8
                              Mr. Andrew W. Robb
 9                            Gibson, Dunn & Crutcher LLP
                              310 University Avenue
10                            Palo Alto, CA 94301
11                            Ms. Hannah L. Bedard
                              Gibson, Dunn & Crutcher LLP
12                            1700 M Street, NW
                              Washington, DC 20036
13
                              Mr. Tom Gorham
14                            Gillam & Smith, LLP
                              303 South Washington Avenue
15                            Marshall, TX 75670
16                            Mr. Deron R. Dacus
                              The Dacus Firm, PC
17                            821 ESE Loop 323
                              Suite 430
18                            Tyler, TX 75701
19   COURT REPORTER:          Ms. Shelly Holmes, CSR, TCRR
                              Official Court Reporter
20                            Honorable Robert W. Schroeder III
                              United States District Judge
21                            Eastern District of Texas
                              Texarkana Division
22                            500 North State Line Avenue
                              Texarkana, Texas 75501
23                            shelly_holmes@txed.uscourts.gov

24
     (Proceedings recorded by mechanical stenography, transcript
25   produced on a CAT system.)
```

| | | |
|---|---|---|
| 09:00:28 | 1 | COURT SECURITY OFFICER:  All rise. |
| 09:00:28 | 2 | THE COURT:  Good morning.  Please be seated. |
| 09:00:31 | 3 | For the record, we're here for the pretrial |
| 09:00:36 | 4 | conference in Headwater Research versus Verizon |
| 09:00:42 | 5 | Communications, which is 2:23-352 on our docket, and |
| 09:00:49 | 6 | Headwater Research versus T-Mobile USA, Inc., et al., which |
| 09:00:56 | 7 | is Case No. 2:23-379 on our docket. |
| 09:01:00 | 8 | Would counsel state their appearances for the |
| 09:01:02 | 9 | record? |
| 09:01:02 | 10 | MS. FAIR:  Good morning, Your Honor.  Andrea Fair |
| 09:01:04 | 11 | on behalf of Headwater.  I'm joined today by Mr. Marc |
| 09:01:07 | 12 | Fenster, Mr. Reza Mirzaie. |
| 09:01:07 | 13 | MR. MIRZAIE:  Morning. |
| 09:01:08 | 14 | MS. FAIR:  Mr. Kristopher Davis, Mr. Adam Hoffman, |
| 09:01:12 | 15 | Mr. Jason Wietholter, Mr. Philip Wang, and Mr. Dale Chang. |
| 09:01:19 | 16 | And we're ready to proceed. |
| 09:01:20 | 17 | THE COURT:  All right.  Thank you, Ms. Fair. |
| 09:01:25 | 18 | MR. GORHAM:  Good morning, Your Honor.  Tom Gorham |
| 09:01:26 | 19 | on behalf of Defendant T-Mobile.  With me here this morning |
| 09:01:30 | 20 | on behalf of Verizon is Mr. Deron Dacus.  We, again, have a |
| 09:01:35 | 21 | number of Gibson Dunn lawyers appearing on behalf of both |
| 09:01:39 | 22 | Verizon and T-Mobile this morning.  We have Ms. Kate |
| 09:01:42 | 23 | Dominguez, Mr. Brian Rosenthal. |
| 09:01:42 | 24 | MR. ROSENTHAL:  Good morning. |
| 09:01:44 | 25 | MR. GORHAM:  Mr. Josh Krevitt. |

09:01:44   1          MR. KREVITT:  Good morning.

09:01:45   2          MR. GORHAM:  Mr. Charlie Sim.

09:01:45   3          MR. SIM:  Good morning.

09:01:46   4          MR. GORHAM:  Mr. Brian Rosenthal, Mr. Rob Vincent,

09:01:50   5   and Ms. Hannah Bedard -- excuse me, Andrew Robb, and

09:01:54   6   Ms. Hannah Bedard.  And we're ready to proceed, Your Honor.

09:01:57   7          THE COURT:  All right.  Thank you, Mr. Gorham.

09:02:09   8          As counsel know, both of these cases are on the

09:02:12   9   June 23 trial docket for Judge Gilstrap.  The Court has

09:02:18   10  designated the Verizon case ahead of the T-Mobile case.

09:02:24   11  Both of them are currently behind the Empire versus Samsung

09:02:32   12  case, but obviously with the Verizon case second on that

09:02:41   13  June 23 docket, there's certainly an excellent chance it'll

09:02:45   14  be reached at that time.

09:02:46   15          I have looked over the record in the case,

09:02:56   16  including the recent representation that the Plaintiff was

09:03:01   17  going to reduce the claims down to four claims for trial.

09:03:09   18  With that and the other information in the pretrial order

09:03:12   19  about the witnesses and the like, I think that 11 hours per

09:03:16   20  side will be sufficient for the case.  But if either party

09:03:23   21  wants to offer argument on that, this would be the time to

09:03:28   22  hear it.

09:03:32   23          Mr. Fenster?

09:03:34   24          MR. FENSTER:  Good morning, Your Honor.  I would

09:03:39   25  request the Court's consideration for 12 hours.  And the

09:03:43  1  basic reason is while we have four claims at issue and one

09:03:49  2  Defendant, this case involves, for the '541 and the '613

09:03:54  3  patent, multiple products.  And so we're accusing for each

09:04:00  4  of the '541 and '613 patents phones from Apple, Samsung,

09:04:07  5  and Motorola, at least.

09:04:11  6       So there are -- there's a whole host of products,

09:04:16  7  both Android and iOS, that will require some going

09:04:21  8  through -- you know, some time to get through.  And so

09:04:24  9  that's why we'd request 12.

09:04:26  10      THE COURT:  All right.  Thank you, Mr. Fenster.

09:04:31  11      MR. ROSENTHAL:  Your Honor, Brian Rosenthal on

09:04:32  12  behalf of the Defendants.

09:04:33  13      I think that if the case remains the size that it

09:04:37  14  is now, we would join in that request.  And by that, I mean

09:04:43  15  there are some issues -- I hope we can discuss some of

09:04:46  16  those issues later today, but there are some issues that we

09:04:48  17  think are rifle shots and actually do substantially reduce

09:04:53  18  the scope of the case.  For instance, knocking out a

09:04:56  19  patent, knocking out products.

09:04:58  20      If the case remains the size that it is today, we

09:05:02  21  would join in the Plaintiff's request for 12 hours a side

09:05:05  22  if the Court's amenable to that.  I do think that there are

09:05:08  23  some complications.

09:05:10  24      We could, of course, you know, revisit that

09:05:11  25  question after the summary judgment motions are disposed

09:05:14    1    of.  I think that will bear a little bit on how complex the

09:05:18    2    case is.

09:05:18    3              THE COURT:  All right.  Thank you, Mr. Rosenthal.

09:05:21    4        I will take those arguments into account and

09:05:26    5    consider that further as we work through the other issues

09:05:29    6    in the case.  But at this point, I'll leave it at 11 hours

09:05:36    7    per side.

09:05:37    8              On June 23, the Court will take up jury selection

09:05:45    9    first on that Monday.  There'll be 30 minutes per side

09:05:50   10    allocated for voir dire, the first up to three minutes of

09:05:55   11    which can be devoted to a non-argumentative barebones

09:06:01   12    overview of what's at issue in the case.  I would stress

09:06:05   13    the non-argumentative part of that description.

09:06:09   14              At the end of that process, eight jurors will be

09:06:14   15    selected.  There will be four peremptory challenges per

09:06:18   16    side, which are exercised in a written blind simultaneous

09:06:24   17    fashion, meaning that both sides turn in their written

09:06:28   18    peremptory challenges at the same time.

09:06:31   19              After the peremptory challenges, the Court will

09:06:35   20    take up the challenges -- or, I'm sorry, before the

09:06:40   21    peremptory challenges, the Court will take up the

09:06:43   22    challenges for cause on the record that's been established.

09:06:49   23              Opening statements will proceed thereafter, 30

09:06:54   24    minutes per side.

09:06:58   25              Closing arguments, the parties should expect 40

09:07:02  1  minutes per side, although you can take that matter up with

09:07:06  2  Judge Gilstrap, and it'll depend a little bit on where the

09:07:16  3  case is in the daily schedule as to whether there can be

09:07:20  4  more time.

09:07:20  5       Plaintiffs are authorized to withhold up to half

09:07:21  6  of their time for rebuttal, but it has to be less than half

09:07:25  7  actually.

09:07:25  8       As you know, Judge Gilstrap will plan to be in

09:07:31  9  chambers daily at 7:30.  If there are issues that affect

09:07:37  10  the trial that starts that morning, I think the pretrial

09:07:43  11  order that the parties have agreed to has a proper -- a

09:07:54  12  proper protocol for disposition of the -- of any disputes

09:08:02  13  that arise during it.

09:08:04  14       There were a few issues in the pretrial order that

09:08:07  15  I think were not agreed to.  I'm trying to -- I think the

09:08:27  16  agreement in the pretrial order includes notifying the

09:08:29  17  Court of existing disputes by an email to the designated

09:08:35  18  law clerk by 10:00 p.m. that night.  You may have agreed to

09:08:39  19  an earlier time.  If so, that's, of course, fine.

09:08:42  20       The one thing I would add to your agreement is

09:08:50  21  that in addition to notifying the Court by that 9:00 or

09:08:55  22  10:00 p.m., depending on what your agreement was, you

09:09:01  23  should plan to have available for Judge Gilstrap the

09:09:03  24  following morning when you're going to present the dispute

09:09:08  25  a jointly prepared three-ring binder that has a copy of the

09:09:13  1  demonstrative, for instance, if that's what the issue is,

09:09:16  2  or if it's an exhibit, a copy of that -- a short narrative

09:09:23  3  from each side, roughly half a page, setting out what the

09:09:27  4  dispute is in preparation for a conference with the Judge

09:09:36  5  at 7:30 or thereabouts.

09:09:39  6        The plan will be for the jury to report around

09:09:42  7  8:30 daily.

09:09:47  8        Lunch is provided for the jury so that the lunch

09:09:50  9  break can be kept short to roughly 45 minutes.

09:09:56 10        The Court will plan to adjourn by around 6:00 p.m.

09:10:02 11  each day in order to accomplish the completion of the trial

09:10:09 12  in that week.

09:10:13 13        If there are disputes about deposition

09:10:18 14  designations, we'll try and resolve any for the first day

09:10:24 15  of trial, if there are any, during the pretrial process,

09:10:34 16  but the situation -- the protocol that you agreed to in the

09:10:37 17  pretrial order is acceptable for resolution of the

09:10:45 18  disputes, but I think the parties had a disagreement about

09:10:51 19  when they need to make those issues known.

09:10:57 20        There was in Paragraph 11 and 12 of the pretrial

09:11:04 21  order a section on the trial management procedures.  There

09:11:11 22  was a dispute about whether 12:30 p.m. two days before or

09:11:19 23  6:30 p.m. three days before would work.  I think that the

09:11:29 24  Court has in the past adopted the 12:30 two days before.

09:11:36 25  And I see no reason not to adopt that this time.

09:11:40    1          If the Defendant wants to offer some argument in

09:11:43    2    support of the 6:30 deadline three days before, I'll be

09:11:51    3    happy to hear it.  But, otherwise, I'll go with what we've

09:11:55    4    used before.

09:11:55    5          Mr. Rosenthal?

09:11:56    6          MR. ROSENTHAL:  Your Honor, we'll live with that.

09:11:57    7    Thank you, Your Honor.

09:11:58    8          THE COURT:  All right.  Then with that

09:12:06    9    clarification, the pretrial order will be adopted.

09:12:16    10         Mr. Rosenthal, I note that there was a request for

09:12:19    11   a separate provision regarding the use of errata when a

09:12:26    12   deposition is being offered.

09:12:30    13         Do you want to provide your argument on that, or

09:12:32    14   is that something that has been resolved?

09:12:34    15         MR. ROSENTHAL:  Your Honor, it has not been

09:12:37    16   resolved.  I think it's a fairly ministerial issue.

09:12:42    17   Mr. Vincent, if you don't mind, can just briefly address

09:12:46    18   what the issue is.

09:12:47    19         THE COURT:  All right.

09:12:47    20         MR. ROSENTHAL:  Thank you.

09:12:48    21         MR. VINCENT:  Your Honor.  Robert Vincent for

09:12:53    22   Defendants.

09:12:53    23         The issue is straightforward.  There are

09:12:55    24   depositions and deposition designations to be played in

09:12:58    25   this case.  Those depositions, errata were made through the

09:13:03    1    normal errata process that bear on the testimony that

09:13:07    2    Headwater wants to designate in the trial.

09:13:10    3            For completeness, we believe that the errata

09:13:13    4    should be read to the jury, to the extent it bears on the

09:13:16    5    testimony that Headwater has designated.  That's why we

09:13:19    6    have an errata process in the deposition process.  That's

09:13:23    7    why we have those.  And so for completeness, to get the

09:13:28    8    complete testimony and context, the errata are necessary to

09:13:34    9    be read, again, to the extent that Headwater wants to

09:13:37    10   designate testimony that relates to that errata.

09:13:40    11           THE COURT:  All right.  And, Mr. Vincent, are you

09:13:43    12   familiar with the errata that are at issue in these

09:13:48    13   depositions?  Are -- is it simply what you would consider

09:13:53    14   the correction of a typo, or is it to do with the witness

09:13:59    15   wanting to clarify or change their answer in some way?

09:14:05    16           MR. ROSENTHAL:  I think that can be corrected.  If

09:14:09    17   wrong -- I think there is a -- there are typos, and there

09:14:11    18   are also, you know, clarifications or explanations of

09:14:16    19   testimony.

09:14:17    20           Again, I don't have that errata in front of me

09:14:19    21   right now, but in -- but I think it involves -- not simply,

09:14:25    22   you know, a misspelled word, but it does go to what the

09:14:29    23   witness testified as their testimony under oath.  And,

09:14:33    24   again, that's what the errata process is for, so that the

09:14:36    25   witness can control the testimony that they provided under

09:14:39    1    oath.

09:14:40    2         And if Headwater has specific objections to

09:14:43    3    specific errata, then they can raise those, but my

09:14:48    4    understanding that this was a global objection to reading

09:14:52    5    errata at all in the -- for witness designations.

09:14:57    6         THE COURT:  It seems to me that perhaps the best

09:15:01    7    way to handle this is like an objection in the designated

09:15:08    8    testimony.  And if the other side -- whichever side is

09:15:16    9    wanting to use the errata, if the other side feels that

09:15:21   10    it's a misuse of the errata process, then I think probably

09:15:27   11    the best way is to meet and confer about that and then

09:15:31   12    raise it as an objection during the deposition designation

09:15:38   13    process.

09:15:39   14         Do you have any reason to think it should be done

09:15:44   15    differently?

09:15:45   16         MR. VINCENT:  No, Your Honor, that's the process

09:15:47   17    that we would propose.

09:15:48   18         THE COURT:  All right.  Then thank you,

09:15:51   19    Mr. Vincent.

09:15:52   20         MR. VINCENT:  Thank you, Your Honor.

09:15:53   21         THE COURT:  If the Plaintiff has a different idea

09:15:54   22    on it, I'd be happy to hear it.

09:15:57   23         Mr. Wang?

09:15:59   24         MR. WANG:  Thank you, Your Honor.

09:16:01   25         Just to address this briefly, we were concerned

09:16:05    1    about errata being read for the point that you mentioned,

09:16:10    2    Your Honor, substantive changes in testimony.  And I

09:16:12    3    believe what Mr. Vincent said, I partly agree with, which

09:16:16    4    is that in some prior pretrial orders, we did not have this

09:16:20    5    sentence, and we could address this issue for specific

09:16:25    6    designations instead of doing it the other way around to

09:16:30    7    have this and do it that way.

09:16:34    8         THE COURT:  Well, why don't we have the

09:16:36    9    understanding be, then, that if there is no objection

09:16:43    10   raised by the party offering the deposition testimony, the

09:16:50    11   errata will be read where it would go in the testimony.

09:16:57    12   And if there's an objection to that errata on the theory

09:16:59    13   that it's not a proper use of an errata, then you would

09:17:05    14   raise that with Judge Gilstrap as part of the objection

09:17:11    15   process that we've been talking about.

09:17:15    16        MR. WANG:  That makes sense, Your Honor, and we

09:17:17    17   agree to that.

09:17:17    18        THE COURT:  All right.  Then the pretrial order

09:17:20    19   will be deemed modified to that extent.

09:17:46    20        I wanted to also address one other procedural

09:17:50    21   issue raised in that section of the pretrial order.

09:17:53    22        On Page 20 of the Verizon pretrial order, Footnote

09:17:57    23   9, there is a statement that the parties reserve the right

09:18:01    24   to object to the use of pre-admitted exhibits with

09:18:07    25   particular witnesses.

09:18:07    1          I'm not familiar with that reservation.  And if --

09:18:15    2    I don't know if both sides are agreeing to that or if that

09:18:21    3    is something that one side wants to speak for.  But unless

09:18:24    4    I have some other explanation, I'll -- I will have to

09:18:30    5    strike that reservation because I -- it's not consistent

09:18:34    6    with my understanding of the purpose of pre-admission.

09:18:40    7          MR. WANG:  Your Honor, I can speak to this

09:18:42    8    briefly.

09:18:43    9          The parties did agree to this.  And in our

09:18:45    10   discussions, I think what we had in mind was this idea that

09:18:49    11   we know that pre-admitted exhibits are pre-admitted but

09:18:53    12   that the parties want to reserve the right to object to

09:18:58    13   certain witnesses testifying about an exhibit.  And what we

09:19:04    14   have here is, you know, not having foundation, not being

09:19:08    15   able to speak to the exhibit, implying expert testimony

09:19:13    16   through the exhibit, and so that was what we preserved

09:19:17    17   here.

09:19:17    18          But, you know, if Your Honor has concerns with it,

09:19:21    19   I mean, the fact that it's in a footnote, we would defer to

09:19:25    20   Your Honor.

09:19:25    21          THE COURT:  Well, if what you're saying is you

09:19:28    22   reserve the right to object to particular questions of a

09:19:34    23   witness, certainly you can do that.  But we're not talking

09:19:38    24   about an objection to the exhibit then.  Is that what --

09:19:46    25          MR. WANG:  I think that's fair.  I think that's

09:19:48    1  fair, Your Honor, and that's why we say object to the use

09:19:54    2  of pre-admitted exhibits.

09:19:55    3        And Your Honor may be correct to identify that as

09:20:01    4  an objection to certain questioning or examination.

09:20:08    5        THE COURT:  Well, I just -- I don't want it to be

09:20:10    6  understood that there is a reservation of the right to

09:20:13    7  object to a lack of foundation for an exhibit.  There may

09:20:17    8  well be a lack of foundation for a question.  And if that's

09:20:27    9  all you're talking about, then that's fine.

09:20:29    10       MR. WANG:  That's what we had in mind, Your Honor,

09:20:32    11  and so we're happy to revise this or take it out with

09:20:35    12  Your Honor's guidance.

09:20:36    13       THE COURT:  Well, I'll just -- as long as it's

09:20:40    14  understood, then, that what that footnote is reserving is

09:20:43    15  the right to object to particular questions of a witness as

09:20:53    16  opposed to object to the exhibit -- and that's consistent

09:21:01    17  with your understanding of that footnote, Mr. Wang?

09:21:05    18       MR. WANG:  Yes, Your Honor.

09:21:06    19       THE COURT:  Okay.  Does counsel for Defendant have

09:21:09    20  a different understanding of that?

09:21:11    21       MR. ROSENTHAL:  No, Your Honor, that's fine.  And

09:21:13    22  striking it is also fine.

09:21:14    23       THE COURT:  All right.  Well, I'll just leave it

09:21:19    24  in there with that clarification.

09:21:20    25       One other similar clarification would be in

09:21:29    1    Paragraph 22 of that section, which is on Page 21, to just

09:21:35    2    clarify that the juror notebooks, as you have described

09:21:39    3    them, are fine, but the witness pages that have the

09:21:49    4    photograph of the witness should have the name but not

09:21:54    5    the -- not title or any other information about the

09:21:58    6    witness, just the witness's name.  And maybe by title, all

09:22:06    7    you meant was if the witness carries a doctor designation,

09:22:13    8    to have -- that designation is fine.  But saying that the

09:22:18    9    witness holds a particular position with a particular

09:22:21   10    entity is not appropriate.

09:22:24   11         MR. ROSENTHAL:  We understand.  We'll follow that.

09:22:27   12         THE COURT:  All right.  I will also note that

09:22:40   13    consistent with the normal practice, the parties are

09:22:43   14    directed to withhold the Rule 50(a) motions until after the

09:22:49   15    close of all evidence.  I know that counsel are routinely

09:22:55   16    worried about waiving their objections by not asserting

09:23:01   17    them at each stage of the case, but the record is being

09:23:06   18    made clear here that there is no waiver as long as you

09:23:12   19    present your motions after the close of all evidence.

09:23:15   20         I looked through the proposed jury instructions.

09:23:26   21    The format that you've got them in is very helpful.  There

09:23:29   22    are at this point still too many disputes, but I would

09:23:35   23    direct the parties to continue to confer about that with

09:23:38   24    the idea that by the time the case gets to trial, you'll

09:23:42   25    have the proposed instructions down to as few disputes as

09:23:51    1    possible.

09:23:51    2         The Court will hold an informal pretrial -- I'm

09:23:57    3    sorry, an informal jury charge conference near the close of

09:24:03    4    all the evidence, and then after the formal charge is

09:24:10    5    prepared, there'll be a formal charge conference after the

09:24:15    6    close of all the evidence.

09:24:16    7         One thing I think that all counsel here are

09:24:20    8    familiar with is the Court's practice of requiring that

09:24:28    9    witnesses and others not refer to persons by only their

09:24:32   10    first name.  In order to keep a clear record, you can use

09:24:41   11    just the last name or the first and last but not the first

09:24:46   12    name only.  And counsel are directed to advise their

09:24:48   13    witnesses to comply with that, as well.

09:24:50   14         Judge Gilstrap has a standing order on sealing the

09:24:58   15    courtroom and sealing parts of the transcript after the

09:25:01   16    trial.  I would direct counsel to review that standing

09:25:08   17    order and follow that if there is going to be a request to

09:25:13   18    seal the courtroom or the transcript.

09:25:16   19         The gist of or one of the goals of that standing

09:25:21   20    order process is to group any confidential evidence so that

09:25:27   21    the courtroom can be sealed and unsealed as few times as

09:25:32   22    possible, and, of course, to be sure to advise the Court as

09:25:37   23    soon as the confidential portion is done so that the

09:25:40   24    courtroom can be reopened promptly.

09:25:43   25         I know that there was a deadline in the docket

| | | |
|---|---|---|
| 09:25:53 | 1 | control order of last week, I think May 23, for the jury |
| 09:25:57 | 2 | questionnaire.  Has a proposed questionnaire been sent to |
| 09:26:03 | 3 | Ms. Clendening? |
| 09:26:06 | 4 | MS. FAIR:  Yes, Your Honor. |
| 09:26:07 | 5 | THE COURT:  Okay.  Good.  Thank you. |
| 09:26:08 | 6 | In that case, you can expect that the |
| 09:26:11 | 7 | questionnaire will be available for counsel on the Thursday |
| 09:26:19 | 8 | before jury selection.  It'll be available in the clerk's |
| 09:26:24 | 9 | office at that time. |
| 09:26:28 | 10 | That questionnaire is made available to counsel |
| 09:26:30 | 11 | with the understanding that it will be held by counsel in |
| 09:26:36 | 12 | confidence, not copied, not distributed, and destroyed |
| 09:26:42 | 13 | after the jury has been selected. |
| 09:26:45 | 14 | If you have any questions about that, |
| 09:26:49 | 15 | Judge Gilstrap does have a standing order on the court |
| 09:26:54 | 16 | website on the use of the questionnaire and the other jury |
| 09:26:59 | 17 | lists that identify prospective jurors. |
| 09:27:04 | 18 | The goal of all of that is to protect the privacy |
| 09:27:08 | 19 | of the whole venire, as well as the ultimately empaneled |
| 09:27:19 | 20 | jury, and so we take that seriously.  And we expect that |
| 09:27:23 | 21 | counsel will not use those names to perform any |
| 09:27:25 | 22 | investigation in a way that can get back to the prospective |
| 09:27:31 | 23 | jurors.  We don't want them to feel that their privacy is |
| 09:27:35 | 24 | being invaded.  They do a lot already for us, and so we |
| 09:27:40 | 25 | want to protect them from that. |

09:27:41  1          In connection with the jury, as you have pointed

09:27:47  2    out in your pretrial order, there are jury notebooks that

09:27:53  3    we'll need.  We'll direct the parties to deliver 12 of

09:27:56  4    those notebooks.  That's eight for the jury and four for

09:28:02  5    the staff.

09:28:06  6          Those should be delivered to chambers also by that

09:28:14  7    Thursday before jury selection so that we can make sure

09:28:16  8    that everything in those notebooks is appropriate.  You can

09:28:21  9    deliver those at the same time that you pick up the jury

09:28:26  10   questionnaires and other jury information.

09:28:28  11         Everything you've set out in your pretrial order

09:28:34  12   is appropriate, so I'll just leave it at that.

09:28:38  13         I also want to mention that you should be prepared

09:28:42  14   to provide the Court with copies of the experts' reports.

09:28:50  15   As you know, the Court holds experts to the four corners of

09:28:54  16   their reports, and that occasionally leads to objections

09:28:59  17   regarding whether the question to an expert is within the

09:29:04  18   scope of the report.  Those objections often require the

09:29:11  19   Court to consult the reports, so you will be requested to

09:29:17  20   provide both a paper copy and an electronic copy of the

09:29:23  21   reports to the Court, and you'll get an email, as we get

09:29:27  22   closer to trial, about when and how that should be

09:29:31  23   accomplished.

09:29:31  24         I will emphasize that resolving those objections

09:29:38  25   often means sending the jury out, therefore, they can take

09:29:44   1   a significant amount of time.  That time will be charged to

09:29:49   2   whichever party is unsuccessful with the objection, and,

09:29:54   3   therefore, you should be careful about those objections.

09:30:01   4   And I would encourage counsel who are examining the direct

09:30:07   5   examination of the expert to have a reference to the

09:30:12   6   expert's report handy for each question you may ask in case

09:30:19   7   an objection comes up.

09:30:20   8        If there are other issues in the pretrial order

09:30:28   9   that need to be resolved, and I think there are a couple, I

09:30:33   10  want to turn to those in a moment.  Then I want to take up

09:30:39   11  any objections regarding witnesses, and I don't mean the

09:30:45   12  Daubert-type objections.  I mean objections that are more

09:30:50   13  procedural or disclosure-based.  We'll then turn to the

09:30:56   14  motions in limine.  We'll then turn to the pre-admission of

09:31:00   15  exhibits.

09:31:01   16       And I was happy to see, if I'm understanding your

09:31:06   17  bucket lists that have been emailed to the Court -- if I'm

09:31:09   18  understanding those, it looks like the number of exhibits

09:31:14   19  each side has is now consistent with Judge Gilstrap's

09:31:19   20  standing order.  If not, I'll want to hear more about that

09:31:28   21  when we get to them.

09:31:30   22       I also want to take up any deposition objections

09:31:33   23  that relate to depositions that the Plaintiff may use on

09:31:40   24  the first day on the afternoon of the 23rd.  And other than

09:31:47   25  that, later deposition objections will need to be addressed

| | |
|---|---|
| 09:31:52 | 1 |
| 09:31:58 | 2 |
| 09:32:03 | 3 |
| 09:32:09 | 4 |
| 09:32:14 | 5 |
| 09:32:19 | 6 |
| 09:32:19 | 7 |
| 09:32:26 | 8 |
| 09:32:32 | 9 |
| 09:32:33 | 10 |
| 09:32:36 | 11 |
| 09:32:38 | 12 |
| 09:32:40 | 13 |
| 09:32:45 | 14 |
| 09:32:50 | 15 |
| 09:32:50 | 16 |
| 09:32:54 | 17 |
| 09:32:55 | 18 |
| 09:32:57 | 19 |
| 09:33:00 | 20 |
| 09:33:04 | 21 |
| 09:33:06 | 22 |
| 09:33:09 | 23 |
| 09:33:13 | 24 |
| 09:33:13 | 25 |

1  in the format agreed to in the pretrial order.

2      I mentioned yesterday to Mr. Krevitt that if there

3  is more time this afternoon, we can give the parties the

4  option of arguing some of the other motions that are

5  pending, and so we'll see what -- what time remains for

6  that.

7      Does the Plaintiff have other items that the Court

8  should put on the agenda for today?

9      MR. FENSTER:  No, Your Honor.

10      THE COURT:  All right.  Thank you, Mr. Fenster.

11      MR. MIRZAIE:  Your Honor, actually there is one

12  more item that we identified for opposing counsel in our

13  email last night, and this is the issue of indemnification.

14  You'll recall that -- we can take it up now or at the end

15  of the day.

16      THE COURT:  Why don't we take it up?  That's

17  the -- about the -- a Google witness?

18      MR. MIRZAIE:  In this case, it's not a Google

19  witness.  It would be an Apple or Samsung witness because

20  they're the vendors in this case.  Sort of akin to the

21  Google's position in the 103 trial.

22      THE COURT:  Okay.  Well, we can -- we can take

23  that up today certainly.  I'll put that on the agenda --

24      MR. MIRZAIE:  Thank you.

25      THE COURT:  -- as well.

09:33:14    1              MR. MIRZAIE:  Thank you.

09:33:15    2              THE COURT:  Anything that the Defendant wants to

09:33:18    3    have on the agenda other than that?

09:33:20    4              MR. KREVITT:  No, Your Honor.  Thank you.

09:33:22    5              THE COURT:  All right.  Thank you, Mr. Krevitt.

09:33:23    6         I did see in the pretrial order some -- let's see,

09:33:51    7    it appears that the Plaintiff has proposed some

09:33:53    8    stipulations that are listed under the general stipulation

09:33:59    9    section as disputed.

09:34:01   10         Generally speaking, Mr. Wang, it takes two to

09:34:07   11    stipulate.

09:34:09   12              MR. WANG:  Your Honor, yes, we had this -- this

09:34:14   13    language in there.  It was agreed to for three or four

09:34:18   14    days, and then kind of the last day, Verizon raised an

09:34:22   15    objection, said -- put this in blue -- and I don't know if

09:34:27   16    they've articulated the objection or if they have a

09:34:30   17    proposal for objecting to authenticity of documents and

09:34:35   18    source code produced by Apple and Samsung.

09:34:38   19         I would note that in Stipulation 4, we agreed that

09:34:42   20    the parties stipulated to the authenticity of each document

09:34:47   21    that on its face appears generated by a party and produced

09:34:51   22    by that party.

09:34:51   23         Here, this -- discovery documents and source code

09:34:57   24    were produced pursuant to subpoena.  I believe both

09:35:00   25    parties -- or at least Headwater subpoena, and they

| | | |
|---|---|---|
| 09:35:04 | 1 | produced these documents.  And this stipulation also |
| 09:35:07 | 2 | doesn't prevent the parties from objecting to admissibility |
| 09:35:10 | 3 | under the other federal rules, 402/403, but we certainly |
| 09:35:16 | 4 | think it's appropriate to -- for them to be deemed |
| 09:35:22 | 5 | authentic.  And we're not sure how this issue would |
| 09:35:27 | 6 | otherwise be resolved. |
| 09:35:30 | 7 | THE COURT:  Well, I do understand that |
| 09:35:36 | 8 | authenticity is a low bar under Rule 901, but if there are |
| 09:35:44 | 9 | documents that were produced by a third party but on their |
| 09:35:49 | 10 | face they give no indication of that, there could be a |
| 09:35:53 | 11 | legitimate issue about authenticity. |
| 09:35:54 | 12 | So let me hear from the Defendant on that. |
| 09:36:01 | 13 | Thank you, Mr. Wang. |
| 09:36:08 | 14 | Mr. Vincent? |
| 09:36:10 | 15 | MR. VINCENT:  Thank you, Your Honor. |
| 09:36:11 | 16 | And you've identified the problem with a global |
| 09:36:15 | 17 | stipulation to authenticity of every document that these |
| 09:36:17 | 18 | third parties have produced.  Some of these productions |
| 09:36:19 | 19 | include third-party documents, not -- not of the party, for |
| 09:36:23 | 20 | example, Samsung. |
| 09:36:24 | 21 | We have an exhibit list we've gone through |
| 09:36:27 | 22 | painstakingly to negotiate and meet and confer on |
| 09:36:30 | 23 | objections to certain exhibits, and we have agreed, some of |
| 09:36:34 | 24 | these documents that have been produced by Samsung and |
| 09:36:37 | 25 | Apple are on the joint list, we don't have objections to. |

| | | |
|---|---|---|
| 09:36:40 | 1 | And so we believe it's -- it's better to address these on |
| 09:36:45 | 2 | an individual basis.  If they want to use a document, we're |
| 09:36:49 | 3 | happy to have that discussion, but we think it's |
| 09:36:52 | 4 | inappropriate to provide a blanket stipulation to |
| 09:36:54 | 5 | authenticity for every single document that these third |
| 09:36:57 | 6 | parties have produced. |
| 09:36:59 | 7 | THE COURT:  All right.  Thank you. |
| 09:37:01 | 8 | I then find that Paragraph 6 and 7 under the |
| 09:37:08 | 9 | general stipulations are not actually stipulated to.  So |
| 09:37:15 | 10 | they will be disregarded. |
| 09:37:19 | 11 | And we'll take up authenticity issues for those |
| 09:37:25 | 12 | documents -- |
| 09:37:27 | 13 | MR. VINCENT:  Thank you. |
| 09:37:27 | 14 | THE COURT:  -- on an exhibit-by-exhibit basis. |
| 09:37:37 | 15 | Is either Plaintiff or Verizon aware of other |
| 09:37:40 | 16 | disputes about the pretrial order that need to be resolved |
| 09:37:46 | 17 | before we adopt it? |
| 09:38:00 | 18 | MR. KREVITT:  Your Honor, we raised an issue in |
| 09:38:02 | 19 | the pretrial order with respect to how to handle issues for |
| 09:38:06 | 20 | the Court, 101, obviousness, double patenting, for example, |
| 09:38:13 | 21 | when and how a bench trial might be appropriate on those |
| 09:38:16 | 22 | issues. |
| 09:38:17 | 23 | THE COURT:  I think, as I understand it, both |
| 09:38:19 | 24 | sides are in agreement that those issues are not proper to |
| 09:38:23 | 25 | be presented to the jury, and it's just a question of when |

09:38:26    1    they will be decided by the Court.

09:38:29    2        MR. KREVITT:  That's our understanding, Your

09:38:31    3    Honor, yes.

09:38:32    4        THE COURT:  All right.

09:38:33    5        MR. WANG:  Not for 101, Your Honor.  We put our

09:38:35    6    position very clearly on -- they have the pending motion.

09:38:40    7    We think it should be denied.  If the claims are found

09:38:44    8    directed to an abstract idea, which we don't think they

09:38:48    9    should be, that would be a Part 2 issue for the jury.  And

09:38:51    10    I think Verizon has a novel position interpreting Alice v.

09:38:58    11    CLS Bank as taking this away from the jury.

09:39:02    12        THE COURT:  You know, I am very favorably inclined

09:39:06    13    to the Defendants' position that it should be for the

09:39:09    14    Court.  I'm not convinced that that's what the law

09:39:14    15    currently provides, but I will make sure that that is

09:39:17    16    addressed in connection with the motion that's directing to

09:39:23    17    101 now.

09:39:25    18        MR. WANG:  Thank you, Your Honor.

09:39:29    19        THE COURT:  All right.  Other than that, the

09:39:38    20    pretrial order --

09:39:39    21        MR. DAVIS:  Hold on a second, Your Honor.

09:39:40    22        THE COURT:  Go ahead, Mr. Davis.

09:39:44    23        MR. DAVIS:  Just one more small item.  So the

09:39:44    24    parties raised objections to witness lists with respect to

09:39:49    25    the joint pretrial order, as well.

| | | |
|---|---|---|
| 09:39:50 | 1 | THE COURT:  And that's the next item that I am |
| 09:39:54 | 2 | going to turn to. |
| 09:39:55 | 3 | MR. DAVIS:  Oh, very well. |
| 09:39:55 | 4 | THE COURT:  So you can stay up there.  I'll just |
| 09:39:58 | 5 | note that the pretrial order is adopted and turn to the |
| 09:40:06 | 6 | issues regarding witnesses. |
| 09:40:08 | 7 | What are the Plaintiff's objections to the |
| 09:40:12 | 8 | Defendants' witnesses? |
| 09:40:14 | 9 | MR. DAVIS:  So the witness list issue that I |
| 09:40:19 | 10 | wanted to speak about, Your Honor, has to do with a |
| 09:40:22 | 11 | timeliness issue.  This is -- there's a series of witnesses |
| 09:40:27 | 12 | who are current or former Verizon employees who were |
| 09:40:33 | 13 | identified to us very, very, very late in discovery.  And, |
| 09:40:39 | 14 | you know, some of those folks we were able to get to sit |
| 09:40:42 | 15 | for deposition, and so we resolved that.  That's not an |
| 09:40:48 | 16 | issue that we're raising.  But others, you know, we tried |
| 09:40:51 | 17 | to subpoena, but it was just so late in the game. |
| 09:40:56 | 18 | One example, Your Honor, is a person named Venkat |
| 09:41:04 | 19 | Gaddam, who was just out of the country for a month and |
| 09:41:07 | 20 | wasn't disclosed to us until the end of fact discovery, so |
| 09:41:11 | 21 | we didn't have an opportunity to take his deposition. |
| 09:41:14 | 22 | So, you know, what we've done, Your Honor, is ask |
| 09:41:17 | 23 | the other side to say -- you're not going to call them at |
| 09:41:24 | 24 | trial, you're not going to rely on them.  If that's the |
| 09:41:27 | 25 | case, then it's water under the bridge.  But if they are |

| | | |
|---|---|---|
| 09:41:31 | 1 | going to rely on these folks at trial, bring former |
| 09:41:32 | 2 | employees to trial who we've never had an opportunity to |
| 09:41:35 | 3 | depose, what we ask is that we get that chance to do so |
| 09:41:39 | 4 | because it's not that we squandered an opportunity, it's |
| 09:41:43 | 5 | that the opportunity was just taken from us because of how |
| 09:41:46 | 6 | late they were disclosed. |
| 09:41:51 | 7 | THE COURT:  Mr. Davis, let's get specific here.  I |
| 09:41:54 | 8 | see Mr. Gaddam.  What other witnesses are you complaining |
| 09:42:00 | 9 | of? |
| 09:42:01 | 10 | MR. DAVIS:  Yes, so it's the -- if you're looking |
| 09:42:03 | 11 | at the same document I am, Your Honor, it's that block of |
| 09:42:07 | 12 | five where -- |
| 09:42:08 | 13 | THE COURT:  I'm looking at Document 283-4. |
| 09:42:11 | 14 | MR. DAVIS:  Okay.  Yep, I was looking at 283-5, |
| 09:42:18 | 15 | but that's just fine.  283-4 will work, as well. |
| 09:42:22 | 16 | So that will be -- so it's starting on Page 4 at |
| 09:42:37 | 17 | Jude Munn, it's Jude Munn, Louis Chan-Lizardo, Venkat |
| 09:42:46 | 18 | Gaddam, Barry Hoffner.  That's four of them.  And then I |
| 09:42:51 | 19 | actually had another one, Your Honor.  And that is Jonathan |
| 09:43:02 | 20 | Hinz, yes.  It's H-i-n-z. |
| 09:43:11 | 21 | THE COURT:  That's on the next page? |
| 09:43:12 | 22 | MR. DAVIS:  Oh, yes, that's right, Your Honor. |
| 09:43:12 | 23 | THE COURT:  All right. |
| 09:43:13 | 24 | MR. DAVIS:  Yes.  They're collected all in a row |
| 09:43:15 | 25 | with our "U," meaning "untimely objection," on -- it looks |

09:43:19    1    like PDF Page 4 of Docket No. 283-5.

09:43:29    2            THE COURT:  All right.  I'm just using their list

09:43:32    3    because it has a little more information about them.

09:43:34    4            MR. DAVIS:  Yes.

09:43:36    5            THE COURT:  But all right.  Let me see -- you are

09:43:41    6    representing that these five employees -- or individuals

09:43:45    7    were identified when?

09:43:47    8            MR. DAVIS:  So it may vary a little bit, but all

09:43:50    9    of them, it's very late in discovery.  You know, sometimes

09:43:56   10    within --

09:43:57   11            THE COURT:  Was it five minutes until midnight on

09:44:00   12    the last day or --

09:44:00   13            MR. DAVIS:  I'm sorry, Your Honor.

09:44:03   14            So I can -- I don't have all of those specifics

09:44:08   15    right now.  I see at least some of those folks -- it looks

09:44:14   16    like two of them were disclosed to us on January 24th.

09:44:18   17    That would be Jude Munn and Louis Chan-Lizardo.  I don't

09:44:24   18    believe the others were disclosed until after that.

09:44:27   19            We have another February 7th disclosure from

09:44:34   20    Verizon that includes -- I'm not sure that -- even that

09:44:40   21    includes -- oh, yes, I'm sorry, that does include

09:44:43   22    Mr. Gaddam at that point.

09:44:46   23            And so apologies, Your Honor, I don't have the

09:44:49   24    exact dates with me, but I can tell you it's very, very

09:44:54   25    close to within a couple of weeks.

09:45:00   1          And so we tried to act quickly in serving

09:45:03   2   subpoenas but just weren't able to get depositions from all

09:45:08   3   these folks.

09:45:08   4          THE COURT:  What is your recollection as to --

09:45:12   5   well, I don't know -- I'll interrupt.

09:45:13   6          Mr. Krevitt, do you have a quick resolution for

09:45:17   7   us?

09:45:17   8          MR. KREVITT:  Yes.  Thank you for taking the blame

09:45:21   9   for the interruption by me standing up.

09:45:23   10          Your Honor, it's very possible that we're not

09:45:26   11   going to call these witnesses.  The parties have reached

09:45:29   12   some resolutions with respect to motions in limine.  It's

09:45:33   13   possible that with additional resolution today, we'll be in

09:45:37   14   a position to make a go/no go call on each one of these

09:45:43   15   witnesses and would suggest, therefore, that we put this

09:45:46   16   issue off.

09:45:46   17          THE COURT:  All right.  Thank you, Mr. Krevitt.

09:45:52   18          Well, Mr. Davis, why don't we proceed that way.

09:45:56   19   You have made the objection, and I will make sure the

09:45:59   20   objection gets resolved, but we'll wait and see at the end

09:46:04   21   of the day whether it's still a live objection or not.

09:46:06   22          MR. DAVIS:  Thank you, Your Honor.

09:46:07   23          THE COURT:  All right.  Do you have any other

09:46:10   24   issues regarding witnesses other than those five?

09:46:15   25          MR. DAVIS:  No.  No, Your Honor.

| | | |
|---|---|---|
| 09:46:18 | 1 | THE COURT:  All right.  Thank you, Mr. Davis. |
| 09:46:31 | 2 | MR. VINCENT:  Your Honor, Robert Vincent, and I'll |
| 09:46:35 | 3 | be quick about objections that Defendants have to |
| 09:46:39 | 4 | witnesses.  Most of the objections will be resolved one way |
| 09:46:41 | 5 | or the other through the various motions that we have. |
| 09:46:44 | 6 | Some of the witnesses, though, are directed to, |
| 09:46:49 | 7 | for example, functionality on patents that are no longer in |
| 09:46:53 | 8 | the case, and, for example, that we have a 30(b)(6) |
| 09:46:57 | 9 | deponent on functionality related to the '543 patent, which |
| 09:47:03 | 10 | is no longer in the case.  Those type of witnesses, there |
| 09:47:06 | 11 | are a few of them, but we would argue that those are |
| 09:47:08 | 12 | irrelevant to the case at this point.  And so to the extent |
| 09:47:11 | 13 | that they involve functionality or issues that are -- that |
| 09:47:15 | 14 | go away -- that are gone now or that go away with the MILs |
| 09:47:19 | 15 | or summary judgment motions or Dauberts, that those issues |
| 09:47:23 | 16 | will be resolved. |
| 09:47:25 | 17 | THE COURT:  All right.  So that doesn't sound like |
| 09:47:28 | 18 | an objection that can be addressed now.  Does that involve |
| 09:47:36 | 19 | specific witnesses that you can identify so we'll know what |
| 09:47:41 | 20 | is -- what you're raising? |
| 09:47:43 | 21 | MR. VINCENT:  Yes, Your Honor.  For example, |
| 09:47:45 | 22 | Michael -- I'm going to get the name wrong -- Kondratiuk. |
| 09:47:51 | 23 | He was a 30(b)(6) on functionality that's no longer |
| 09:47:54 | 24 | relevant to the case. |
| 09:47:55 | 25 | THE COURT:  All right.  I see him on the |

| | | |
|---|---|---|
| 09:48:01 | 1 | Plaintiff's witness list, which is at Document 283-1. |
| 09:48:07 | 2 | Who else? |
| 09:48:13 | 3 | MR. VINCENT:  So just a list of names, Thomas |
| 09:48:16 | 4 | McArtney, Michael Schiksnis -- |
| 09:48:30 | 5 | THE COURT:  All right. |
| 09:48:31 | 6 | MR. VINCENT:  -- Nem Kashanian, Kartik |
| 09:48:46 | 7 | Umamaheswaran -- I'm sorry, I'm going to butcher these |
| 09:48:48 | 8 | names but -- Thomas Russell. |
| 09:49:05 | 9 | THE COURT:  I don't see Mr. Russell on the witness |
| 09:49:08 | 10 | list. |
| 09:49:12 | 11 | MR. VINCENT:  I believe, Your Honor, they filed a |
| 09:49:14 | 12 | corrected exhibit list -- or witness list, excuse me, Your |
| 09:49:18 | 13 | Honor, at some point, trying -- attempting to add |
| 09:49:21 | 14 | Mr. Russell. |
| 09:49:22 | 15 | THE COURT:  All right. |
| 09:49:25 | 16 | MR. VINCENT:  Oh, I apologize, Your Honor.  We |
| 09:49:27 | 17 | thought they were, but I don't believe they ended up |
| 09:49:29 | 18 | actually filing it -- that corrected witness list, I'm |
| 09:49:36 | 19 | informed. |
| 09:49:43 | 20 | THE COURT:  Any other witnesses that you have an |
| 09:49:45 | 21 | objection to? |
| 09:49:46 | 22 | MR. VINCENT:  Yes, Your Honor.  Just on the |
| 09:49:49 | 23 | T-Mobile side, there's a Mr. Ryan McGinn, and his testimony |
| 09:49:56 | 24 | is unrelated to any functionality still in the case for |
| 09:50:00 | 25 | T-Mobile. |

09:50:03    1          THE COURT:  I'll tell you what, let -- why don't

09:50:06    2    we hold that, because when we get past this, we'll have to

09:50:13    3    take up T-Mobile issues all at the same time.  So...

09:50:21    4          MR. VINCENT:  Thank you, Your Honor.

09:50:22    5          THE COURT:  But what you have identified now are

09:50:24    6    objections that are just based on relevance on your

09:50:30    7    understanding that the purpose of those witnesses is no

09:50:36    8    longer in the case?

09:50:37    9          MR. VINCENT:  Yes, Your Honor.  That's a bucket of

09:50:39   10    witnesses for which we believe all relevance is no longer

09:50:43   11    in the case.

09:50:45   12          THE COURT:  All right.  Good enough.  Thank you,

09:50:52   13    Mr. Vincent.

09:50:54   14          Does the Plaintiff agree that any of the witnesses

09:51:08   15    that Mr. Vincent just identified are no longer going to be

09:51:12   16    used by the Plaintiff, or is there a difference of opinion

09:51:15   17    as to what the relevance of their testimony is?

09:51:18   18          MR. WIETHOLTER:  Yes, Your Honor.  There's a

09:51:20   19    difference of opinion.

09:51:20   20          And one important note, many of these witnesses --

09:51:24   21    in fact, I believe all of them, will be coming via

09:51:28   22    deposition, unless Defendants were planning on calling one

09:51:31   23    of these people live.  So we can handle all those

09:51:35   24    objections as part of the deposition designation process.

09:51:38   25          But I will note for the record that it's our

09:51:43  1  position that many of those witnesses that are Verizon

09:51:46  2  witnesses have relevance to issues other than the '543

09:51:50  3  patent.  And one specific name is Mr. Schiksnis.

09:51:57  4  Mr. Schiksnis is actually not a Verizon employee.  He's a

09:52:02  5  Samsung employee.  He was the Samsung witness who Headwater

09:52:07  6  subpoenaed and deposed in this case.  So he has relevance

09:52:08  7  to the device-side functionality, which is relevant to much

09:52:12  8  more than just the '543.  So that witness in particular is

09:52:16  9  very different from the rest of the batch.

09:52:23  10      THE COURT:  All right.  Well, then, thank you,

09:52:26  11  Mr. Wietholter.

09:52:29  12      Mr. Vincent --

09:52:30  13      MR. VINCENT:  Counsel is correct.  I misspoke.  We

09:52:31  14  have a motion on Mr. Schiksnis and the late-taken

09:52:35  15  deposition for the Samsung witness.  But, again, that will

09:52:39  16  be resolved through that motion practice.

09:52:41  17      And we are also fine with -- to the extent they're

09:52:43  18  introducing deposition testimony of these witnesses to

09:52:45  19  handle objections through that process.

09:52:47  20      THE COURT:  All right.  Well, all five of the

09:52:50  21  witnesses that you named are shown on the witness list as

09:52:57  22  by deposition.  So with that understanding, we will leave

09:53:01  23  those objections to be resolved through the deposition

09:53:07  24  objection process.

09:53:09  25      MR. VINCENT:  Thank you, Your Honor.

09:53:10  1          THE COURT:  Thank you, Mr. Vincent.

09:53:20  2          All right.  Then let's turn to the motions in

09:53:22  3  limine.  And we'll take up first Plaintiff's motions in

09:53:30  4  limine.

09:53:30  5          MR. DAVIS:  Thank you, Your Honor.  Kris Davis for

09:53:42  6  Plaintiff, Headwater.

09:53:42  7          With respect to Headwater MIL 1, happy to report

09:53:46  8  there has been some narrowing.

09:53:47  9          So the Defendants have agreed to Parts 2 and 3 of

09:53:51  10  this motion in limine so long as those conditions apply to

09:53:57  11  Verizon, to T-Mobile, and to Headwater, which is fine from

09:54:01  12  our perspective.

09:54:02  13          So that leaves Part 1 of this MIL.  That relates

09:54:07  14  to ███████████████████████████████.  So --

09:54:13  15          THE COURT:  Before we move on, is your

09:54:17  16  understanding of Part 2, is the agreement just applicable

09:54:20  17  to the Qualcomm and Fortress offers, or are you applying it

09:54:32  18  more generally to any unconsummated offers?

09:54:35  19          MR. DAVIS:  I believe just to the Qualcomm and

09:54:40  20  Fortress offers.

09:54:42  21          THE COURT:  All right.  I will consider it agreed,

09:54:45  22  then, with that understanding.

09:54:46  23          Go ahead on the first one then.

09:54:48  24          MR. DAVIS:  And I should clarify, I don't believe

09:54:50  25  there are any other unconsummated offers besides Qualcomm

| | | |
|---|---|---|
| 09:54:54 | 1 | and Fortress that are at issue.  So I think it ends up |
| 09:55:00 | 2 | being one and the same. |
| 09:55:04 | 3 | THE COURT:  Well, we'll see, but it is limited to |
| 09:55:06 | 4 | Qualcomm and Fortress. |
| 09:55:07 | 5 | MR. DAVIS:  Understood. |
| 09:55:09 | 6 | THE COURT:  All right. |
| 09:55:09 | 7 | MR. DAVIS:  All right.  Thank you, Your Honor. |
| 09:55:11 | 8 | So, again, that leaves Part 1 of the MIL.  That |
| 09:55:16 | 9 | relates to ████████████████████████. |
| 09:55:20 | 10 | And the Court previously granted a MIL on this exact issue |
| 09:55:24 | 11 | in the 422 case.  For the record, that's Headwater versus |
| 09:55:29 | 12 | Samsung, Case No. 2:22-CV-422.  And this was in the 422 MIL |
| 09:55:35 | 13 | order at Pages 2 to 3 that was attached to our motions in |
| 09:55:42 | 14 | limine here as Exhibit 1. |
| 09:55:44 | 15 | The Court found that this had virtually no |
| 09:55:47 | 16 | probative value and that it was -- what little probative |
| 09:55:54 | 17 | value it might have was seriously outweighed by unfair |
| 09:55:58 | 18 | prejudice.  I think the Court did so because it's a |
| 09:56:00 | 19 | salacious story that just isn't relevant to the issues in |
| 09:56:04 | 20 | this case. |
| 09:56:04 | 21 | The Defendants have a new twist or two here that |
| 09:56:08 | 22 | they say warrants different treatment.  It does not.  What |
| 09:56:13 | 23 | they're -- what they're raising, Your Honor, they want to |
| 09:56:18 | 24 | tell the jury about supposed ███████████████ that |
| 09:56:22 | 25 | misled Verizon into investing into ItsOn, which was the |

09:56:27    1    operating company that licensed Headwater's patented

09:56:31    2    technology.

09:56:32    3         But what they described is just plainly not

09:56:35    4    financial misconduct, and we'll show you why.  I'll step

09:56:41    5    through it in more detail in a moment, but just at a high

09:56:45    6    level, what they're referring to is deposition testimony

09:56:48    7    about an email chain between Dr. Raleigh of ItsOn and a

09:56:54    8    person named ███████████  who was working with Dr. Raleigh

09:56:57    9    in the early stages to develop a financial model for

09:57:03   10    Headwater -- or, I'm sorry, for ItsOn.

09:57:06   11         At this point in time, ItsOn is just a brand new

09:57:09   12    startup.  It hasn't even conducted Series A funding round,

09:57:15   13    and they're working on figuring out what should -- how they

09:57:18   14    should characterize the operating expenses over time and

09:57:22   15    what would be an accurate way of representing that to

09:57:24   16    potential investors.

09:57:25   17         So let's take a look at the email chain that gives

09:57:37   18    rise to all of this.  Okay.  And I'll begin at the bottom,

09:57:45   19    Your Honor.  We also have a copy for the Court if you'd

09:57:47   20    like to see.

09:57:57   21         May we hand this up to Your Honor --

09:57:59   22         THE COURT:  All right.

09:58:00   23         MR. DAVIS:  -- if you'd like?

09:58:00   24         So what we see is -- I think that's -- it's

09:58:03   25    Johnson Exhibit 4.

09:58:04  1        So where this email thread begins, it's July 2009,

09:58:12  2   and the folks at ItsOn, including Dr. Raleigh, are

09:58:14  3   preparing documents for Verizon, sort of an investment

09:58:21  4   pitch to see if Verizon will be interested in investing in

09:58:25  5   ItsOn.

09:58:25  6        And as part of that, Verizon wants to see, not

09:58:29  7   surprisingly, expense plans, business revenue models,

09:58:32  8   et cetera.  And so this is what they're working on.

09:58:37  9        THE COURT:  Just so I can follow, is your argument

09:58:41  10  here, Mr. Davis, that this information that you're showing,

09:58:47  11  this email, would be excluded by your -- by your MIL, or

09:58:55  12  are you just trying to rebut their argument that they need

09:59:01  13  information or evidence that would be excluded by the MIL?

09:59:04  14       MR. DAVIS:  It's a good question, Your Honor.  So

09:59:07  15  what they want to do is bring in -- you see this reflected

09:59:10  16  in Page 2 of their opposition brief.  They want to bring in

09:59:15  17  the prior -- ███████████████████████████████████████████

09:59:19  18  ███████████████████████████████  is exactly what

09:59:23  19  Your Honor excluded in the 422 case, but then they also

09:59:26  20  want to bring in what they're calling a second instance of

09:59:30  21  ███████████████████████████████████  testified

09:59:34  22  about at his deposition and what's reflected in these

09:59:38  23  emails.

09:59:39  24       We don't think -- this just is not ████████████

09:59:44  25  ███████████, and I'll show you why.

| 09:59:46 | 1 | So it's a fair question -- |

THE COURT:  So would this be excluded by your MIL?

MR. DAVIS:  Well, Your Honor, I think it should be because they're characterizing it as ████████████████. And so it just -- I can explain to you why I think it is not ████████████████, but we think it's prejudicial in any event and it's a distraction.  I guess maybe what we would do is tweak the MIL to say alleged ███████████. I think -- you know, it's not actual ████████████ ████████████, but it is alleged to be by Verizon in this case, and T-Mobile for that matter.

THE COURT:  Go ahead.

MR. DAVIS:  Okay.  So, Your Honor, what we see now, this is just a few days later, and -- and we see ████████████ gets involved, and he has some experience working with companies and doing financial projections. And he is explaining that there's -- he's having a sort of debate with Dr. Raleigh about how they should characterize the operating expenses.

████████████ includes sort of a fixed number for operating expenses that don't really change over time as the company develops, whereas Dr. Raleigh is saying, you know, no, I don't think that's really that -- as accurate as it should be because we think the company's going to grow, have more partnerships, and because we have more

10:01:26    1    partnerships, our operating expenses are going to grow, as

10:01:28    2    well.  And so Dr. Raleigh is looking for the operating

10:01:34    3    expense information to be more dynamic, something that

10:01:37    4    changes over time.

10:01:38    5          And so they're -- they're going back and forth.

10:01:44    6    There's what -- the terminology that was used is a "fudge

10:01:49    7    factor" that is -- that appeared in the financial model to

10:01:56    8    show sort of this is what the operating expenses will be.

10:02:00    9          Dr. Raleigh is saying I think we should make it a

10:02:03   10    more dynamic model, and so let's remove that and make it

10:02:07   11    change over time.

10:02:08   12          ███████████ is saying here, you know, I think it

10:02:12   13    does make sense for it to be this sort of fixed approach,

10:02:14   14    but I've removed the fudge line in this version.  He's also

10:02:20   15    saying what you see here in the middle of the screen is,

10:02:23   16    you know, I, of course, would like to make the numbers

10:02:25   17    completely ground up, but that's just a level of detail

10:02:30   18    that is very tough to build at this stage because it's a

10:02:33   19    brand new startup.  It has no products, no revenue, no real

10:02:39   20    relationships at this point.

10:02:41   21          THE COURT:  Mr. Davis, your presentation is

10:02:45   22    convincing me that this is not something that I can address

10:02:48   23    on a categorical basis as a MIL.  Anything that could be

10:02:55   24    understood as financial mismanagement, I think that's too

10:02:59   25    vague a standard.

10:03:00  1          If you've got something specific -- like in the

10:03:03  2   422 case, what we were dealing with actually was wrongdoing

10:03:09  3   by a particular employee, and that was identified.  And

10:03:16  4   maybe the MIL was written in a way that seemed broader, but

10:03:19  5   it was designed to deal with a specific incident.

10:03:22  6          MR. DAVIS:  I see.

10:03:23  7          So what I would say, Your Honor, is that all

10:03:26  8   they've identified is this one particular instance, this --

10:03:32  9   what they call, like, fudging the financial model.  I think

10:03:37  10  if the MIL includes this, that's sufficient for our

10:03:42  11  purposes at this point, Your Honor, because we don't -- we

10:03:45  12  don't know -- we're not aware of any other, you know,

10:03:49  13  allegations of financial misconduct that they want to

10:03:52  14  raise.

10:03:52  15         THE COURT:  I mean, there -- in the prior case

10:03:56  16  that you're referring to, there was a specific allegation

10:04:03  17  of █████████████████████████████████, and that's what

10:04:08  18  we were dealing with.  So you're saying that this MIL --

10:04:15  19  this part of MIL 1 is really aimed at this event that

10:04:20  20  you're -- that's in this email?

10:04:22  21         MR. DAVIS:  So I think it's -- they -- oh, no, I'm

10:04:29  22  sorry, no, Your Honor.  This is a completely separate

10:04:32  23  factual event from the █████████ that you're referring

10:04:35  24  to from the 422 case.

10:04:36  25         Verizon and T-Mobile try to link those two

| | | |
|---|---|---|
| 10:04:40 | 1 | together.  What they say in their brief is that -- is this, |
| 10:04:45 | 2 | Your Honor. |
| 10:04:45 | 3 | THE COURT:  I saw what they put in their brief.  I |
| 10:04:48 | 4 | thought they were still addressing the issue about the |
| 10:04:53 | 5 | former employee from the 422 case. |
| 10:05:00 | 6 | MR. DAVIS:  That's right, Your Honor, because this |
| 10:05:01 | 7 | is the same person.  This is ███████████████████████ |
| 10:05:07 | 8 | ███████████████████████████████████, as well.  And |
| 10:05:10 | 9 | so what they're trying to show, and I think you see it in |
| 10:05:13 | 10 | their briefing, is that this is a pattern of ██████████ |
| 10:05:18 | 11 | ██████████ by ItsOn. |
| 10:05:19 | 12 | They say: ████████████████████████████████ |
| 10:05:25 | 13 | █████████████████  They were never disclosed to Verizon. |
| 10:05:28 | 14 | ████████████████████████████████████████████████████████ |
| 10:05:32 | 15 | ██████████████████████████████, are thus directly |
| 10:05:35 | 16 | relevant to contextualize this misconduct, what we're |
| 10:05:40 | 17 | seeing in the email, and Verizon's investments into ItsOn. |
| 10:05:43 | 18 | And so it's the Defendants who are trying to link |
| 10:05:47 | 19 | these two together. |
| 10:05:50 | 20 | THE COURT:  Well, I don't have any problem in |
| 10:05:53 | 21 | saying that I'm not persuaded that the ██████████ is |
| 10:06:00 | 22 | relevant to contextualize this email exchange, but the |
| 10:06:08 | 23 | question of whether this email exchange is admissible in |
| 10:06:15 | 24 | this -- in this case is something that I didn't understand |
| 10:06:21 | 25 | your MIL was aimed at. |

| | | |
|---|---|---|
| 10:06:26 | 1 | MR. DAVIS:  So, Your Honor, what -- what happened |
| 10:06:29 | 2 | was we went to -- as you may have seen, our MIL 1 was a |
| 10:06:34 | 3 | multi-part MIL where we went to the other side and said: |
| 10:06:38 | 4 | The Court has already ruled on a number of issues in prior |
| 10:06:42 | 5 | Headwater cases.  Will you stipulate to these MILs? |
| 10:06:45 | 6 | And the Defendants -- now they've stipulated to |
| 10:06:49 | 7 | Parts 2 and 3, but they refuse to stipulate as to Part 1. |
| 10:06:53 | 8 | They did not say at any point in time that this is what |
| 10:06:57 | 9 | factual circumstances they intended to raise, this fudging |
| 10:07:02 | 10 | of financial models, or what have you.  And so that's why |
| 10:07:06 | 11 | our MIL was written in very short form.  We spent just a |
| 10:07:11 | 12 | few sentences because all we thought was it was the |
| 10:07:14 | 13 | ████████████████.  We said:  Will you exclude -- will you |
| 10:07:18 | 14 | agree to exclude that? |
| 10:07:19 | 15 | They said:  No. |
| 10:07:20 | 16 | They didn't say:  No, because we have this other |
| 10:07:25 | 17 | instance of supposed fudging of financial models, and |
| 10:07:30 | 18 | that's what we want to keep in. |
| 10:07:32 | 19 | And so we saw this in their opposition brief.  In |
| 10:07:36 | 20 | other words, we didn't write our opening brief to address |
| 10:07:40 | 21 | what's in their opposition brief. |
| 10:07:44 | 22 | THE COURT:  Well -- so I take it that you are |
| 10:07:53 | 23 | seeking an order, as broad as it is written, that you want |
| 10:07:58 | 24 | the Court to say any alleged breach of ethical or fiduciary |
| 10:08:05 | 25 | duties is inadmissible? |

```
10:08:06    1           MR. DAVIS:  I think, Your Honor, that may be
10:08:12    2   preferable, but I think we would be fine with essentially
10:08:16    3   the sort of narrower 422 MIL order keeping out that
10:08:22    4   specific instance of ████████████████████████████
10:08:25    5   ████████████████████████████████████████████████████
10:08:32    6   ████████████████████████████.
10:08:34    7           If it keeps out those two instances, those are the
10:08:37    8   only two things that we're aware of that they would try to
10:08:40    9   raise.
10:08:42   10           THE COURT:  Well, tell me why this email exchange
10:08:48   11   about the financial model is not relevant to their
10:08:56   12   investments in ItsOn.
10:08:57   13           MR. DAVIS:  I mean, the -- I think I take your
10:09:05   14   point, Your Honor, that the general concept of, you know,
10:09:11   15   there being investments into ItsOn by Verizon and this is
10:09:17   16   talking about the investment into Verizon.  If that's all
10:09:22   17   this was, that's fine from our perspective, Your Honor.
10:09:25   18           But it's -- it's the fact that they're
10:09:27   19   characterizing this as ██████████, which is just completely
10:09:31   20   inaccurate, and that they're trying to show this pattern of
10:09:36   21   ████████████████████ by linking it to this ██████████████
10:09:40   22   story.
10:09:41   23           THE COURT:  Well, I could deal with the latter
10:09:45   24   part of that, but as far as whether this is something that
10:09:51   25   would be deemed misconduct or not, why isn't that just a
```

| | | |
|---|---|---|
| 10:09:55 | 1 | question for the jury?  And, I mean, obviously, you -- you |
| 10:10:01 | 2 | have a way to respond to it and explain it.  I'm not seeing |
| 10:10:09 | 3 | why it requires a motion in limine to address it. |
| 10:10:15 | 4 | MR. DAVIS:  Uh-huh.  So I think -- you know, there |
| 10:10:25 | 5 | is one other issue.  With respect to the Verizon case, the |
| 10:10:31 | 6 | parties have agreed for Verizon's investments into |
| 10:10:38 | 7 | Headwater or ItsOn to be out of the case, and so -- |
| 10:10:43 | 8 | THE COURT:  Where is that agreement reflected? |
| 10:10:46 | 9 | MR. DAVIS:  That was just this morning in the |
| 10:10:48 | 10 | courtroom.  So it is not -- I'm not sure it's reduced to |
| 10:10:52 | 11 | paper yet. |
| 10:10:53 | 12 | THE COURT:  All right.  Well, that might resolve |
| 10:10:55 | 13 | this issue. |
| 10:10:58 | 14 | Let me interrupt you, Mr. Davis, and hear from |
| 10:11:02 | 15 | Mr. Rosenthal on that. |
| 10:11:04 | 16 | MR. DAVIS:  Okay.  Thank you, Your Honor. |
| 10:11:05 | 17 | THE COURT:  Thank you. |
| 10:11:06 | 18 | Or Ms. Dominguez, I'm sorry. |
| 10:11:06 | 19 | MS. DOMINGUEZ:  Good morning, Judge Payne. |
| 10:11:06 | 20 | Ms. Dominguez for Defendants. |
| 10:11:17 | 21 | So we agree with the Court.  It sounds like the |
| 10:11:18 | 22 | MIL originally was supposed to be targeted to ███████. |
| 10:11:22 | 23 | That's what's in the title of the MIL.  There's no issue |
| 10:11:24 | 24 | there.  We don't intend to raise ███████. |
| 10:11:27 | 25 | Our concern was then in the body, it got -- it |

| | |
|---|---|
| 10:11:30 | 1 |
| 10:11:35 | 2 |
| 10:11:38 | 3 |
| 10:11:42 | 4 |
| 10:11:43 | 5 |
| 10:11:45 | 6 |
| 10:11:48 | 7 |
| 10:11:51 | 8 |
| 10:11:54 | 9 |
| 10:11:57 | 10 |
| 10:12:00 | 11 |
| 10:12:08 | 12 |
| 10:12:15 | 13 |
| 10:12:16 | 14 |
| 10:12:19 | 15 |
| 10:12:21 | 16 |
| 10:12:25 | 17 |
| 10:12:28 | 18 |
| 10:12:30 | 19 |
| 10:12:32 | 20 |
| 10:12:36 | 21 |
| 10:12:39 | 22 |
| 10:12:42 | 23 |
| 10:12:43 | 24 |
| 10:12:46 | 25 |

1   seemed to get broader.  It was talking about more amorphous

2   concepts like ethical and fiduciary duties.  And we wanted

3   to be clear there are things that maybe they would

4   characterize that way that fairly come in, and that's why

5   we addressed what we did in our paper.

6       I think if Your Honor is just going to limit it to

7   ███████████ , we have no issue with that, and that seems

8   like an easy way to resolve it.

9       THE COURT:  And that is very helpful on the MIL.

10  Since we have spent a while talking about this email

11  exchange, is this something that you intend to offer if the

12  issue of investments by Verizon into Headwater/ItsOn is not

13  going to be an issue?

14      MS. DOMINGUEZ:  So that particular exchange, if

15  there were no issue with Verizon's investments, which I

16  agree with Mr. Davis has been settled for the Verizon case,

17  then Your Honor is correct, we would not need to talk about

18  Verizon's investments, including the way those financial

19  numbers were presented to induce the investment.

20      However, they have not agreed that the Verizon

21  investments won't come in in the T-Mo case.  We're hoping

22  to work that out.  We discussed this morning that we would

23  continue to have discussions on that.

24      If they're still trying to bring in those Verizon

25  investments in the T-Mobile case, then certainly this would

| | | |
|---|---|---|
| 10:12:51 | 1 | be an example of evidence that -- testimony and emails that |
| 10:12:55 | 2 | contextualizes those investments. |
| 10:12:58 | 3 | THE COURT:  All right.  Well, we will then address |
| 10:13:01 | 4 | that when we take up separate issues in the T-Mobile case. |
| 10:13:04 | 5 | But it's fair for the Court to understand that |
| 10:13:10 | 6 | this July 27, 2009 email exchange between ▮▮▮▮▮▮ and |
| 10:13:21 | 7 | Dr. Raleigh is not going to be used by the -- by Verizon? |
| 10:13:26 | 8 | MS. DOMINGUEZ:  In the Verizon case, no, Your |
| 10:13:28 | 9 | Honor, because we've agreed that nothing about the Verizon |
| 10:13:30 | 10 | investments will come in. |
| 10:13:31 | 11 | THE COURT:  All right.  Thank you, Ms. Dominguez. |
| 10:13:39 | 12 | MS. DOMINGUEZ:  Thank you. |
| 10:13:40 | 13 | THE COURT:  Then I'm going to grant Motion in |
| 10:13:43 | 14 | Limine No. 1 with respect to the second and third parts as |
| 10:13:46 | 15 | agreed.  And as to the first part, only as to evidence of |
| 10:13:54 | 16 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ if |
| 10:14:04 | 17 | there are -- and frankly, it won't be limited to that.  But |
| 10:14:07 | 18 | as to ▮▮▮▮▮▮, any remaining issues would have to be |
| 10:14:13 | 19 | addressed by seeking leave if there is something on that. |
| 10:14:17 | 20 | Mr. Davis, on the third point, you said there was |
| 10:14:21 | 21 | an agreement.  Is the agreement limited to the expert's |
| 10:14:33 | 22 | relationship with the Plaintiff's law firm?  Is that as far |
| 10:14:38 | 23 | as the agreement goes? |
| 10:14:39 | 24 | MR. DAVIS:  Yes, that's right, Your Honor. |
| 10:14:43 | 25 | THE COURT:  Because there was discussion about |

| 10:14:47 | 1 | should it involve clients, or should it be bilateral, but |
| 10:14:51 | 2 | the agreement you're saying has been reached is just as to |
| 10:14:55 | 3 | the -- what was sought in the MIL itself? |
| 10:14:58 | 4 | MR. DAVIS:  Just that it's bilateral, Your Honor, |
| 10:15:03 | 5 | in other words, Plaintiff's law firm and Defendants' law |
| 10:15:05 | 6 | firm. |
| 10:15:05 | 7 | THE COURT:  Okay. |
| 10:15:06 | 8 | MR. DAVIS:  Sorry. |
| 10:15:07 | 9 | THE COURT:  I didn't know if that meant your |
| 10:15:11 | 10 | relationship to their experts and you. |
| 10:15:13 | 11 | MR. DAVIS:  Oh, I understand. |
| 10:15:15 | 12 | THE COURT:  We're talking about two different |
| 10:15:16 | 13 | firms, then, and the relationship of each side's experts to |
| 10:15:20 | 14 | their law firm? |
| 10:15:20 | 15 | MR. DAVIS:  Correct.  That's right. |
| 10:15:21 | 16 | THE COURT:  All right.  Then it will be granted to |
| 10:15:25 | 17 | that extent. |
| 10:15:30 | 18 | Which takes us to your second MIL. |
| 10:15:32 | 19 | MR. DAVIS:  All right.  So Headwater's MIL No. 2 |
| 10:15:38 | 20 | relates to the InterDigital letter of intent.  We seek to |
| 10:15:44 | 21 | exclude the letter of intent altogether.  As the Court may |
| 10:15:49 | 22 | have seen in our briefing, there's some important context |
| 10:15:52 | 23 | from the prior cases that -- you know, between Headwater |
| 10:15:59 | 24 | and Samsung that we think bears on this issue. |
| 10:16:05 | 25 | You know, in the 422 case, Your Honor, this Court |

10:16:08   1    excluded evidence of unconsummated offers, but it allowed

10:16:12   2    evidence of the InterDigital letter of intent.  And the

10:16:14   3    reason was it was -- although it was a non-binding letter

10:16:19   4    of intent and although it never actually materialized in a

10:16:22   5    deal, the Court sort of drew the line as -- it was signed

10:16:28   6    by Headwater, and so that's why the Court, I think,

10:16:34   7    decided, you know, the InterDigital letter of intent is a

10:16:37   8    little bit different from those unconsummated offers and

10:16:40   9    allowed it.

10:16:41   10         But there have been a couple of things that have

10:16:44   11    transpired since that time that we want to raise with the

10:16:46   12    Court and, you know, revisit this issue.

10:16:52   13         So in the --

10:16:53   14         THE COURT:  Is it just the question of whether

10:16:56   15    speculation about why the letter of intent was not

10:17:00   16    consummated should be prohibited?

10:17:03   17         MR. DAVIS:  So that's certainly a concern.  We

10:17:07   18    think, Your Honor, that because the line-drawing is

10:17:10   19    extremely difficult to do, that it really makes sense to

10:17:15   20    exclude the exhibit altogether.  And we saw that sort of

10:17:23   21    bear out in the 103 case between Headwater and Samsung.

10:17:28   22         But then there's also this additional reason that

10:17:29   23    we can talk about that relates to the results of the 103

10:17:38   24    trial and how -- the difficulty that we would have in sort

10:17:42   25    of fairly defending ourselves against the Defendants' point

| | | |
|---|---|---|
| 10:17:47 | 1 | that, you know, this -- the cash component of this |
| 10:17:51 | 2 | InterDigital letter of intent sets a ceiling for what the |
| 10:17:55 | 3 | patents are valued at. |
| 10:17:59 | 4 | Your Honor, needless to say, we understand and we |
| 10:18:01 | 5 | tried to convey it in our briefing, as well, that we |
| 10:18:04 | 6 | certainly understand that jury verdicts are not something |
| 10:18:07 | 7 | that is -- is normal to permit. |
| 10:18:13 | 8 | The issue we see is that the InterDigital letter |
| 10:18:16 | 9 | of intent, it's a -- it's a very particular agreement in |
| 10:18:19 | 10 | that there was a cash component and an equity component. |
| 10:18:23 | 11 | The cash component was for ▮▮▮▮▮▮, but what |
| 10:18:28 | 12 | Dr. Raleigh has testified to many times for years is that |
| 10:18:30 | 13 | he valued the equity component at an amount even higher |
| 10:18:36 | 14 | than that.  He thought that was actually very valuable and |
| 10:18:40 | 15 | specifically because not only did InterDigital have value |
| 10:18:44 | 16 | in itself but also that InterDigital, as part of the deal |
| 10:18:48 | 17 | if it went through, would be acquiring Headwater's 500 or |
| 10:18:52 | 18 | so patents, and Dr. Raleigh thought my patents are very |
| 10:18:55 | 19 | valuable, that's going to increase the equity value. |
| 10:18:59 | 20 | Now, what Defendants have said in -- or have tried |
| 10:19:01 | 21 | to convey in this case and others is that, well, you know, |
| 10:19:07 | 22 | Dr. Raleigh is just sort of speculating or making this up |
| 10:19:10 | 23 | because he doesn't have verdicts or large licenses or |
| 10:19:13 | 24 | something like that to support this, you know, notion that |
| 10:19:18 | 25 | it would actually add significant value to the equity |

10:19:21    1    component of the deal.  And the verdict in the 103 case

10:19:25    2    does support Dr. Raleigh's point that his patents -- at

10:19:31    3    least those patents, did have significant value.

10:19:34    4         And so what we tried to convey, Your Honor, is

10:19:38    5    that we would be in a position where, you know, Defendants

10:19:41    6    are getting to introduce this ████████ amount to try to

10:19:47    7    convey that that's a ceiling on what the damages should be,

10:19:50    8    and, you know, we're seeking damages above ███████, so,

10:19:54    9    therefore, you know, our damages' numbers are outlandish

10:19:59   10    and should be rejected.

10:20:01   11         But what -- if Dr. Raleigh could fairly defend

10:20:05   12    himself, he would be able to say, well, some of my patents

10:20:08   13    have, in fact, you know, been found to be infringed, valid,

10:20:13   14    and worth hundreds of millions of dollars.

10:20:19   15         And so that's the difficulty we have is that, you

10:20:22   16    know, we -- we appreciate that, you know, ordinarily, we

10:20:25   17    could not admit evidence that, you know, in another

10:20:29   18    Headwater case there was this large verdict, but the

10:20:33   19    particular facts here make it so that, you know, we should,

10:20:39   20    in fairness, be able to defend ourselves against the

10:20:43   21    allegations that Defendants have about this.

10:20:45   22         So that's sort of an additional reason, Your

10:20:48   23    Honor, beyond the speculation point, that we think it makes

10:20:52   24    sense to exclude the LOI altogether.

10:20:56   25         The issue with respect to speculation, I'm also

| | |
|---|---|
| 10:20:59 | 1 |
| 10:21:04 | 2 |
| 10:21:12 | 3 |
| 10:21:16 | 4 |
| 10:21:20 | 5 |
| 10:21:23 | 6 |
| 10:21:26 | 7 |
| 10:21:29 | 8 |
| 10:21:30 | 9 |
| 10:21:33 | 10 |
| 10:21:33 | 11 |
| 10:21:34 | 12 |
| 10:21:36 | 13 |
| 10:21:38 | 14 |
| 10:21:47 | 15 |
| 10:21:47 | 16 |
| 10:21:48 | 17 |
| 10:21:52 | 18 |
| 10:21:55 | 19 |
| 10:21:58 | 20 |
| 10:22:04 | 21 |
| 10:22:07 | 22 |
| 10:22:11 | 23 |
| 10:22:12 | 24 |
| 10:22:14 | 25 |

1  happy to speak about.  We tried to quote from the trial
2  transcript in our briefing that Your Honor may have seen.
3  What transpired there is that, you know, there was a MIL
4  order, as Your Honor knows, in the 103 case where the --
5  where Samsung was prohibited from speculating about why the
6  InterDigital deal was not consummated.
7          THE COURT:  And the Court decided that Samsung did
8  not speculate.
9          MR. DAVIS:  I'm sorry, and Judge Gilstrap decided
10 that?
11         THE COURT:  Yeah.
12         MR. DAVIS:  Yes, you're correct, Your Honor.
13         Now, Judge Gilstrap did also say that he thought
14 that they got to -- 99.9 percent of the way there.
15 Respectfully, we disagree.  We think they did cross the
16 line.
17         But the fact that we're either at 99.9 percent or
18 we're over the line, it sort of indicates that, you know,
19 we would -- at minimum, we think we should have some more
20 guardrails on this if the Court is inclined to let the
21 InterDigital letter of intent come into evidence at all.
22 We think some more specificity of guardrails would be
23 helpful.
24         I think what Your Honor saw in that transcript was
25 that Samsung, because they thought this was so important,

10:22:21   1   that they ended Dr. Raleigh's cross-examination with this

10:22:24   2   point -- with these couple of questions, saying, you know:

10:22:28   3   Well, didn't InterDigital get to, you know, due diligence,

10:22:32   4   look into the validity of these patents?  And then followed

10:22:36   5   by didn't the deal fall through?

10:22:40   6              Yes, it fell through.

10:22:42   7              Okay.  No further questions.

10:22:43   8              Now, we think that does insinuate that there's a

10:22:47   9   causal relationship between InterDigital looking at

10:22:50  10   validity of the patents and them not -- not going through

10:22:54  11   with the deal as a result of that.

10:22:56  12              THE COURT:  And that caused the jury to reject

10:22:58  13   your claims?

10:22:59  14              MR. DAVIS:  No, Your Honor.

10:23:03  15              THE COURT:  Oh, the jury handled that

10:23:05  16   appropriately?

10:23:05  17              MR. DAVIS:  I understand, Your Honor.  They did.

10:23:07  18   And we appreciate that.

10:23:09  19              But I do think -- you know, we were very concerned

10:23:12  20   about it in the moment, and we're -- we're grateful that it

10:23:18  21   didn't ultimately, you know -- well, I guess who knows.  We

10:23:22  22   didn't get our full damages request, but in any event, we

10:23:27  23   certainly take your point, Your Honor, that they didn't

10:23:28  24   award ███████, for example.

10:23:33  25              But I think this is the difficulty that we just

10:23:36    1    don't want to have the -- the line-drawing of what does it

10:23:39    2    mean to speculate.  You know, it may be helpful if there's

10:23:44    3    some additional guardrail of something like they don't get

10:23:49    4    to refer to InterDigital looking at the validity of the

10:23:53    5    patents or performing diligence on the patents and then

10:23:59    6    linking that to the deal not falling through -- or not

10:24:02    7    going through.

10:24:07    8            THE COURT:  Well, I understand the argument.  I

10:24:15    9    continue to feel that the InterDigital letter of intent is

10:24:20   10    something that is fair game in the case.  It's not just

10:24:24   11    because it was signed but because it represents a position

10:24:31   12    that Headwater has actually taken that relates to the value

10:24:38   13    of the -- of the patents, and whereas mere offers that were

10:24:45   14    unconsummated do not represent a position by Headwater.

10:24:54   15            But unless the Defendant wants to try and talk me

10:24:59   16    out of it, I'm going to make the same ruling that -- that

10:25:05   17    the Defendant will be prohibited from offering or implying

10:25:16   18    any speculation about why the letter of intent was not

10:25:19   19    consummated.  And I understand that that may be a hard line

10:25:25   20    to draw, but I'm confident that the Court can -- can

10:25:29   21    observe it.  But I am not going to exclude reference to the

10:25:39   22    letter of intent itself.

10:25:42   23            I also do not accept the proposition that

10:25:50   24    the letter of intent justifies introduction of evidence

10:25:56   25    about a non-final verdict in another case.  And I would

| | | |
|---|---|---|
| 10:26:04 | 1 | direct you to steer clear of that unless you get leave of |
| 10:26:08 | 2 | Court to go there. |
| 10:26:09 | 3 | MR. DAVIS:  Understood, Your Honor. |
| 10:26:10 | 4 | THE COURT:  All right.  Does the Defendant want to |
| 10:26:16 | 5 | argue against the grant of MIL No. 2 to the extent I've |
| 10:26:19 | 6 | mentioned? |
| 10:26:20 | 7 | MR. KREVITT:  No, Your Honor. |
| 10:26:21 | 8 | THE COURT:  All right.  Then I'll -- I'll grant |
| 10:26:26 | 9 | Motion in Limine No. 2 only to the extent of disallowing or |
| 10:26:30 | 10 | prohibiting any argument or evidence implying speculation |
| 10:26:38 | 11 | about why the letter of intent was not consummated, and |
| 10:26:43 | 12 | obviously that's something that would require leave to go |
| 10:26:46 | 13 | there. |
| 10:26:48 | 14 | That takes us -- before we turn to Motion in |
| 10:26:53 | 15 | Limine No. 3, we'll take the morning recess.  I'm going to |
| 10:26:58 | 16 | try to keep it to a minimum because I'm going to have to |
| 10:27:02 | 17 | break for lunch at 11:30. |
| 10:27:06 | 18 | So anyway, we'll take a 10-minute recess. |
| 10:27:10 | 19 | COURT SECURITY OFFICER:  All rise. |
| 10:27:11 | 20 | (Recess.) |
| 10:27:11 | 21 | COURT SECURITY OFFICER:  All rise. |
| 10:27:12 | 22 | THE COURT:  Thank you.  Please be seated. |
| 10:39:16 | 23 | Mr. Fenster, are you ready for the next motion in |
| 10:39:20 | 24 | limine? |
| 10:39:20 | 25 | MR. FENSTER:  Good morning, Your Honor.  I'll be |

10:39:22  1   addressing Headwater's Motion in Limine No. 3.

10:39:25  2        THE COURT:  All right.

10:39:26  3        MR. FENSTER:  And, specifically, this relates to

10:39:32  4   testimony -- excluding testimony from a prior case about

10:39:38  5   different patents that involved a different limitation that

10:39:42  6   would be confusing to discuss here.  And specifically, Your

10:39:47  7   Honor, I would give you an example.

10:39:51  8        If we can pull up the first slide.

10:39:55  9        So, Your Honor, the '976 patent, which is listed

10:40:04  10  above, that was at issue Headwater versus Samsung 422 case.

10:40:13  11  The '613 patent is at issue in this case.

10:40:15  12        The specific limitation that was at issue in the

10:40:19  13  '976 patent was interacting in the device display

10:40:24  14  foreground.  That limitation does not appear in any of the

10:40:27  15  patents, either the '541 or the '613 patent at issue in

10:40:32  16  this case.

10:40:32  17        There was specific testimony from the inventor,

10:40:39  18  James Lavine, and from the expert, Dr. Rick Wesel,

10:40:45  19  regarding that limitation.  It would be confusing to

10:40:54  20  have -- to allow Verizon to cross-examine or to introduce

10:40:57  21  either the Lavine testimony by deposition or to

10:41:06  22  cross-examine Dr. Wesel with his opinions or testimony

10:41:10  23  regarding that limitation that -- from the 422 case that

10:41:12  24  does not appear in this case.  And that's really the

10:41:15  25  specific testimony that we're seeking to exclude with

10:41:18    1    Motion in Limine 3.

10:41:18    2            And if you can go to the next slide, this, Your

10:41:24    3    Honor, is trial testimony from the 422 case.  It was the

10:41:31    4    introduction of testimony from James Lavine by deposition,

10:41:35    5    and specifically it's that last Q&A:  Do you believe

10:41:39    6    there's a distinction between a determination as to whether

10:41:41    7    an application is running in the foreground or background

10:41:45    8    versus a determination as to whether an application is

10:41:48    9    interacting in the device display foreground with the user?

10:41:52   10            And he answers:  Yeah, there's a big difference.

10:41:57   11            That testimony, as -- is literally directed to a

10:42:02   12    specific limitation that does not appear in this case and

10:42:06   13    would be confusing to introduce it in this case.

10:42:09   14            There was similar testimony with respect to

10:42:12   15    questioning by Dr. Rick Wesel, and while we agree that he

10:42:20   16    should -- it's fair to cross-examine him with materials and

10:42:25   17    testimony from the 422 case, in general, this -- where

10:42:32   18    there's a difference in language in his testimony was

10:42:34   19    directed to a particular limitation that was not at issue

10:42:38   20    here, we think it would be prejudicial and confusing rather

10:42:42   21    than probative.

10:42:43   22            THE COURT:  So what you're seeking to exclude is

10:42:47   23    just questions that are directed to a specific claim

10:42:52   24    limitation that's not being asserted in this case?

10:42:58   25            MR. FENSTER:  Yes, with a slight tweak, Your

10:43:01  1   Honor, that we're seeking to exclude introduction of

10:43:04  2   testimony or cross-examine -- cross-examination using

10:43:08  3   testimony or materials that were directed to a specific

10:43:11  4   limitation that is not at issue in this case.

10:43:14  5        THE COURT:  What the Defendants raise in their

10:43:17  6   opposition is that that they want to be able to ask about

10:43:23  7   testimony regarding products that are common to both.

10:43:28  8        MR. FENSTER:  And I agree that that's fair game,

10:43:31  9   Your Honor.  To the extent that Dr. Wesel testified about

10:43:35  10  Android functionality that was not specifically in the

10:43:37  11  context of or directed to the particular limitation "device

10:43:45  12  display foreground," we're fine with that.

10:43:47  13       Where the questioning was specific to a particular

10:43:49  14  limitation that was not at issue here, we think it would be

10:43:52  15  confusing and prejudicial because his testimony there was

10:43:56  16  directed to device display foreground.  That doesn't appear

10:44:00  17  in this case, and it would require us to unpack the

10:44:05  18  different -- the difference in the language and that that

10:44:09  19  testimony was in a different case, a different patent,

10:44:12  20  et cetera.

10:44:13  21       THE COURT:  All right.

10:44:15  22       MR. FENSTER:  Thank you, Your Honor.

10:44:16  23       THE COURT:  Thank you, Mr. Fenster.

10:44:20  24       MS. DOMINGUEZ:  Hello again, Judge Payne.

10:44:28  25       Okay.  So I'll just first point out that this --

10:44:33    1    what you just heard, the example that was given on the two

10:44:37    2    slides that Mr. Fenster put up, is the first time we've

10:44:39    3    ever seen an example of testimony that Headwater is trying

10:44:44    4    to exclude under this MIL.

10:44:45    5         We asked them in the meet and confer process to

10:44:49    6    identify what they thought was testimony specific to other

10:44:53    7    patents, and they didn't do so.  They didn't do so in their

10:44:57    8    brief either.

10:44:58    9         So I'll -- I'll deal with the example that

10:45:01   10    Mr. Fenster just raised, and I think it shows exactly why

10:45:06   11    the MIL is not appropriate.

10:45:08   12         It is common, as Your Honor knows, when

10:45:11   13    questioning a fact witness about matters that are pertinent

10:45:16   14    to claim language, you don't necessarily use and frequently

10:45:19   15    don't use the exact language of the claim.  To the extent

10:45:23   16    that we were, for instance, to ask a question using claim

10:45:26   17    language that doesn't precisely match, it would, of course,

10:45:30   18    be within Headwater's prerogative to point that out, to ask

10:45:35   19    questions about the differences.

10:45:37   20         But the idea that we are wholesale excluding, and

10:45:42   21    it's pretty vague, anything that's about other patents and

10:45:46   22    then Headwater gets to decide whether particular language

10:45:49   23    is about other patents, I think, is really unworkable.

10:45:52   24         So not only is the example that Mr. Fenster gave,

10:45:56   25    I think, an example of testimony that should not be

10:45:59    1    excluded and that is fair, the Defendants can ask about,

10:46:03    2    but the MIL itself is so broad and amorphous, and they've

10:46:09    3    not given any other examples, that it really hamstrings

10:46:12    4    Defendants from being able to ask fair questions about

10:46:17    5    identical subject matter or highly relevant overlapping

10:46:21    6    subject matter without fear of intruding upon this MIL that

10:46:25    7    they've requested.

10:46:26    8              THE COURT:  What would be your analysis of the

10:46:30    9    example that was just shown?

10:46:35    10             MS. DOMINGUEZ:  So, Your Honor, I know we have an

10:46:37    11   entire brief on the '613 patent and why we think, in fact,

10:46:41    12   those issues are dispositive.  So I don't want to preempt

10:46:47    13   that issue, but we've -- we've spilled a lot of ink on this

10:46:51    14   already.  This would be an example of where we have our

10:46:54    15   argument that the limitations are actually substantively

10:46:58    16   identical.  We set that out.  They have their argument as

10:47:01    17   to why they believe there is a material difference between

10:47:05    18   the two limitations.

10:47:08    19             But asking a question -- again, it's Defendants'

10:47:11    20   prerogative to ask the question.  If the witness can be

10:47:15    21   impeached with prior inconsistent testimony, then

10:47:18    22   Defendants should be able to do that.  That's the standard

10:47:21    23   rules.

10:47:21    24             If Headwater wants to point out that it wasn't

10:47:23    25   really inconsistent or that there's some difference that

10:47:25  1  makes it not inconsistent, Headwater can do that.

10:47:28  2       But what the MIL is asking is really a broad

10:47:32  3  sweeping limitation that would hamstring Defendants from

10:47:37  4  doing a full cross-examination of the same witnesses with

10:47:41  5  their own inconsistent testimony in the prior proceeding.

10:47:45  6       THE COURT:  So what you're contemplating is that

10:47:55  7  if the Plaintiffs feel that the question is really directed

10:48:01  8  to a limitation in a patent that's not asserted here, they

10:48:06  9  would just have to make that objection in front of the

10:48:10  10  jury?

10:48:12  11       MS. DOMINGUEZ:  Yes, Your Honor.  I think it's

10:48:14  12  entirely appropriate.  If we ask a question and they think

10:48:17  13  it's not a proper question, they can object to the

10:48:19  14  question.  But the MIL is really unworkable and overbroad

10:48:23  15  as it's stated.

10:48:24  16       THE COURT:  I think the point I'm hearing from

10:48:27  17  them is the concern that it would be prejudicial or

10:48:32  18  confusing to have to take the position that the witness was

10:48:39  19  addressing a different patent and, therefore, likely in a

10:48:44  20  different case.

10:48:46  21       MS. DOMINGUEZ:  I don't think, Your Honor, that

10:48:48  22  that is something we would need to get into.  We certainly

10:48:51  23  wouldn't bring up an another proceeding.  And our questions

10:48:55  24  would be targeted to the relevant subject matter that is

10:48:57  25  identical here.  We're under a -- as Your Honor said this

10:49:01  1  morning, presumptively an 11-hour time limit.  So we

10:49:05  2  certainly don't want to waste our time talking about

10:49:08  3  patents that aren't in the case or issues that aren't in

10:49:11  4  the case.

10:49:11  5       But where a witness has testified about something

10:49:15  6  directly pertinent to the issues here, we certainly want to

10:49:18  7  be able to impeach that witness with their prior

10:49:22  8  inconsistent testimony.

10:49:22  9       THE COURT:  But you would agree that the --

10:49:28  10  neither side should mention in front of the jury that there

10:49:36  11  is -- or there has been previous litigation asserting

10:49:41  12  different patents?

10:49:43  13       MS. DOMINGUEZ:  Absolutely, Your Honor.  Neither

10:49:46  14  side should be getting into that at all.

10:49:48  15       THE COURT:  Uh-huh.  What I'm tempted to do is to

10:49:58  16  carve out something that says that the parties are not to

10:50:04  17  reference patents that aren't asserted here or testimony

10:50:09  18  about those.  And obviously, to the extent that you think

10:50:17  19  your question is directed to the description of the accused

10:50:27  20  products and the function of the accused products as

10:50:31  21  opposed to the patent that was asserted in that action,

10:50:37  22  then that would be -- you'd be on the right side of that

10:50:41  23  line.

10:50:41  24       What's the downside of the Court granting this MIL

10:50:50  25  to the extent of prohibiting testimony that is directed

10:50:58   1   specifically to patents that aren't asserted in this case?

10:51:02   2        MS. DOMINGUEZ:  I would just do a small tweak on

10:51:04   3   that, Your Honor, because I think as long as it's -- that

10:51:09   4   we would not ask questions directed to patents asserted in

10:51:12   5   another case, the only reason I'm flagging for Your Honor

10:51:16   6   is there are some prior art patents, there are -- there's

10:51:18   7   going to be an exhibit dispute about a Verizon patent

10:51:22   8   relevant to damages.  So there may be discussion of other

10:51:27   9   patents that could be captured in what you just said, but

10:51:31  10   certainly as to other asserted patents.

10:51:32  11        THE COURT:  So that -- what you're wanting to make

10:51:35  12   sure we carve out is prior art?

10:51:39  13        MS. DOMINGUEZ:  I'm sorry, Your Honor?

10:51:40  14        THE COURT:  You're wanting to make sure we carve

10:51:41  15   out prior art patents?

10:51:44  16        MS. DOMINGUEZ:  There are also at least one or two

10:51:47  17   patents relating to damages issues that are being disputed,

10:51:49  18   and so I just wanted to clarify that the MIL was not going

10:51:55  19   to other patents that relate to those other prior art or

10:52:00  20   damages issues.

10:52:01  21        THE COURT:  Would any of those that you're

10:52:04  22   concerned about be patents previously asserted by the

10:52:11  23   Plaintiff?

10:52:12  24        MS. DOMINGUEZ:  No, Your Honor.

10:52:14  25        THE COURT:  So if I frame it that way, it would

| | | |
|---|---|---|
| 10:52:16 | 1 | capture what I want but not what you're concerned about. |
| 10:52:24 | 2 | All right. |
| 10:52:26 | 3 | MS. DOMINGUEZ:  Your Honor, just one other |
| 10:52:30 | 4 | clarification.  It would need to be clear that as long as |
| 10:52:32 | 5 | something is relevant to these patents, it comes in.  It |
| 10:52:36 | 6 | could be relevant to another patent.  And so maybe we need |
| 10:52:41 | 7 | to see the exact language, but certainly we would not be |
| 10:52:44 | 8 | asking questions specifically raising -- actually |
| 10:52:49 | 9 | discussing a patent that was asserted in another |
| 10:52:51 | 10 | litigation.  But any questions that are about subject |
| 10:52:54 | 11 | matter that is relevant to these patents asserted in this |
| 10:52:57 | 12 | case, it may also be relevant to another patent.  We would |
| 10:53:01 | 13 | want to be clear that anything that is relevant to these |
| 10:53:04 | 14 | patents asserted in this case comes in. |
| 10:53:07 | 15 | THE COURT:  All right.  Thank you, Ms. Dominguez. |
| 10:53:12 | 16 | Mr. Fenster? |
| 10:53:15 | 17 | MR. FENSTER:  Your Honor, we would be -- we would |
| 10:53:24 | 18 | welcome Your Honor's articulated ruling.  The caveat or the |
| 10:53:30 | 19 | carve-out that Ms. Dominguez just articulated I think would |
| 10:53:35 | 20 | gut the entire thing. |
| 10:53:36 | 21 | So, for example, this testimony -- can you pull up |
| 10:53:44 | 22 | the first -- the second slide?  Yeah, this is fine. |
| 10:53:46 | 23 | So this was the testimony by Mr. Lavine that I |
| 10:53:52 | 24 | referenced.  It's specifically addressing device display |
| 10:53:56 | 25 | foreground.  They may argue that it's relevant because they |

10:53:58   1   have the view that it's relevant, but this was clearly

10:54:06   2   being directed to a different patent.

10:54:11   3         And so we would request that the Court grant the

10:54:15   4   MIL to the extent that it would prohibit testimony that was

10:54:22   5   directed to patents that are not asserted here by the

10:54:25   6   Plaintiff.  And that would include, for example, this

10:54:31   7   specific testimony by Mr. Lavine where he was asked

10:54:34   8   specifically about the patent -- this is not about a

10:54:39   9   product but the inventor testifying about the scope of a

10:54:42  10   patent and a particular patent limitation that is not at

10:54:45  11   issue here.

10:54:47  12         THE COURT:  All right.

10:54:49  13         MR. FENSTER:  Thank you, Your Honor.

10:54:51  14         THE COURT:  Thank you.

10:54:52  15         I'm going to grant it, and I will try to be as

10:55:03  16   clear as possible in the written order about exactly what

10:55:06  17   it's directed to, but it will be something along the lines

10:55:09  18   of testimony or argument expressly directed to claim

10:55:21  19   limitations that are not asserted.

10:55:25  20         And I'll also mention in the order that it is not

10:55:35  21   designed to reach references to prior art.  And I think

10:55:49  22   that the Court will be able to apply it appropriately.

10:55:52  23         But anyway, I'll take into account the arguments

10:55:54  24   made.

10:55:54  25         MS. DOMINGUEZ:  Judge Payne --

10:55:56    1          THE COURT:  Yes.

10:55:57    2          MS. DOMINGUEZ:  -- if I could, I just want to

10:56:00    3    address, though, the particular question and answer that

10:56:04    4    Mr. Fenster raised and whether that would fall inside or

10:56:06    5    outside the scope of Your Honor's order because that

10:56:10    6    question is actually very pertinent to the patents in this

10:56:15    7    case.

10:56:16    8          So it's a question of one of the inventors of the

10:56:22    9    asserted patents in this case about language in a patent

10:56:25   10    that shares the same specification.  These are both

10:56:31   11    continuations of the same application.  They have the same

10:56:33   12    specification.

10:56:33   13          So whether the inventor believes there's a

10:56:36   14    distinction between a determination as to whether an

10:56:38   15    application is running in the foreground versus whether

10:56:41   16    it's interacting, and I understand it says device display

10:56:46   17    foreground, that "display" word is a different word, but

10:56:51   18    it's an extremely pertinent -- his answer that there's a

10:56:54   19    big difference bears on some of the most central issues for

10:56:59   20    the '613 patent.

10:57:00   21          So I just wanted to be clear, like, this would be

10:57:03   22    the type of question that should be fair game.

10:57:09   23          THE COURT:  Obviously, if you can ask the inventor

10:57:13   24    a question that is just getting to what the inventor's

10:57:18   25    knowledge or understanding is, that's one thing.  But if

10:57:22   1   you're wanting to impeach him with testimony that was

10:57:27   2   expressly directed to a limitation that's not in this case,

10:57:32   3   that's the problem.

10:57:34   4        MS. DOMINGUEZ:  Your Honor, I would point out that

10:57:35   5   this would be an example of testimony where it would be

10:57:41   6   something we would want to use directly.  We've designated

10:57:46   7   the testimony.  This particular inventor wouldn't be

10:57:51   8   coming.  So it wouldn't an impeachment issue.  It would be

10:57:54   9   an issue of playing the testimony or reading in the

10:57:56   10  testimony, and Headwater could make its arguments about

10:57:59   11  whether there was an important distinction in the question

10:58:01   12  and answer.

10:58:02   13       THE COURT:  And certainly so can you.  I

10:58:04   14  understand that, but I'm not concerned about the effect of

10:58:10   15  the motion in limine on depositions where you'll be able to

10:58:13   16  argue these things out of the presence of the jury

10:58:18   17  beforehand.

10:58:19   18       The concern is with the live testimony, and the

10:58:22   19  function of the MIL is to try and shift this discussion to

10:58:28   20  something at the bench as opposed to in front of the jury.

10:58:35   21       MS. DOMINGUEZ:  Okay.  Thank you, Your Honor.

10:58:36   22       THE COURT:  Thank you, Ms. Dominguez.

10:58:38   23       I'll try and take into account your arguments.

10:58:57   24       Let's go to MIL 4.

10:58:58   25       MR. HOFFMAN:  Your Honor, the parties' agreement

10:59:01  1  to -- that both will not address Verizon's investments or

10:59:05  2  offers to invest in the Verizon case resolves MIL 4 as just

10:59:11  3  to the Verizon case.

10:59:12  4       The parties are still discussing a potential

10:59:17  5  agreement as to the T-Mobile case.  And --

10:59:22  6       THE COURT:  So should I interpret that to mean

10:59:25  7  that MIL 4 is agreed in the Verizon case?

10:59:30  8       MR. HOFFMAN:  Yes.  There's specific language the

10:59:31  9  parties have agreed to that we can submit to the Court.

10:59:36  10  But, yes, essentially it is agreed.

10:59:39  11       THE COURT:  When are you going to submit that

10:59:44  12  language?

10:59:44  13       MR. HOFFMAN:  I think we can take a look at it and

10:59:47  14  this afternoon?

10:59:48  15       MR. ROSENTHAL:  Yes, Your Honor, that's fine.  I

10:59:49  16  just wanted to be clear.  It's language that the parties

10:59:52  17  have agreed.  We'll submit it to the Court.

10:59:55  18       THE COURT:  Okay.  I'll expect to get back to that

10:59:57  19  this afternoon then.

11:00:04  20       MR. HOFFMAN:  And as to T-Mobile, because the

11:00:06  21  parties are discussing a potential resolution, we would

11:00:08  22  suggest not addressing that today unless they -- not

11:00:14  23  addressing it until the parties have a chance to try to

11:00:19  24  resolve it.

11:00:20  25       THE COURT:  All right.  And we will address

| | | |
|---|---|---|
| 11:00:23 | 1 | T-Mobile as soon as we finish with Verizon.  Thank you. |
| 11:00:29 | 2 | MR. HOFFMAN:  Thank you. |
| 11:00:29 | 3 | THE COURT:  So that takes us to No. 5, which |
| 11:00:34 | 4 | appears to be tied up, if I'm understanding it correctly, |
| 11:00:39 | 5 | with the motion that we heard yesterday. |
| 11:00:43 | 6 | Is there any reason that the resolution of |
| 11:00:47 | 7 | yesterday's motion won't also resolve MIL 5? |
| 11:00:51 | 8 | MR. WANG:  Yes, Your Honor.  So under MIL 5, the |
| 11:00:56 | 9 | Court should exclude evidence or argument with the jury |
| 11:01:00 | 10 | regarding alleged spoliation or document destruction by |
| 11:01:05 | 11 | Headwater or ItsOn. |
| 11:01:06 | 12 | And with Your Honor's question and comment in |
| 11:01:10 | 13 | mind, I just want to discuss specifically three reasons why |
| 11:01:13 | 14 | the Court should grant this relief now, and it doesn't |
| 11:01:18 | 15 | depend on -- it doesn't hinge on the arguments we heard |
| 11:01:22 | 16 | yesterday. |
| 11:01:23 | 17 | THE COURT:  All right. |
| 11:01:28 | 18 | MR. WANG:  Okay, Your Honor.  So it's a clear |
| 11:01:32 | 19 | 402/403 issue where we saw two thick binders of argument |
| 11:01:39 | 20 | papers yesterday regarding alleged spoliation document |
| 11:01:43 | 21 | destruction.  And the probative value to the claims and |
| 11:01:47 | 22 | defenses of this patent infringement case are near zero. |
| 11:01:53 | 23 | Whereas, there's a very high substantial risk of unfair |
| 11:01:59 | 24 | prejudice, confusing the jury, and wasting what's currently |
| 11:02:02 | 25 | 11 hours of trial time per side. |

| 11:02:04 | 1 | And -- |

THE COURT:  Mr. Wang, let me interrupt you and see.  As I recall the Defendants' motion, they're not asking for relief that would involve instructing the jury about this issue.  They're asking for relief that would take items away from the jury.  So maybe there is not a situation where the resolution of their motion would leave it as a jury issue, in which case your MIL would seem appropriate, but...

MR. WANG:  Exactly, Your Honor.  That was going to be my second point.  They have not asked for any kind of that relief.  So we have a live ripe issue here.  In none of their papers on that motion do they ask for, you know, allowance to introduce this with the jury.

THE COURT:  All right.

MR. WANG:  Mr. Krevitt didn't say anything about that yesterday.

THE COURT:  Thank you, Mr. Wang.

Let me hear -- if the Defendant has argument of a scenario under which this would be an issue for the jury, tell me about it.

MR. KREVITT:  Thank you, Your Honor.

Your Honor obviously heard extensive argument yesterday and is aware of the relief that we're seeking in connection with the sanctions motions and why, given the

11:03:31     1   prejudice.

11:03:32     2        If Your Honor were to grant that motion, that

11:03:36     3   would -- which is why we said in our opposition here that

11:03:39     4   this is premature.  If Your Honor were to agree with us

11:03:43     5   that a sanction is appropriate and were to agree with the

11:03:48     6   relief we have requested, for example, if ItsOn weren't

11:03:51     7   discussed in the case, we have no interest in coming to

11:03:54     8   trial and talking about the destruction of evidence.

11:04:00     9        If, though, the issues that were discussed

11:04:03    10   yesterday with Your Honor, any of those remain in the case,

11:04:06    11   then for all the reasons I explained as to why our ability

11:04:09    12   to defend ourselves has been severely hampered, we would

11:04:15    13   be -- it would be appropriate, and the cases, including

11:04:19    14   cases from Your Honor say it's appropriate, for us to talk

11:04:21    15   to the jury to explain to the jury that the material no

11:04:25    16   longer exists, that efforts to preserve it weren't taken.

11:04:30    17        THE COURT:  You know, that's where I disagree with

11:04:32    18   you.  I believe that you're right that you are entitled to

11:04:37    19   discuss with the jury whether or not there has been

11:04:40    20   spoliation, that certain records are not in existence or

11:04:46    21   not available, that you don't have them.  But the fact that

11:04:54    22   efforts to preserve were not taken appropriately in your

11:05:00    23   opinion is not something that is necessary or appropriate

11:05:08    24   to tell the jury.

11:05:10    25        MR. KREVITT:  Well, I'm hoping that's a question,

11:05:13    1    Your Honor, as opposed to a ruling.

11:05:14    2        And I have authority from Judge Payne that is to

11:05:21    3    the contrary.  In the Aldridge case, for example, evidence

11:05:25    4    that should have been preserved and wasn't was allowed

11:05:31    5    before the jury.

11:05:32    6        In the Rembrandt case, the existence and the

11:05:35    7    maintenance and the preservation of information was allowed

11:05:38    8    to be discussed with the jury.

11:05:39    9        The Fifth Circuit has found that the issues of the

11:05:41    10    preservation and the maintenance and the production of

11:05:46    11    information is germane when Headwater could have preserved

11:05:51    12    this information.  And I promise, I'm not arguing the

11:05:54    13    merits of that motion.

11:05:55    14        But when that could have been preserved and wasn't

11:05:58    15    preserved and now we're in a situation, if they were

11:06:01    16    permitted, pending Your Honor's resolution of the sanctions

11:06:04    17    motion, to make arguments about what ItsOn did and what

11:06:07    18    ItsOn didn't do and what Verizon knew and what Verizon

11:06:10    19    didn't know, it is, in our view, highly germane for the

11:06:13    20    jury to be aware not only that documents don't exist, that

11:06:18    21    were they to exist, we might be able to respond, but why

11:06:23    22    they don't exist.

11:06:24    23        To be clear, Your Honor, some of this may be

11:06:27    24    fine-tuning and parsing language.  We don't intend to use

11:06:31    25    the verb "destroy" or the word "destruction."  Spoliation

| | | |
|---|---|---|
| 11:06:37 | 1 | is not a word that we need to use.  We would -- what we |
| 11:06:41 | 2 | would want -- and, again, we hope none of this becomes |
| 11:06:44 | 3 | necessary in light of the sanctions motion, but were it to |
| 11:06:47 | 4 | be necessary, we would want to be able to explain to the |
| 11:06:51 | 5 | jury why we don't have the information that might be highly |
| 11:06:56 | 6 | relevant here. |
| 11:06:57 | 7 | THE COURT:  If the Court decides that a party has |
| 11:06:59 | 8 | not violated a duty of preservation, why should you be |
| 11:07:05 | 9 | allowed to argue to the jury that the party has? |
| 11:07:11 | 10 | MR. KREVITT:  If the Court finds that there has |
| 11:07:15 | 11 | been no violation under Rule 37, then why should we be in a |
| 11:07:23 | 12 | position?  Because in that case, Your Honor, your -- the |
| 11:07:26 | 13 | Court would have found simply that there could be any |
| 11:07:30 | 14 | manner of reasons as to how the Court were to get there, |
| 11:07:33 | 15 | for example -- well, Your Honor understands the different |
| 11:07:36 | 16 | factors that go into that -- any manner of reason the Court |
| 11:07:40 | 17 | could find that, including whether certain steps were |
| 11:07:43 | 18 | reasonable or not reasonable. |
| 11:07:44 | 19 | We would not be arguing any of that to the jury. |
| 11:07:46 | 20 | We wouldn't be arguing reasonableness, not reasonableness. |
| 11:07:51 | 21 | We would be saying to them -- rather to the jury the facts |
| 11:07:53 | 22 | that existed, that there was an ability to preserve these |
| 11:07:58 | 23 | documents.  There was an ability to maintain these |
| 11:08:02 | 24 | documents and that wasn't -- |
| 11:08:03 | 25 | THE COURT:  What does it matter that there was an |

| | | |
|---|---|---|
| 11:08:06 | 1 | ability to do it if the Court has decided that they were |
| 11:08:08 | 2 | not required to do it? |
| 11:08:08 | 3 | MR. KREVITT:  Because the absence of evidence, |
| 11:08:10 | 4 | Your Honor, without explanation can very well and likely |
| 11:08:14 | 5 | would be used against Defendants unfairly.  It's a double |
| 11:08:14 | 6 | prejudice, Your Honor. |
| 11:08:18 | 7 | We don't have the information to defend ourselves, |
| 11:08:22 | 8 | and we don't have the ability to tell the jury why we don't |
| 11:08:25 | 9 | have the information to defend ourselves. |
| 11:08:27 | 10 | THE COURT:  Sure, you do.  You don't have that |
| 11:08:30 | 11 | information because it's not been provided to you.  But |
| 11:08:36 | 12 | what you want to do is go beyond that and say, and the |
| 11:08:38 | 13 | reason it wasn't provided to us is because the other side |
| 11:08:43 | 14 | lost it, destroyed it, negligently let it go. |
| 11:08:47 | 15 | MR. KREVITT:  Well, again, maybe it's a question |
| 11:08:49 | 16 | of parsing, Your Honor.  We are comfortable not saying |
| 11:08:53 | 17 | "destroying."  We're comfortable not saying "negligently |
| 11:08:56 | 18 | let it go."  We would -- and this is, again, not -- I know |
| 11:09:03 | 19 | I was cute earlier or pretended to be with referring to |
| 11:09:06 | 20 | Your Honor's authority, but this is done and has been in |
| 11:09:09 | 21 | many cases, including out of this court, in which -- and, |
| 11:09:15 | 22 | in fact, instructions have been given even when they |
| 11:09:18 | 23 | haven't been requested in connection with the Rule 37 |
| 11:09:19 | 24 | motion that when we are at trial and Headwater is putting |
| 11:09:24 | 25 | on evidence that relates to ItsOn, should we get there, |

11:09:26    1   should they be permitted to do so in light of the

11:09:30    2   circumstance that we find ourselves in, we would want to be

11:09:33    3   able and believe under the case law we should be entitled

11:09:37    4   to, explain where the documents were that no longer exist,

11:09:42    5   why they no longer exist, not because anybody intentionally

11:09:46    6   destroyed them or negligently destroyed them, but instead

11:09:50    7   because -- well, just the factual recitation as to what

11:09:53    8   happened as to whether the documents were preserved,

11:09:55    9   whether the documents were not preserved, whether the --

11:09:58   10   when and why the documents are no longer accessible to us.

11:10:07   11        Again, Your Honor, we would not be looking to end

11:10:10   12   run -- this presumes a denial of at least some of the

11:10:11   13   relief we requested, and we wouldn't be looking to end run

11:10:15   14   that ruling.

11:10:16   15        But as the prior cases, as I mentioned, the

11:10:17   16   Rembrandt, the Aldridge, the ZiiLabs case all find it is --

11:10:23   17   that last was -- was a case also from Your Honor in which

11:10:28   18   spoliation was not explicitly found and yet the Court

11:10:32   19   allowed a party -- and I confess, I don't remember if it's

11:10:36   20   the Plaintiff or the Defendant, but the aggrieved party, if

11:10:40   21   you will, to explain to the jury or to elicit testimony

11:10:42   22   regarding the maintenance, the preservation, the production

11:10:45   23   of relevant information, so the jury isn't left with the

11:10:49   24   false impression that we just didn't get the information or

11:10:53   25   maybe it's reasonable that the information isn't there.

| | | |
|---|---|---|
| 11:10:56 | 1 | And it's -- it may just be coincidental that the |
| 11:10:59 | 2 | only information that is there happens to support the |
| 11:11:02 | 3 | propositions that are being offered by Headwater. |
| 11:11:04 | 4 | That's why I call that a double prejudice, Your |
| 11:11:07 | 5 | Honor, and that's why the cases even when not giving an |
| 11:11:10 | 6 | instruction, even when not giving a remedy have still |
| 11:11:13 | 7 | allowed the introduction of argument and evidence regarding |
| 11:11:15 | 8 | the preservation and production of documents. |
| 11:11:22 | 9 | THE COURT:  All right.  Thank you -- |
| 11:11:24 | 10 | MR. KREVITT:  Thank you, Your Honor. |
| 11:11:25 | 11 | THE COURT:  -- Mr. Krevitt. |
| 11:11:30 | 12 | And, Mr. Wang, I'm going to carry this one.  I |
| 11:11:37 | 13 | expect to be ruling on the motion that was heard yesterday, |
| 11:11:43 | 14 | and that will inform the ruling on this Motion in Limine |
| 11:11:49 | 15 | No. 5. |
| 11:11:52 | 16 | MR. WANG:  Your Honor, we respect that.  Could I |
| 11:11:55 | 17 | have maybe 30 seconds to make three quick points? |
| 11:11:58 | 18 | THE COURT:  All right.  I'll give you 30 seconds. |
| 11:12:00 | 19 | MR. WANG:  Thank you. |
| 11:12:00 | 20 | One, we agree with Your Honor's comments.  The |
| 11:12:02 | 21 | concerns, they're very apparent.  We're talking about |
| 11:12:05 | 22 | frolics and detours that are substantially unfairly |
| 11:12:08 | 23 | prejudicial. |
| 11:12:09 | 24 | The cases that Mr. Krevitt mentioned are nothing |
| 11:12:12 | 25 | like the case here.  It's not relief that they've asked, |

| | |
|---|---|
| 11:12:15 | 1 |
| 11:12:20 | 2 |
| 11:12:24 | 3 |
| 11:12:27 | 4 |
| 11:12:31 | 5 |
| 11:12:34 | 6 |
| 11:12:37 | 7 |
| 11:12:41 | 8 |
| 11:12:44 | 9 |
| 11:12:46 | 10 |
| 11:12:51 | 11 |
| 11:12:52 | 12 |
| 11:12:54 | 13 |
| 11:13:05 | 14 |
| 11:13:10 | 15 |
| 11:13:11 | 16 |
| 11:13:16 | 17 |
| 11:13:20 | 18 |
| 11:13:27 | 19 |
| 11:13:31 | 20 |
| 11:13:32 | 21 |
| 11:13:37 | 22 |
| 11:13:41 | 23 |
| 11:13:43 | 24 |
| 11:13:46 | 25 |

1  but they all involve intentional deletion or destruction of

2  discovery in a party's control while a case is pending.

3  And to analogize that here -- here is not appropriate.

4       The last thing I would say, Your Honor, is I would

5  just respectfully submit that although Mr. Krevitt agreed

6  not to mention destruction, on this issue respectfully,

7  Defendants have somewhat unclean hands where they've

8  accused us of doing destruction, spoliation.

9       THE COURT:  All right.

10       MR. WANG:  It's a very thin line that we don't

11  want to go down.

12       THE COURT:  Thank you, Mr. Wang.

13       Let's move on to the Defendants' motions.

14       MR. ROSENTHAL:  Good morning, Your Honor.  Brian

15  Rosenthal on behalf of Defendants.

16       So with respect to our first MIL, this is a motion

17  to exclude any reference, whether testimony, argument, fact

18  witness, expert testimony, that the ItsOn product practiced

19  any of the three asserted claims -- of the three asserted

20  patents, I should say.

21       Couple easy parts of this.  With respect to the

22  '613 patent, this doesn't seem to be an issue.  It now

23  appears that Headwater's position is that they don't

24  practice, and so I think everyone's agreed that they will

25  not be saying that they practice the '613.

| | | |
|---|---|---|
| 11:13:49 | 1 | With respect to the '042 patent, I believe that is |
| 11:13:52 | 2 | also easy.  I took the deposition of the expert, |
| 11:13:57 | 3 | Mr. Cooklev -- Dr. Cooklev with respect to the '042, and |
| 11:14:02 | 4 | I'm happy to show the testimony, but he said unambiguously: |
| 11:14:02 | 5 | I have no opinion whatsoever as to whether the ItsOn |
| 11:14:05 | 6 | product practices the '042. |
| 11:14:07 | 7 | And in making our arguments with respect to this |
| 11:14:12 | 8 | motion in limine, there was no attempt in the briefing to |
| 11:14:14 | 9 | show any evidence, argument, or anything else in the record |
| 11:14:18 | 10 | that would support the idea that they practice the '042. |
| 11:14:21 | 11 | So I believe that those two issues are very simple. |
| 11:14:25 | 12 | I believe that the issue with respect to the |
| 11:14:27 | 13 | remaining patent, the '541, is equally simple.  There is |
| 11:14:33 | 14 | zero evidence in this case that is competent evidence that |
| 11:14:38 | 15 | the ItsOn product practiced the asserted claims of the |
| 11:14:42 | 16 | '541. |
| 11:14:43 | 17 | Now, we've had a lot of briefing on this, and at |
| 11:14:46 | 18 | every turn, the Plaintiff has said that's wrong.  There |
| 11:14:49 | 19 | actually is evidence of that.  And then they cite to a |
| 11:14:52 | 20 | bunch of stuff.  They don't quote it.  They cite to a bunch |
| 11:14:54 | 21 | of stuff.  And when you actually look at what the evidence |
| 11:14:59 | 22 | is, no expert in this case has ever examined the ItsOn |
| 11:15:04 | 23 | product, even the hundred thousand pages of technical |
| 11:15:07 | 24 | documents that they alleged yesterday for the first time |
| 11:15:09 | 25 | exists about the ItsOn product.  No expert has looked at |

11:15:14  1    those documents and concluded, based on those documents,

11:15:17  2    I think that the '541 patent is practiced, let alone said

11:15:22  3    I think that Claims 79 and 83 of that patent are practiced.

11:15:27  4          This is a critical issue, and this is why we made

11:15:30  5    it our first motion in limine, because this is the trojan

11:15:36  6    horse that Headwater is using to bring in a whole host of

11:15:40  7    irrelevant stuff, copying and willfulness and notice and

11:15:44  8    all kinds of stuff, based on the notion that when

11:15:49  9    activities occur with respect to the ItsOn product, that

11:15:55  10   somehow that bears on these patents.

11:15:56  11         That entire line of argument is dependent on a

11:15:59  12   premise for which there is zero evidence in this case, and

11:16:02  13   that is that the two asserted claims of the '541 patent are

11:16:06  14   practiced.

11:16:07  15         So what have they actually pointed to?  The first

11:16:11  16   thing they point to is they point to their experts.

11:16:13  17         Now, I heard Your Honor say, as I've heard

11:16:17  18   Judge Gilstrap and you say many, many times, in this court,

11:16:21  19   experts are limited to the four corners of what they wrote

11:16:24  20   down in their expert reports.

11:16:25  21         I have in my hand excerpts of their two experts on

11:16:28  22   the '541 patent, Mr. de la Iglesia and Mr. -- I'm sorry,

11:16:34  23   Dr. de la Iglesia and Dr. Wesel.  These are all of the

11:16:37  24   paragraphs that they cite to in their briefs, and I've

11:16:42  25   studied them carefully.  I have them on a slide if

| | | |
|---|---|---|
| 11:16:44 | 1 | Your Honor would like to walk through each one of them, |
| 11:16:47 | 2 | but -- and I'll hand these up to the Court, with the |
| 11:16:51 | 3 | Court's permission now. |
| 11:16:54 | 4 | THE COURT:  If you could also provide a copy to |
| 11:16:55 | 5 | Plaintiff's counsel. |
| 11:16:56 | 6 | MR. ROSENTHAL:  Yes, Your Honor. |
| 11:17:07 | 7 | Here's Dr. Wesel.  Here's Dr. de la Iglesia. |
| 11:17:14 | 8 | MR. MIRZAIE:  Thank you. |
| 11:17:14 | 9 | MR. ROSENTHAL:  You got it? |
| 11:17:15 | 10 | And here are copies of those for the Court -- I'm |
| 11:17:19 | 11 | sorry, Mr. de la Iglesia. |
| 11:17:27 | 12 | So there are multiple copies of each, but there's |
| 11:17:30 | 13 | a -- within the paperclip, you'll find copies of Dr. Wesel |
| 11:17:35 | 14 | and you'll find copies of Mr. de la Iglesia. |
| 11:17:45 | 15 | And we can bring that up on the slide. |
| 11:17:48 | 16 | There should be three copies of each of them. |
| 11:18:10 | 17 | Hopefully I did that right. |
| 11:18:11 | 18 | So if I could have the -- you have two? |
| 11:18:16 | 19 | COURTROOM DEPUTY:  Two witnesses. |
| 11:18:17 | 20 | MR. ROSENTHAL:  Two witnesses, that's right. |
| 11:18:19 | 21 | So, Your Honor, if we could start, I'll show on |
| 11:18:22 | 22 | the ELMO exactly what was said in those paragraphs. |
| 11:18:23 | 23 | If we could start, please, with Dr. Wesel. |
| 11:18:34 | 24 | So the paragraphs that they pointed to of |
| 11:18:40 | 25 | Dr. Wesel that they say show that Dr. Wesel actually did |

11:18:42    1   this analysis and should be permitted to testify about this

11:18:46    2   begin at Paragraph 84.

11:18:48    3       Paragraph 84 has no analysis.  Paragraph 84 simply

11:18:51    4   says that there was a marking page.  And then it goes

11:18:55    5   through with many bullets showing evidence of that marking

11:18:58    6   page where he says that the '541 patent was present on the

11:19:02    7   marking page and that the '613 patent was not.  That's what

11:19:07    8   that entire paragraphs says.  It has no analysis whatsoever

11:19:11    9   of how the ItsOn product worked.

11:19:14   10       Even to the extent that the '541 patent appeared

11:19:17   11   on the marking page, we have evidence in the record from

11:19:21   12   Krista Jacobsen, who was in charge of that marking page,

11:19:25   13   who was the 30(b)(6) witness who testified that all that

11:19:28   14   they determined in order to see whether or not a product

11:19:31   15   goes up on that marking page or a patent goes up on that

11:19:34   16   marking page is if one or more claims of that patent are

11:19:40   17   met.

11:19:41   18       And in this case, Claim 1 of the '541 patent,

11:19:44   19   which would be the most natural one for people to look at,

11:19:49   20   has been disclaimed.

11:19:49   21       The only question in this case is about Claim 79

11:19:53   22   and 83.  The fact that the product and the patent appear on

11:19:57   23   a marking page have nothing to do with whether those two

11:19:57   24   claims are met by the product.

11:20:04   25       And in any event, Dr. Wesel does none of that

11:20:07    1    analysis.  He simply says:  The ItsOn software included

11:20:10    2    links.  And he goes through and explains what all that --

11:20:12    3    that evidence that supports it shows.  That's what all

11:20:14    4    these bullets on the next page are, just more evidence

11:20:18    5    about the marking page.  So there's no analysis there.

11:20:21    6         The next paragraph is Paragraph 85, which simply

11:20:27    7    says, see also a bunch of stuff in my appendices.  There's

11:20:32    8    nothing in those appendices that says anything -- and I'll

11:20:35    9    represent to you, that says anything about whether the

11:20:38   10    ItsOn product meets those claims.

11:20:41   11         The next paragraph is the only paragraph that has

11:20:43   12    any relevance to this issue, and it simply says:  I

11:20:49   13    understand -- not opine, not believe, understand -- I

11:20:54   14    understand that ItsOn practiced the '541 but not the '613.

11:20:58   15         He never even says that it practiced Claim 79 and

11:21:02   16    83.  He says, I understand -- not believe, analyzed,

11:21:07   17    opined, and he doesn't even address the two claims at

11:21:09   18    issue.

11:21:10   19         The remaining paragraphs that they cite, 87

11:21:13   20    through 91, I believe, all of those have only to do with

11:21:18   21    the '613 patent and his explanation as to why the '613

11:21:22   22    patent is not practiced.

11:21:23   23         So Headwater repeatedly says in their briefing

11:21:28   24    that Dr. Wesel did do an analysis and that he did opine and

11:21:32   25    did conclude that Claim 79 and 83 are practiced by the

11:21:36  1  ItsOn product.  That is absolutely incorrect.  He did not

11:21:39  2  do that analysis.  That is not in his report.

11:21:42  3      The only paragraph that comes close is 86, and

11:21:48  4  there he doesn't say anything other than he has an

11:21:51  5  understanding.  So that's Dr. Wesel.

11:21:54  6      Mr. de la Iglesia is worse.  For Mr. de la

11:22:01  7  Iglesia, they identified several paragraphs of Mr. de la

11:22:06  8  Iglesia's report.  And in none of those paragraphs does he

11:22:10  9  do any analysis whatsoever of the asserted claims and

11:22:14  10  compare it to the ItsOn product.

11:22:17  11      Instead, he says -- and I'm showing Paragraph 430,

11:22:21  12  and I've highlighted the sentence -- the only sentence that

11:22:23  13  has any relevance here.  It says:  I understand from

11:22:27  14  Dr. Wesel's report -- that's the paragraph we just saw --

11:22:30  15  that the ItsOn software offered these benefits similar to

11:22:36  16  those offered by the accused features.  And then in

11:22:39  17  parentheses, he says:  Because they -- presumably the

11:22:42  18  accused features -- practice the asserted claims.  That's

11:22:46  19  as close as he comes.

11:22:47  20      There's nothing else in the entirety of this

11:22:50  21  paragraph, Paragraph 430, that does any analysis of the

11:22:55  22  ItsOn software in comparing it to the asserted claims.

11:22:57  23      They've also cited -- I've highlighted Paragraph

11:23:06  24  454.  454 is nearly identical to 430, and it has the very

11:23:13  25  same sentence.  The ItsOn software offers these benefits

11:23:16    1    that are similar to the accused products because

11:23:19    2    the accused -- because those accused products practice the

11:23:21    3    asserted claims.

11:23:23    4         And they also identified Paragraph 463, which has

11:23:29    5    the same sentence and the same general content.

11:23:32    6         Those are the only three paragraphs of Mr. de la

11:23:36    7    Iglesia's report that they point to.

11:23:39    8         Now, they also point to stuff in his deposition,

11:23:42    9    which is -- is hand-wavy, at best, but in any event, that's

11:23:48   10    not the rule in this court.  The rule in this court is

11:23:53   11    you're limited to the opinions that you provided in your

11:23:56   12    reports.  And there is no opinion by either expert that the

11:23:58   13    two asserted claims of the '541, in fact, are practiced by

11:24:01   14    ItsOn.  Nobody's ever made that analysis.

11:24:04   15         Mr. Krevitt argued yesterday that nobody could

11:24:07   16    have done so because the material to do so doesn't exist.

11:24:10   17    But even -- I mean, you heard Headwater get up and say, oh,

11:24:13   18    there's lots of documents from which you could have made

11:24:15   19    that assessment.  There's lots of documents -- technical

11:24:18   20    documents that we produced from which you could have made

11:24:20   21    that assessment, and they pointed to all kinds of stuff

11:24:23   22    that they say exist in the record.

11:24:25   23         But their experts never looked at any of that and

11:24:28   24    concluded based on that, ah, here's where the elements of

11:24:33   25    Claim 79 and 83 are.

11:24:36  1          And so what we have is a whole house of cards of

11:24:39  2   copying and willfulness and all kinds of other stuff that

11:24:42  3   is resting on a premise, a necessary legal premise for the

11:24:46  4   relevance of that information, which is that the product

11:24:49  5   practiced the two claims that are at issue in this case for

11:24:53  6   which there is zero evidence.

11:24:54  7          The only other two things that they point to as

11:24:58  8   alleged evidence of that fact, other than those

11:25:04  9   non-existent opinions of their experts, are they say, A,

11:25:08  10  Dr. Raleigh said he thinks that they practice.  Well,

11:25:10  11  that's a lay witness who has not provided any expert report

11:25:14  12  in this case.  We wouldn't even be permitted to ask him

11:25:17  13  that question in this court, let alone have them rely on

11:25:21  14  that naked lay opinion about claims for which there is a

11:25:26  15  legal question about whether or not they're practiced.

11:25:29  16         In fact, Dr. Raleigh -- and we pointed to this

11:25:32  17  testimony in our briefing.  Dr. Raleigh, when we were

11:25:36  18  asking, why didn't you sue us for 10 years?  Why didn't you

11:25:39  19  write us a letter for 10 years?  He said:  There's no way I

11:25:43  20  could have because you need an expert to see whether you

11:25:45  21  infringe.  You require expert testimony, and we didn't have

11:25:48  22  access to an expert for 10 years.  It was too expensive.

11:25:50  23         That was his story.

11:25:53  24         Now Headwater wants to be able to introduce

11:25:56  25  Dr. Raleigh to say:  Don't worry about it, trust me --

11:25:59    1    literally he said trust me -- I did the analysis, and you

11:26:03    2    infringe -- or, sorry, the ItsOn product meets the claims.

11:26:06    3         So that is really inappropriate.  It's

11:26:10    4    inappropriate not only as a general matter to have a lay

11:26:14    5    witness testify about whether a product meets a claim, it

11:26:19    6    is particularly inappropriate when that particular witness

11:26:22    7    has said I cannot even make that assessment without an

11:26:25    8    expert.

11:26:27    9         And the last piece of evidence that they point to

11:26:30   10    is they say, well, we marked.  And since we included the

11:26:36   11    '541 patent on our marking page, we should be allowed to

11:26:38   12    tell the jury that these claims are practiced by the

11:26:40   13    product.

11:26:42   14         That's backward and bootstrapping.  I mean, the

11:26:44   15    fact that they made some decision to put a product and a

11:26:47   16    patent up on a marking page is not evidence that it, in

11:26:50   17    fact, meets the claims.  It's evidence that someone put

11:26:52   18    that patent number on the marking page.

11:26:54   19         But even if you take that -- we actually took the

11:26:58   20    deposition of Ms. Jacobsen who testified about that marking

11:27:03   21    page, and we asked her the question directly:  Does the

11:27:06   22    ItsOn product meet any claims of the '541?

11:27:09   23         And she said:  I don't know the answer to that.

11:27:13   24    All I know is the procedure we went to.  And all I know

11:27:16   25    about the procedure is that we would put a product up there

| | | |
|---|---|---|
| 11:27:19 | 1 | if one or more claims we believe were met. |
| 11:27:23 | 2 | So that's the most that that marking page could |
| 11:27:26 | 3 | possibly do is establish that someone at some point |
| 11:27:30 | 4 | believed that one or more of the claims are met.  The |
| 11:27:33 | 5 | question in this case is about these two claims. |
| 11:27:38 | 6 | And so we don't believe that they should be |
| 11:27:43 | 7 | permitted to put any evidence of this on since there's no |
| 11:27:47 | 8 | competent evidence that would support it.  This is a motion |
| 11:27:50 | 9 | in limine issue because there's a huge prejudice that comes |
| 11:27:53 | 10 | with their ability to link -- improperly and without |
| 11:27:55 | 11 | support through speculation, to link this product to these |
| 11:28:01 | 12 | two claims of this patent because it brings with it so much |
| 11:28:04 | 13 | prejudicial evidence. |
| 11:28:06 | 14 | The other thing that they argue is we can't make |
| 11:28:09 | 15 | this argument because we are separately arguing that they |
| 11:28:13 | 16 | haven't met their marking obligations.  They say there's an |
| 11:28:16 | 17 | inconsistency between those two things.  That is absolutely |
| 11:28:19 | 18 | not true.  At no point in this case have we ever said that |
| 11:28:23 | 19 | the '541 patent is practiced by the ItsOn product. |
| 11:28:27 | 20 | We have a -- we submitted an Arctic Cat letter, |
| 11:28:36 | 21 | which is Exhibit 14 to our MILs.  And in that Arctic Cat |
| 11:28:40 | 22 | letter on May 24th of 2024, we said only the following. |
| 11:28:46 | 23 | We said:  You, Headwater, have taken the position |
| 11:28:49 | 24 | that the ItsOn product practices this patent, therefore, we |
| 11:28:53 | 25 | are notifying you under Arctic Cat that you are now obliged |

| | | |
|---|---|---|
| 11:28:58 | 1 | to demonstrate that you met the marking requisites -- that |
| 11:29:02 | 2 | you met the marking requirements. |
| 11:29:05 | 3 | We never said that we agree with that.  To this |
| 11:29:07 | 4 | day, there is not a single piece of paper in this case |
| 11:29:10 | 5 | where we said we believe that this product practices the |
| 11:29:14 | 6 | '541, and we do not believe that it does, right? |
| 11:29:18 | 7 | But they said it did.  They continue to say it |
| 11:29:21 | 8 | does.  And, therefore, under the law, they have an |
| 11:29:23 | 9 | obligation to demonstrate that they've met their marking |
| 11:29:25 | 10 | obligations. |
| 11:29:25 | 11 | So there's no inconsistency at all between what |
| 11:29:28 | 12 | we're arguing now and what we have in our marking paper. |
| 11:29:31 | 13 | So I believe that's it. |
| 11:29:34 | 14 | The only other thing I will say is this.  They |
| 11:29:37 | 15 | also say that, well, if -- if this motion is granted, that |
| 11:29:39 | 16 | that has some impact on whether we can talk about the |
| 11:29:44 | 17 | failure of the ItsOn products.  That's an issue that we're |
| 11:29:47 | 18 | going to discuss later today.  And based on the outcome of |
| 11:29:49 | 19 | this MIL, they can argue that that has some impact on that. |
| 11:29:52 | 20 | We don't believe it does.  That is not what this MIL is |
| 11:29:57 | 21 | about. |
| 11:29:57 | 22 | This MIL is about a very singular issue.  Are they |
| 11:30:00 | 23 | permitted to put on any evidence, argument, or suggestion |
| 11:30:02 | 24 | that the ItsOn product practices these two claims -- well, |
| 11:30:06 | 25 | any of the patents, but these two are the only real issue. |

| | | |
|---|---|---|
| 11:30:09 | 1 | THE COURT:  All right. |
| 11:30:09 | 2 | MR. ROSENTHAL:  Thank you, Your Honor. |
| 11:30:12 | 3 | THE COURT:  Thank you, Mr. Rosenthal. |
| 11:30:13 | 4 | We will adjourn until 1:30.  And I'll hear from |
| 11:30:17 | 5 | the Plaintiff on this MIL.  Thank you. |
| 11:30:20 | 6 | COURT SECURITY OFFICER:  All rise. |
| 11:30:21 | 7 | (Recess.) |
| 11:30:22 | 8 | COURT SECURITY OFFICER:  All rise. |
| 01:29:00 | 9 | THE COURT:  Thank you.  Please be seated. |
| 01:30:44 | 10 | Mr. Mirzaie, whenever you're ready. |
| 01:30:51 | 11 | MR. MIRZAIE:  Thank you, Your Honor. |
| 01:30:52 | 12 | And we do have a set of slides, mainly on MIL 1, |
| 01:30:59 | 13 | but I think they also relate to portions of the next MIL, |
| 01:31:04 | 14 | Your Honor, so we'll pass those out. |
| 01:31:12 | 15 | Can we get the -- I guess the -- thanks.  Can I |
| 01:31:16 | 16 | get Slide 1? |
| 01:31:16 | 17 | Your Honor, the entire basis of Defendants' MIL |
| 01:31:38 | 18 | No. 1, as we just heard, was Headwater has no competent |
| 01:31:43 | 19 | evidence that the patents were practiced by ItsOn.  And |
| 01:31:48 | 20 | what was made clear in the briefs and is crystal clear now |
| 01:31:52 | 21 | that -- is that what Defendants mean by that is one thing |
| 01:31:56 | 22 | only, that Headwater has no competent evidence because it |
| 01:32:01 | 23 | should have presented expert opinions detailing a claim |
| 01:32:05 | 24 | mapping between the claims and the ItsOn products for |
| 01:32:09 | 25 | purposes other than infringement, marking, and secondary |

01:32:12    1    indicia.

01:32:13    2            And the main problem with that for them is that

01:32:17    3    the case law does not in any way support that argument, and

01:32:21    4    I'll get into that.  And the relevant case law contradicts

01:32:24    5    it.  It's not Headwater's burden to have that kind of claim

01:32:33    6    mapping or expert evidence at all for marking where they

01:32:37    7    agree or stipulate that a product by ItsOn uses the patent.

01:32:42    8    And it's also not Headwater's burden of persuasion at all

01:32:46    9    with regard to secondary indicia.

01:32:48    10           Headwater has the burden of production with regard

01:32:53    11   to a secondary indicia to identify products.  And it's

01:32:56    12   actually the burden of proof and persuasion with regard to

01:33:00    13   expert testimony or otherwise stays with Defendants on

01:33:04    14   secondary indicia because it's an issue of validity --

01:33:08    15   invalidity rather.

01:33:09    16           And what the cases will show also is that there is

01:33:12    17   no requirement that expert testimony on those things is

01:33:15    18   required at all.  The main case that Defendants have -- the

01:33:20    19   only case they cited is the Centricut case.  The Centricut

01:33:25    20   case makes clear that -- and the Defendants concede in

01:33:28    21   their reply that it's not a per se rule that expert

01:33:32    22   testimony is needed in every case.  It's only needed for

01:33:35    23   infringement and validity in highly complex cases.

01:33:38    24           But the bigger point of that case, Your Honor, is

01:33:41    25   that it's limited to the issues where a claim mapping is

01:33:45    1  required, and that's infringement and validity.  Those do

01:33:50    2  not apply to the issues of marking or secondary indicia,

01:33:55    3  which is I think the real thrust of this MIL.

01:34:00    4      The Defendants' MIL is not about any infringement

01:34:02    5  opinions.  It's about opinions regarding whether ItsOn, a

01:34:06    6  licensed product, practiced it.  And for that, there's just

01:34:10    7  no legal requirement at all that there be expert opinions,

01:34:13    8  let alone expert opinions detailing claim mapping.

01:34:17    9      What the law does demand -- Headwater has met that

01:34:22   10  and exceeded that on every issue covered by Defendants' MIL

01:34:26   11  No. 1.  And because expert testimony is not required, we

01:34:31   12  also went above and beyond to cite other types of evidence,

01:34:38   13  and I'll go through a little bit of that now.

01:34:39   14      So as I detailed, Centricut, that only stands for

01:34:46   15  the proposition that for the issues of infringement and

01:34:50   16  invalidity for complex technical cases only, not every

01:34:54   17  case, there is an expert opinion required on the claim

01:34:57   18  mapping.  And we agree with that.  That is -- that is -- we

01:35:03   19  followed that in this case.  Their MIL is not about

01:35:06   20  claim -- is not about infringement at all.

01:35:08   21      The issue with their MIL is with regard to not

01:35:12   22  products that infringe but products that are licensed,

01:35:15   23  namely ItsOn, whether ItsOn practiced.

01:35:18   24      Now, that relates to two issues in the case,

01:35:20   25  marking and secondary considerations.

01:35:22    1          For marking, the Arctic Cat rule is that

01:35:29    2    Defendants have a burden of production to identify products

01:35:36    3    they practice.

01:35:36    4          They served us with a letter.  That letter

01:35:40    5    identified all the patents as practicing.  And they needed

01:35:44    6    to have a good-faith basis -- that's what's Arctic Cat

01:35:50    7    requires -- to meet that burden of production.  And in this

01:35:54    8    case, they said that the ItsOn products do practice in the

01:35:58    9    letters, and they needed a good-faith basis to do so.

01:36:01   10          And now many months later, they've maintained that

01:36:06   11    position.  And, in fact, filed a motion for summary

01:36:08   12    judgment that rests on that position, Your Honor.  It rests

01:36:11   13    on the position that Headwater's -- rather -- sorry,

01:36:15   14    ItsOn's products the patents, and, therefore, there's a

01:36:20   15    marking obligation triggered.

01:36:22   16          Now --

01:36:22   17          THE COURT:  Mr. Mirzaie --

01:36:23   18          MR. MIRZAIE:  Yeah.

01:36:24   19          THE COURT:  -- does your client contend that ItsOn

01:36:27   20    practices any of the asserted patents?

01:36:29   21          MR. MIRZAIE:  Yes, Your Honor.

01:36:31   22          THE COURT:  And what is -- what is the basis for

01:36:36   23    that contention?

01:36:37   24          MR. MIRZAIE:  Your Honor, the -- Mr. Rosenthal is

01:36:40   25    correct that my client does not contend that it practices

01:36:44  1  the '613 patent, but it does contend that it practices the

01:36:50  2  other two patents.  And the basis of that contention is --

01:36:56  3  there's several pieces of evidence.

01:36:58  4      The first piece of evidence is the marking page

01:37:02  5  that ItsOn has had for a very long time.  That lists the --

01:37:10  6  the patents that are practiced by ItsOn.  That's been

01:37:12  7  around for years.  The Defendants have had that list.

01:37:14  8  They've deposed the people that were involved in creating

01:37:17  9  that list.

01:37:18  10      Beyond that list, though -- and we submit that

01:37:21  11  that -- that's enough in terms of the marking issue, and

01:37:26  12  the reason why -- but there's lot more -- but the reason

01:37:31  13  why that's enough is that what Arctic Cat tells us is that

01:37:35  14  where the Plaintiff -- after the Defendant has met their

01:37:38  15  burden of production, where the Plaintiff disputes that the

01:37:42  16  licensed product practices it, then that triggers a burden

01:37:47  17  of proof and persuasion to prove otherwise.

01:37:50  18      We did that with the '613.  That's not the basis

01:37:52  19  of Defendants' MIL.  We provided expert opinions on the

01:37:55  20  '613 about the limitation that's not met.

01:37:57  21      Where the Plaintiff concedes and stipulates that a

01:38:01  22  licensed product is practiced by a particular patent --

01:38:05  23  then there's just an agreement between the parties.  And

01:38:08  24  the Defendants haven't cited a case that -- at that point

01:38:11  25  the Defendant -- the Plaintiff has to provide some type of

| | | |
|---|---|---|
| 01:38:14 | 1 | claim chart. |
| 01:38:14 | 2 | It's quite the opposite, Your Honor.  All the |
| 01:38:16 | 3 | cases that we've been involved in -- all the cases cited, |
| 01:38:20 | 4 | the issue sort of goes off the table.  There's no claim |
| 01:38:23 | 5 | charts in those cases.  In fact, it's now our burden to |
| 01:38:28 | 6 | show that the marking obligation was satisfied.  And so |
| 01:38:32 | 7 | that's the kind of evidence we have to show. |
| 01:38:34 | 8 | And so here, they had a good-faith basis, or they |
| 01:38:41 | 9 | were supposed to, for the Arctic Cat letter to say that for |
| 01:38:45 | 10 | certain patents, ItsOn did practice those patents.  We |
| 01:38:49 | 11 | agreed.  We didn't just stop there.  There is the marking |
| 01:38:52 | 12 | page. |
| 01:38:53 | 13 | Beyond the marking page, there's also documents |
| 01:38:56 | 14 | that we've cited and produced to them.  It includes |
| 01:38:59 | 15 | documents like the ones that are on Slides 6 through 8, |
| 01:39:03 | 16 | Your Honor. |
| 01:39:03 | 17 | These are just some examples.  These are 2011, |
| 01:39:10 | 18 | 2012, and later requirements -- documents from ItsOn, white |
| 01:39:17 | 19 | papers from ItsOn describing the product that they had. |
| 01:39:18 | 20 | There's been plenty of depositions on this issue |
| 01:39:21 | 21 | from the inventor, who was also at ItsOn.  And what you'll |
| 01:39:27 | 22 | see in those documents and also based on the deposition |
| 01:39:30 | 23 | testimony is that the products -- it wasn't some conclusory |
| 01:39:36 | 24 | testimony or evidence. |
| 01:39:39 | 25 | In fact, the testimony and evidence from |

01:39:43  1    Dr. Raleigh in the documents ties the products to claim

01:39:46  2    elements.

01:39:46  3          The '541, for example, it has the control of

01:39:51  4    background traffic.  You've heard of those types of claim

01:39:55  5    elements.  And what the testimony and the documents show is

01:39:58  6    that it did have that feature -- the ItsOn products had

01:40:01  7    that feature.

01:40:01  8          This is a Verizon Wireless trial readout dated

01:40:08  9    2011, based on some testing that the two parties had done.

01:40:11  10          And you'll see here there was a request that was

01:40:16  11    met for that same type of background service restriction.

01:40:19  12          Slide 8 is similar in that it describes other

01:40:22  13    parts of the claim elements.  So there's plenty of evidence

01:40:25  14    that it is met.  And it's not our burden to show that once

01:40:29  15    we've stipulated that an accused -- that a licensed

01:40:35  16    product, rather, does practice a patent.

01:40:37  17          Once you've done that, there is no burden that

01:40:39  18    Headwater has.  Headwater had a burden on the '613 patent

01:40:44  19    to disprove that it used that, and that's not part of

01:40:51  20    Defendants' MIL No. 1 as far as we understand.  There's an

01:40:54  21    agreement there, too.

01:40:55  22          So the other issue that we have -- and, again, the

01:40:59  23    crux of this is there's not a single case on this issue of

01:41:02  24    namely whether -- not infringing products but licensed

01:41:06  25    products practice the patent where a Plaintiff was required

01:41:09  1   to have expert testimony to prove that up and have to deal

01:41:14  2   with the pre-suit damages defense, Your Honor.

01:41:17  3          This is an issue that's different from

01:41:19  4   infringement.  Centricut does govern the issue of expert

01:41:26  5   testimony and whether it's required in complex -- the most

01:41:29  6   complex of cases on the issue of infringement.  It doesn't

01:41:32  7   apply to the issue of licensed products and whether those

01:41:36  8   are practiced.  There's no burden of proof or persuasion,

01:41:38  9   but we have the evidence anyway.

01:41:40  10          THE COURT:  And in what context is there an issue

01:41:48  11   about whether a licensed product practices the patent?

01:41:54  12          MR. MIRZAIE:  Your Honor, do you mean which issues

01:41:57  13   in the case?

01:41:58  14          THE COURT:  Well, in marking, it's never going to

01:42:00  15   be the Plaintiff's burden to show that the product

01:42:05  16   practices the patent.

01:42:07  17          MR. MIRZAIE:  Precisely, Your Honor.

01:42:08  18          THE COURT:  You're simply either admitting it or

01:42:12  19   denying it.

01:42:12  20          MR. MIRZAIE:  Exactly, Your Honor.

01:42:14  21          THE COURT:  But what does that have to do with the

01:42:17  22   question we're dealing with here where their motion in

01:42:20  23   limine is saying that you should not be allowed to

01:42:24  24   represent that ItsOn practices the patent if you don't have

01:42:30  25   evidence to support that?

01:42:31   1          MR. MIRZAIE:  Well, I believe that -- the

01:42:33   2   Defendants don't come out and state it, but what we can

01:42:36   3   glean from their briefing is that they want to eliminate

01:42:41   4   background facts and facts that concern secondary indicia,

01:42:47   5   Your Honor.

01:42:47   6          For secondary indicia, we have pointed to evidence

01:42:51   7   about copying.  That's the subject of Defendants' MIL No.

01:42:55   8   2.  We've pointed to evidence of long-felt need, Your

01:42:59   9   Honor.  We've pointed to evidence of praise for patented

01:43:02   10  features.  We've pointed to all that evidence, and the key

01:43:06   11  point there, Your Honor, and I think that's really what

01:43:08   12  they're trying to get at even though they don't come out

01:43:10   13  and say it, I think they -- if they believe that if they

01:43:15   14  win on this motion, then they're going to come back and

01:43:19   15  say, well, some of our secondary consideration evidence

01:43:22   16  needs to come out.

01:43:23   17         I'll let Mr. Rosenthal address that question, but

01:43:26   18  that was our understanding of sort of the impact of this.

01:43:29   19  I'd love to hear if that's not true.

01:43:31   20         And on that question, the only other question we

01:43:36   21  think that this could be relevant to in terms of an actual

01:43:43   22  issue on validity, infringement, or damages, the important

01:43:45   23  point there, Your Honor, is that the burden of production

01:43:47   24  and persuasion are flipped from Arctic Cat.

01:43:51   25         And on that issue, what we know from the Federal

01:43:54    1    Circuit is that for secondary indicia, the burden of

01:43:58    2    persuasion, because it's an issue of validity, remains with

01:44:01    3    the challenger.  The patentee just bears the burden of

01:44:05    4    production.

01:44:05    5          So all the same evidence that we showed goes well

01:44:08    6    beyond the burden of production, which, again, for both

01:44:11    7    marking and Defendants' burden of production and secondary

01:44:15    8    indicia and Headwater's burden of production, it just

01:44:19    9    requires having a good-faith basis in identifying a

01:44:22   10    practicing product that's licensed.

01:44:24   11          And we did that by saying that ItsOn is licensed

01:44:28   12    for the '541 and the '042, and not the '613.  And the

01:44:35   13    burden of proof and persuasion stays with Defendants.  For

01:44:41   14    their part, they don't have any evidence whatsoever, expert

01:44:43   15    or otherwise, trying to disprove that the ItsOn products

01:44:49   16    practice the '541 and the '042.  They have no evidence.

01:44:52   17          And there's a reason why, Your Honor, because they

01:44:54   18    are taking the position, as you've probably read -- seen

01:45:00   19    today and read in their MSJ of marking, that the -- for the

01:45:05   20    '541 and '042, ItsOn did practice.  And that's a necessary

01:45:10   21    argument that they need to make in good faith to trigger

01:45:12   22    even having -- even having that defense in the first place.

01:45:15   23          Now, we think that that motion fails for multiple

01:45:19   24    reasons, but the statement from Mr. Rosenthal that we

01:45:23   25    heard, I think, today for the first time is an absolute

01:45:28   1   contradiction to what we've heard so far.

01:45:31   2         I think he's said that they aren't saying that the

01:45:34   3   ItsOn products practice the '541 and '042.  That's the

01:45:37   4   first we've heard of it, and I think the record is clear

01:45:39   5   that from the moment they sent us their Arctic Cat letter,

01:45:43   6   they were required to and did say that they have a

01:45:45   7   good-faith basis to believing that the '541 and '042

01:45:50   8   patents are practiced by ItsOn.  And they've maintained

01:45:53   9   until today in the moment they filed the motion for summary

01:45:57  10   judgment on pre-suit damages, which rests on that premise.

01:46:01  11         And so for secondary indicia, we don't have any

01:46:08  12   burden to show evidence of mapping claim elements, let

01:46:12  13   alone through expert opinion.  And you'll find no case

01:46:16  14   cited by Defendants stating otherwise.

01:46:21  15         The ZUP case and plenty others that you see on

01:46:26  16   Slide 13 clearly shows the opposite.  The burden of

01:46:29  17   persuasion remains with the challenger to disprove it.

01:46:33  18         We just had a burden of production of identifying

01:46:35  19   it.  We've done that through the rog responses.  We've done

01:46:39  20   that with the marking page.  We've done that with

01:46:41  21   Dr. Raleigh's testimony.  We've done that with Krista

01:46:48  22   Jacobsen's testimony.  We've done that by producing and

01:46:51  23   citing documents about ItsOn's products that actually map

01:46:55  24   to the claim elements -- that have a nexus to the claim

01:46:59  25   elements.

01:46:59  1          Now --

01:46:59  2          THE COURT:  Are you saying that the ZUP case deals

01:47:03  3    with whether a product practices the patent?

01:47:07  4          MR. MIRZAIE:  The ZUP case deals with the burden

01:47:10  5    of -- the burdens on the issue of secondary indicia.  And

01:47:17  6    what it does deal with is, you know, whose burden is it on

01:47:21  7    that issue.  That's the only other issue besides marking

01:47:25  8    that we're aware of that this can even relate to, Your

01:47:28  9    Honor.

01:47:28  10         And so on that issue, what this makes clear -- and

01:47:32  11   there's numerous other cases, too, that make clear -- there

01:47:36  12   is no case that suggests that the patentee, in order to

01:47:40  13   have an argument or evidence concerning secondary

01:47:48  14   considerations, that they need to do a claim mapping first.

01:47:48  15   And that, by the way, Your Honor, is regardless of the

01:47:52  16   marking issue.

01:47:52  17         THE COURT:  I didn't hear anybody on the Defense

01:47:54  18   side talk about claim mapping at all.  It was just talking

01:47:57  19   about whether there is evidence that the ItsOn product

01:48:05  20   practices the patents.

01:48:07  21         MR. MIRZAIE:  Your Honor, from the briefs, and

01:48:10  22   also I think what we did hear from Mr. Rosenthal's argument

01:48:13  23   today is that you need expert testimony tying the ItsOn

01:48:21  24   product -- we needed that for these issues -- tying the

01:48:24  25   ItsOn product to a patent.  And he mentioned that it needs

01:48:29  1   to tie to the claim elements.  He mentioned that -- even as

01:48:33  2   he stated this morning, Your Honor, that Claim 1 is not

01:48:36  3   even good enough, which is inconsistent with the law.  You

01:48:39  4   need to tie it to the claim elements of the asserted

01:48:42  5   claims, and that's just not true.

01:48:43  6        There is no case that stands for the proposition

01:48:45  7   that for -- for -- not an infringing product, but a

01:48:51  8   licensed product, a practicing product that's licensed,

01:48:56  9   those are the kinds of things that patentees use to try to

01:49:00  10  prove long-felt need, to try to prove copying, and try to

01:49:04  11  prove praise and other secondary indicia.

01:49:09  12       There is no case that stands for the proposition

01:49:12  13  that for that issue -- for the patentee or the patentee's

01:49:18  14  licensee's products, you need to do a claim mapping or that

01:49:22  15  you need to have any kind of expert testimony at all.

01:49:27  16  Centricut does not stand for that proposition, claim

01:49:31  17  mapping or otherwise.

01:49:31  18       And so there's a mere burden of production which

01:49:34  19  applies to whether there is a practicing product, and it

01:49:39  20  also applies to the nexus, Your Honor.  And this is the

01:49:41  21  next point I wanted to make.

01:49:44  22       There is a further requirement of having a nexus,

01:49:47  23  and that is part of the same requirement, actually, for

01:49:51  24  secondary indicia.  And what the WBIP case on Slide 14

01:49:58  25  shows is that -- they use the example of commercial

01:50:00    1    success, but it certainly stands for the broader

01:50:04    2    proposition of secondary considerations in general.  They

01:50:10    3    may be linked with a nexus to a, quote, individual element.

01:50:10    4        And we have evidence of that, too, and that's part

01:50:14    5    of the evidence that I showed earlier.  We have evidence

01:50:17    6    through the documents, through the witness testimony that

01:50:23    7    the background/foreground limitations, for example, that

01:50:28    8    were in the ItsOn product literature, that was, you know,

01:50:33    9    in the -- that was actually in the ItsOn product.  And so

01:50:37    10   what our evidence shows -- and the nexus actually -- there

01:50:42    11   is also expert testimony on that, Your Honor.  Not that

01:50:44    12   that's required, but we do have expert testimony on the

01:50:46    13   nexus.

01:50:47    14       We also have testimony, as we show on this slide,

01:50:53    15   about -- concerning some of the dealings and communications

01:50:57    16   between Verizon and ItsOn, about 15 or so years ago, and

01:51:03    17   this is regarding Mr. Russell.  And Defendants have filed

01:51:07    18   another MIL on related issues on this, but we cite to this

01:51:12    19   evidence that you see here for, among other things, this

01:51:16    20   secondary indicia.  And we have evidence, including through

01:51:18    21   expert testimony, about the fact that there's a nexus

01:51:22    22   there.

01:51:23    23       What we -- what we don't have -- the only thing we

01:51:27    24   don't have is expert testimony mapping all the claim

01:51:31    25   elements or, like, a majority of the claim elements to the

01:51:37    1    ItsOn products.

01:51:37    2        I will concede that.  We do have some expert

01:51:43    3    testimony of -- Dr. Wesel, for example, did say that based

01:51:48    4    on his citations, and Mr. Rosenthal's exhibit that he

01:51:53    5    handed up showed this, as well -- based on his review of

01:51:56    6    all this evidence, including the evidence that you see on

01:51:58    7    the screen, including the evidence concerning some other

01:52:01    8    ItsOn-related documents and the marking page, that he

01:52:06    9    understands that it's met, that the products -- ItsOn

01:52:11   10    products do practice the '541 patent.

01:52:19   11        And what he doesn't have is something that you

01:52:22   12    don't need, which is an element-by-element claim mapping,

01:52:28   13    mapping all the claim elements to the ItsOn product.

01:52:30   14        THE COURT:  You know, I don't have any doubt that

01:52:35   15    a fact witness like, I guess, Mr. Russell is who you have

01:52:40   16    on the screen there, can testify as to whether or not a

01:52:45   17    product has certain features, but to say whether those

01:52:51   18    features meet the limitations of a patent claim, I think,

01:52:57   19    is inherently an opinion.

01:52:59   20        So I'm having trouble understanding how you would

01:53:05   21    do that without what you're calling expert testimony.

01:53:12   22    Whether it's an expert or not, it has to be someone who can

01:53:16   23    provide an opinion.

01:53:17   24        MR. MIRZAIE:  Well, Your Honor, I think the key

01:53:19   25    point there -- I appreciate the question -- is that what's

01:53:21  1  not required is an element-by-element claim mapping for

01:53:26  2  ItsOn products by an expert witness for any issue in the

01:53:29  3  case.  That may be required for infringement, but not for

01:53:34  4  the ItsOn products.

01:53:34  5      On nexus, which I showed here on Claim 14, that --

01:53:40  6  there just has to be some type of linkage to even an

01:53:44  7  individual element, like background/foreground.  And I do

01:53:49  8  think that we have plenty evidence of that, including

01:53:51  9  expert opinion.

01:53:53  10     So we do have nexus.  You know, in our expert

01:53:57  11  reports, if -- we're certainly obviously -- we're going to

01:54:01  12  live by Rule 26, and the experts do cite the documents

01:54:06  13  about background/foreground from ItsOn for this very

01:54:10  14  reason.

01:54:12  15     Dr. Wesel cites the documents, including documents

01:54:15  16  of the kind that I showed on Slides 6 through 8, and he

01:54:22  17  goes through the various ItsOn-related documents to tell

01:54:28  18  the overall story about ItsOn.  And he -- after he cites to

01:54:35  19  all the evidence about ItsOn and the background story,

01:54:38  20  including Mr. Russell's place in it, he then says that he

01:54:44  21  understands based on the evidence, including the

01:54:47  22  Defendants' Arctic Cat letter, including, you know, the

01:54:51  23  marking page, including other evidence, that there is

01:54:57  24  products from ItsOn that practice the '541, and that's more

01:55:00  25  than enough for Headwater's obligations for secondary

01:55:08   1    indicia.

01:55:08   2         Nexus -- we do have expert testimony on nexus, and

01:55:14   3    we're certainly going to live by Rule 26.  If this MIL is

01:55:18   4    just about applying Rule 26 to the expert opinions on

01:55:25   5    ItsOn, then we're certainly going to live by that.  We're

01:55:28   6    not going beyond our expert reports on that.

01:55:30   7         I think the key issue -- among several, the key

01:55:37   8    issue is what is required from the experts on whether ItsOn

01:55:40   9    practices.  And the case law suggests that on -- or states

01:55:45   10   that on secondary indicia, it's just a burden of production

01:55:50   11   of having a good-faith belief that one does.

01:55:54   12        We have much more than that, and we have the nexus

01:55:56   13   in our expert reports.

01:55:58   14        THE COURT:  So you would direct the Court to that

01:56:02   15   Centricut case and the ZUP case?

01:56:07   16        MR. MIRZAIE:  Yes, Your Honor.  Centricut, I

01:56:11   17   believe, is the key or only case cited by Defendants on

01:56:15   18   this proposition of expert testimony being required, but

01:56:19   19   what's clear from Centricut and all the cases that came

01:56:23   20   before and after it is that that's not talking about

01:56:26   21   secondary indicia and what the patent owners' burdens are

01:56:32   22   there.  It's not talking about marking, as Your Honor

01:56:36   23   correctly stated, I think, a few minutes ago.

01:56:39   24        That's talking about the patentee's burden on

01:56:47   25   infringement or the Defendants' burden on invalidity of

01:56:50   1  doing claim mapping in a, quote, complex -- technically

01:56:53   2  complex case.

01:56:54   3        Now, you could debate whether this is a

01:56:56   4  technically complex case or not, but setting that aside,

01:57:00   5  Centricut just does not apply to any obligation or burden

01:57:03   6  that Headwater has beyond infringement.  And on

01:57:08   7  infringement, we certainly have a claim mapping, and

01:57:10   8  Defendants have never stated otherwise in our expert

01:57:15   9  report.

01:57:16  10        So I would -- I would point to those cases.

01:57:21  11        I would also point to the WBIP case that makes

01:57:25  12  clear that for nexus -- again, the burden of persuasion on

01:57:30  13  validity rests with Defendant at all times.  That's what

01:57:34  14  the Federal Circuit case law says.

01:57:35  15        But on nexus, it could be linked to just an

01:57:38  16  individual element, and there's no claim mapping required

01:57:40  17  there.  But we have expert testimony, and we'll live by

01:57:43  18  that, on that issue.

01:57:44  19        I don't think that there's a case, Your Honor,

01:57:46  20  that requires that the only kind of evidence that you're

01:57:49  21  allowed to present on nexus is expert testimony.  I don't

01:57:53  22  think that you'll find that case.

01:57:56  23        But we -- you know, we have it in our -- there is

01:58:01  24  evidence cited on that in our expert reports, but the law

01:58:07  25  does not demand that for nexus, you know, there has to be

01:58:10     1     expert opinions and only expert opinions.

01:58:14     2          We have opinions citing that nexus, but we also

01:58:18     3     have plenty of other evidence about the ItsOn products

01:58:22     4     having, you know, background/foreground restrictions and

01:58:27     5     other issues.

01:58:27     6          And the other correction I'll make is that on the

01:58:30     7     '042 patent, Mr. Rosenthal said that -- I think he said

01:58:33     8     that we concede that it doesn't practice.  But that's

01:58:36     9     incorrect.  We've never conceded that it doesn't practice

01:58:40     10    in any -- in any place.

01:58:42     11         But that issue just blends together with the '541

01:58:45     12    issues.  And these are the relevant cases -- and these

01:58:49     13    cases and their progeny are sort of, you know, the cases

01:58:52     14    that govern this issue.

01:58:54     15         And, of course, with the nexus issue, Your Honor,

01:58:57     16    that's something that case after case -- and I don't think

01:58:59     17    Defendants argue otherwise -- make clear that that goes to

01:59:03     18    weight, not admissibility.

01:59:07     19         So if we had no evidence of nexus, expert or

01:59:12     20    beyond the expert report, that'd be one thing, but that's

01:59:16     21    not this case, and that's not what Defendants are arguing,

01:59:19     22    as far as we understand it.  And it's just not consistent

01:59:22     23    with the record at all.  As long as you have some evidence,

01:59:26     24    then the nexus part, you know, goes to weight, not

01:59:29     25    admissibility.

01:59:30   1    And the WARF case that you see here on Slide 17

01:59:40   2    stands for that proposition, as well.  This is WARF v.

01:59:46   3    Apple at 135 F.Supp.3d at 876 to '77.  There's other cases

01:59:55   4    on this issue, as well.

01:59:56   5    But -- so I think bottom line is that for issues

02:00:01   6    beyond infringement, Your Honor, the case law makes clear

02:00:04   7    that there is no element-by-element claim mapping required.

02:00:09   8    And Defendants, for their part, have certainly not pointed

02:00:13   9    to a case that argues that or shows that for opinion -- for

02:00:16   10   opinion testimony especially.  And we've gone well beyond

02:00:20   11   what we're required to do, both for whatever issues we

02:00:28   12   can -- whatever issues relate to whether ItsOn practices,

02:00:32   13   we -- it seems clear to us that the only two issues are

02:00:35   14   marking, for which we don't have any burden once we concede

02:00:39   15   it, and for -- the relevant burden there was just to show

02:00:46   16   that there was sufficient marking or notice.

02:00:48   17   And then for secondary indicia, we just have a

02:00:51   18   burden of production of identifying it.

02:00:54   19   Defendants' burden is for persuasion to show that

02:00:56   20   there is none, and they have zero expert testimony or

02:00:59   21   evidence on that.  That's not really the basis of this MIL

02:01:01   22   anyway, which brings me to sort of the final point here,

02:01:05   23   which is that if you -- we think this is an improper MIL,

02:01:10   24   too, in general because the MIL is essentially saying that

02:01:18   25   because there's insufficient evidence from Headwater that

02:01:22  1  ItsOn products practice, Headwater cannot tell the jury

02:01:26  2  that ItsOn products practice.

02:01:28  3      And the extension of various arguments that

02:01:31  4  Defendants are making -- I'd love for Mr. Rosenthal to tell

02:01:34  5  me that this is wrong -- is that, therefore, certain

02:01:38  6  secondary indicias can't be shown by Headwater -- maybe it

02:01:42  7  has an impact to other issues, such as maybe willfulness or

02:01:46  8  something, and that's just not -- not the case here.  And

02:01:48  9  because of that, we think it's an improper summary judgment

02:01:54  10  seeking to exclude evidence concerning secondary indicia

02:02:00  11  and other things.  And that just goes well beyond the scope

02:02:05  12  of what MILs should be.

02:02:06  13      But the key is that it rests on a legal -- legal

02:02:10  14  requirements that are completely inconsistent with the

02:02:13  15  actual law for practicing products that are licensed and

02:02:19  16  what Headwater's burdens are.

02:02:21  17      THE COURT:  Isn't the whole question that's being

02:02:23  18  presented by their motion whether it is a practicing

02:02:26  19  product?

02:02:27  20      MR. MIRZAIE:  The question that's being presented

02:02:29  21  by their motion is whether we have competent evidence of it

02:02:33  22  being a practicing product.

02:02:34  23      THE COURT:  All right.  Do you?

02:02:36  24      MR. MIRZAIE:  We do because Defendants' argument

02:02:39  25  is that the only way to have that is through expert

02:02:43  1  testimony and mapping, and that is an incorrect premise of

02:02:47  2  law.

02:02:47  3      And also the Defendants are obviously trying to

02:02:50  4  have it both ways, Your Honor, by telling us and

02:02:53  5  maintaining the position that -- that they believe that the

02:02:58  6  '541 and '042 practice -- are practiced by ItsOn, and then

02:03:03  7  when it comes to -- also at the same time saying that

02:03:06  8  there's no competent evidence that it does so that they can

02:03:10  9  sort of have it both ways.

02:03:11  10      THE COURT:  You know, that is a marking question

02:03:18  11  that certainly we can take up in connection with the

02:03:20  12  motions on that.

02:03:21  13      If I'm understanding your position properly on

02:03:23  14  this MIL, you're not arguing that you have an opinion from

02:03:30  15  anyone that ItsOn practices either the '042 or the '541,

02:03:37  16  you're saying that you don't need an opinion?

02:03:39  17      MR. MIRZAIE:  Well, to be clear, Your Honor, what

02:03:42  18  we're saying is that you don't -- we don't have an opinion

02:03:46  19  mapping all the claim elements.

02:03:48  20      THE COURT:  I'm not asking about that.  You keep

02:03:50  21  bringing up whether something is mapping all the claim

02:03:55  22  elements.

02:03:55  23      I'm just saying do you have testimony from anyone

02:03:57  24  that you'll be offering that it practices the patent?

02:04:01  25      MR. MIRZAIE:  Yes.  We have opinions and other

02:04:06  1  testimony from non-experts that the ItsOn products do

02:04:11  2  practice, for example, the '541.

02:04:12  3          THE COURT:  And who -- who are those?

02:04:14  4          MR. MIRZAIE:  So Dr. Wesel -- well, I'll start

02:04:21  5  with Dr. Raleigh, the inventor.

02:04:23  6          Dr. Raleigh, the inventor, he will talk about --

02:04:29  7  or plans to talk about ItsOn -- the ItsOn products, the

02:04:34  8  technical configurations of the ItsOn products, using

02:04:39  9  documents that we've long-produced about exactly what those

02:04:42  10  products and services entailed.

02:04:46  11          Then Dr. Raleigh and Krista Jacobsen will have

02:04:50  12  testimony that based on an analysis of all of the product

02:04:55  13  literature and technical ability of the products years

02:05:01  14  ago -- roughly 10-plus years ago, there was a conclusion by

02:05:09  15  ItsOn to add the '541 patent, for example, and the '042

02:05:11  16  patent, by the way, to the marking page.  And we have the

02:05:15  17  marking page that shows that also.

02:05:20  18          THE COURT:  Did Dr. Raleigh in any of his

02:05:23  19  depositions testify that the ItsOn products practiced

02:05:28  20  either the '042 or the '541?

02:05:30  21          MR. MIRZAIE:  I believe he did, Your Honor.  I

02:05:34  22  believe he did say that based on the marking page, because

02:05:38  23  those patents were and have been for many, many years on

02:05:41  24  the marking page, what that meant was there was a

02:05:43  25  determination by ItsOn and its lawyers years ago, based on

02:05:49   1   the product literature -- there was a determination that

02:05:52   2   the ItsOn products did practice, and that's why it's been

02:05:56   3   on the marking page for such a long time.  And based on all

02:06:00   4   of that evidence and including Defendants' Arctic Cat

02:06:04   5   letter and other evidence, Dr. Wesel then, for his part,

02:06:08   6   cites that evidence and says that his understanding is that

02:06:14   7   the ItsOn products practice the '541.

02:06:16   8        THE COURT:  Why does he say it's my understanding

02:06:18   9   instead of it's my opinion?

02:06:19  10        MR. MIRZAIE:  I'm not sure, Your Honor, but I also

02:06:25  11   don't think that it matters.  It is in his expert report,

02:06:28  12   and what it's preceded by in many, many pages in sections

02:06:32  13   of his report is the same type of evidence that I just

02:06:35  14   discussed, namely, the ItsOn story, the ItsOn technical

02:06:39  15   documents, the marking page, and that -- that's what

02:06:42  16   precedes that one sentence that is quoted in Defendants'

02:06:46  17   brief.

02:06:47  18        So perhaps he could have been a bit more, you

02:06:53  19   know, artful in his testimony on that issue.  But, again,

02:06:56  20   we don't believe that there is expert testimony required

02:07:00  21   for whether licensed products practice.

02:07:05  22        In any event, he cites the relevant documents and

02:07:09  23   has that opinion anyway based on the fact -- the facts of

02:07:13  24   the case, including product literature and the marking page

02:07:17  25   and what went into it, and all of that is certainly more

02:07:21    1    than enough for whether -- for Headwater's part as to

02:07:26    2    whether the ItsOn products practice.

02:07:29    3          THE COURT:  All right.  Are there -- besides

02:07:34    4    Centricut and ZUP, what -- what other case law do you want

02:07:38    5    the Court to examine in connection with your argument?

02:07:43    6          MR. MIRZAIE:  I think that the other cases are

02:07:46    7    WBIP v. Kohler Co.  That's at 829 F.3d 1317.  That's a

02:07:54    8    Federal Circuit case from 2016.  This is the case that I

02:07:58    9    just showed Your Honor that does talk about the extent to

02:08:04   10    which you -- there's any nexus required is -- can be for a

02:08:06   11    claim element.  And for -- for that, we certainly have

02:08:12   12    non-expert and expert testimony.  So that's one more case.

02:08:15   13          And then on nexus and in terms of -- for secondary

02:08:22   14    indicia, whether products practice, which is the only other

02:08:25   15    issue that we could think this matters for, I think

02:08:30   16    Quanergy Systems, which is at 24 F.4th 1406.  And this is

02:08:36   17    at 1417 specifically for a pincite.  It's a Federal Circuit

02:08:41   18    case from 2022.  It says that evidence of secondary

02:08:46   19    considerations must always be considered before reaching a

02:08:48   20    determination on obviousness, and that the nexus

02:08:51   21    requirement goes to the weight that the evidence should be

02:08:54   22    given, not the admissibility.

02:08:55   23          And there's plenty of cases from this district, as

02:08:59   24    well, as Your Honor knows, on that point.

02:09:03   25          And that brings me to perhaps the final point,

02:09:05  1  which is we didn't hear any argument today and there's not

02:09:08  2  really any in the briefs either about any prejudice that

02:09:12  3  would be suffered under Rule 403 by presenting this.  If

02:09:17  4  anything, there'd be prejudice the other way, because we --

02:09:20  5  all the requirements have been met from Headwater's part to

02:09:24  6  present expert and non-expert opinions according to the law

02:09:27  7  on all these non-infringement -- issues that go beyond the

02:09:31  8  issue of infringement, which is what this MIL is about.

02:09:36  9        And because the law also says that evidence of

02:09:38  10  secondary considerations must be considered when they're

02:09:42  11  available, we would suffer great prejudice actually if this

02:09:47  12  was precluded.

02:09:48  13        THE COURT:  All right.  Thank you, Mr. Mirzaie.

02:10:04  14        MR. ROSENTHAL:  Your Honor, I have a few

02:10:06  15  responses.

02:10:07  16        THE COURT:  All right.

02:10:07  17        MR. ROSENTHAL:  First, I want to clear one thing

02:10:10  18  up.  I must have heard about 20 times during that

02:10:14  19  presentation that we have agreed that the ItsOn product

02:10:24  20  practices these patents.  That has never, ever, ever been

02:10:27  21  the case.  We have not once said that, not in a single

02:10:28  22  piece of paper, correspondence, anything.  We have never

02:10:32  23  said it.

02:10:32  24        The only thing that we did is we wrote a letter in

02:10:36  25  May of 2024, which is Exhibit 14, which is our Arctic Cat

113

02:10:41  1  letter.  And I saw some quotes of that Arctic Cat letter up

02:10:44  2  on the screen, and none of those said it.  What we said is

02:10:47  3  you have said that you practice your patents.  Well, based

02:10:51  4  on that -- and I'll read exactly the language so I'm not

02:10:55  5  paraphrasing it.

02:10:57  6        THE COURT:  I understand the issue about that.

02:10:59  7  The Arctic Cat case talks about the Defendant having a

02:11:05  8  belief that the unmarked product practices the patent, and

02:11:12  9  obviously it is a low bar, but I know that the -- y'all are

02:11:17  10  fighting back and forth.

02:11:19  11        Whether what you have done is enough to satisfy

02:11:24  12  your Arctic Cat burden is an issue we'll take up otherwise.

02:11:30  13  But I do understand that you have not said the words

02:11:35  14  that -- that they're suggesting.

02:11:38  15        MR. ROSENTHAL:  And thank you, Your Honor.

02:11:40  16        And I would also direct the Court to your decision

02:11:42  17  in the Barkan Wireless case, 2021 Westlaw 8441751, in which

02:11:51  18  you said that the bar for Arctic Cat is whether or not

02:11:55  19  there -- they have identified products that, quote,

02:11:58  20  potentially practice the asserted patents.

02:12:01  21        And in this case, we have a Plaintiff who said at

02:12:06  22  that time we practice all of our patents.  And so our

02:12:10  23  response was, okay, well, then, you've got a marking

02:12:12  24  obligation.  And that was the end of it.

02:12:15  25        And so at the core, this issue has nothing to do

02:12:17  1  with that.  This issue that is presented by our motion

02:12:20  2  is -- I think you said it very, very well -- it's whether

02:12:23  3  they have competent evidence of any kind that they practice

02:12:30  4  the asserted claims of these two patents.

02:12:32  5          Now, you asked several times what that evidence

02:12:34  6  was, and finally at the end of the presentation, counsel

02:12:37  7  gave you some examples of what he relied on.  There are a

02:12:40  8  few categories.

02:12:41  9          First, he said I've got Dr. Raleigh.  Dr. Raleigh

02:12:45  10  said, well, because it's on our page, therefore, we

02:12:48  11  practice.

02:12:49  12          Well, that's not competent evidence for a couple

02:12:52  13  of reasons.  First of all, as this Court has held in

02:12:56  14  several cases, including the SSL case that we cited in our

02:13:00  15  brief on Page 2 of our MIL, fact witnesses can't offer

02:13:07  16  expert opinion testimony.  And expert opinion testimony

02:13:11  17  includes whether or not this particular product practices.

02:13:14  18  That's doubly true here where this particular fact witness,

02:13:17  19  Dr. Raleigh, stated over and over and over again that he

02:13:22  20  cannot assess infringement without experts in this

02:13:26  21  particular case with respect to these patents.  And he did

02:13:28  22  that because he was trying to explain away why he didn't

02:13:32  23  sue or write a letter for 10 years.  And he said in that

02:13:35  24  context, I couldn't because you need experts to understand

02:13:38  25  whether there's infringement or not.

02:13:40    1          So that's not competent evidence for that reason.

02:13:43    2          It's not competent evidence for the second reason,

02:13:47    3   which is we actually -- he's relying entirely on the

02:13:52    4   marking page.  So we asked the person that put together the

02:13:54    5   marking page, Ms. Jacobsen.  And she said:  All we know is

02:13:58    6   we would have done one claim or more.

02:14:01    7          THE COURT:  And, Mr. Rosenthal, you don't have to

02:14:03    8   repeat the argument you've already made.

02:14:05    9          MR. ROSENTHAL:  Fair enough.  Thank you.

02:14:07   10          So, Your Honor, what I do want to talk about in

02:14:10   11   direct response to what counsel said is, number one, there

02:14:15   12   was a -- well, I don't remember the word right now, but an

02:14:18   13   argument that we are not making.  They keep saying we don't

02:14:21   14   have to have an expert do a claim-by-claim mapping.  That's

02:14:25   15   not what we're arguing.  What we're saying is there's got

02:14:28   16   to be something, and we have experts here who have said

02:14:31   17   nothing.

02:14:32   18          And by the way, I do want to -- one point that I

02:14:35   19   was surprised to hear.  Counsel said, well, I know that

02:14:39   20   Dr. Wesel said understand, but he really means an opinion.

02:14:44   21   That was just a -- you know, that was just a poor choice of

02:14:46   22   words, in effect.

02:14:47   23          If I could have the ELMO, please.  Thank you very

02:14:50   24   much.

02:14:50   25          This is Dr. Wesel's testimony.  I took his

02:14:52  1    deposition.  I asked him about that word.  I said

02:15:02  2    somewhere -- I said:  You believe that the ItsOn software

02:15:07  3    practiced the asserted claims, right?

02:15:08  4            He said:  Yes, that's my understanding.

02:15:10  5            Have you done any analysis of the ItsOn software?

02:15:13  6            I have not.

02:15:14  7            Okay.  That's your understanding, though.

02:15:17  8    Correct?

02:15:17  9            That's my understanding.

02:15:19  10           I mean, I asked him if he'd done any analysis, and

02:15:21  11    he said no.  He's just stating an understanding.

02:15:24  12           Counsel said there's pages and pages of analysis

02:15:26  13    than precedes it.  That is false.

02:15:28  14           The only thing that they've ever pointed to is

02:15:31  15    Paragraph 84 and 85, which immediately precede 86, and

02:15:36  16    those simply say -- and I showed Your Honor the pages,

02:15:40  17    nothing to hide -- they simply said it's marked on the

02:15:43  18    marking page.  And it all comes down to that.

02:15:45  19           Raleigh says because it's marked.  Jacobsen says

02:15:48  20    because it's marked.  Wesel says because it's marked.  And

02:15:53  21    de la Iglesia says because Wesel says.  It all comes down

02:15:56  22    to the very simple fact that because they put this on their

02:15:59  23    marking page, they get to tell the jury that they're

02:16:01  24    practiced.

02:16:01  25           And this is a proper MIL because as soon as they

02:16:05    1    say that their product practiced these claims, it's not

02:16:11    2    just about secondary considerations.  It's not just about

02:16:15    3    willfulness, although it's also about those things.  All of

02:16:19    4    a sudden these patents carry an air of significance, of

02:16:21    5    commercial viability, of -- as though there's something to

02:16:24    6    these claims because they practice them.  And that's --

02:16:27    7    there's simply no evidence of that.

02:16:29    8         And so we are not asking for a claim chart.  We're

02:16:31    9    not asking for a mapping.  We're asking for some piece of

02:16:34    10   competent evidence that someone has looked at these

02:16:38    11   particular claims and decided that these particular claims

02:16:43    12   are in the product based on looking at some evidence.  And

02:16:46    13   that has not happened in this case.

02:16:48    14        I do want to address the Centricut case because

02:16:51    15   that was a centerpiece of the discussion.  The Centricut

02:16:56    16   case says it is possible.  There may be in some

02:16:59    17   circumstances a situation where you don't need expert

02:17:01    18   testimony.  If you, for instance, had a patent on a chair

02:17:04    19   and I say, hey, my chair has three legs and it's got a seat

02:17:08    20   and it's got a back and that's all that's in the claim,

02:17:11    21   ordinary jurors could understand, okay, that's enough for

02:17:14    22   me to conclude.

02:17:15    23        But the vast majority of cases, including complex

02:17:19    24   patents -- and I got to say there's literally thousands of

02:17:21    25   pages of expert reports on whether or not the accused

02:17:25  1  products infringe, based on analysis of source code,

02:17:27  2  technical documents, all of this stuff that is the subject

02:17:30  3  of this case, and they're saying when it comes to their own

02:17:33  4  product, they literally don't have to do anything.

02:17:36  5       We're not saying the bar is the same.  We're

02:17:38  6  saying there is a bar.  There is some modicum of evidence

02:17:42  7  that must be presented for them to proceed to tell the jury

02:17:45  8  that these two claims were actually used.  And they have --

02:17:52  9  counsel said Defendants aren't saying we have zero

02:17:55  10  evidence.  That is exactly what we're saying.  There is

02:17:57  11  zero competent evidence of practice in this case.  There is

02:18:00  12  innuendo.  There is the fact that a patent made it on a

02:18:04  13  marking page.

02:18:05  14       I don't want to overstay my welcome.  Let me just

02:18:09  15  make sure that there's nothing else.

02:18:11  16       Oh, this whole point about nexus.  They said,

02:18:15  17  well, nexus does not need to be tied to the claim as a

02:18:17  18  whole, it can be tied to individual elements.  None of

02:18:20  19  their experts did that.  Their experts are very, very

02:18:23  20  plain.  They say:  ItsOn practices, and, therefore,

02:18:26  21  evidence that ItsOn was copied is relevant.  They say:

02:18:31  22  ItsOn practices, and, therefore, evidence of what Samsung

02:18:34  23  did is irrelevant.

02:18:35  24       They never say:  Oh, well, because these aspects

02:18:38  25  of the claims are in there, I've tied it to that.

| | | |
|---|---|---|
| 02:18:41 | 1 | And counsel didn't show you any of that, they |
| 02:18:44 | 2 | didn't put any of that in the briefs because it didn't |
| 02:18:48 | 3 | happen. |
| 02:18:48 | 4 | And I believe that is all I have.  Unless you have |
| 02:18:50 | 5 | other questions, Your Honor, that's all I have on this one. |
| 02:18:53 | 6 | THE COURT:  No, I do not. |
| 02:18:54 | 7 | MR. ROSENTHAL:  Thank you very much. |
| 02:18:55 | 8 | MR. MIRZAIE:  Your Honor, if I could just have a |
| 02:18:57 | 9 | couple minutes, just a few things that I need to correct |
| 02:19:00 | 10 | the record on with what Mr. Rosenthal said. |
| 02:19:02 | 11 | THE COURT:  All right.  Very briefly. |
| 02:19:03 | 12 | MR. MIRZAIE:  I appreciate it, Your Honor. |
| 02:19:04 | 13 | We're not going to belabor the Arctic Cat point. |
| 02:19:11 | 14 | They said what they said, and they can't have it both ways. |
| 02:19:15 | 15 | But that's not -- the Court doesn't need to decide that for |
| 02:19:17 | 16 | this MIL in order to deny it, Your Honor. |
| 02:19:18 | 17 | Again, for any issue in the case relating to |
| 02:19:25 | 18 | whether ItsOn practiced, which is marking, and we've, I |
| 02:19:27 | 19 | think, already decided we have no -- nothing to be done |
| 02:19:28 | 20 | there.  The only other issue could be secondary |
| 02:19:32 | 21 | considerations, and it's only our burden of production. |
| 02:19:34 | 22 | There's no expert testimony requirement for ItsOn |
| 02:19:37 | 23 | practicing on that issue either. |
| 02:19:43 | 24 | Mr. Rosenthal still hasn't cited a case. |
| 02:19:45 | 25 | Defendants still have not cited a case for that |

02:19:49  1  proposition.  Centricut does not stand for that

02:19:50  2  proposition.

02:19:51  3       Now, in terms of nexus, Mr. Rosenthal is incorrect

02:19:56  4  about that issue, and I want to make sure that in addition

02:19:59  5  to the cases, the Court understands that we have a second

02:20:02  6  expert in this case, and that is Mr. de la Iglesia.  He's

02:20:08  7  our validity expert, and I'm not exactly sure right now

02:20:13  8  whether this is an exhibit to our briefs on this topic, but

02:20:17  9  it is, I think, an exhibit to other briefs.  And his report

02:20:22  10  at Paragraphs 421 to 437, and we can provide that -- if the

02:20:27  11  Court doesn't have it, we can provide it to the Court at

02:20:31  12  some point today.

02:20:32  13       Those are 17 paragraphs where he details the nexus

02:20:40  14  to claim elements from ItsOn, Your Honor.  So I -- we

02:20:45  15  certainly don't want to make -- we want to make sure that

02:20:48  16  doesn't get lost here.  And I think -- therefore, I think

02:20:51  17  that in summary, there's no requirement in Centricut or

02:20:54  18  otherwise for practicing products that are licensed.

02:20:59  19       So not infringement, but for practicing products

02:21:01  20  that are licensed, for Headwater to provide anything other

02:21:05  21  than the burden of production identifying it.

02:21:08  22       We've gone way further than that in citing

02:21:11  23  evidence, talking through the marking page, and actually

02:21:15  24  providing nexus, including with expert testimony in those

02:21:21  25  17 pages of Mr. DLI's report to claim elements of the '541,

| | | |
|---|---|---|
| 02:21:32 | 1 | for example.  And while that wasn't required from us, we |
| 02:21:34 | 2 | went ahead and did it anyway. |
| 02:21:36 | 3 | And what the WBIP case makes clear is that one |
| 02:21:41 | 4 | element will do.  And so we have gone into that linking for |
| 02:21:46 | 5 | nexus, and all of the other arguments go to weight, not |
| 02:21:50 | 6 | admissibility. |
| 02:21:51 | 7 | Thank you. |
| 02:21:51 | 8 | THE COURT:  All right.  Thank you, Mr. Mirzaie. |
| 02:21:52 | 9 | I'm going to carry this MIL.  I want to look |
| 02:21:55 | 10 | further at both the exhibits and the cited cases. |
| 02:22:01 | 11 | So we can move on to Defendants' Motion in Limine |
| 02:22:05 | 12 | No. 2. |
| 02:22:06 | 13 | MR. ROSENTHAL:  Thank you, Your Honor. |
| 02:22:10 | 14 | MR. FENSTER:  Your Honor, may I just ask to be |
| 02:22:12 | 15 | excused? |
| 02:22:14 | 16 | THE COURT:  You are excused. |
| 02:22:15 | 17 | MR. FENSTER:  Thank you. |
| 02:22:17 | 18 | MR. ROSENTHAL:  Okay.  MIL No. 2, I believe, will |
| 02:22:22 | 19 | go much more quickly than MIL No. 1. |
| 02:22:25 | 20 | Our argument here on MIL No. 2 is that Headwater |
| 02:22:33 | 21 | has made allegations of copying, specifically copying the |
| 02:22:38 | 22 | ItsOn product.  It is our view that those should be |
| 02:22:42 | 23 | excluded from this trial. |
| 02:22:45 | 24 | Now, the first and foremost reason is that if you |
| 02:22:48 | 25 | agree with us on MIL 1, that there's no competent evidence |

02:22:52   1   that the ItsOn product practiced, then by definition,

02:22:54   2   copying of a non-practicing product, unless they've linked

02:22:59   3   it to something specific in the accused -- in the -- in

02:23:03   4   the -- in the claims, which they have not, they've said

02:23:06   5   that there's evidence of copying the ItsOn product as a

02:23:09   6   whole and that, therefore, that is secondary considerations

02:23:11   7   of non-obviousness.

02:23:15   8          Definitionally -- and we've cited, I think, seven

02:23:18   9   or eight cases in our -- in the opening few lines of our

02:23:22   10  brief.  Definitionally, if the product doesn't practice,

02:23:25   11  copying is irrelevant.  And case upon case upon case has

02:23:29   12  excluded evidence of copying in those circumstances.

02:23:33   13         So if MIL 1 is decided in our favor, MIL 2 is

02:23:37   14  necessarily decided in our favor, in our view.

02:23:39   15         However, even if MIL 1 is not decided in our

02:23:43   16  favor, there are independent reasons to not allow these

02:23:49   17  allegations of copying.  Now, in the briefing, there are

02:23:53   18  two instances of copying that have been distilled down as

02:23:58   19  what's really at issue, Verizon's alleged copying and

02:24:01   20  Samsung's alleged copying.

02:24:03   21         With respect to Verizon's alleged copying, we

02:24:06   22  heard yesterday from Mr. Fenster that they are narrowing

02:24:11   23  and limiting that to one single instance, and that is the

02:24:14   24  allegation that Mr. -- I'm sorry, Russell, I couldn't

02:24:22   25  remember Mr. Russell's name -- that Mr. Russell said that

02:24:22    1  he saw someone take a PowerPoint presentation and pass it

02:24:31    2  off as Verizon's own.  That's what Mr. Fenster said is

02:24:31    3  their Verizon copying allegation.

02:24:32    4      There is no testimony at all that anything in that

02:24:40    5  presentation meets the claims of the patent.  There's no

02:24:42    6  connection whatsoever between that presentation and what's

02:24:45    7  in the patent.

02:24:45    8      So whether or not MIL 1 goes our way, at least

02:24:48    9  with respect to Verizon's copying, that -- that should not

02:24:52   10  be there.

02:24:53   11      And by the way, that is entirely premised on the

02:24:58   12  '042 patent.  And for the '042 patent, we know that there's

02:25:00   13  no evidence of practicing the '042 patent because I asked

02:25:07   14  their expert, Dr. Cooklev:  Do you have any opinion as to

02:25:11   15  whether or not the accused -- the ItsOn product practices

02:25:16   16  the '042 patent?

02:25:16   17      And he said unequivocally in his deposition:  I

02:25:19   18  have no opinion.  I have not done any analysis of that.

02:25:22   19      So that's an easy one.

02:25:23   20      So since the entire foundation of that alleged

02:25:29   21  Verizon copying is based on the '042 patent and the '042

02:25:33   22  patent alone, which -- and by the way, those activities

02:25:36   23  happened four years before the '042 patent even issued in

02:25:39   24  2010 -- April of 2010, because there's absolutely no

02:25:44   25  connection between what was allegedly copied and the '042

02:25:48    1    patent, there's not even a link between the '042 patent and

02:25:52    2    the ItsOn product, let alone that presentation, all of that

02:25:56    3    evidence should be excluded because it's irrelevant, and

02:25:59    4    because it's immensely prejudicial to hear an argument by

02:26:04    5    the other side that we copied something that has nothing to

02:26:07    6    do with the issues in this case is by its nature

02:26:14    7    inflammatory and prejudicial.  And unless they can tie it

02:26:16    8    to something that's at issue in this case, which they

02:26:20    9    cannot, it should be excluded.

02:26:21   10         THE COURT:  Is this an issue in a separately

02:26:23   11    pending motion?

02:26:24   12         MR. ROSENTHAL:  It is a subsection of our MIL 2.

02:26:27   13    So if you look at our MIL 2 on Page 4, our MIL 2 is about

02:26:39   14    no argument or evidence that anyone copied ItsOn.

02:26:42   15         And then within that, we talk about evidence

02:26:45   16    related to Verizon's alleged copying and Samsung's.  And if

02:26:49   17    you look at our reply, it's very laid out.  I think we have

02:26:53   18    separate headings for it in our reply.

02:27:01   19         THE COURT:  I'm confused.  I thought we were

02:27:03   20    talking about your MIL 2 now.

02:27:05   21         MR. ROSENTHAL:  We are, yes.

02:27:06   22         THE COURT:  And I'm asking if your MIL 2 is also

02:27:11   23    in -- asserted in another pending motion?  In other words,

02:27:16   24    is this a part of --

02:27:18   25         MR. ROSENTHAL:  Oh.

02:27:20   1           THE COURT:  -- this argument a part of some other

02:27:23   2   motion you've got?

02:27:23   3           MR. ROSENTHAL:  I'm sorry, Your Honor.  I

02:27:24   4   misunderstood the question.

02:27:26   5           We do have summary judgment motions on copying

02:27:28   6   allegations.  So we have a summary judgment of no copying

02:27:30   7   that raises many of the same issues.  Of course, in that

02:27:34   8   circumstance, the issues are whether or not there is

02:27:37   9   sufficient evidence to go to the jury on those questions.

02:27:39   10          This, of course, is from a different vantage

02:27:42   11  point.  This is from the question of whether there is any

02:27:45   12  relevance to this evidence and whether or not there's

02:27:48   13  sufficient prejudice that outweighs that relevance.  And so

02:27:52   14  this is from a different angle.

02:27:54   15          Of course, if the Court agrees with respect to the

02:27:58   16  copying allegations, that there's insufficient evidence to

02:28:01   17  go to the jury, then we don't have to get to this MIL.

02:28:04   18          I will say that when we moved for summary judgment

02:28:07   19  of no copying, Headwater didn't even point to these Verizon

02:28:11   20  allegations as evidence on which it would rely.  So from

02:28:15   21  our understanding, they've abandoned that.

02:28:17   22          Now, we may hear differently, but that wasn't even

02:28:20   23  part of their defense to our summary judgment motion.  So

02:28:20   24  when we talk about these two categories and we talk first

02:28:26   25  about the allegations that Verizon copied, they're not even

02:28:27    1  relying on those as a reason to go to the jury on the

02:28:31    2  question of copying.  But that's a summary judgment issue.

02:28:36    3          Our argument here with respect to the MIL is that

02:28:39    4  there is no relevance to this because there's no connection

02:28:42    5  to the patent, and the prejudice far outweighs any

02:28:48    6  potential relevance.

02:28:48    7          THE COURT:  If you lose the summary judgment

02:28:52    8  motion --

02:28:52    9          MR. ROSENTHAL:  Yes.

02:28:53   10          THE COURT:  -- and the decision is that there is

02:28:55   11  sufficient evidence to take it to a jury, how is this MIL

02:28:58   12  consistent with that?

02:28:59   13          MR. ROSENTHAL:  Well, because there's still the

02:29:01   14  question of whether -- even if there is a tiny bit of

02:29:04   15  relevance, if they've been able to piece together because,

02:29:08   16  hey, it generally deals with ItsOn, even though it's not

02:29:11   17  specifically connected to the patent, and they can argue

02:29:13   18  sort of by the hair of the nose that they're able to get

02:29:17   19  something before the jury, there's still a question of

02:29:21   20  whether or not there is prejudice that outweighs that

02:29:24   21  relevance.

02:29:25   22          So we think that this implicates some of that.

02:29:28   23          I will say I think in assessing the summary

02:29:31   24  judgment motion, it is likely that the Court will assess

02:29:34   25  whether there is admissible evidence that they could

02:29:36    1    present, and if the Court finds that there is, it probably

02:29:39    2    is the case that we're going to lose this MIL, as well.

02:29:42    3    But I think legally, logically, there is a wide space

02:29:47    4    between the two.

02:29:48    5          THE COURT:  It has to be admissible in order to

02:29:50    6    matter on summary judgment.

02:29:51    7          MR. ROSENTHAL:  That's absolutely right, Your

02:29:53    8    Honor.  And so if the Court considers the question of

02:29:55    9    prejudice with respect to the summary judgment motion and

02:29:58    10   considers all of that and determines that they have

02:30:01    11   competent evidence that is, in fact, connected to the

02:30:04    12   patent that is not outweighed by the prejudice and that's a

02:30:09    13   decision the Court makes in resolving the summary judgment

02:30:12    14   motion, then, of course, that resolves this issue, as well,

02:30:16    15   in the MIL.

02:30:16    16         THE COURT:  All right.  Well, I don't see any

02:30:17    17   benefit in assessing this evidence twice.  So I think the

02:30:25    18   logical thing to do is to defer this MIL to consideration

02:30:29    19   with your motion for summary judgment and --

02:30:32    20         MR. ROSENTHAL:  I'm sorry, Your Honor, I didn't

02:30:34    21   mean to interrupt.

02:30:35    22         THE COURT:  Go ahead.

02:30:36    23         MR. ROSENTHAL:  I'm so sorry.

02:30:38    24         I understand and agree with that, and the only

02:30:41    25   thing that I'll add is that with respect to the second

02:30:44  1  category of alleged copying, which is the Samsung issue,

02:30:48  2  there is a special prejudice involved there that even goes

02:30:52  3  beyond the Verizon allegations.

02:30:54  4      So we have the argument, of course, that if

02:30:57  5  Samsung copied the ItsOn product, and there's no evidence

02:31:00  6  that the ItsOn product meets the claims, then there's no

02:31:03  7  relevance.  And we've made that argument in our summary

02:31:06  8  judgment motion, and we've made it here.

02:31:09  9      There is -- in that circumstance, there is an

02:31:12  10  extra prejudice even beyond the Verizon allegations.  And

02:31:16  11  that extra prejudice is Samsung's not part of this case.

02:31:20  12  We will now have to be defending and explaining why

02:31:24  13  Samsung, a party not -- not here in this case, did or did

02:31:27  14  not copy.  We don't have the benefit of having Samsung here

02:31:31  15  to defend itself.

02:31:32  16      And by the way, this Court excluded those

02:31:35  17  allegations in the actual Samsung case.  So we are now

02:31:38  18  fighting a fight that didn't happen in the Samsung case.

02:31:41  19  And by the way, Samsung was actually found to not infringe

02:31:45  20  that patent in the first trial.

02:31:47  21      And so we're now forced to defend ourselves about

02:31:51  22  Samsung's alleged copying when Samsung was determined by a

02:31:55  23  jury to have not, in fact, copied.  And that puts us in a

02:32:01  24  uniquely prejudicial situation.  And it would require a

02:32:03  25  trial within a trial as to whether Samsung did, in fact,

02:32:06    1    copy the ItsOn product.

02:32:07    2         THE COURT:  I don't know that the jury made a

02:32:10    3    decision about copying.  They made a decision about

02:32:13    4    infringement.

02:32:13    5         MR. ROSENTHAL:  Certainly that's true.  And in

02:32:16    6    determining that the product that Samsung made and sold in

02:32:20    7    that case did not meet the elements, they certainly made

02:32:24    8    some conclusion about the comparison between what Samsung

02:32:28    9    did and what was in that patent.

02:32:29    10        Now, does that necessarily mean they rejected the

02:32:33    11   copying allegations?  No.  But it is probative of that

02:32:36    12   question.

02:32:36    13        THE COURT:  I think the Court excluded the copying

02:32:42    14   allegation, if I'm remembering right.

02:32:44    15        MR. ROSENTHAL:  That's true.

02:32:45    16        THE COURT:  So I don't think that issue was

02:32:46    17   presented to the jury.

02:32:47    18        MR. ROSENTHAL:  It was not, Your Honor.  And I

02:32:48    19   guess that's my point is -- that's exactly right.

02:32:51    20        THE COURT:  You just said the jury rejected it.

02:32:53    21        MR. ROSENTHAL:  No, no.  What I mean is there's

02:32:56    22   nothing that we can discern about whether the jury actually

02:33:03    23   assessed the copying question, per se, but what the jury

02:33:03    24   did do is determine that Samsung's products do not meet the

02:33:06    25   elements of the claims.  How could Samsung have copied the

02:33:09    1    elements of the claims if they don't meet the elements of

02:33:11    2    the claims?  That's the point.

02:33:13    3         And my point is if they are permitted to have a

02:33:17    4    trial within a trial in this case and to argue to the jury

02:33:21    5    that Samsung copied the patent, we will have to then say --

02:33:25    6    or at least we ought to be able to say -- we ought to be

02:33:31    7    able to say, well, a jury actually determined that the

02:33:33    8    product that you say is a copy does not actually meet the

02:33:35    9    claims.

02:33:36    10        Now, I don't think we're going to be allowed to

02:33:38    11   say that.  I'm quite sure I'm not going to be allowed to

02:33:41    12   say that, but that's the prejudice of allowing this trial

02:33:44    13   within the trial.

02:33:45    14        The prejudice is we're now going to have a fight

02:33:48    15   in a case where there's a lot for the jury to actually look

02:33:51    16   at.  We're going to have a fight about whether our products

02:33:54    17   infringe.  And what they want to do is say, well, some

02:33:56    18   other company that's not here in this court copied the

02:34:00    19   ItsOn product.

02:34:02    20        And not only is there no evidence that the ItsOn

02:34:04    21   product relates to the patent claims, the evidence actually

02:34:07    22   suggests that Samsung didn't actually copy it.  And that's

02:34:09    23   the point.  That's what's so prejudicial about allowing

02:34:13    24   that copying allegation in, whether we win MIL 1 or not.

02:34:18    25        THE COURT:  All right.

02:34:19  1          MR. ROSENTHAL:  I fear from your expression that

02:34:21  2     I'm not making that point, but I don't know if there's any

02:34:25  3     questions that I can help answer.

02:34:27  4          THE COURT:  I don't think so.

02:34:28  5          MR. ROSENTHAL:  Okay.

02:34:29  6          THE COURT:  I'm going to take up MIL 2 in

02:34:32  7     connection with the motion for summary judgment that you

02:34:35  8     have fully briefed.

02:34:37  9          MR. ROSENTHAL:  That makes sense, Your Honor.

02:34:39  10         I'm happy to move to MIL 3.

02:34:41  11         THE COURT:  All right.

02:34:41  12         MR. ROSENTHAL:  So with respect to MIL 3, MIL 3 --

02:34:44  13    first of all, we have made some pleasant end roads to

02:34:49  14    MIL 3.  The parties have agreed just this morning, and I

02:34:52  15    believe we have agreed language that we are either going

02:34:55  16    to -- we did, in fact, send to the Court that there is a

02:34:59  17    piece of MIL 3 that we have agreed to for the Verizon case.

02:35:03  18         MIL 3 is Verizon's motion to exclude evidence of

02:35:08  19    the communications and relationship between the company

02:35:11  20    ItsOn and Verizon.

02:35:14  21         One of the key pieces of evidence that they sought

02:35:16  22    to admit, until this morning, was that Verizon paid a bunch

02:35:20  23    of money to ItsOn and invested a lot of money in ItsOn.

02:35:25  24    They have now agreed that they are not going to present

02:35:27  25    that evidence, so that aspect of our MIL is now agreed.

02:35:34    1    What remains are the other aspects of the

02:35:39    2    Verizon/ItsOn relationship.  So Verizon entered into an NDA

02:35:42    3    with ItsOn in 2010.  They received samples.  They

02:35:49    4    trialed -- they did some trialing of the software.  They

02:35:52    5    paid money for that trial.  Ultimately they didn't go

02:35:55    6    forward.

02:35:56    7    Now, what we have seen from many, many pages of

02:36:00    8    their expert reports is that they want to, from that,

02:36:03    9    create the impression that somehow Verizon looked at all of

02:36:09    10   this stuff, and we decided, oh, we don't need to pay for

02:36:12    11   all of this.  We don't need to enter into this

02:36:15    12   relationship.  We can do it all ourselves.

02:36:17    13   Now, there's all kinds of problems with that

02:36:19    14   theory, but that seems to be the theory that they're trying

02:36:22    15   to present.  And the fact is that none of that has any

02:36:24    16   relevance to this case.

02:36:25    17   ItsOn, as we've already talked about, is a piece

02:36:28    18   of software for which there is no evidence, whether it

02:36:30    19   practices the claims of these patents.  If there's no

02:36:33    20   evidence that the patent is practiced by this product, then

02:36:36    21   whether we contracted with them for the product, whether we

02:36:39    22   trialed the product, the results of those trials, all of

02:36:42    23   that stuff has nothing to do with the issues in this case.

02:36:45    24   There are two -- you know, they've already agreed

02:36:50    25   they're not going to put in the investments, but there are

02:36:53   1    two other aspects that are in particular prejudicial.

02:36:56   2          The first is the NDA.  They want to enter into

02:37:00   3    evidence an NDA that Verizon and ItsOn got into.  I don't

02:37:03   4    know what possible relevance that has to this case.  The

02:37:06   5    only possible thing that we can think of is they want to

02:37:09   6    suggest to the jury that somehow that NDA was violated,

02:37:15   7    that somehow we did something improper with respect to that

02:37:17   8    NDA.  And that's just not appropriate at all, and there's

02:37:21   9    no probative value of the NDA itself.  It has nothing to do

02:37:24   10   with the issues in this case.

02:37:25   11         So at a minimum, that NDA should be excluded.

02:37:27   12         And the second specific example is the trials.

02:37:35   13   The fact that we received software from them, we tried it

02:37:38   14   on our phones in, I think, it was early 2011, there's

02:37:43   15   results of those trials, that has nothing to do with the

02:37:46   16   issues in this case, and it has nothing to do with it

02:37:49   17   because what we were trialing had nothing to do with these

02:37:54   18   patents.

02:37:54   19         What Sprint -- what Verizon was interested in was

02:38:00   20   something called a -- like a meter, a usage data meter for

02:38:04   21   how much usage you're using.  How much data am I using at

02:38:05   22   this moment?

02:38:06   23         It had nothing to do with intercepting.  It had

02:38:09   24   nothing to do with turning the Internet on and -- on for

02:38:12   25   background apps when they're not interfacing.  It had

02:38:15   1   nothing to do with any of that.  And there's no evidence at

02:38:17   2   all that anything that we were trialing met any of the

02:38:22   3   claims that are at issue in this case.  And we've just

02:38:24   4   talked about that.

02:38:25   5        And so what they're trying to do is create the

02:38:28   6   impression that we looked at the patented technology, we

02:38:32   7   tried it, and then we went and infringed.  And none of that

02:38:35   8   is true.  But putting aside whether it's true, they have no

02:38:39   9   evidence connecting anything that we did to the actual

02:38:42   10  patents in this case.

02:38:43   11       And then the prejudice, once you -- once the jury

02:38:46   12  hears that we tried this software and decided not to go

02:38:49   13  forward -- we didn't actually decide not to go forward.

02:38:52   14  The company just went bankrupt.  But once we -- once that

02:38:57   15  evidence -- once that suggestion gets before the jury,

02:39:02   16  there's no coming back from that.  The jury is now infected

02:39:02   17  with that, and it really has nothing to do with the case.

02:39:07   18       So we believe the entire communication, the entire

02:39:09   19  relationship between Verizon and ItsOn should go -- we just

02:39:12   20  don't see how it's relevant at all.  But at a minimum, in

02:39:16   21  addition to the investments, the NDA and the trials should

02:39:20   22  be excluded from evidence.

02:39:22   23       And I had only one more point that I wanted to

02:39:25   24  make, and that is with respect to the investments.

02:39:28   25  Curiously, the Plaintiff has agreed that they are not going

02:39:32   1   to introduce Verizon investments in the Verizon case, but

02:39:37   2   they maintain that they would like to talk about the

02:39:40   3   Verizon investments in the T-Mobile case.

02:39:41   4        Now, that's even more attenuated for the T-Mobile

02:39:45   5   case.  The fact that Verizon invested money in ItsOn, in

02:39:50   6   the T-Mobile case, has nothing to do with the T-Mobile

02:39:52   7   case.  And it's totally detached from the patents.

02:39:57   8        As the Court knows, ItsOn had 88 patents or

02:40:01   9   something like that at the time.  And the Court has already

02:40:04  10   made rulings in this case and in the Samsung case that

02:40:08  11   investments in the company as a whole do not bear and are

02:40:11  12   not sufficiently connected to talk about what the value of

02:40:14  13   an individual patent is.  And the same is true of the

02:40:18  14   investments with respect to ItsOn.

02:40:23  15        We do not think it's appropriate that they can

02:40:26  16   introduce evidence of Verizon's investments in the company

02:40:27  17   as a whole which creates this impression that somehow

02:40:31  18   Verizon valued the patented technology when there are

02:40:34  19   literally dozens and dozens and dozens of other things that

02:40:40  20   were -- that ItsOn had in addition to the particular

02:40:42  21   patents here.

02:40:43  22        So for the same reason that the Court found that

02:40:46  23   investments in ItsOn doesn't give any information about the

02:40:49  24   value of a patent, it also doesn't -- isn't relevant to the

02:40:53  25   value of the patent in this circumstance.

02:40:55  1          And so we would ask that the Court also rule that

02:40:58  2    that -- those investments should be excluded from the

02:41:00  3    T-Mobile case, as well.

02:41:01  4          THE COURT:  All right.

02:41:03  5          MR. ROSENTHAL:  Thank you, Your Honor.

02:41:04  6          THE COURT:  Thank you.

02:41:17  7          MR. WIETHOLTER:  Good afternoon, Your Honor.

02:41:18  8    Jason Wietholter for Headwater.

02:41:19  9          First of all, Your Honor, Verizon's position is

02:41:23  10   now a much, much narrower version of their title for this

02:41:27  11   MIL.  Their title for this MIL is:  No Argument or Evidence

02:41:31  12   Regarding Headwater or ItsOn's Pre-Suit Communications with

02:41:34  13   Verizon.

02:41:35  14         Based on Verizon's argument just now and

02:41:37  15   T-Mobile's argument just now, it's specific to ItsOn and

02:41:43  16   ItsOn's pre-suit communications with Verizon, not

02:41:47  17   Headwater.

02:41:48  18         And with respect to the two issues that are still

02:41:51  19   live in the Verizon case, the NDA and the trial, both of

02:41:56  20   these pieces of evidence are relevant to show a whole host

02:42:01  21   of different -- or support a whole host of different

02:42:03  22   arguments from Headwater and contentions from Headwater in

02:42:06  23   this case, including marking, damages, willfulness,

02:42:12  24   secondary considerations, and to rebut certain arguments

02:42:18  25   that -- that Verizon and T-Mobile are going to make, such

02:42:20    1    as the ItsOn software was -- had poor -- was buggy and was

02:42:30    2    insecure.

02:42:31    3         But all of this evidence about ItsOn's pre-suit

02:42:34    4    communications, the fact that Verizon knew of ItsOn, knew

02:42:36    5    of the technology, trialed the technology, paid for the

02:42:40    6    trial of the technology, all that evidence is relevant to

02:42:44    7    rebut those allegations about ItsOn's software and how --

02:42:48    8    how it actually operated.

02:42:50    9         And then separately, it's also affirmative

02:42:53    10   evidence for Headwater to show that Verizon was aware of

02:42:56    11   Headwater and ItsOn's technology, how it operated, that it

02:43:03    12   was -- that there were multiple patents that had been

02:43:05    13   applied for that were in the process of being issued, that

02:43:09    14   ItsOn's software was ultimately marked.

02:43:11    15        THE COURT:  And what is the relationship between

02:43:15    16   those arguments that you want to make and the question

02:43:18    17   whether ItsOn practiced the asserted patent?

02:43:23    18        MR. WIETHOLTER:  So, Your Honor, irrespective of

02:43:27    19   whether ItsOn practiced the asserted patents, the evidence

02:43:30    20   still is relevant to show what Headwater and ItsOn were

02:43:32    21   sharing with Verizon about Headwater's technology that

02:43:37    22   would issue in further patents.

02:43:39    23        So irrespective of whether ItsOn actually

02:43:42    24   practiced any of the patents, which seems to be the subject

02:43:45    25   and will be decided and probably rise and fall with the

02:43:48    1    other MILs and issues, what Headwater shared and what ItsOn

02:43:52    2    shared with Verizon about Headwater's technology that was

02:43:56    3    going to be implemented in ItsOn's functionality or that

02:44:00    4    was implemented in ItsOn's functionality is relevant to

02:44:03    5    show that Verizon, again, knew of Headwater and ItsOn, knew

02:44:06    6    that the patents -- knew about Headwater and its patents

02:44:12    7    and what it was planning to do with its patents and its

02:44:15    8    portfolio, and then also how all of that rebuts Defendants'

02:44:20    9    obviousness allegations, how all of that rebuts their

02:44:23    10   marking and failure to mark allegations.

02:44:30    11        In our -- in -- with respect to willfulness,

02:44:34    12   willfulness is also in our briefing on that issue, which I

02:44:34    13   believe is Docket 203, our opposition to their MSJ.  The

02:44:40    14   Gustafson case specifically says that willfulness is based

02:44:43    15   on all of the circumstances or all the circumstances.  It's

02:44:45    16   not a single specific fact that happens at one moment in

02:44:49    17   time, but rather it's all the facts and circumstances that

02:44:52    18   can give rise to willfulness or willful blindness.

02:44:55    19        If there is never -- if there isn't a patent

02:44:59    20   that's issued or if -- or if there isn't a patent

02:45:00    21   identified by number, the facts are still relevant to

02:45:01    22   willfulness and willful blindness.

02:45:05    23        So all of that is probative of the issues with --

02:45:10    24   that permeate this entire case on various different fronts,

02:45:15    25   irrespective of whether or not ItsOn itself actually

02:45:18    1    practiced those patents.

02:45:19    2            And Defendants really want to have it both ways,

02:45:23    3    and they want to argue that, you know, Headwater's patents

02:45:27    4    are obvious, but they don't want us to be able to talk

02:45:29    5    about evidence to rebut that based on Verizon's own

02:45:32    6    actions.

02:45:33    7            They want to argue we failed to mark, but they

02:45:38    8    don't want us to be able to talk about how ItsOn marked or

02:45:40    9    came to mark.

02:45:43   10            They want to talk about how -- or they want to

02:45:47   11    refute this allegation about willfulness, but they don't

02:45:49   12    want us to be able to talk about all the facts and

02:45:52   13    circumstances that lead to that.

02:45:54   14            So this MIL is really clearly about facts that are

02:45:57   15    relevant to a number of different issues here.  And this

02:46:00   16    isn't a case where Headwater is asserting some fact from, I

02:46:07   17    don't know, like a market report or something that's not

02:46:09   18    tethered to the issues in this case.  These are facts of

02:46:12   19    Verizon's own making.  These are facts that shouldn't be

02:46:16   20    prejudicial to Verizon because Verizon or T-Mobile

02:46:19   21    themselves had interactions with Headwater and ItsOn.

02:46:23   22            And so whatever those facts show, those are -- to

02:46:26   23    the extent that they are prejudicial to Verizon and

02:46:28   24    T-Mobile, that prejudice is of their own making.  It's not

02:46:33   25    something that Headwater has unduly created or that would

02:46:37  1  outweigh that relevance to all the various issues in the

02:46:40  2  case.

02:46:43  3           THE COURT:  All right.  Thank you, Mr. Wietholter.

02:46:47  4           MR. ROSENTHAL:  Your Honor, I just have a few

02:46:49  5  brief responses.

02:46:50  6           The first that I'll raise is, you know, there's a

02:46:56  7  fundamental unfairness of them being able to tell the story

02:47:00  8  of the ItsOn relationship that they say is relevant to all

02:47:03  9  of these things.  And that really goes back to what

02:47:05  10 Mr. Krevitt was arguing yesterday.  You know, this is --

02:47:07  11 this is the problem.  The problem is they want to tell this

02:47:09  12 story about alleged willfulness and communications and

02:47:13  13 trials and all that stuff, but there's a vast trove of

02:47:17  14 documents that no longer exist that we don't have to fight

02:47:21  15 back and to actually explain what the product really was.

02:47:24  16          So that's -- that's a -- I just don't want to lose

02:47:28  17 sight of that's what we're talking about.  That's the

02:47:31  18 prejudice that Mr. Krevitt was talking about yesterday.

02:47:33  19          Second, counsel went on at length for all the

02:47:37  20 reasons that he thinks that this whole story is important,

02:47:40  21 that we trialed the technology, that we knew of the

02:47:43  22 technology, that we paid for the technology.

02:47:48  23          What is "the" technology?  This is only

02:47:50  24 relevant -- it's only relevant if there's some connection

02:47:54  25 between that technology and these patents, and that's

02:47:57    1   MIL 1.  There is none.  And so I don't think they have an

02:48:01    2   argument.  I really don't.  If we win MIL 1, MIL 3 should

02:48:05    3   be -- should follow like a domino.

02:48:08    4        Now, even if we lose MIL 1, nonetheless we already

02:48:12    5   know that there's a huge amount of stuff in this

02:48:15    6   relationship and a huge amount of stuff in these products

02:48:18    7   that are unrelated to the patents.  We know that because

02:48:21    8   they say they practice, you know, 88 different patents in

02:48:24    9   these -- in these products.

02:48:27   10        And so we know that there's no -- no sufficient

02:48:30   11   connection that we can draw any inference about the value

02:48:33   12   of this technology merely from the fact that Verizon

02:48:36   13   decided to trial an ItsOn product that may or may not have

02:48:41   14   practiced this particular patent but certainly has tons of

02:48:43   15   other things in it.  And that really is the decision that

02:48:47   16   the Court has already made with respect to valuations.

02:48:50   17   It's the same analysis.  The fact that somebody has looked

02:48:53   18   at a product or learned information, unless you tie it

02:48:56   19   somehow to the patent, that's -- that's insufficient.

02:48:58   20        So from our perspective, whether -- if we win

02:49:05   21   MIL 1 -- in other words, if they can't establish through

02:49:07   22   some evidence that this product or these products that

02:49:11   23   ItsOn had had any connection at all to these patents, then

02:49:15   24   all of the relationship and discussion about them should go

02:49:19   25   out the door.

02:49:20  1          But even if we lose MIL 1, there's independent

02:49:24  2   prejudicial reasons and lack of relevance reasons to

02:49:26  3   exclude this evidence.

02:49:26  4          I do want to raise just two additional points.

02:49:29  5   The first is I didn't hear anything about the NDA.  I

02:49:32  6   didn't hear anything about why the NDA is relevant, and the

02:49:36  7   reason is it's not.  And it really has nothing to do with

02:49:39  8   this case.  That should be an easy first step in this

02:49:43  9   particular MIL.

02:49:44  10         And with respect to the trials, I didn't hear

02:49:46  11  anything about why the trials in particular bear at all on

02:49:50  12  the value here, the fact that we trialed this -- this

02:49:54  13  software.  Even if it practiced the claims, the fact of the

02:49:57  14  trials -- I mean, they've already agreed that they're not

02:50:00  15  going to talk about the payments for the trials, so why are

02:50:03  16  we talking about the trials themselves?  It has the same

02:50:06  17  prejudicial effect.

02:50:06  18         So at a minimum, those should be excluded.

02:50:09  19         THE COURT:  You're saying even if it -- even if

02:50:11  20  the trials practiced the claims, you would say it's

02:50:15  21  irrelevant?

02:50:16  22         MR. ROSENTHAL:  Yes, Your Honor.  It has marginal

02:50:18  23  relevance.  I'm not sure what the fact that we trialed a

02:50:18  24  product, what -- the fact that Verizon -- let's assume for

02:50:22  25  a moment that they had evidence that it actually practiced

02:50:25   1   the patents, which by the way didn't issue.  The patents

02:50:28   2   didn't issue until years later.  So none of the patents had

02:50:31   3   actually issued at this time.

02:50:33   4        All right.  The trial happened in 2011.  The first

02:50:36   5   of the patents issued in 2013.  So at that time, for the

02:50:43   6   product that was being trialed, let's say it did have the

02:50:45   7   elements of the claims, the fact that we looked at that

02:50:50   8   product and tried it out, what does that go to?  It doesn't

02:50:53   9   go to anything.

02:50:57   10        THE COURT:  You're saying there was no application

02:50:59   11   pending at the time?

02:51:00   12        MR. ROSENTHAL:  There were applications -- there

02:51:00   13   was a parent application for one of the patents -- or for

02:51:02   14   some of the patents, I should say.  The priority date is

02:51:04   15   earlier.  I think of the three patents, two of the actual

02:51:07   16   applications hadn't even been filed yet.

02:51:12   17        So at the time that these trials were happening,

02:51:14   18   it's not like it could probably be evidence of willfulness

02:51:18   19   because the patents didn't exist at that time.

02:51:19   20        So this argument that somehow this is evidence of

02:51:21   21   willfulness, they never told us anything about these

02:51:23   22   particular patents.  They never said, you know, that

02:51:27   23   there's -- these features that we're talking about here are

02:51:29   24   going to be patented.  They did, of course, say generally

02:51:33   25   our products are covered by patents, but as the Court

02:51:35   1   knows, that's not sufficient for willfulness.

02:51:37   2        What they want to do is they want to blur the

02:51:39   3   lines.  What they want to do is say, hey, you all trialed

02:51:43   4   the product, and it's called ItsOn, and ItsOn licensed

02:51:46   5   patents from Headwater.  Therefore, these particular claims

02:51:48   6   of these patents were copied.  That's what they're trying

02:51:52   7   to do.

02:51:53   8        And it's exactly that broad-brush approach that we

02:51:56   9   think requires the Court to step in and exercise its

02:52:00   10  gatekeeper role to say there's not a sufficient connection

02:52:03   11  to these patents in this case to justify the prejudice that

02:52:09   12  comes from telling that story.  There's just not a

02:52:12   13  sufficient connection.  And that's our point, especially,

02:52:16   14  Your Honor, with respect to those two pieces of evidence.

02:52:18   15  We think with respect to the whole relationship, as well.

02:52:21   16       And the last point I want to make is I didn't hear

02:52:24   17  any response at all to why the investments that Verizon

02:52:29   18  made has any relevance whatsoever to the T-Mobile case.

02:52:33   19  So, again, at a minimum, that should be excluded, as well.

02:52:36   20       THE COURT:  All right.

02:52:39   21       MR. ROSENTHAL:  Thank you, Your Honor.

02:52:39   22       THE COURT:  Thank you, Mr. Rosenthal.

02:52:43   23       As far as the T-Mobile issue goes, I'll circle

02:52:47   24  back to that when we take up that case separately.

02:52:53   25       MR. WIETHOLTER:  Thank you, Your Honor.

02:52:54    1         THE COURT:  I understand there'll be other

02:52:56    2    arguments then.

02:52:56    3         But I'm going to decide the first motion in limine

02:53:06    4    for Defendants before reaching this one.

02:53:15    5         So we can move on to --

02:53:17    6         MR. WIETHOLTER:  Your Honor?

02:53:18    7         THE COURT:  Yes.

02:53:19    8         MR. WIETHOLTER:  Your Honor, if I may, a couple of

02:53:20    9    points of clarification on this MIL No. 3.

02:53:23   10         THE COURT:  All right.

02:53:25   11         MR. WIETHOLTER:  As we've already discussed at

02:53:27   12    length, we do have sufficient facts, evidence, and opinions

02:53:33   13    in this case from both of our experts on invalidity issues,

02:53:39   14    Erik de la Iglesia and Mr. Cooklev, on nexus and secondary

02:53:46   15    considerations that apply, even setting aside the issues

02:53:52   16    from MIL No. 1 -- Defendants' MIL No. 1.

02:53:57   17         And as we state in our briefing, as to the value

02:54:02   18    of the trials and the value of the work that was done with

02:54:10   19    Verizon, including the investments which I'll address in

02:54:13   20    more detail later, the amount of that value isn't necessary

02:54:16   21    to show any of the facts that we're contending are relevant

02:54:20   22    here.  The very fact that Verizon was interested in

02:54:25   23    Headwater's patented technology in ItsOn is evidence to

02:54:30   24    support secondary considerations and to rebut certain of

02:54:35   25    their allegations that they're making in this case about

02:54:38    1    ItsOn.

02:54:38    2          So even if the value -- the amount of that value

02:54:43    3    is out, is irrelevant, the fact that they hired the

02:54:48    4    companies involved in this case to implement the technology

02:54:52    5    is relevant to the issues.

02:54:53    6          And the NDA -- I think maybe I didn't say it as

02:54:58    7    artfully or as clearly as I wanted to, but the NDA is

02:55:02    8    relevant to show when Verizon was aware of Headwater and

02:55:05    9    ItsOn and when they began to work with them and that the

02:55:08    10   technology was important such that it was covered by an NDA

02:55:12    11   to protect that confidential technical information.

02:55:22    12         And in particular, the de la Iglesia paragraph,

02:55:27    13   just so we're clear in the record -- and this is in Docket

02:55:30    14   184-2, Paragraphs 421 through '77, and Mr. Cooklev's

02:55:37    15   report -- I apologize, I don't have the docket number

02:55:40    16   handy.  I will get that for the Court -- those are

02:55:42    17   Paragraphs 90 to 99.

02:55:44    18         And, finally, Your Honor, there -- the Avia Group

02:55:50    19   International, Inc. vs. L.A. Gear California case, this is

02:55:55    20   853 F.2d 1557, and this is at 1566.  This case -- this case

02:56:12    21   shows that even -- that willfulness -- willfulness can

02:56:16    22   result even if knowledge of -- even if there's knowledge of

02:56:21    23   a patent application that later leads to a patented

02:56:24    24   invention, that the Defendant ultimately infringes knowing

02:56:29    25   of the application and the later -- and the later

02:56:36     1   infringement by using that technology.

02:56:40     2          So even if the patents did issue after the time

02:56:44     3   period in which Verizon entered into an NDA with ItsOn and

02:56:51     4   learned of Headwater and even if the patents issued after

02:56:54     5   the trials were over, that doesn't defeat the willfulness

02:57:01     6   claim.  That's merely one cog, if you will, in the totality

02:57:05     7   of the circumstances that should be weighed in the

02:57:08     8   willfulness determination.

02:57:09     9          And, Your Honor, Cooklev -- the Cooklev report is

02:57:13    10   at Docket 185-3.

02:57:20    11          THE COURT:  All right.

02:57:21    12          MR. WIETHOLTER:  Thank you, Your Honor.

02:57:21    13          THE COURT:  Thank you, Mr. Wietholter.

02:57:22    14          MR. ROSENTHAL:  Okay.  Your Honor, I'd like to

02:57:24    15   move to Defendants' MIL No. 4, and this has to do, I will

02:57:31    16   say, with something that is very narrow.  This is a

02:57:35    17   gentleman by the name of Thomas Russell who was an employee

02:57:39    18   of Verizon who had dealings with ItsOn in 2010 and 2011.

02:57:46    19   And he filed at some point a whistleblower lawsuit in which

02:57:52    20   he alleged that there was some copying by Verizon of

02:57:55    21   certain things of ItsOn.

02:57:58    22          And he filed the lawsuit because in his view there

02:58:00    23   was retaliation against him, and he believes he was forced

02:58:03    24   out into a lesser role in the company.

02:58:05    25          So we don't think any of this story has any place

02:58:09   1   in this trial.  This is -- this is truly a trial within a

02:58:12   2   trial.  Thankfully, last night and this morning, Headwater

02:58:16   3   has now backed off of much of this.  They have now agreed

02:58:20   4   that they will not introduce evidence of the lawsuit, so

02:58:24   5   the actual whistleblower complaint.  They will not

02:58:27   6   introduce evidence of any retaliation that was alleged to

02:58:31   7   have occurred.  And they will not make any reference to

02:58:36   8   so-called reverse engineering.

02:58:38   9        Mr. Russell referred to reverse engineering, but

02:58:43  10   he explained very clearly in his deposition he didn't mean

02:58:46  11   reverse engineering, he meant there was a PowerPoint

02:58:50  12   presentation and he saw similar slides in a Verizon

02:58:52  13   presentation, and he thought that they hadn't properly

02:58:55  14   given credit to ItsOn for those slides.  That's what this

02:59:00  15   whole thing is about is a slideshow that he thought was

02:59:03  16   replicated within Verizon.

02:59:04  17        So those three aspects have -- are now off the

02:59:07  18   table.  And what is left is our fundamental problem with

02:59:15  19   Mr. Russell testifying that he believes that Verizon copied

02:59:18  20   things from ItsOn, when the things that he alleged to have

02:59:22  21   been copied in 2010 are a PowerPoint presentation that has

02:59:28  22   absolutely no connection to the patent in this case or to

02:59:31  23   the patents in this case.

02:59:32  24        So let me start with one important thing.  One of

02:59:36  25   the things that Headwater keeps saying with respect to all

02:59:41   1   of this ItsOn-Verizon relationship is, well, there was a

02:59:46   2   patent marking page.  I want to make one fact very clear.

02:59:49   3   There was no patent marking page in 2011.  That did not

02:59:55   4   exist in 2011.

02:59:56   5        So any notion that somehow these interactions are

03:00:00   6   relevant because there was a patent marking page, which by

03:00:00   7   the way didn't list any of these patents because the

03:00:03   8   patents didn't exist, but in any event, they said, well,

03:00:06   9   what if you knew about the applications?  There was no

03:00:09  10   marking page.  So that's just a red herring.

03:00:12  11        Now, what we argued in our brief is that

03:00:19  12   Mr. Russell's allegations of copying have no connection to

03:00:23  13   this case.  And what Headwater said in response has nothing

03:00:26  14   to do with what we argued.  Headwater has a page in their

03:00:29  15   brief of bulleted excerpts from Mr. Russel's testimony

03:00:34  16   where Mr. Russell says, well, there were lots of

03:00:37  17   conversations with ItsOn, where he says, we understood that

03:00:40  18   ItsOn had a lot of patents, we understand that if anybody

03:00:43  19   were to use this, we'd have an intellectual property

03:00:47  20   problem.  None of that is what our MIL is about.

03:00:50  21        We have problems with that testimony

03:00:52  22   independently.  We'll raise that on deposition designation

03:00:54  23   day.  But none of that is what we're complaining about.

03:00:59  24   What we're complaining about and what they haven't agreed

03:01:01  25   to withdraw is the allegations that Mr. Russell makes about

03:01:05  1   this copying.

03:01:07  2        Now, this is something that was settled by

03:01:11  3   Mr. Russell out of court.  They agreed to waive any claims

03:01:15  4   that anything had gone wrong.  Nobody admitted any

03:01:18  5   liability for anything.  There was a payment made, and the

03:01:22  6   case was settled.  And for us to now have a mini trial

03:01:24  7   about whether or not this copying occurred would require

03:01:27  8   some connection to the issues in this case.

03:01:28  9        Now, there is zero testimony in this case, zero

03:01:34  10  testimony that what's in that April 2010 PowerPoint has

03:01:40  11  anything to do with the '042 patent.  That's the only

03:01:45  12  patent that they say that the ItsOn product practiced at

03:01:50  13  that time was the '042 patent.  They have made no

03:01:51  14  connection.

03:01:52  15       First of all, their expert, Dr. Cooklev, I asked

03:01:55  16  if he has an opinion even about the ItsOn product.

03:01:58  17       And he said:  I have no opinion.  I've done no

03:01:58  18  analysis about whether the ItsOn product practices.

03:02:04  19       We've talked about that.

03:02:04  20       But it's even worse for the PowerPoint because the

03:02:07  21  PowerPoint has to do with all kinds of things.  And the

03:02:09  22  question is, is there anything in that PowerPoint

03:02:12  23  presentation that embodies or captures what's written down

03:02:15  24  in the '042 patent?  And -- and there's been no evidence in

03:02:18  25  this case that there is.

03:02:19    1          So this is just a salacious sort of sexy story

03:02:22    2    that they want to tell, and they're desperate to keep some

03:02:26    3    little part of it, but it just doesn't have anything to do

03:02:29    4    with the case.

03:02:30    5          I don't have to say much about prejudice, I don't

03:02:33    6    think.  I can't imagine something more prejudicial than an

03:02:36    7    insider saying, oh, I saw them copy something, which is, of

03:02:40    8    course, why they want it to be in front of the jury.  But

03:02:42    9    unless that's something that was copied is the claims or

03:02:45   10    something to do with the claims and unless there's evidence

03:02:48   11    that it is, which there is not, that's all it is, is a

03:02:51   12    salacious allegation that they're going to use to taint the

03:02:54   13    jury.

03:02:57   14          So we don't believe that there's any showing at

03:02:59   15    all that this is relevant to anything.

03:03:01   16          The only other thing I'll say is in their

03:03:04   17    opposition, they point to patent briefs where they say

03:03:08   18    Headwater disclosed to Verizon these things called patent

03:03:11   19    briefs that describe their patent portfolio.  That's not

03:03:14   20    the subject of our MIL.  We have independent objections to

03:03:17   21    those documents.  We'll take that up at the time that we

03:03:21   22    talk about objections to documents.  That's not copying

03:03:24   23    allegations.

03:03:25   24          Our MIL is about Mr. Russell's allegations that

03:03:28   25    something was taken, and that's all this MIL is about.

| | | |
|---|---|---|
| 03:03:32 | 1 | Thank you, Your Honor. |
| 03:03:33 | 2 | THE COURT:  All right. |
| 03:03:37 | 3 | MR. CHANG:  May I approach? |
| 03:04:04 | 4 | THE COURT:  Yes. |
| 03:05:00 | 5 | MR. CHANG:  Good afternoon, Your Honor.  Dale |
| 03:05:01 | 6 | Chang for Plaintiff, Headwater. |
| 03:05:05 | 7 | Let me just try to get my slides up here. |
| 03:05:08 | 8 | Okay.  All right.  So Mr. Rosenthal said that the |
| 03:05:34 | 9 | ItsOn presentation that Mr. Russell testified about is |
| 03:05:39 | 10 | irrelevant to any of the patents in the case.  That's just |
| 03:05:43 | 11 | not true. |
| 03:05:43 | 12 | So as we'll see throughout this presentation, we |
| 03:05:50 | 13 | have technical disclosures that ItsOn made to -- provided |
| 03:05:55 | 14 | to Verizon under that NDA that directly relate to some of |
| 03:06:04 | 15 | the core features of the patented technology. |
| 03:06:08 | 16 | Now, for example, on Slide 1, which is the slide |
| 03:06:12 | 17 | that ends in 986, we talk about controlling at a device |
| 03:06:19 | 18 | level on a per-application basis network traffic.  That's |
| 03:06:24 | 19 | something that hadn't been done before, and Mr. Russell |
| 03:06:28 | 20 | testified that Verizon itself thought that this was a |
| 03:06:32 | 21 | game-changing solution to the problems that it was facing. |
| 03:06:34 | 22 | On the next slide, we see -- and this is in the |
| 03:06:40 | 23 | slide deck -- that April 2010 presentation, the page ending |
| 03:06:45 | 24 | in 992, a description of network traffic characterization |
| 03:06:51 | 25 | accomplished on the devices.  Before it was accomplished in |

03:06:55   1   the network, and that had also sorts of problems.  ItsOn's

03:06:58   2   solution was game-changing in that they moved that

03:07:01   3   functionality to the device, and they disclosed information

03:07:05   4   describing how they would do that to Verizon.

03:07:09   5        Millions of devices individually control traffic.

03:07:13   6   Each device has perfect visibility.  So it's talking about

03:07:17   7   the benefits, the solution, and some of the ways that these

03:07:22   8   things would be accomplished.

03:07:23   9        Next slide, again, conserves network capacity.

03:07:29  10   Controls device network access behavior at the source,

03:07:33  11   meaning at the device.  Example, background OS maintenance

03:07:35  12   and software update access.  Background traffic control.

03:07:42  13        We have another example on the slide ending in

03:07:46  14   998.  Example activities that cause difficulties for

03:07:53  15   carriers like Verizon.  Background OS accesses and

03:07:56  16   information exchanges, constant and inefficient small and

03:08:01  17   large socket open/close events, software updates,

03:08:06  18   application background OS accesses, content subscription

03:08:06  19   service background updates, and it goes on.

03:08:11  20        And then near the bottom it says:  The ItsOn

03:08:13  21   solution meets these -- the needs of the carrier because it

03:08:17  22   can control these background accesses.  It can throttle

03:08:21  23   background accesses at the device.  And this was --

03:08:27  24   and Mr. -- according to Mr. Russell, received by Verizon as

03:08:34  25   groundbreaking, revolutionary, something that hadn't been

| | | |
|---|---|---|
| 03:08:38 | 1 | thought of before. |
| 03:08:39 | 2 | THE COURT:  And, Mr. Chang -- |
| 03:08:43 | 3 | MR. CHANG:  Yes. |
| 03:08:43 | 4 | THE COURT:  -- has one of your experts opined that |
| 03:08:46 | 5 | any of these slide materials are related to the claims of |
| 03:08:53 | 6 | the asserted patents? |
| 03:08:55 | 7 | MR. CHANG:  Well, yes.  I mean -- so what they do |
| 03:09:00 | 8 | is both Dr. Cooklev and Dr. Wesel, they walk through the |
| 03:09:07 | 9 | evidence, including this presentation, to show that |
| 03:09:13 | 10 | Verizon, after receiving this information, shortly |
| 03:09:16 | 11 | thereafter came up with this PCO technology that was |
| 03:09:24 | 12 | suspiciously similar to the information that ItsOn |
| 03:09:29 | 13 | disclosed.  And that is the infringing -- accused |
| 03:09:33 | 14 | infringing technology for the '042 patent, as well as the |
| 03:09:39 | 15 | '541 patent and a dependent claim of the '613 patent. |
| 03:09:42 | 16 | THE COURT:  And you may be answering my question, |
| 03:09:46 | 17 | but my question is just whether your experts have said |
| 03:09:51 | 18 | these materials are related to the asserted patents, and -- |
| 03:09:57 | 19 | MR. CHANG:  Yes. |
| 03:09:59 | 20 | THE COURT:  -- that's all the relevance I would |
| 03:10:02 | 21 | need.  And I'm trying to figure out if I have to arrive at |
| 03:10:04 | 22 | that opinion myself, based on what you're telling me, or if |
| 03:10:07 | 23 | you have an expert opinion in this case that says that. |
| 03:10:12 | 24 | MR. CHANG:  Yes, we do.  And as one example, |
| 03:10:15 | 25 | Docket 185-3, the Cooklev report, if you look at |

03:10:19  1    Paragraphs 90 to I think around 110, 116, you will see a

03:10:27  2    lengthy discussion there of the patented features and how

03:10:36  3    Verizon had touted or praised these features.  And then

03:10:41  4    ultimately how the evidence indicates that Verizon copied

03:10:46  5    the ItsOn information and ended up infringing the asserted

03:10:52  6    patents.

03:10:53  7              THE COURT:  And what you're showing there now is

03:10:57  8    part of what Mr. Russell says that he saw Verizon

03:11:05  9    discussing back in 2010 or '11?

03:11:14  10             MR. CHANG:  Correct.

03:11:14  11             THE COURT:  Okay.

03:11:14  12             MR. CHANG:  He testifies about that presentation.

03:11:19  13   And if you look at Slide -- yeah, so Slide 7 of my

03:11:31  14   presentation, you'll see -- now, a few months after this

03:11:37  15   April 2010 presentation, that's the presentation we were

03:11:40  16   just looking at, did you learn of troubling conduct by

03:11:43  17   Verizon's employees?

03:11:44  18             Yes.  Well, I saw them put some of this

03:11:47  19   information in Verizon's internal presentation and present

03:11:51  20   it as their own.

03:11:52  21             THE COURT:  All right.  And what you pointed me to

03:12:10  22   in -- is it Dr. Cooklev?

03:12:13  23             MR. CHANG:  Yes.

03:12:13  24             THE COURT:  And what was the docket number on

03:12:16  25   that?

03:12:18    1              MR. CHANG:  185-3.

03:12:28    2              THE COURT:  All right.  All right.  Thank you,

03:12:29    3    Mr. Chang.  I think that's all I really need to hear from

03:12:32    4    the Plaintiff on this.

03:12:33    5              MR. CHANG:  Thank you, Your Honor.

03:12:34    6              MR. ROSENTHAL:  Your Honor, can I go right to that

03:12:36    7    point?

03:12:36    8              THE COURT:  You can.

03:12:37    9              MR. ROSENTHAL:  You asked a question that I

03:12:40   10    thought was very direct, which is does any Headwater expert

03:12:45   11    look at this PowerPoint presentation and connect it in any

03:12:48   12    way to the claims?  And Mr. Chang said yes.  And he pointed

03:12:53   13    you to Paragraphs 90 to 110 of Dr. Cooklev's declaration.

03:12:59   14    I have those paragraphs here, and I've just read them

03:13:01   15    again.  And not a single one of those paragraphs does

03:13:01   16    anything of the kind.

03:13:04   17              What Paragraphs 90 through 110 do is they -- in

03:13:09   18    fact, we have a Daubert motion on this because they

03:13:11   19    literally have no analysis.  This is a section that is

03:13:18   20    entirely factual, no opinions whatsoever.  This is a

03:13:21   21    section where Dr. Cooklev goes for 20 paragraphs and sets

03:13:26   22    forth their opening statement.

03:13:29   23              They say -- he says here's some facts.  There is

03:13:33   24    an NDA.  They entered into an NDA.  They received

03:13:38   25    information.  That information included information about

03:13:40  1  the ItsOn product.  The ItsOn product was described in

03:13:43  2  these details.  They took that information.  They did

03:13:46  3  something with it.

03:13:47  4       At no time does he ever connect this to the claims

03:13:50  5  because it has nothing to do with the claim.

03:13:52  6       Now, I heard Dr. -- Dr. Chang, sorry, sounded like

03:13:55  7  expert testimony.  I heard Mr. Chang say about the document

03:14:01  8  that he believes that it is connected to the claims.  But

03:14:03  9  if you look at these paragraphs -- so Paragraph 90 just

03:14:08  10 sets it up.  It's just throat clearing.

03:14:12  11      THE COURT:  Mr. Rosenthal, given that we're

03:14:14  12 running out of time, let me just ask -- Mr. Chang, would

03:14:18  13 you show me where in the paragraphs you think that there's

03:14:23  14 something that connects in some way this presentation to

03:14:30  15 the asserted patent?

03:14:49  16      MR. CHANG:  I'm having trouble --

03:15:25  17      THE COURT:  I tell you what, we're really overdue

03:15:29  18 for the afternoon recess.  While you're trying to locate

03:15:33  19 that --

03:15:35  20      MR. CHANG:  I've got it up actually.

03:15:38  21      THE COURT:  -- we'll go ahead and take the

03:15:41  22 afternoon recess and then come back and pick up right

03:15:43  23 there.

03:15:44  24      Thank you.

03:15:44  25      COURT SECURITY OFFICER:  All rise.

03:15:45    1          (Recess.)

03:15:45    2          COURT SECURITY OFFICER:  All rise.

03:35:00    3          THE COURT:  Thank you.  Please be seated.

03:35:01    4          Whenever you're ready, Mr. Chang.

03:35:04    5          MR. CHANG:  Thank you, Your Honor.

03:35:05    6          So I have up on the screen Dr. Cooklev's opening

03:35:12    7    report, again, Document No. 185-3.  We're looking at

03:35:17    8    Paragraph 90, and this is the very first paragraph of that

03:35:20    9    entire section in which he talks about that very

03:35:23   10    presentation, and he says:  Based on my experience in the

03:35:27   11    telecommunications industry, the extensive interactions

03:35:31   12    Verizon had with Headwater and ItsOn, and the timeline of

03:35:35   13    events discussed below, it is my opinion that Verizon would

03:35:38   14    have been aware of or at least willfully blinded itself to

03:35:43   15    the '042 patent.

03:35:43   16          And going on to Paragraph 101, he discusses

03:35:49   17    specifically the April 2010 presentation.

03:35:51   18          102:  By May 2011, ItsOn had developed a

03:35:57   19    Verizon-specific DAS platform and conducted field trials to

03:36:01   20    evaluate the platform's effectiveness, including features

03:36:04   21    protected by the '042 patent.

03:36:05   22          And then he talks about -- you know, to address

03:36:11   23    the issues, Verizon proposed the DAS system remarkably

03:36:17   24    similar to the one that Verizon had trialed just months

03:36:20   25    before, including by extending service usage controls to

03:36:24  1    the user -- UE, which is the end-user device, and provide

03:36:28  2    customized device behaviors, such as having the UE block

03:36:30  3    background data traffic while allowing foreground data

03:36:32  4    traffic.

03:36:32  5        And then going down to the end, as another

03:36:39  6    example, he says:  It is my opinion that based on the facts

03:36:42  7    above, including the technical documents, et cetera, a

03:36:45  8    POSITA would conclude that Verizon understood that there

03:36:48  9    was a high probability that its device assisted services

03:36:52  10   system infringes one or more Headwater patents and that

03:36:55  11   Verizon deliberately avoided learning of that fact, which

03:36:59  12   is further underscored by Mr. Russell's testimony.

03:37:02  13       So I submit that there are clear linkages between

03:37:07  14   not only the April 2010 presentation but other information

03:37:10  15   that was provided to Verizon under the NDA which Verizon

03:37:15  16   then took, put in its own presentations, and then

03:37:18  17   ultimately adopted in its network.

03:37:22  18           THE COURT:  All right.  Thank you, Mr. Chang.

03:37:25  19           MR. CHANG:  Thank you, Your Honor.

03:37:28  20       Oh, and sorry, I forgot to mention one other

03:37:33  21   thing.  Just to make the record clear, I wanted to mention

03:37:36  22   that Dr. Wesel also has a similar discussion in his report,

03:37:44  23   Appendix A for Verizon, his opening report with respect to

03:37:49  24   the '541 and '613 patents.  And that would be Docket 182-6.

03:38:06  25           Thank you, Your Honor.

03:38:07   1          THE COURT:  All right.

03:38:07   2          MR. ROSENTHAL:  Your Honor, if I can briefly

03:38:12   3  respond to that?

03:38:17   4          THE COURT:  All right.

03:38:18   5          MR. ROSENTHAL:  The question that this MIL

03:38:20   6  presents is whether Mr. Russell can make an allegation or

03:38:26   7  recount his allegation or his belief that Verizon copied an

03:38:32   8  April 2010 presentation.  That is the extent of his

03:38:36   9  allegation.  That is it.  And you heard Mr. Fenster

03:38:40  10  yesterday say that is it, that is all we're alleging with

03:38:42  11  respect to Verizon's copying.  That's it.  Nothing about

03:38:46  12  the trials.  Nothing about anything else.

03:38:47  13          And so Your Honor asked a very simple question:

03:38:50  14  Did any expert link that presentation or anything in that

03:38:53  15  presentation to the '042 patent?

03:38:57  16          And I just saw four paragraphs that Mr. Chang put

03:39:00  17  on the screen.  Not a single one of them did so.  Paragraph

03:39:04  18  90 doesn't mention the presentation at all.  He's talking

03:39:08  19  about knowledge in 2016, five years later, and he doesn't

03:39:10  20  cite that presentation, and nowhere does he say here's

03:39:15  21  where it links up to the '042.

03:39:17  22          Paragraph 101 has to do with the presentation, but

03:39:20  23  it doesn't link it in any way or discuss the '042.

03:39:24  24          Paragraph 102 has to do with the field trials.  It

03:39:27  25  had nothing to do with the presentation.

03:39:29    1    And then Paragraph 116 is a conclusion where he

03:39:33    2    doesn't even link it to the '042. He says: I think that

03:39:36    3    there was willful infringement of one or more Headwater

03:39:37    4    patents.

03:39:38    5    Now, if there were any doubt as to whether

03:39:42    6    Dr. Cooklev actually did this analysis, I asked him in his

03:39:48    7    deposition whether he did it. I asked him for -- may I

03:39:52    8    please have the ELMO? Thank you.

03:39:54    9    I asked him for a couple pages because he was sort

03:39:57    10   of being a little bit coy about what I was talking about.

03:40:00    11   But in his deposition, starting at Page 36, I asked him

03:40:05    12   over and over again whether he did any analysis about

03:40:10    13   whether or not the ItsOn proposals or products or software

03:40:15    14   practiced at all the '042 patent. I mean, he didn't even

03:40:20    15   understand what I was talking about. He said: I don't

03:40:22    16   know what you mean by ItsOn.

03:40:24    17   I mean, he didn't remember having written these

03:40:25    18   paragraphs.

03:40:26    19   And I said -- so this is now on Page 37 at 18:

03:40:30    20   Have you performed any analysis as to whether ItsOn

03:40:33    21   practiced?

03:40:36    22   As I stated, ItsOn invented that. Beyond that, I

03:40:39    23   did not analyze whether ItsOn's proposals or offerings

03:40:44    24   practiced the claims.

03:40:45    25   I asked him again: Do you have any opinions as to

03:40:48  1  whether any of the products that they offered or sold?

03:40:50  2       And he said:  I don't have anywhere in my report

03:40:52  3  memorized.  If somewhere I refer to ItsOn products, point

03:40:55  4  me to it.  I'll be happy to answer.  But subject to that, I

03:40:56  5  didn't think investigating ItsOn's products is at all

03:40:59  6  necessary for my opinions.

03:41:00  7       And then the ultimate question on Page 39, Line

03:41:05  8  14:  Do you have an opinion as to whether any of these

03:41:08  9  practice?

03:41:09  10       I think we went over it.  I don't clearly even

03:41:12  11  recall what products we're talking about.  I don't recall

03:41:14  12  and I don't think I've ever provided opinions on that, so I

03:41:17  13  did not investigate that.

03:41:18  14       They are now trying to tell you that Dr. Cooklev

03:41:23  15  did some kind of an analysis to link this presentation

03:41:26  16  about ItsOn's products to the '042 when the man said he

03:41:28  17  didn't even do that analysis.  And it's not in his report.

03:41:31  18       And so what we have here is a salacious allegation

03:41:35  19  of copying that stands alone that has nothing to do with

03:41:39  20  the '042 patent that Mr. Chang wants to do an analysis

03:41:43  21  himself and explain why he thinks it's relevant to the '042

03:41:46  22  patent.  Totally inappropriate.

03:41:47  23       The other thing that I'll mention, and this is

03:41:50  24  just -- you know, I've used the word "trojan horse" both in

03:41:54  25  the briefs and today, but this is what the '042 patent, by

| | | |
|---|---|---|
| 03:41:57 | 1 | the way, is in this case for.  They're not seeking damages |
| 03:42:00 | 2 | for the '042 patent.  The '042 patent is the subject of a |
| 03:42:03 | 3 | summary judgment motion which I hope we have a chance to |
| 03:42:05 | 4 | argue later today, but I doubt it. |
| 03:42:07 | 5 | THE COURT:  I don't think we will. |
| 03:42:08 | 6 | MR. ROSENTHAL:  I doubt it. |
| 03:42:09 | 7 | But the '042 patent is in this case for this |
| 03:42:13 | 8 | reason and this reason alone, because it's the only link. |
| 03:42:16 | 9 | Mr. Chang just mentioned Dr. Wesel.  He doesn't talk about |
| 03:42:19 | 10 | the '042 patent.  And you heard and it's in their briefs, |
| 03:42:24 | 11 | the only allegation that this Russell thing has anything to |
| 03:42:28 | 12 | do with is the '042 patent.  It's the only reason it's in |
| 03:42:31 | 13 | the case.  And there's a reason for that, because the |
| 03:42:34 | 14 | technology that's accused of infringing the other two |
| 03:42:36 | 15 | patents wasn't even developed by Verizon.  It was developed |
| 03:42:40 | 16 | by the phone manufacturers.  Verizon had nothing to do with |
| 03:42:44 | 17 | the development of that. |
| 03:42:44 | 18 | So what they're talking about here is only with |
| 03:42:47 | 19 | respect to the '042. All of this is tied up with the '042. |
| 03:42:50 | 20 | And they don't have any evidence that anything that was |
| 03:42:52 | 21 | being presented has anything to do with the '042 patent. |
| 03:42:56 | 22 | THE COURT:  I notice that the questions you |
| 03:42:59 | 23 | pointed out from the deposition are all focused on ItsOn |
| 03:43:05 | 24 | products, and it is apparent that Dr. Cooklev has not |
| 03:43:11 | 25 | examined the ItsOn products.  The documents that we've been |

03:43:17  1  looking at that Mr. Russell is involved with are about the

03:43:24  2  ItsOn technology.

03:43:24  3       MR. ROSENTHAL:  Your Honor, the questions were not

03:43:26  4  limited to products.  He specifically -- when I asked

03:43:29  5  him -- and it begins on Page 36.  When I asked him about

03:43:34  6  this, he said, you know, what do you mean by the ItsOn

03:43:37  7  products?

03:43:38  8       So this is up here on Page 36, Line 6.

03:43:42  9       I said:  Well, have you done any analysis of

03:43:45  10 whether anything that ItsOn did practiced the claims?

03:43:48  11      And he said:  Well, one of the things that ItsOn

03:43:51  12 did was actually file the patent.

03:43:52  13      And so I clarified, and by the time we got to the

03:43:55  14 answer, he made it very clear.  He said:  I did not analyze

03:43:59  15 whether ItsOn's proposals or offerings -- proposals or

03:44:05  16 offerings.

03:44:06  17      Now, look, I don't need the deposition testimony

03:44:08  18 to make the point because his report simply does not do it.

03:44:13  19 His report simply does not ever look at the pages that

03:44:16  20 Mr. Chang put up on the screen and say here's how this

03:44:18  21 relates to the '042 patent or even state this relates to

03:44:25  22 the '042 patent.

03:44:26  23      He simply has 30 paragraphs where he recites the

03:44:29  24 facts that these things happened, and then says:  In my

03:44:32  25 view, all of this supports the idea that we willfully

03:44:36    1    infringe one or more patents.

03:44:37    2         But he never has any analysis at all that this has

03:44:40    3    anything to do with the patent.  That's just made up

03:44:43    4    attorney argument.

03:44:44    5         And I do think he clearly testified in his

03:44:48    6    deposition that he didn't perform any analysis of ItsOn

03:44:51    7    proposals or ItsOn products.  And so what we're left with

03:44:58    8    is an -- and I will say one other thing.  Mr. Russell --

03:45:02    9    and that's what this MIL is about.  Mr. Russell made it

03:45:05    10   very clear that here's what he thinks happened.  There's an

03:45:09    11   April 2010 presentation, and then later a gentleman named

03:45:12    12   Nem Kashanian put together a Verizon presentation, and he

03:45:15    13   saw some of the same concepts in that presentation.

03:45:18    14        And Mr. Russell testified unequivocally that never

03:45:21    15   went into any Verizon products.  He said:  That was a

03:45:23    16   proposal that never went anywhere.  It didn't get

03:45:26    17   implemented.  It's just a proposal.  And he said:  As long

03:45:28    18   as I was at the company, it never got implemented.  And as

03:45:33    19   far as I know, it never got implemented when I left.

03:45:36    20        So this is -- this is just sexy.  It has nothing

03:45:38    21   to do whether we actually took this stuff and put it into

03:45:42    22   our products, which we didn't.

03:45:43    23        So this is just so that they -- this is why the

03:45:46    24   '042 is in the case.  It's why they're trying to get

03:45:49    25   this -- Mr. Russell testimony in is so that they can use

03:45:52  1  this word "copying" with the jury.  But unless they tie it

03:45:56  2  to the '042 patent, it's not relevant.

03:45:59  3         And one last point, Your Honor, one last point.

03:46:04  4  When we moved for summary judgment of no copying on the

03:46:08  5  '042 patent, they didn't even raise this as evidence that

03:46:12  6  supports their claim of copying.  If it's not relevant

03:46:16  7  enough for them to even raise it, then why should that form

03:46:19  8  a basis for them to get this allegation into the case?

03:46:23  9         That's all I have, Your Honor.

03:46:24  10         THE COURT:  All right.  Thank you, Mr. Rosenthal.

03:46:37  11         Mr. Chang, would you show me one more time the

03:46:41  12  portion of Dr. Cooklev's report that cited to the '042 in

03:46:46  13  connection with that part of his report that discusses the

03:46:53  14  ItsOn presentation?

03:46:58  15         MR. CHANG:  Yes, Your Honor.

03:46:59  16         Okay.  So I think Mr. Rosenthal keeps focusing on

03:47:46  17  products, products, products.  The point here is, setting

03:47:52  18  that aside, the fact that Verizon elicited information

03:48:00  19  under an NDA -- proprietary ItsOn information under an NDA,

03:48:05  20  put that in its own presentation, and then, you know, the

03:48:11  21  evidence indicates that they then at least borrowed some of

03:48:16  22  the ideas to implement its own solution, which is called

03:48:18  23  the PCO solution, to address the very problems that are

03:48:22  24  described throughout the ItsOn presentations is relevant to

03:48:27  25  multiple issues in the case, including, for example,

03:48:30  1    long-felt need, recognition by one of the industries'

03:48:35  2    largest carriers, praise by others, copying, and so on.

03:48:44  3         So setting aside ItsOn's products and whether

03:48:51  4    Dr. Cooklev analyzed ItsOn products and tried to do a

03:48:56  5    mapping between ItsOn's products and '042, this is still

03:49:00  6    highly relevant to many issues in the case.

03:49:00  7         And so in Paragraph 90, again, he talks about

03:49:03  8    based on the timeline of events below, including its

03:49:06  9    discussion of the April 2010 presentation, this shows

03:49:10  10   Verizon would have been aware of or at least willfully

03:49:13  11   blinded itself to the '042 patent.  And then he says in the

03:49:17  12   2016 time frame when Verizon defined its LTE PCO

03:49:24  13   requirements, because that's when it actually implemented

03:49:26  14   the PCO solution that we say was derived from the

03:49:30  15   information it got from ItsOn.

03:49:32  16        So the 2016 time frame point that Mr. Rosenthal

03:49:35  17   raised has nothing to do with the events that unfolded in

03:49:44  18   the 2010 timeframe when ItsOn presented that April

03:49:47  19   presentation to Verizon.

03:49:49  20        2016 is when Verizon ultimately adopted what's

03:49:54  21   called the PCO solution, that it actually started proposing

03:49:59  22   in documents beginning in 2012, just months after it

03:50:05  23   trialed the ItsOn software in 2011.  And we can see that,

03:50:20  24   for example, in Paragraph 107.

03:50:22  25        By April 2012, Verizon identified specific network

| | | |
|---|---|---|
| 03:50:25 | 1 | congestion and customer experience issues that it had been |
| 03:50:27 | 2 | experiencing, some of the very issues Headwater and ItsOn |
| 03:50:31 | 3 | predicted would occur in their 2010 presentations to |
| 03:50:34 | 4 | Verizon.  And then it gives some examples of a device |
| 03:50:38 | 5 | pinging issue.  I mean, the similarities are remarkable. |
| 03:50:44 | 6 | And then it goes on:  The solution that they |
| 03:50:46 | 7 | proposed in 2012 -- again, just months after the trial -- |
| 03:50:53 | 8 | was a device-assisted services system that uses what's |
| 03:50:58 | 9 | called PCO to control network traffic using the device. |
| 03:51:06 | 10 | And this is one of the core concepts of the patented |
| 03:51:11 | 11 | technology. |
| 03:51:11 | 12 | THE COURT:  All right.  I'm also looking at |
| 03:51:20 | 13 | Document 185-3, which is excerpts of the same report of |
| 03:51:26 | 14 | Dr. Cooklev, and I'm satisfied that it shows that there is |
| 03:51:35 | 15 | an expert who is connecting the presentation at issue in |
| 03:51:42 | 16 | Mr. Russell's testimony with the technology in the '042 |
| 03:51:50 | 17 | patent.  And, therefore, I'll deny that part of Motion in |
| 03:51:58 | 18 | Limine No. 4. |
| 03:52:01 | 19 | And, Mr. Rosenthal, I would call on you to |
| 03:52:08 | 20 | identify for me what the agreement is that you said had |
| 03:52:12 | 21 | been reached on the other part of MIL 4. |
| 03:52:17 | 22 | MR. ROSENTHAL:  Your Honor, do you mean to send an |
| 03:52:19 | 23 | email to the Court with that or to repeat it here? |
| 03:52:22 | 24 | THE COURT:  If you think it is too much to |
| 03:52:23 | 25 | accurately dictate into the record, you can do it by email. |

| 03:52:29 | 1 | MR. ROSENTHAL:  I'm happy to say it right now. |

03:52:29   1          MR. ROSENTHAL:  I'm happy to say it right now.

03:52:31   2          So what has been agreed is that there will be no

03:52:35   3   reference to the complaint that Mr. Russell filed against

03:52:41   4   Verizon.

03:52:42   5          There will be no reference to any retaliation that

03:52:46   6   Mr. Russell believes he was subjected to as a result of

03:52:49   7   that complaint or as a result of his whistle blowing, no

03:52:54   8   retaliation at all.

03:52:55   9          And there will be no reference to, quote, reverse

03:52:58   10  engineering that was part of his allegations.

03:53:03   11         And the only other comment I'll make, I understand

03:53:06   12  and appreciate the Court's ruling right now, is that we

03:53:09   13  would ask that that, of course, be revisited if the '042

03:53:12   14  does not go to trial.

03:53:14   15         THE COURT:  All right.

03:53:15   16         MR. ROSENTHAL:  Thank you, Your Honor.

03:53:16   17         THE COURT:  Thank you.

03:53:18   18         MR. CHANG:  Your Honor, just briefly.  So we

03:53:21   19  agree -- Defendant -- I mean, Plaintiff agrees on the

03:53:25   20  agreed portion of what should get -- be excluded by the

03:53:30   21  MIL.

03:53:30   22         We disagree, however, that if the '042 patent --

03:53:34   23  for example, issues regarding the '042 patent are disposed

03:53:40   24  of in the case, that somehow that disposes of the evidence

03:53:46   25  that we've been discussing today.

03:53:49   1          THE COURT:  Well, I'm not going to make a decision
03:53:51   2    on that at this time.
03:53:53   3          MR. CHANG:  Okay.  Sure.  I appreciate that.
03:53:56   4    Thank you, Your Honor.
03:53:56   5          THE COURT:  All right.  That takes us to MIL
03:54:21   6    No. 5.
03:54:55   7          MR. ROBB:  Ma'am, may I ask that the computer be
03:54:58   8    displayed?  Thank you.
03:54:59   9          Thank you, Your Honor.  Andrew Robb for
03:55:13  10    Defendants.
03:55:13  11          MIL No. 5 addresses a couple of issues relating to
03:55:18  12    damages numbers that are prejudicial.
03:55:20  13          I want to focus the presentation today on one of
03:55:23  14    those issues, which is the issue of post-judgment
03:55:27  15    royalties, and then I'll touch briefly on a couple of
03:55:30  16    others.
03:55:30  17          On the issue of post-judgment royalties, so for
03:55:35  18    context -- and I'll go briefly because I'm sure Your Honor
03:55:37  19    is familiar with it.  Headwater's damages model relies on
03:55:40  20    three steps.
03:55:41  21          So first Dr. Wesel calculates the data savings
03:55:45  22    associated with devices that Verizon sells that use the
03:55:50  23    accused features.
03:55:51  24          Next, Dr. Bazelon calculates the total value of
03:55:57  25    the spectrum holdings of the Defendants.  I'll note that

03:55:59    1    this MIL is almost identical between T-Mobile and Verizon,

03:56:03    2    so I'll just refer to Verizon.  But the numbers are

03:56:05    3    slightly different, the arguments are precisely the same

03:56:08    4    for T-Mobile.  He calculates the total value of Verizon's

03:56:11    5    spectrum holdings.  He then determines the data savings

03:56:15    6    associated with the accused devices on a per-year basis and

03:56:19    7    calculates the value of those to the spectrum holdings,

03:56:24    8    again, on a per-year basis, running through the expiration

03:56:28    9    of the patents in 2029.  He then sums those year-by-year

03:56:34    10   calculations into a single number, and that is his analysis

03:56:37    11   of the total value of the patents.

03:56:40    12         Mr. Bergman is their third expert.  He's the final

03:56:45    13   damages expert.  He simply takes that final total and

03:56:47    14   performs a 75/25 bargaining split where Headwater would get

03:56:52    15   25 percent of the value.

03:56:53    16         This is Dr. Bazelon's analysis.  This is where he

03:56:59    17   is charting year-by-year for each year.  Here is the

03:57:04    18   running value of the accused products that are being sold

03:57:12    19   as applied to the spectrum holdings.

03:57:14    20         To use one example on the right, he's assuming

03:57:18    21   that the '541 patent is infringed both with respect to

03:57:21    22   background app refresh and low data mode.  And under that

03:57:24    23   assumption, he has the column on the right showing

03:57:28    24   year-by-year totals with the grand total at the bottom.

03:57:31    25   That's a straight summation of the year-by-year totals

03:57:35    1    above.

03:57:35    2         Mr. Bergman, as I indicated, takes those numbers.

03:57:40    3    They're different because they rely on different

03:57:43    4    assumptions, but you'll note the second number there is the

03:57:46    5    $420 million number.  That's just a straight copy from the

03:57:52    6    sums totals that Dr. Bazelon calculated.  And he credits

03:57:58    7    Dr. Bazelon as calculating the overall value of the patent,

03:58:03    8    and then Mr. Bergman applies his bargaining split.

03:58:06    9         One more schedule to show the year-by-year running

03:58:10    10   total of the analyses that Dr. Bazelon and Mr. Bergman

03:58:13    11   performed.  These are schedules to Mr. Bergman's report.

03:58:19    12        And in the first excerpt, we see -- the top right

03:58:23    13   is one of his total damages number that is simply the

03:58:27    14   summation of each of the years through 2029 that

03:58:31    15   Dr. Bazelon calculated, then, of course, with the

03:58:31    16   bargaining split.

03:58:36    17        He then calculates infringing units, that is the

03:58:39    18   total number of devices sold, and divides those two numbers

03:58:43    19   to come up with a per-unit royalty rate of ███████.

03:58:47    20        In the second excerpt, he shows how he calculated

03:58:50    21   the infringing units, and it's small, and I apologize for

03:58:53    22   that, but in the very bottom, it says:  Per Dr. Bazelon's

03:58:57    23   analysis, assumes 2024 to 2029, annual units equal 2023

03:59:03    24   figures.

03:59:04    25        So in calculating the number of devices sold, he

03:59:07   1   has actual numbers through 2023, and then he simply uses

03:59:12   2   those same numbers out through 2029 when the patent

03:59:18   3   expires.

03:59:19   4         Now, as Your Honor knows, because most of the

03:59:21   5   opinions I'm going to cite today were written by Your

03:59:24   6   Honor, there is a distinction in the law between lump sums

03:59:25   7   that allow you to capture the full value of the patent and

03:59:27   8   prohibitions against running royalties post-judgment.

03:59:30   9         This form of I'm going to have a year-by-year

03:59:35   10  total and then simply sum that at the end and declare it to

03:59:39   11  be a lump sum, Your Honor has already addressed this

03:59:42   12  precise issue in the Samsung I case.

03:59:46   13        So in the Samsung I case, Headwater's expert was a

03:59:49   14  gentleman by the name of Mr. Kennedy.  Mr. Kennedy, one of

03:59:53   15  the components of his damages model was what he called a

03:59:56   16  post-judgment lump sum.  To calculate the post-judgment

04:00:01   17  lump sum, he had a year-by-year schedule that he then

04:00:04   18  summed together.  And there's no dispute -- and I have a

04:00:08   19  copy of the excerpt of Dr. Kennedy's -- Mr. Kennedy's

04:00:11   20  report.  There's no dispute that it was a year-by-year,

04:00:15   21  column-by-column demonstration of the purported value of

04:00:20   22  the patents and that he then summed it and that he called

04:00:23   23  it a lump sum when doing so.

04:00:25   24        And Samsung called him on this.  They said he's

04:00:30   25  not actually offering a lump-sum opinion.  He's clearly

04:00:33    1    offering a running royalty disguised as a lump sum because

04:00:38    2    all he's doing is he's taking a running royalty and adding

04:00:40    3    them together at the end.  He's simply summing them.

04:00:43    4         And Your Honor agreed.  Your Honor agreed that

04:00:46    5    simply taking what is transparently a year-by-year running

04:00:52    6    royalty through post-judgment to the expiration of the

04:00:56    7    patent is clearly a running royalty post-judgment.  That's

04:01:04    8    it.

04:01:04    9         Headwater in their opposition brief says, well,

04:01:08   10    Mr. Kennedy was not doing a lump sum.  He was doing a

04:01:11   11    running royalty.  And that's true, he was.  But the point

04:01:16   12    is he tried to do exactly what Mr. Bergman is trying to do

04:01:20   13    here where he takes what is transparently a year-by-year

04:01:25   14    running royalty and then summing it and declaring it to be

04:01:28   15    a lump sum.

04:01:29   16         And that's precisely that -- the mere fact that

04:01:31   17    those numbers are summed does not magically convert them

04:01:36   18    into a lump-sum figure, particularly in light of the

04:01:38   19    problems associated with post-judgment running royalties

04:01:42   20    that this Court has repeatedly recognized, namely that

04:01:45   21    they're inherently speculative.

04:01:47   22         The case that Headwater cites, which is -- sorry,

04:01:56   23    my papers are out of order.  Netlist -- Headwater cites

04:02:01   24    Netlist, draws the same distinction that a number of cases

04:02:05   25    have cited, which is that there's a difference between a

04:02:07    1    lump sum and a running royalty in that running royalties

04:02:07    2    post-judgment are not permissible.  And that's true.

04:02:10    3           But Netlist never suggests that what Mr. Bergman

04:02:14    4    has done here, which is, again, take what is transparently

04:02:18    5    a running royalty post-judgment and sum those numbers

04:02:22    6    together and include it in the pre-judgment component,

04:02:26    7    converts that into a permissible lump sum.

04:02:29    8           The one other case that I'll draw Your Honor's

04:02:34    9    attention to is Allergan, which is Your Honor's opinion

04:02:43   10    from 2016.  It is 2016 Westlaw 8222619.

04:02:52   11           That is notable for two reasons.  First -- and

04:02:57   12    that case is a case where Your Honor excluded the

04:03:00   13    post-judgment component of a -- of a damages model that --

04:03:05   14    both pre-judgment and post-judgment on the basis that the

04:03:09   15    post-judgment portion was clearly just a running royalty,

04:03:11   16    even though in the first paragraph of the order, there was

04:03:15   17    an acknowledgement that the -- the post-trial damages range

04:03:23   18    from about 34 to $57 million.

04:03:27   19           So there, too, there was a summation of the

04:03:29   20    running royalty.  But simply taking a calculator and

04:03:32   21    combining a schedule does not convert it into what is a

04:03:36   22    proper damages analysis.

04:03:40   23           The other thing I'll note about this opinion,

04:03:44   24    Headwater makes an argument of waiver that we did not

04:03:46   25    include this argument in the opening Daubert briefs.

04:03:50  1          Now, as Your Honor knows, we did include it in the

04:03:53  2   reply Daubert briefs, but for purposes of this motion, that

04:03:56  3   is not relevant, because in Allergan, Your Honor held that

04:04:00  4   opinions on a future royalty that may accrue from

04:04:03  5   infringement that has not yet occurred is properly

04:04:07  6   excludable under Rule 702 as being contrary to law, not

04:04:10  7   helpful to the trier of fact -- so that, of course, is

04:04:13  8   Daubert -- or such an opinion is simply excludable under

04:04:17  9   Rules 401 and 402 as irrelevant.

04:04:21  10          And so the fact that we are presenting this in a

04:04:23  11  motion in limine as opposed to a Daubert ruling does not

04:04:26  12  mean that this is not relief that we can be entitled to.

04:04:31  13          I want to make -- whoops.

04:04:32  14          I want to make one other point very quickly.  So

04:04:36  15  our motion identifies a number of prejudicial figures,

04:04:42  16  including industrywide totals, total revenue, et cetera.

04:04:46  17  Most of those Headwater has agreed that it will not

04:04:49  18  present.

04:04:49  19          The one dispute that remains on those is total

04:04:52  20  spectrum holdings.  So this is an excerpt of Dr. Bazelon's

04:04:57  21  report in the Verizon case.  He has summed what is in his

04:05:01  22  view the total value of Verizon's spectrum holdings at

04:05:06  23  $155 billion.  He then uses that as the starting point for

04:05:13  24  how he apportions down to the ultimate value -- he does a

04:05:16  25  proration by year and then applies a distributed version of

04:05:22    1    Dr. Wesel's findings to come up with the total value.

04:05:25    2         Our expert disputes portions of this, in

04:05:29    3    particular the spectrum price, the megahertz per pop, which

04:05:29    4    is essentially -- think of it as the dollar per square

04:05:38    5    footage for spectrum.  Our expert disputes that, and

04:05:40    6    there's a dispute between the parties about that.

04:05:43    7         The parties can have that dispute without this

04:05:45    8    total number being presented.  This total number is

04:05:48    9    inherently prejudicial at $155 billion.  It's not necessary

04:05:52    10   for them to show this table or tables like it where they

04:05:56    11   talk about Auction 97 generated, you know, $57 billion.

04:06:03    12   Right?  These massive numbers are not necessary for the

04:06:06    13   schedule or don't need to be displayed to understand the

04:06:08    14   schedule.  The relevant schedule is this one where the

04:06:12    15   numbers are still very large but not in the literally

04:06:17    16   hundreds of billions of dollars.

04:06:18    17        And so for that reason, we would ask that the

04:06:23    18   prejudicially high numbers relating to overall spectrum

04:06:27    19   auction results, company's overall spectrum holdings,

04:06:33    20   et cetera, would be excluded in addition to the large

04:06:35    21   numbers that Headwater has not asked to be excluded -- or

04:06:39    22   has -- sorry, has not opposed agreeing to not discuss.

04:06:43    23        THE COURT:  So tell me again the numbers that you

04:06:52    24   say are left in dispute.

04:06:52    25        MR. ROBB:  The numbers that are left in dispute.

04:06:52  1    So for purposes of what Dr. Bazelon did, which is -- he's

04:07:02  2    the one -- the middle step in Headwater's model, the

04:07:09  3    spectrum price, the dollar per megahertz-pop, which is

04:07:14  4    essentially the -- think of it as the value per square

04:07:20  5    footage of their spectrum.  So Verizon has billions and

04:07:21  6    billions of spectrum holding units, and the two competing

04:07:25  7    spectrum experts look at FCC auction results and come up

04:07:29  8    with competing spectrum price per megahertz-pop.

04:07:34  9          So this 2.53 number that you see on the first row

04:07:38  10   is the disputed number.  So our expert calculates it at

04:07:43  11   about $1.10, which then translates to a much lower spectrum

04:07:45  12   value.  But both our expert and their expert can make the

04:07:49  13   case simply by relying on the $2.53 without ever showing

04:07:53  14   the $98 billion or the $155 billion.  And I think the

04:07:59  15   prejudice associated with those numbers speaks for

04:08:02  16   themselves.

04:08:02  17         There are, of course, other inputs to the damages

04:08:07  18   models that the experts dispute.  Dr. Wesel and Dr. Jeffay

04:08:12  19   dispute the data savings per hour.  Multiple of our experts

04:08:16  20   and Dr. Wesel dispute how frequently the features are used.

04:08:19  21   So there are other disputes.

04:08:20  22         But for the purposes of spectrum, the one dispute

04:08:23  23   is the price per megahertz-pop of 2.53 versus, I believe,

04:08:30  24   it's $1.10.

04:08:33  25         THE COURT:  All right.  There are three numbers

04:08:38    1    that you're seeking to exclude there, the spectrum value at

04:08:45    2    98 and 57 billion and the total at 155 billion.  Those are

04:08:51    3    the three numbers that are still in dispute?

04:08:55    4         MR. ROBB:  Your Honor, I'm so sorry.  I have a

04:08:56    5    hearing problem.  I couldn't hear you.

04:08:59    6         THE COURT:  I'm sorry.  I should have been closer.

04:09:01    7         On the screen now, you've got three large figures.

04:09:04    8    That's on your Slide 6.

04:09:06    9         MR. ROBB:  Yes, Your Honor.

04:09:07    10        THE COURT:  98 billion, 57 billion, and 155

04:09:10    11   billion.  Those are the numbers you're seeking to exclude?

04:09:15    12        MR. ROBB:  So essentially, yes, with a couple of

04:09:19    13   caveats.

04:09:20    14        So, first, we have identified in our motion other

04:09:23    15   numbers, for example, total revenue of the company, total

04:09:28    16   industry revenue, total industry cost, et cetera.

04:09:32    17   Headwater, in their opposition brief, indicated they would

04:09:34    18   not oppose those.  So those, I haven't addressed on the

04:09:38    19   understanding that Headwater is not opposing.

04:09:40    20        For the large spectrum numbers that Headwater is

04:09:43    21   opposing, it's the -- either broken out by category or the

04:09:48    22   sum total.  So on this slide, it's 98,007,000,000, with a

04:09:55    23   footnote about why I'm saying that number, 57 billion, and

04:10:00    24   155 billion.

04:10:00    25        The reason I had the footnote, the T-Mobile and

| | | |
|---|---|---|
| 04:10:00 | 1 | Verizon reports are different on this issue in the sense |
| 04:10:05 | 2 | that T-Mobile has a much larger 2.5 gigahertz set of |
| 04:10:09 | 3 | holdings.  And so for them, that number is in the billions. |
| 04:10:13 | 4 | And so we're not prejudiced by the $7 million number, but |
| 04:10:18 | 5 | any of the large spectrum buckets or the total is, one, a |
| 04:10:22 | 6 | related category are total spectrum results from the FCC |
| 04:10:28 | 7 | auctions or from private sales. |
| 04:10:30 | 8 | So, for example, the -- there was an auction in |
| 04:10:35 | 9 | 2021 which generated, I believe, over a hundred billion |
| 04:10:43 | 10 | dollars in revenue, I think.  Certainly -- certainly over |
| 04:10:44 | 11 | $50 billion.  That total value that the whole industry paid |
| 04:10:47 | 12 | for that giant block of spectrum should be excluded for the |
| 04:10:51 | 13 | same reasons. |
| 04:10:52 | 14 | Again, the experts can do their disputes about how |
| 04:10:54 | 15 | to calculate the 2.53 versus $1.10 numbers without |
| 04:11:02 | 16 | referring to the total amount at issue at that auction. |
| 04:11:26 | 17 | THE COURT:  Where is that auction figure in your |
| 04:11:27 | 18 | motion? |
| 04:11:28 | 19 | MR. ROBB:  Yes, Your Honor.  So two notes here, |
| 04:12:08 | 20 | first, and I apologize for this.  On Page -- so I'm looking |
| 04:12:11 | 21 | at the Verizon motion.  On Page 14 of the motion, there's a |
| 04:12:16 | 22 | reference to Tables 5 and Table 6.  That should be Tables 3 |
| 04:12:22 | 23 | and Tables 4.  Table 4 is what we're looking at now. |
| 04:12:26 | 24 | Second, in the next paragraph, there are examples |
| 04:12:30 | 25 | of citing, for example, the $233 billion raised at FCC |

04:12:37    1    auctions.  So, again, the total amount raised at various

04:12:45    2    auctions individually or combined we think are

04:12:53    3    inappropriate.

04:12:54    4            THE COURT:  All right.  And as far as your

04:13:06    5    presentation on the running royalty issues you mentioned,

04:13:13    6    are those covered, as well, in your Daubert motion?

04:13:21    7            MR. ROBB:  Your Honor, there was an inadvertent

04:13:25    8    error in our opening Daubert motion where we omitted this

04:13:28    9    argument.  We inserted that into our reply brief, and they

04:13:28   10    had the opportunity to address it in the sur-reply.  So we

04:13:31   11    think that there's no prejudice the fact that it was not

04:13:34   12    raised in the opening motion.

04:13:35   13            And, moreover, as I cited, this issue of

04:13:39   14    post-judgment running royalties under the law can be

04:13:42   15    addressed either in a motion in limine or a Daubert ruling.

04:13:48   16            THE COURT:  So the relief that you're seeking with

04:13:51   17    respect to the running royalty issue, the future -- the

04:13:59   18    post-judgment running royalty, is what?

04:14:04   19            MR. ROBB:  That that portion of the sum be

04:14:06   20    essentially truncated, cut off.

04:14:09   21            So here, where he's calculating transparently a

04:14:16   22    year-by-year running royalty where in the left-hand columns

04:14:20   23    we have the years, that in the middle of 2025, presuming

04:14:25   24    that's when judgment is entered, that essentially 2026

04:14:29   25    through 2029 would be excluded -- would not be included in

04:14:31  1   the summation because this is -- the reality of what he's

04:14:34  2   doing is he has two components.  He has a pre-judgment and

04:14:38  3   a post-judgment component.  And so the $420 million number

04:14:38  4   on the right, as an example, would be reduced by the

04:14:46  5   summation of 2026 through 2029.

04:14:49  6         THE COURT:  You know, the effect of that, I think,

04:14:54  7   would be that if the infringement continued, then the

04:15:04  8   Plaintiff would be entitled to seek a continuing royalty on

04:15:12  9   that by showing that whatever you have done post-judgment

04:15:18  10  is not colorably different than what you were found to have

04:15:24  11  done as infringement?

04:15:25  12        MR. ROBB:  Your Honor, the -- how the parties

04:15:28  13  address that later, I think, is best suited to later.

04:15:32  14        But, for example, if after judgment Verizon

04:15:39  15  continues to infringe, then there would be a follow-on

04:15:43  16  action where presumably estoppel rules would apply.  They

04:15:48  17  would have been adjudged to be an infringer for selling

04:15:52  18  precisely the same products, and they would get an

04:15:54  19  accounting on those products.  Of course, if the products

04:15:57  20  change, if it turns out that Dr. Bazelon and Mr. Bergman's

04:16:00  21  analyses change, all that would change the numbers.  Or if

04:16:04  22  the parties settle out of court, that would also be an

04:16:06  23  issue to be addressed there.

04:16:08  24        But the problem with including that here

04:16:11  25  prospectively is the inherently speculative nature of, as

04:16:17    1  the footnote indicates, simply taking the 2023 numbers and

04:16:23    2  writing them in in each of the subsequent years.

04:16:25    3            THE COURT:  And does the Plaintiff's expert

04:16:27    4  contend that his analysis is a running royalty all the way,

04:16:33    5  or is he trying to take the position that he is arguing for

04:16:39    6  a lump sum before judgment and this running royalty

04:16:44    7  thereafter?

04:16:46    8            MR. ROBB:  Your Honor, their experts contend that

04:16:49    9  this is a lump sum through the life of the patent.

04:16:53   10            Our point is that in the Samsung case,

04:17:00   11  Dr. Kennedy -- Mr. Kennedy had the very similar schedules

04:17:03   12  for post-judgment infringement, summed them together,

04:17:07   13  called them a lump sum to capture the full value, and

04:17:13   14  Your Honor said, no, that you can't -- you can't convert a

04:17:16   15  lump sum to -- sorry, you cannot convert a running royalty

04:17:23   16  into a lump sum simply by taking what is transparently a

04:17:28   17  running royalty and adding those numbers together.

04:17:30   18            THE COURT:  All right.  Thank you, Mr. Robb.

04:17:33   19            MR. ROBB:  Thank you, Your Honor.  If there's not

04:17:34   20  anything else, I'll rest.

04:17:41   21            MR. HOFFMAN:  Your Honor, may I approach with some

04:17:43   22  slides?

04:17:44   23            THE COURT:  Yes.

04:18:15   24            MR. HOFFMAN:  Your Honor, Adam Hoffman for

04:18:17   25  Headwater.

04:18:17    1          So as we -- I think we see that these are -- this

04:18:22    2    MIL is two entirely separate motions, one of which has to

04:18:27    3    do with large numbers and one of which has to do with a

04:18:31    4    misrepresentation about what the experts' opinions are in

04:18:36    5    this case for Headwater.

04:18:38    6          Taking the large number part first.  As I think

04:18:41    7    Your Honor saw here with a shifting recitation of what

04:18:46    8    large numbers are at issue and what aren't, saying that

04:18:50    9    certain tables were at issue in the motion and now certain

04:18:53   10    other tables are at issue in the argument, simply positing

04:19:00   11    that large numbers are bad is not an enforceable MIL.  And

04:19:06   12    to the degree that there's a specific argument about a

04:19:08   13    specific document or number, those should be addressed on a

04:19:12   14    number-by-number basis.

04:19:14   15          The Federal Circuit held in Elbit, made very clear

04:19:18   16    that cases like Uniloc and LaserDynamics are not simply

04:19:23   17    rules that large numbers cannot be presented to the jury.

04:19:26   18    The Court has to look at the specific use in each of those

04:19:31   19    instances.  And in particular, what's prohibited is using

04:19:36   20    the large numbers to make -- to argue that what's being

04:19:39   21    asked for in damages is a small portion of that.

04:19:43   22          They haven't presented any indication of any of

04:19:48   23    the experts making such an argument because they don't.

04:19:51   24    The numbers that are used are integral to their opinions

04:19:58   25    and necessary to explain how they calculate their opinions.

04:20:01    1        If we can go to the next slide, please.

04:20:04    2        So one of the numbers that apparently they are

04:20:07    3    trying to exclude is the amount that is -- the amount that

04:20:13    4    was obtained through FCC auctions.  Dr. Bazelon was also a

04:20:20    5    witness -- expert witness in Finesse shown here.  This

04:20:24    6    exact issue was addressed in Finesse.  Because those

04:20:28    7    amounts of those auctions was the basis of his spectrum

04:20:34    8    savings model, it was relevant -- those numbers were

04:20:38    9    relevant to his calculations, and there was no --

04:20:43    10   therefore, no basis to say that he was using those numbers

04:20:46    11   simply to skew the horizon or to mislead the jury.  He was

04:20:54    12   using them because they were the necessary evidence.

04:20:56    13       That's also the case here.

04:20:58    14       THE COURT:  Good.  Tell me how Dr. Bazelon is

04:21:00    15   using the spectrum value numbers and the spectrum auction

04:21:09    16   amounts.

04:21:10    17       MR. HOFFMAN:  Okay.  So Dr. Bazelon uses the

04:21:13    18   auction amounts, and he combines those with other FCC data

04:21:18    19   relating to populations in the -- populations and the

04:21:27    20   particular licenses granted to various parties to use

04:21:32    21   those -- the real-world evidence of the auction amounts to

04:21:35    22   calculate -- and I guess we can go to the next slide

04:21:39    23   because this was the one -- to calculate these numbers, the

04:21:43    24   spectrum price.  Those are direct results of the input of

04:21:49    25   the FCC auction data and the population data.  In other

04:21:54   1   words, the FCC auction data is the real-world evidence that

04:21:57   2   is the starting point and basis for his opinion.

04:22:01   3          The biggest dispute in this case between

04:22:05   4   Dr. Bazelon and their counter expert, Dr. Hazlett, is them

04:22:09   5   saying you used the wrong -- the wrong auctions.  You

04:22:12   6   should have looked at these other auctions because the

04:22:14   7   auctions are the basis of the opinion.

04:22:16   8          So to say that the auction amounts are irrelevant

04:22:21   9   to his opinion or improper to present is to say that he's

04:22:24  10   unable to put into evidence the real-world evidence upon

04:22:29  11   which his opinion is based and which is, of course,

04:22:32  12   necessary to establish that his opinions are tied to the

04:22:35  13   evidence of the case.

04:22:36  14          The second point I'd like to make is that the

04:22:42  15   number here, the 155 billion number, that is the basis of

04:22:48  16   his calculation of spectrum savings.

04:22:51  17          If we can go to the next slide, please.

04:22:54  18          He uses a formula whereby he takes various inputs,

04:23:00  19   including Dr. Wesel's estimate of what the technical

04:23:05  20   benefit of the patents is, but also uses other percentages

04:23:09  21   to, for example, exclude instances where Verizon or

04:23:15  22   T-Mobile didn't sell the phone, the user brought their own

04:23:19  23   phone.  He applies these various things to come up with an

04:23:22  24   overall factor, an overall percentage factor, which he then

04:23:26  25   applies to the spectrum value.  In other words, the 155

04:23:31    1    billion, that is the number to which he applies his factor

04:23:35    2    analysis.  And in the absence of that number, he is unable

04:23:41    3    to explain to the jury how he calculates any of his

04:23:45    4    numbers.

04:23:46    5            If you'll go to the next slide, please.

04:23:52    6            There's a claim here that this is a running

04:23:54    7    royalty.  It's just not.  There seems to be a position

04:23:58    8    taken by Verizon and T-Mobile in this case that lump sums

04:24:03    9    cannot be based on extent of use over time, even though

04:24:07    10   that's literally the law that that's what patent damages

04:24:11    11   are based on.

04:24:11    12           Dr. Bazelon annualized that 155 million (sic), in

04:24:19    13   other words, he broke it up over the years, because Verizon

04:24:24    14   obtained spectrum at different times.  And also spectrum,

04:24:32    15   he wanted to -- as is required, he wanted to look at the

04:24:36    16   discount factor and the effect of the discount factor of

04:24:40    17   the value of that spectrum over time.

04:24:42    18           So he annualized that overall number to arrive at

04:24:46    19   a number for each year so that he can accurately both

04:24:49    20   reflect the extent of use and so that he can fairly give --

04:24:56    21   give the Defendants credit for the discount factor as

04:25:01    22   really he's required to do.

04:25:02    23           But this merely just shows the extent of use.  And

04:25:07    24   then he does add up the various values over time and comes

04:25:14    25   up -- this is not a royalty, by the way.  This is an

04:25:16  1  opinion on the value of the saved spectrum, the spectrum

04:25:20  2  that is saved directly incrementally as an effect of

04:25:25  3  infringement.

04:25:25  4      So I guess I'm at a loss at what an expert could

04:25:32  5  possibly do to have a lump sum that reflects accurately

04:25:40  6  changing value over time and extent of use over time,

04:25:43  7  because apparently if they break it up by year, according

04:25:47  8  to Defendant, they, therefore, can only have a running

04:25:49  9  royalty, because as Your Honor knows, particularly in this

04:25:53  10  court, where the opinion of the expert is that a lump

04:25:56  11  sum -- that that's a lump sum, and more importantly where

04:25:58  12  the jury awards a lump sum, that award is for the entire

04:26:03  13  life of the patent.

04:26:05  14      And to be very clear, all the experts in this case

04:26:10  15  opine on a lump sum.  Nobody is opining on a reasonable

04:26:14  16  royalty.  The only thing going to the jury is a lump sum.

04:26:16  17  If the jury awards a lump sum that ignores any post -- any

04:26:23  18  post-trial infringement, then that simply deprives

04:26:28  19  Headwater of the vast majority -- or not the vast majority,

04:26:34  20  of a significant portion of the damages that would be

04:26:36  21  considered -- should be considered and at the hypothetical

04:26:38  22  negotiation would, of course, be considered because at the

04:26:41  23  hypothetical negotiation all parties agree the parties

04:26:45  24  would be negotiating a license through the expiration of

04:26:48  25  the patents.

04:26:49    1          Another way to think of this is it's clear that

04:26:52    2    under this Court's precedence, that it is appropriate to

04:26:57    3    consider post-trial infringement and the resulting benefit

04:27:02    4    of that infringement as part of a lump-sum analysis.  They

04:27:07    5    don't seem to dispute that.

04:27:09    6          How would that be possible -- according to them,

04:27:12    7    you can't look at that on a year-by-year basis.  You can't

04:27:16    8    consider what that benefit is over years.  You have to

04:27:17    9    somehow -- actually I don't even know what they're talking

04:27:19   10    about.  You have to do projections without doing

04:27:22   11    projections by year, according to them, which just simply

04:27:25   12    isn't even possible.

04:27:26   13          This very clearly is nothing like the 422 case,

04:27:31   14    the Headwater I case.  There, there was no dispute at all

04:27:35   15    that Dr. Kennedy was opining that the reasonable royalty in

04:27:40   16    the case was a running royalty.  He never opined that the

04:27:44   17    reasonable royalty was a lump sum.

04:27:46   18          He opined that -- that if the Defendants argued

04:27:50   19    for a lump sum, that it is -- it would be necessary,

04:27:56   20    therefore, for the jury to consider future post-trial use,

04:28:02   21    and he therefore calculated that future use as a -- as a

04:28:07   22    sort of anticipatory rebuttal.

04:28:09   23          But that was not his opinion, and that's your

04:28:13   24    court excluded it, because you said you have a reasonable

04:28:18   25    royalty opinion, and you can't have a reasonable royalty

| | | |
|---|---|---|
| 04:28:20 | 1 | opinion and then also calculate post-trial damages. |
| 04:28:24 | 2 | THE COURT:  I am going to defer that side of this |
| 04:28:30 | 3 | motion to the Daubert motion addressing the Plaintiff's |
| 04:28:37 | 4 | damages.  So what I do want to discuss with you just is the |
| 04:28:48 | 5 | use of the figures that the Plaintiff is complaining about. |
| 04:28:54 | 6 | I'm looking at what is your Slide 6 on this MIL 5. |
| 04:29:02 | 7 | MR. HOFFMAN:  Yes, Your Honor. |
| 04:29:03 | 8 | THE COURT:  The one that has the 98, 7, and 57 |
| 04:29:07 | 9 | adding up to 155. |
| 04:29:12 | 10 | Does Dr. Bazelon calculate those spectrum price |
| 04:29:25 | 11 | dollars per megahertz, whatever, at that level, or is it |
| 04:29:32 | 12 | calculated on many years that add up to what's shown on |
| 04:29:36 | 13 | Slide 6? |
| 04:29:37 | 14 | MR. HOFFMAN:  He calculates it at this level, and |
| 04:29:40 | 15 | then he annualizes that number.  He takes the 155 billion |
| 04:29:45 | 16 | and then spreads it over the years based on the extent of |
| 04:29:49 | 17 | use and based on the discount factor for the depreciation |
| 04:29:54 | 18 | of that value over time. |
| 04:29:55 | 19 | So then -- so this is -- this is the number he |
| 04:30:03 | 20 | gets from his analysis of the auction pricing and which he |
| 04:30:08 | 21 | then annualizes. |
| 04:30:10 | 22 | THE COURT:  So tell me what -- all right.  You're |
| 04:30:19 | 23 | looking -- I see.  You're looking at a different slide than |
| 04:30:22 | 24 | I am. |
| 04:30:23 | 25 | MR. HOFFMAN:  Yes, Your Honor.  I think you were |

04:30:24  1  referring to my Slide 4 when you were asking about the

04:30:27  2  98 million -- 98 billion --

04:30:28  3          THE COURT:  It says 6 on the copy I'm looking at.

04:30:31  4          MR. HOFFMAN:  Oh, I'm sorry, Your Honor.

04:30:33  5          But in any case, it should say Table 3 if that's

04:30:37  6  the one you were asking about.  The numbering might have

04:30:49  7  gotten messed up.  This is the one you were just asking

04:30:52  8  about, correct, Your Honor?

04:30:53  9          THE COURT:  That is the one I was asking about.

04:30:55  10  So I don't understand how the numbers work on that to

04:30:59  11  generate the result.  It looks like that's more of a

04:31:01  12  composite.

04:31:07  13          MR. HOFFMAN:  Well, so because the auctions take

04:31:10  14  place for different bands, there's three different numbers

04:31:13  15  because there's different inputs in terms of the auction

04:31:16  16  prices for those different bands.  So you have three

04:31:16  17  different numbers for the value of Verizon's holdings at

04:31:20  18  those three different bands.  He then adds those together

04:31:23  19  to get the value of the total holdings.

04:31:25  20          He then -- if we can go to -- two slides forward.

04:31:29  21          THE COURT:  Where does he get those numbers from,

04:31:32  22  the 98, the 7, and the 57?

04:31:35  23          MR. HOFFMAN:  He gets them by deriving from the

04:31:41  24  auction price number the prior column for the megahertz-pop

04:31:49  25  number and then applying that to the extent of

04:31:51   1   infringement.

04:31:58   2        THE COURT:  So why does he need to add it up to

04:32:01   3   those figures before breaking it down?

04:32:04   4        MR. HOFFMAN:  Well, these are all, I think -- he's

04:32:07   5   a Ph.D. in economics and sometimes takes -- his

04:32:11   6   explanations are very complicated.  My understanding is

04:32:15   7   that in his mind, the most accurate way in which to

04:32:17   8   determine this is to determine the total value and then

04:32:22   9   using that total value then annualize that value from that

04:32:28   10   starting point.  I mean, that's his methodology.

04:32:30   11        And I think that goes to another issue here, which

04:32:37   12   is whether this is essentially a Daubert motion rather than

04:32:40   13   a MIL.

04:32:45   14        THE COURT:  I'm just looking at whether he needs

04:32:49   15   to put that $155 billion figure in front of the jury.  And

04:32:54   16   I'm trying to understand the role it plays in his analysis.

04:32:58   17   But it appears that he's starting with it, not using it.

04:33:04   18        MR. HOFFMAN:  I mean, you're correct, Your Honor,

04:33:06   19   in that it is a -- it is a starting point to which then

04:33:11   20   other apportionment factors are applied.

04:33:15   21        However, in explaining his opinion to the jury and

04:33:19   22   having the jury understand how he arrives at the numbers he

04:33:22   23   does and be able to evaluate the credibility of that to cut

04:33:27   24   out steps in his analysis undermines his ability to present

04:33:33   25   his opinion -- his entire opinion and to explain it fully

| | | |
|---|---|---|
| 04:33:38 | 1 | to the jury. |
| 04:33:39 | 2 | THE COURT:  Where does his analysis start? |
| 04:33:44 | 3 | MR. HOFFMAN:  It starts from the spectrum value at |
| 04:33:51 | 4 | the various bands, so the 98 billion, the 7 billion, and |
| 04:33:55 | 5 | the 57 billion, which added together is the total spectrum |
| 04:33:59 | 6 | value, which he then goes through a fairly complicated |
| 04:34:04 | 7 | calculation to take that total value and spread it over the |
| 04:34:10 | 8 | life of the patents, again, so he can take into account the |
| 04:34:14 | 9 | discount factor that reasonably would apply at the |
| 04:34:19 | 10 | hypothetical negotiation, as well as the time at which |
| 04:34:24 | 11 | Verizon and T-Mobile obtained that spectrum. |
| 04:34:32 | 12 | So I think Your Honor is correct in that |
| 04:34:33 | 13 | conceivably, he could start at Table 5-8, where -- starting |
| 04:34:39 | 14 | from the annualized numbers.  But without able to -- he |
| 04:34:43 | 15 | wouldn't be able to explain to the jury how he gets there |
| 04:34:47 | 16 | from the auction pricing without explaining the |
| 04:34:50 | 17 | intermediary steps. |
| 04:34:54 | 18 | THE COURT:  Well, what auction pricing is |
| 04:34:56 | 19 | reflected in that Table 3? |
| 04:35:00 | 20 | MR. HOFFMAN:  Table 3 reflects -- as you can see, |
| 04:35:03 | 21 | there are footnotes there.  So it reflects Auction 97 and |
| 04:35:09 | 22 | Auction 107.  Those were two separate auctions for two |
| 04:35:12 | 23 | separate bands.  And that's the source of the data which |
| 04:35:17 | 24 | when combined with population data he used to calculate the |
| 04:35:21 | 25 | spectrum price in the middle column there, the dollar per |

04:35:26    1    megahertz per population.

04:35:42    2         So if you look at this, the Footnote 1 and 3 here,

04:35:45    3    that's the starting point of his analysis, the real-world

04:35:48    4    evidence of the market price for spectrum, which he then

04:35:52    5    uses to, through several steps, come up with the value --

04:35:59    6    the value of Defendants' spectrum.

04:36:15    7         THE COURT:  All right.  And the amounts raised in

04:36:18    8    the various spectrum auctions, which was the other issue

04:36:20    9    raised, those are numbers that he turns into these -- that

04:36:33   10    calculation in Footnote 2?

04:36:37   11         MR. HOFFMAN:  I think Footnote 2 only refers to

04:36:40   12    that particular band where because there's -- there isn't

04:36:45   13    direct auction data, he kind of has to do some additional

04:36:47   14    calculations, and he explains what those are there.

04:36:51   15         This doesn't show the sort of formula of his

04:36:56   16    calculation for how he takes the input of the auction price

04:37:05   17    and from that calculation total value.

04:37:06   18         But I don't believe, Your Honor, that there's any

04:37:08   19    dispute that the starting point of his analysis and the

04:37:11   20    basis of his numbers, the real-world evidence upon which

04:37:15   21    his numbers are based are the auction pricing.

04:37:18   22         And, again, the main dispute between the experts

04:37:22   23    on this issue is not whether that's an unreasonable

04:37:30   24    starting point but whether he -- which auctions to look at,

04:37:36   25    that Dr. Bazelon believes that the two auctions shown here,

04:37:39  1  the 97 and the 107, are the most comparable and relevant

04:37:44  2  ones.  And their expert, Dr. Hazlett, thinks that other

04:37:48  3  ones are more relevant.  But they're both essentially

04:37:51  4  starting from the same place in terms of the kind of data

04:37:55  5  that they're looking at.

04:37:56  6        THE COURT:  Dr. Bazelon's report is in the record

04:37:59  7  at -- as Exhibit 12; is that right?

04:38:03  8        MR. HOFFMAN:  Your Honor, I don't have -- yes,

04:38:09  9  Your Honor, Exhibit 12.

04:38:10  10        And also I'd point out that not just this issue --

04:38:14  11  sorry, not just the issue about post-trial damages but

04:38:18  12  also -- or post-trial infringement but also this issue

04:38:21  13  that's specifically about this large number issue is also

04:38:23  14  addressed in the Daubert briefing.

04:38:27  15        So in Verizon, that's Docket 216 and 212, two

04:38:33  16  different ones because there's motions against both

04:38:36  17  Mr. Bergman and Dr. Bazelon.  And in the T-Mobile case, at

04:38:40  18  Docket 205 and 209.

04:38:44  19        THE COURT:  All right.  And I'm going to carry MIL

04:38:49  20  No. 5 and look at it in connection with the Daubert and

04:38:55  21  with Dr. Bazelon's report and make a determination about

04:39:00  22  both issues.

04:39:01  23        MR. HOFFMAN:  Thank you, Your Honor.

04:39:02  24        MR. ROBB:  Your Honor, if I may, I don't have

04:39:05  25  anything of substance to say, but I'd like to offer

| | | |
|---|---|---|
| 04:39:08 | 1 | something. |
| 04:39:08 | 2 | THE COURT:  All right. |
| 04:39:09 | 3 | MR. ROBB:  I have with me excerpts of |
| 04:39:13 | 4 | Mr. Kennedy's report from the original Samsung case, which |
| 04:39:17 | 5 | is the basis of the ruling in that case that we think |
| 04:39:19 | 6 | applies here.  If I could provide a copy to counsel and to |
| 04:39:24 | 7 | Your Honor? |
| 04:39:26 | 8 | THE COURT:  All right. |
| 04:39:43 | 9 | MR. ROBB:  Thank you, Your Honor. |
| 04:39:51 | 10 | MR. HOFFMAN:  And, Your Honor, in terms of what |
| 04:39:53 | 11 | you've just been handed, I would just direct you to |
| 04:39:56 | 12 | Paragraph 433 on the first -- the first page which makes it |
| 04:39:59 | 13 | clear that what Dr. Kennedy was doing was not what |
| 04:40:04 | 14 | Dr. Bazelon was doing. |
| 04:40:06 | 15 | THE COURT:  All right.  I will consider that, as |
| 04:40:07 | 16 | well. |
| 04:40:07 | 17 | I'm going to grant the Defendants' motion for |
| 04:40:13 | 18 | leave to take up their sixth motion in limine, and I'd like |
| 04:40:21 | 19 | to hear from counsel about that now.  I understand that |
| 04:40:25 | 20 | there is some measure of agreement, but I understand |
| 04:40:31 | 21 | Plaintiff has some concerns about it? |
| 04:40:36 | 22 | MR. GORHAM:  Yes, Your Honor.  Tom Gorham on |
| 04:40:37 | 23 | behalf of Defendants. |
| 04:40:39 | 24 | I'm pleased to announce that we worked out an |
| 04:40:41 | 25 | agreement over the lunch hour.  If I may approach the bench |

| | | |
|---|---|---|
| 04:40:46 | 1 | and hand up a paper that displays the structure of the |
| 04:40:50 | 2 | agreement.  And I have a couple of additional comments, as |
| 04:40:53 | 3 | well. |
| 04:40:54 | 4 | THE COURT:  All right. |
| 04:40:55 | 5 | MR. GORHAM:  Thank you. |
| 04:41:16 | 6 | So, Your Honor, what I've handed up is Docket |
| 04:41:20 | 7 | Entry 262 in the 379 case.  And in the right-hand column, |
| 04:41:25 | 8 | what is shown is Headwater's requested clarifications to |
| 04:41:30 | 9 | Defendants' proposed MIL No. 6. |
| 04:41:33 | 10 | And over the lunch hour, we met and conferred |
| 04:41:37 | 11 | about Headwater's proposed clarifications.  We have agreed |
| 04:41:42 | 12 | with these clarifications with a few of -- a few additions |
| 04:41:46 | 13 | of our own. |
| 04:41:47 | 14 | And my question for Your Honor is how would you |
| 04:41:49 | 15 | like for us to present these to the Court for |
| 04:41:51 | 16 | implementation, if the Court is willing to do so?  It might |
| 04:41:55 | 17 | be a little bit difficult to read the entirety of the |
| 04:41:59 | 18 | agreed-to MIL with the edits from the podium.  And in lieu |
| 04:42:07 | 19 | of doing that, I'm happy to email the Court the language |
| 04:42:09 | 20 | that the parties have agreed to. |
| 04:42:11 | 21 | THE COURT:  And the language that would be added |
| 04:42:15 | 22 | is what is handwritten on the copy of what was handed to |
| 04:42:20 | 23 | me? |
| 04:42:21 | 24 | MR. GORHAM:  That's correct, and I've shown that |
| 04:42:22 | 25 | to opposing counsel before I approached the bench. |

04:42:27   1          THE COURT:  That is fine.  Why don't you go ahead

04:42:29   2   and email that --

04:42:29   3          MR. GORHAM:  Okay.

04:42:30   4          THE COURT:  -- and we'll make sure that it gets

04:42:34   5   into the order on the MILs.

04:42:36   6          MR. GORHAM:  Okay.  And one comment -- perhaps two

04:42:42   7   comments on behalf of the Defendants as to what is driving

04:42:45   8   these edits, Your Honor.

04:42:47   9          Headwater's proposed clarification -- and I'm

04:42:51   10  looking now at the second proposed clarification -- asks a

04:42:55   11  party is permitted to question the opposing party's

04:43:00   12  corporate representative at trial regarding that opposing

04:43:02   13  party's positions taken in the litigation and at trial.  It

04:43:08   14  was the language "the positions taken in the litigation at

04:43:12   15  trial" that Defendants thought was a little too broad --

04:43:15   16  actually a lot too broad.

04:43:16   17         So we proposed the two clarifications to narrow

04:43:19   18  the scope of that area for which Plaintiff is allowed to

04:43:24   19  question our corporate representative.  And that was the

04:43:28   20  principal animating factor behind that edit, Your Honor.

04:43:34   21         THE COURT:  All right.  That it is relating to the

04:43:39   22  opposing party's high-level positions?

04:43:45   23         MR. GORHAM:  Yes, exactly.

04:43:46   24         THE COURT:  And regarding infringement,

04:43:49   25  invalidity, and damages?

04:43:50  1          MR. GORHAM:  Yes, sir.

04:43:51  2          THE COURT:  All right.  I understand that.

04:43:55  3          MR. GORHAM:  Thank you.  I have nothing further,

04:43:56  4  and I will email the document to the Court.  Thanks.

04:44:00  5          THE COURT:  All right.  Thank you, Mr. Gorham.

04:44:03  6          Obviously, we are not going to finish the exhibits

04:44:15  7  for the Verizon case, and we still have matters to take up

04:44:20  8  regarding T-Mobile.  I'm not quite as worried about the

04:44:26  9  timing on the T-Mobile matters because I -- it is not going

04:44:30  10  to go to trial before Verizon.

04:44:32  11          I guess theoretically Verizon could settle and

04:44:39  12  leave T-Mobile first.

04:44:40  13          I'm looking at the people who would know that.

04:44:44  14          MR. ROSENTHAL:  I think Verizon will go first,

04:44:46  15  Your Honor.

04:44:46  16          THE COURT:  All right.  I'm counting on that.

04:44:51  17          Then I've got a couple of options.  We don't have

04:45:01  18  tremendous flexibility, but on Thursday and Friday of next

04:45:06  19  week, I've got time to take up the exhibits.  It does not

04:45:12  20  require everybody to come back, just whoever you entrust

04:45:16  21  with the exhibit issues.

04:45:20  22          It looks like, frankly, the parties have gotten

04:45:25  23  the exhibits down to a fairly manageable number, and I will

04:45:31  24  make an effort to get a ruling out on the MILs that we have

04:45:37  25  taken under advisement, although not necessarily the ones

04:45:43  1    that are deferred to another substantive motion.

04:45:47  2         But if counsel want to consult their calendars and

04:45:54  3    let Ms. Asbel know before you leave here which of those two

04:46:00  4    days work best for you, and then we can at least finish up

04:46:05  5    the exhibits for Verizon and hopefully launch into issues

04:46:13  6    for the T-Mobile case, as well.

04:46:16  7         I am assuming that a lot of what we've done will

04:46:19  8    apply to the T-Mobile case, as well.

04:46:25  9         MR. DACUS:  Your Honor --

04:46:25  10        THE COURT:  Yes.

04:46:26  11        MR. DACUS:  -- on the Thursday and Friday of next

04:46:27  12   week, I show on my calendar Friday of next week is the

04:46:33  13   AT&T-Headwater pretrial.  Am I --

04:46:35  14        THE COURT:  That's in the morning.

04:46:38  15        MR. DACUS:  So that one will be done by noon?

04:46:43  16        MS. FAIR:  Your Honor, if I may.  We have spoken

04:46:46  17   with AT&T's counsel about whether it makes sense, because a

04:46:49  18   lot of the issues do overlap, to go ahead and finish the

04:46:52  19   Verizon issues before we get to AT&T.  And so I don't

04:46:56  20   know -- we've floated this idea with everyone of

04:47:01  21   supplanting the AT&T pretrial next Friday with a

04:47:04  22   continuation of this hearing.  I don't want to speak for

04:47:07  23   Verizon, T-Mobile, and AT&T on that, but from our

04:47:10  24   perspective, that would -- that would work just fine.

04:47:14  25        THE COURT:  Well, I -- that makes sense.

04:47:17    1          Is that -- that would mean we have the day, and I

04:47:20    2    know we'd accomplish quite a lot.

04:47:24    3          MR. KREVITT:  Your Honor, if we could just huddle,

04:47:26    4    as you suggested, on schedules --

04:47:26    5          THE COURT:  Okay.

04:47:28    6          MR. KREVITT:  -- because we have not had an

04:47:30    7    opportunity to consider that, and we'll --

04:47:32    8          THE COURT:  All right.

04:47:32    9          MR. KREVITT:  We understand Thursday and Friday

04:47:34   10    are available, and I'm sure we can make one of those work.

04:47:37   11          THE COURT:  All right.  Well, I know we had a

04:47:40   12    variety of other matters on the agenda, but I think we'll

04:47:43   13    just carry all of those over to next week.

04:47:47   14          And if you are able to arrive at a decision on the

04:47:50   15    date before you leave, that'd be helpful, and let us know.

04:47:56   16          MS. FAIR:  Does that include the potential for

04:47:58   17    Friday morning if the parties are all agreeable to the

04:48:01   18    Verizon issues being taken up that morning, or is the Court

04:48:04   19    wanting to keep AT&T on calendar there?

04:48:06   20          THE COURT:  I am quite willing to move it.  And it

04:48:13   21    looks like I'm hearing from Mr. Saltz that we may have a

04:48:20   22    motion hearing in that case on that date.  We would move

04:48:24   23    that, as well.

04:48:24   24          MS. FAIR:  Yes.  That would be something I think

04:48:25   25    we would contemplating moving, as well.  I know that was

| | | |
|---|---|---|
| 04:48:28 | 1 | also part of what was set Friday morning.  But since we |
| 04:48:31 | 2 | have counsel for all three of the carriers and Headwater |
| 04:48:33 | 3 | here, if the Court's amenable to being flexible, we can |
| 04:48:37 | 4 | reach an agreement and get with Ms. Asbel about that -- |
| 04:48:40 | 5 | THE COURT:  All right. |
| 04:48:41 | 6 | MS. FAIR:  -- if that's all right with the Court? |
| 04:48:43 | 7 | THE COURT:  Yes, I think that sounds good, and I |
| 04:48:46 | 8 | will let you confer. |
| 04:48:47 | 9 | Thank you. |
| 04:48:47 | 10 | MR. KREVITT:  Thank you, Your Honor. |
| 04:48:47 | 11 | MR. ROSENTHAL:  Thank you, Your Honor. |
| 04:48:48 | 12 | COURT SECURITY OFFICER:  All rise. |
| 04:48:49 | 13 | (Hearing concluded at 4:48 p.m.) |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1                            CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9     /S/ Shelly Holmes                    6/2/2025
     SHELLY HOLMES, CSR, TCRR              Date
10   CERTIFIED SHORTHAND REPORTER
     State of Texas No.: 7804
11   Expiration Date: 10/31/2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25