# Exhibit A

```
 1                 UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3                                    )
     HEADWATER RESEARCH, LLC,         )
 4                                    )
         Plaintiff,                   )
 5                                    )
     VS.                              )  CIVIL ACTION
 6                                    )  NO.2:23-CV-352-JRG-RSP
     VERIZON COMMUNICATIONS,          )
 7   INC., et al.,                    )
                                      )
 8       Defendant.                   )
     _____    ) _____
 9   HEADWATER RESEARCH, LLC,         )
                                      )
10       Plaintiff,                   )
                                      )  CIVIL ACTION
11   VS.                              )  NO.2:23-CV-379-JRG-RSP
                                      )
12   T-MOBILE US, INC., et al.,       )
                                      )
13       Defendant.                   )

14                       REPORTER'S RECORD

15          TRANSCRIPT OF FINAL PRETRIAL CONFERENCE

16            BEFORE THE HONORABLE ROY S. PAYNE

17               June 5, 2025; 9:03 a.m.

18                    MARSHALL, TEXAS

19

20

21

22

23    Proceedings recorded in realtime via machine shorthand.
     _____
24           Dana Hayden, CCR, RMR, CRR, CRC
25       Dana@ArkansasRealtimeReporting.com
```

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFF:

 3        Messrs. Kristopher Davis and Adam Hoffman
          Russ August & Kabat
 4        12424 Wilshire Boulevard, 12th Floor
          Los Angeles, CA 90025
 5
          Ms. Andrea L. Fair
 6        Miller Fair Henry PLLC
          1507 Bill Owens Parkway
 7        Longview, TX 75604

 8
     FOR THE DEFENDANTS:
 9
          Mr. Josh A. Krevitt
10        Ms. Katherine Dominguez
          Mr. Charlie Sim
11        Gibson Dunn & Crutcher, LLP
          200 Park Avenue, 48th Floor
12        New York, NY 10166

13        Mr. Robert Vincent
          Gibson, Dunn & Crutcher LLP
14        2001 Ross Avenue, Suite 2100
          Dallas, TX 75201
15
          Mr. Andrew W. Robb
16        Gibson, Dunn & Crutcher LLP
          310 University Avenue
17        Palo Alto, CA 94301

18        Ms. Hannah L. Bedard
          Gibson, Dunn & Crutcher LLP
19        1700 M Street, NW
          Washington, DC 20036
20
          Mr. Tom Gorham
21        Gillam & Smith, LLP
          303 South Washington Avenue
22        Marshall, TX 75670

23        Mr. Deron R. Dacus
          The Dacus Firm, PC
24        821 ESE Loop 323, Suite 430
          Tyler, TX 75701
25
```

1                    ***** PROCEEDINGS *****

2          THE COURT:  For the record, we are here for the

3    completion of the pretrial conference in *Headwater*

4    *Research versus Verizon Communications*, which is

5    2:23-352 on our docket, as well as taking up, and

6    hopefully completing, the pretrial conference for

7    *Headwater Research versus T-Mobile US*, which is our

8    2:23-379 case.

9          Would counsel state their appearances for the

10   record.

11         MS. FAIR:  Good morning, Your Honor.  Andrea

12   Fair on behalf of Headwater.  I'm joined today by

13   Mr. Kristopher Davis, Mr. Adam Hoffman, and we are ready

14   to proceed.

15         THE COURT:  All right.  Thank you, Ms. Fair.

16         MR. GORHAM:  Good morning, Your Honor.  Tom

17   Gorham on behalf of T-Mobile Defendants.  I'm joined

18   this morning by Dr. Deron Dacus, representing Verizon.

19   Representing Verizon and T-Mobile are a number of Gibson

20   Dunn lawyers.  We have Ms. Kate Dominguez, Mr. Robb

21   Vincent, Mr. Josh Krevitt, Mr. Charlie Sim and Andrew

22   Robb, and Ms. Hannah Bedard.

23         Defendants are ready, Your Honor.

24         THE COURT:  All right.  Thank you, Mr. Gorham.

25         We left off last week with the exhibit issues,

1  so I want to take up the exhibits; and I understand the

2  way counsel have prepared them, we can take up the

3  exhibits for both cases at the same time, and that's

4  fine.

09:04AM  5          I then want to take up any other issues that

6  may have been careted or are otherwise unresolved

7  regarding the Verizon case and then take up T-Mobile and

8  go back to any issues from the pretrial order that are

9  different with respect to T-Mobile, then take up the

09:05AM  10  MILs, to the extent they are different with respect to

11  T-Mobile, and hopefully end the day with both cases

12  being ready for trial.

13          And I will say that it's my understanding that

14  there are discussions going on in the *Empire* case which

09:05AM  15  is, as I understand it, the only case ahead of

16  Headwater/Verizon.  So I think there's a very real

17  chance that that case, that the Verizon matter will be

18  first up on the 23rd, in two weeks.

19          So having said that, I would like to hear from

09:06AM  20  either side if there are additional issues that you want

21  to make sure are on the agenda for today.  It would be

22  helpful to know about them in advance.

23          Mr. Davis?

24          MR. DAVIS:  Thank you, Your Honor.

09:06AM  25          So I think as we mentioned at the last pretrial

5

 1    conference, the issue of indemnification we wanted to

 2    talk about at some point during the conference as well.

 3              THE COURT:  And that is in this case affecting

 4    Apple; is that right?

09:06AM  5              MR. DAVIS:  That affects at least Apple and

 6    Google, who have been identified with witnesses in the

 7    Verizon and T-Mobile witness lists as potential

 8    may-call-live witnesses.

 9              THE COURT:  All right.  I will make sure that

09:06AM 10    that is on the agenda for later today.

11              MR. DAVIS:  All right.  Thank Your Honor.

12              MR. KREVITT:  Good morning, Your Honor.  The

13    only thing I would add is we've received, Your Honor, is

14    rulings of this morning and are digesting them.  At

09:07AM 15    least one of the rulings, the summary judgment with

16    respect to the '042 patent implicates in our view, or

17    likely implicates in our view one of the motion in

18    limine rulings Your Honor had, and we'd like an

19    opportunity to think about that, not stand at the podium

09:07AM 20    half-baked and give you my preliminary thoughts on that,

21    but we'd like an opportunity to address that at some

22    point, hopefully soon this morning.

23              And then in addition, Your Honor, as you'll

24    recall from when we were last together, if we have an

09:07AM 25    opportunity, we thought it might be helpful for Your

1    Honor to hear brief argument with respect to the claim

2    construction issues.  One of those patents was the '042

3    patent.  That, of course, has been resolved.  The other

4    is the '541 patent that has a claim construction issue

09:08AM  5    baked in explicitly so by the Plaintiffs and our related

6    Daubert motion.

7         So if we have time, I just wanted to remind the

8    Court that we had discussed and think it may be helpful

9    to address those briefly.

09:08AM  10         THE COURT:  And I do intend to go back through

11    the MILs, to the extent that T-Mobile has a different

12    take on any of them.  The issue that you're mentioning

13    about the '042 I assume relates to the copying question?

14         MR. KREVITT:  Actually, no, Your Honor.  So

09:08AM  15    maybe let me just identify for the Court.  You'll recall

16    that MIL 4 was a motion in limine that Verizon filed

17    with respect to a Mr. Russell.  He had filed a

18    whistleblower.  We had extensive discussion.

19         Your Honor had extensive discussion with

09:09AM  20    Mr. Rosenthal on our side and Mr. Chang for Headwater

21    about whether the Cooklev report actually tied what was

22    in those documents to the '042 patent or not.  Mr. Chang

23    referred you to paragraph 90 and walked you through

24    several paragraphs in the Cooklev report.

09:09AM  25         Ultimately Your Honor concluded -- I think your

1  words were that you were persuaded that Mr. Cooklev --

2  or I'm sorry; it may be Dr. Cooklev; I'm not sure -- had

3  connected those allegations, those paragraphs to the

4  '042 patent and, therefore, denied our motion in limine.

09:09AM  5      There is no more '042 patent in light of Your

6  Honor's rulings; there is no more Dr. Cooklev in light

7  of Your Honor's rulings.  He is here only to talk

8  about -- or would have been here only to talk about the

9  '042 and, as a consequence, there is no basis for any of

09:09AM  10  those documents to come in, given that they are relevant

11  only to the '042 patent.  That's the ruling.

12      We are digesting Your Honor's ruling in light

13  of the other MIL, including the copying, but the one

14  that I am certain that we believe requires revision is

09:10AM  15  Motion in Limine Number 4, which was tied explicitly and

16  entirely to the '042 patent.

17      THE COURT:  And I feel the need to say for the

18  record that I recognize that the recommendation on the

19  '042 is not -- has not been adopted and may or may not

09:10AM  20  be adopted, but I will also say that I am proceeding on

21  the assumption that it will be with the understanding

22  that if it's not --

23      MR. KREVITT:  Yes, Your Honor.

24      THE COURT:  -- we will revisit the issue.  I

09:10AM  25  just say that because I don't want the record to reflect

```
 1   that I am assuming the outcome.

 2           MR. KREVITT:  I should have said that as well,

 3   Your Honor.

 4           THE COURT:  No.

 5           MR. KREVITT:  Apologies.

 6           THE COURT:  I'm more best to say that, not you.

 7   In any event, all right.  I will note that that's

 8   something that, at the end of the day, we'll address.

 9           MR. KREVITT:  Thank you, Your Honor.

10           THE COURT:  Thank you, Mr. Krevitt.

11           All right.  With respect to the exhibits, I

12   would like to take up first the Defendants' objections

13   to the Plaintiff's exhibits.  And we have had emailed to

14   us, either yesterday or this morning, an updated bucket

15   list on those, and I'll see that those bucket lists are

16   exhibits to the minutes so that it will be

17   understandable in the record what we're talking about

18   when we refer to it, but the first of those relates to

19   marking and that's bucket 1 of group 1.

20           So if the Plaintiff wants to tell me about

21   those and then I'll hear from the Defendant as well.

22           MR. HOFFMAN:  If we can have the...

23           Your Honor, we have some slides that we

24   prepared.  May I approach?

25           THE COURT:  Yes.
```

09:13AM

09:14AM

09:14AM

09:14AM

09:14AM

1    And, Mr. Hoffman, let me just say that I don't

2    know the level at which you were able to confer with the

3    other side about these things.  If you think it would be

4    more efficient for me to hear what their objections are

5    before you tell me about the exhibits, I'm open to go

6    either way.

7        MR. HOFFMAN:  I think, Your Honor, since we

8    already are set up here, maybe at least for this one, it

9    makes sense for me to proceed.

10        THE COURT:  All right.

11        MR. HOFFMAN:  It might make sense to do it the

12    other way for some of the other buckets.

13        So, Your Honor, what's at issue here is the

14    marking page Your Honor's heard quite a bit about, the

15    ItsOn marking page in last week's hearing and ruling on

16    the summary judgment on marking.  So obviously these

17    mark -- in terms of relevance, there's a high degree of

18    relevance for these marking page, not only for marking

19    but also for notice as it relates to willfulness and

20    also for validity.

21        So the degree that the objection is really

22    about hearsay because it's an ItsOn document, at least

23    for willfulness, the documents are not being offered for

24    the matter -- for the truth of the matter asserted.

25    They are being offered to show these are documents that

1    were produced from Headwater's records and they're kept

2    in the normal course of business.

3            Your Honor, I put on the screen a deposition

4    from Krista Jacobsen, which was -- who was the internal

09:15AM    5    counsel at Headwater, and I can -- if Your Honor would

6    like a copy of that, I can also give you a copy.

7            Ms. Jacobsen testified that Headwater worked

8    with ItsOn to figure out which patents should be on the

9    marking page, which patents the ItsOn products

09:15AM    10    practiced.  They collaborated with them on the contents

11    of the marking page and, of course, ItsOn was closely

12    related, at least early on, with Headwater and its

13    primary licensee and also its main pathway to

14    commercializing its patents.  So it's natural that

09:15AM    15    Headwater would maintain records of the ItsOn marking

16    page.

17            THE COURT:  Are you contending that these

18    marking pages would be admissible whether or not the

19    Defendants are going forward with a defense of failure

09:16AM    20    to mark?

21            MR. HOFFMAN:  Yes, Your Honor.  It's part of

22    the argument for how Defendants were given or made aware

23    of the patents by Headwater and ItsOn in terms of

24    willfulness, and it's also relied on by our expert in

09:16AM    25    terms of validity as well, in terms of commercial

1    success and practice.

2           I'd also point out, Your Honor, that both

3    damages experts as well -- oh, sorry.  Actually that's

4    for the next one.

09:16AM  5           Yeah, so we don't believe it is hearsay and it

6    is relevant to issues besides marking, Your Honor.

7           THE COURT:  All right.

8           MR. VINCENT:  Your Honor, Robert Vincent for

9    Defendants.  On these marking pages, Defendants

09:17AM 10   recognize Your Honor's order of this morning on the

11   summary judgment of Defendants, at least Verizon's

12   marking summary judgment; and although it has not been

13   admitted in T-Mobile, I imagine that a similar order is

14   going to be issuing soon on a similar motion in the

09:17AM 15   T-Mobile case.

16          Notwithstanding that fact, these marking pages

17   remain hearsay for all of the reasons that counsel just

18   explained as to why they might be relevant.

19          THE COURT:  How long --

09:17AM 20          MR. VINCENT:  They cannot be evidence as to

21   practice of the patents.

22          THE COURT:  How are they hearsay as to notice?

23          MR. VINCENT:  Well, for Verizon there's no

24   evidence at all that I'm aware of -- counsel can correct

09:18AM 25   me.  For Verizon, there's no evidence that Verizon ever

knew about the Web page.  There's zero evidence that

ItsOn or Headwater or anyone conveyed the existence of

the marking page to Verizon, to any Verizon employee.

There -- it cannot be evidence of notice to Verizon when

there's simply no evidence that any Verizon employee

ever knew about it.

          For T-Mobile, there is evidence that ItsOn

conveyed the existence of the website to Sprint

employees.  There's no evidence that any Sprint

employees visited that website.  But nevertheless, for

Sprint, T-Mobile, it cannot be -- it is hearsay for the

concept that any ItsOn product practiced those patents.

          Your Honor heard extensive discussion last week

about this issue, and all -- at most, what the Headwater

and ItsOn employees testified was that the process was

that they, at least one claim of those patents, at least

one claim was practiced.  They put it -- of some product

was put on the website, not the asserted claims.  And

they're not even -- and it wasn't -- didn't mention the

'613 patent.  Only the '541 patent was listed on the

website.  So it's definitely hearsay for trying to

establish that the products practiced the patent.

          Again, Your Honor, not to revisit the arguments

last week, they have a burden to show that -- to link,

to show a nexus to link, to establish that these

1    products practice the asserted claims here, and they

2    have no evidence, no witness testimony, no competent

3    testimony to establish that fact.

4         They cannot -- certainly can't do so because a

09:20AM    5    patent appears on a website.  That is insufficient

6    itself substantively.  It's also, under the rules of

7    evidence, hearsay for that purpose, to the extent they

8    are going to try to somehow get that inference before

9    the jury, that the existence of a patent on a website, a

09:20AM   10    patent number on a website somehow means that these

11    asserted claims were practiced.  It's insufficient

12    substantively, but for these purposes, it's hearsay for

13    that purpose.

14         So I think, Your Honor, that's -- all of these

09:20AM   15    issues, I think Your Honor mentioned notice; I've

16    addressed that.  Practice, practice of the patents.

17         It is -- these documents are hearsay for those

18    purposes.  So to the extent -- in the Verizon case,

19    again, the Verizon case, there's no basis at all for

09:21AM   20    these to come in for issues for purposes of notice

21    because there's no evidence that Verizon ever saw it.

22    For T-Mobile/Sprint, even if they came in because Sprint

23    had knowledge of the website, even though there's no

24    evidence that anyone visited, they can't come in for any

09:21AM   25    purpose to in any way insinuate that the ItsOn products

09:21AM

1    that were sold to Sprint practiced the patents and

2    that's one of the bases on which counsel said that they

3    were relevant and probative.  That can't be the case.

4    That's definitely hearsay.  That's an out-of-court

5    statement, and what we know about those, the creation of

6    those websites necessarily means they cannot show that

7    these asserted claims were practiced.

8           THE COURT:  Well, to the extent it is hearsay,

9    Mr. Vincent, the witnesses could still testify that they

10   believe they marked it through that marking page, even

11   if the marking page is not in evidence.  How would that

12   be hearsay?

13          MR. VINCENT:  A witness could testify that they

14   had a marking page.  A witness could testify -- again,

15   the Defendants are differently situated.  But for at

16   least T-Mobile and Sprint, their witnesses could say

17   that a marking page existed and the '541 patent was

18   listed on the page.

19          What they can't say, what they can't imply,

20   what they can't use that evidence for is to argue that

21   that means these -- that means the asserted claims here

22   were practiced.

23          Again, we're talking about practice because

24   counsel raised that as one of the reasons why these

25   documents are relevant and admissible.  That cannot be

1    the case.

2              THE COURT:  All right.  Thank you, Mr. Vincent.

3              MR. VINCENT:  Thank Your Honor.

4              MR. HOFFMAN:  Your Honor, many of these

09:23AM  5   arguments just made go to Daubert motions and motions

6    for summary judgments that are pending rather than

7    evidentiary issues.  The -- counsel didn't really

8    respond to the argument that these are documents kept in

9    the normal course of business.

09:23AM 10             Again, ItsOn and Headwater shared management

11   and ownership of; and, more importantly, Headwater

12   was -- we have testimony that Headwater was directly

13   involved in working with ItsOn to identify the patents,

14   to put them on their page.  And ItsOn also was their

09:23AM 15   licensee and primary partner in monetization; therefore,

16   was completely within the normal course of their

17   business to retain records of the marking page, and the

18   pages we're talking about were produced by Headwater

19   from its records.

09:24AM 20             THE COURT:  Are these marking pages websites

21   that were maintained by Headwater or ItsOn?

22             MR. HOFFMAN:  The websites themselves were

23   maintained by ItsOn.  The printouts of the website were

24   kept in Headwater's records and that's what we're

09:24AM 25   looking at here.

1          THE COURT:  So you're saying that the exhibits

2     themselves are Headwater documents?

3          MR. HOFFMAN:  Yes, Your Honor.  They are

4     printouts from the marking page that Headwater

09:24AM   5     maintained in its files.

6          THE COURT:  And --

7          MR. HOFFMAN:  And Dr. Raleigh can testify to

8     that at trial.

9          THE COURT:  Has he testified to that already?

09:24AM  10          MR. HOFFMAN:  He hasn't.  I don't think he was

11     asked directly about that in his deposition.

12          THE COURT:  What is your way to connect these

13     marking pages to Verizon in terms of notice?

14          MR. HOFFMAN:  Well, first, it seems like

09:25AM  15     there's a concession that these were provided to

16     T-Mobile, so I just want to note that.

17          And, Your Honor, I don't -- counsel I think

18     correctly pointed out that they are not directly

19     relevant to Verizon for the notice issue, but that's why

09:25AM  20     we would look to the business records exception there

21     and for T-Mobile that it's not being offered for the

22     truth of the matter because it's being offered as

23     evidence of notice.

24          And it's not the only evidence of notice.  It

09:25AM  25     is a piece of a number of communications that, together,

1    show notice to T-Mobile.

2         THE COURT:  As you know, one of the

3    requirements of 803(6) is that the records are prepared

4    by a person with knowledge.  What evidence do you have

09:26AM  5    that the person who prepared these documents had

6    knowledge of whether the patents practiced or the

7    product practiced the patents?

8         MR. HOFFMAN:  Well, in terms of the contents of

9    the document, again we have testimony about the

09:26AM  10   consultation between Headwater, its counsel, and ItsOn

11   engineers to making the determination for the contents

12   of the document.

13        In terms of preparing the printout, I don't

14   believe, again, that that's been addressed in

09:26AM  15   deposition, but Dr. Raleigh didn't address that at

16   trial.

17        THE COURT:  And what will he say that will

18   indicate that the person responsible for putting the

19   patent on the marking page had knowledge of whether the

09:27AM  20   ItsOn services practiced the patents that were on the

21   page?

22        MR. HOFFMAN:  Well, Dr. Raleigh has testified

23   about the way in which the marking page was determined.

24   Again, consultation between Headwater's lawyers and

09:27AM  25   engineers at ItsOn, so people who knew the patents well

1   and people who knew the products well, consulting to put

2   it on there.

3        He's identified who those people are.  James

4   Lavine, for example, was usually the engineer on the

09:27AM   5   ItsOn side.  Krista Jacobsen was usually involved, if

6   not always on as internal counsel for Headwater.  And,

7   again, Ms. Jacobsen also testified about that process

8   and the way in which Headwater collaborated with ItsOn

9   and the ItsOn engineer to determine what goes on the

09:28AM   10   page.  And obviously the ItsOn engineers had knowledge

11   of the products, and Headwater had knowledge of ItsOn

12   patents.

13        THE COURT:  All right.  Thank you, Mr. Hoffman.

14        MR. VINCENT:  Just quickly, Your Honor, a

09:28AM   15   couple of responses, just first to make sure the

16   record's clear.

17        We do not concede that the marking pages were

18   ever provided to Sprint or T-Mobile.  There is evidence

19   that Sprint employees were aware of the link but no

09:28AM   20   evidence that anyone ever visited that link to see what

21   patents were, if any, were listed on that page.

22        More to the point, Your Honor, Your Honor asked

23   an important question about what evidence there is about

24   how these -- how this marking page was created, and this

09:28AM   25   goes -- this is such a critical point that touches so

many issues.

         We know Ms. Jacobsen testified -- and we cited
this testimony in our briefing -- we know that they --
all that was done was there was a process in place to
09:29AM  determine if they believed at least one claim was
practiced.  And when confronted with the marking page in
her deposition and shown the '541 patent, the only
patent that matters here, when shown the '541 patent on
that page, she was asked, "Can you tell me whether or
09:29AM  not ItsOn practiced that patent," she says, "I can't.  I
can't for any specific patent.  I know there was a
process.  Whether it was followed, I can't tell you
that."  That's point one.

         So whether there was a process says nothing
09:29AM  about whether that process was followed for this patent
because the person who created -- who testified on this
issue said she couldn't tell.

         And secondly, again, just one claim.  What
claim?  This marking page doesn't list any claims at
09:30AM  all, and that is particularly problematic in this case,
Your Honor, with the '541 patent.  Because logically if
you were going to pick a claim, you'd pick the
independent claim, Claim 1.

         That claim no longer exists, Your Honor.
09:30AM  Headwater disclaimed that claim, along with several

others, in the IPR proceedings, and the legal effect of

that means it's treated as if it was never part of the

patent.

So whether ItsOn practiced Claim 1 of the '541

09:30AM  patent is irrelevant.  It's not protected by any patent.

Whether the accused products practice Claim 1 is

irrelevant.  They don't have -- Headwater does not have

a patent protection on Claim 1.

The only way it matters in this case is if

09:30AM  there is evidence that ItsOn practiced the Claims 79 and

83 of the '541 patent, and there's not any competent

evidence that they practiced any claim, Your Honor.

There is certainly no evidence that ItsOn practiced

Claims 79 and 83.  That's all that matters.

09:31AM  So, again, these marking pages are only

relevant to the extent ItsOn practiced those claims, and

there is no evidence of that happening.

THE COURT:  We've already talked about the fact

that the witnesses will be able to talk about what was

09:31AM  on the marking page.  The question we're dealing with

here is whether the marking page is admissible, and I

think that there is a reasonable likelihood that

Dr. Raleigh can establish the requisites under 803(6)

for that.

09:31AM  What I'm going to do is to say that Plaintiff's

1  Exhibit PX35, and I guess in the T-Mobile case, it

2  appears to be PX29 and 35?

3          MR. VINCENT:  Yes.  In the T-Mobile case, there

4  is an email, an email string.  I think that there's --

09:32AM   5  just to be clear, I think the top of the email string is

6  an ItsOn internal email.  The rest with -- that would be

7  hearsay.  The rest of it is emails with Sprint, with

8  Sprint employees.

9          And so that, again, to the extent the marking

09:32AM  10  pages or the existence of the link is relevant, then

11  that email, we would not have that portion of the email

12  that is the discussions with Sprint employees, we agree

13  there wouldn't be a separate reason for excluding that.

14  But the marking pages themselves and that email are all,

09:32AM  15  again, hearsay for the purposes we discussed.

16          THE COURT:  All right.  Well, PX35 will be

17  allowed to remain on the exhibit list with an asterisk,

18  and I'll make clear when I see the final exhibit list

19  that it's clear to Judge Gilstrap that the order out of

09:33AM  20  this hearing will be that PX35 cannot be used in front

21  of the jury until Dr. Raleigh has laid a foundation

22  under 803(6) that passes muster with Judge Gilstrap.

23          As far as PX29 in the T-Mobile case, it seems

24  from what Mr. Vincent just said that the resolution

09:33AM  25  there should be that the email, to the extent it was

1    just between ItsOn employees, would be redacted, but the

2    portion that was shared with Sprint could be admissible.

3         Does the Plaintiff have an argument against

4    redacting the part that was not sent to Sprint?

09:34AM  5         MR. HOFFMAN:  No, Your Honor.  That makes

6    sense.

7         THE COURT:  All right.

8         MR. VINCENT:  And just to add, Your Honor, I

9    note -- I have not had a chance to review all of Your

09:34AM 10   Honor's rulings this morning.  I know we have summary

11   judgment motions on issues of notice and things like

12   that.

13        To the extent those rulings affect the

14   relevance of the things we discussed, that might be a

09:34AM 15   reason to revisit, but I understand Your Honor's ruling

16   today.

17        THE COURT:  I think, frankly, the hearsay issue

18   is for the circumstance that notice is not still

19   necessary.  To the extent that notice is still a

09:34AM 20   relevant part of the case, I think it's a nonhearsay use

21   of the document.  So I don't expect that to change it,

22   but if you think it does, you can certainly raise it

23   again.

24        MR. VINCENT:  Yes, Your Honor.  I understand

09:35AM 25   with that explanation.  I agree with that explanation.

1          THE COURT:  All right.  While you're up there,

2   Mr. Vincent, tell me about your objection to the next

3   bucket, which is entitled willfulness/copying.  It's

4   PX26 and 93 and 13, it looks like.

09:35AM   5          MR. VINCENT:  Yes, Your Honor.  These,

6   according to the list we have from Headwater, appear to

7   be all directed to Verizon.  PX26 is an email to a

8   Mr. Diaz at Verizon, supposedly attaching an attachment

9   which is not part of that exhibit.

09:35AM  10          And PX93 -- again, I'm going by the list we

11   were given -- it's a compilation.  It's a compilation of

12   several presentations or several slide decks that

13   Headwater purportedly gave to Verizon, patent briefs.

14   They are dated 2009 and 2011.

09:36AM  15          Again, the list we have, there are some

16   duplicates on that list.  Obviously I'm assuming those

17   would be removed.  But the argument here, and the reason

18   why they should be excluded, is because these go to the

19   investments that Verizon made in Headwater's last ItsOn.

09:36AM  20   And these documents, the 2009 patent brief, for example,

21   that document predates any of the filing dates of the

22   asserted patents.  They contain numerous other patent

23   assets.

24          When Verizon's investments began, there were

09:36AM  25   approximately 30-some-odd patent assets, none of which

1    were the applications or the patents at issue here.  And

2    by the time Verizon ended those investments, there

3    was -- I believe the marking page has 88 patents listed,

4    numerous patents.

09:37AM    5         These patent briefs that are part of PX93,

6    again, predate the patents, contain many other patents

7    not relevant to the asserted patents.  And so, again,

8    can't provide notice and can only confuse the jury into

9    thinking that to lump Headwater's patents, IP together,

09:37AM    10    to think to that, to come to the mistaken conclusion

11    that Verizon was investing, Verizon was knowledgeable

12    and interested in Headwater's last ItsOn because of the

13    asserted patents, asserted claims, and that's clearly

14    not the case.

09:37AM    15         That's why we had the MIL last week about not

16    allowing investments and that type of evidence in.  If

17    so, Verizon would be then compelled to bring witnesses

18    to explain why the investments had nothing to do with

19    these patents.  So this is, I think, another flavor of

09:38AM    20    that same argument, Your Honor.

21         THE COURT:  All right.  Thank you, Mr. Vincent.

22         Mr. Davis, tell me the response to the

23    relevance objection.

24         MR. DAVIS:  So, Your Honor, on the relevance

09:38AM    25    objection for these exhibits, so we're looking at

1    representative exhibits PTX26 and 93.

2              If I can have the podium, and I have copies of

3    these slides as well, if I may hand those up.

4              And so what we see here, Your Honor, are PTX26

09:38AM  5    and 93, and I wanted to highlight as one example the

6    lower right-hand corner from PTX93.  So this is a --

7    what was called an IP portfolio review.  You can see

8    it's dated August 24th, 2011.  This was provided from

9    Headwater to Verizon, and it provided a number of these

09:39AM  10   types of documents describing Headwater's patents.

11             I wanted to highlight, as an example, Number 16

12   that you see here that refers to background services,

13   noncritical downloads that are happening, applying

14   policies and DAS, device-assisted services.  It also

09:39AM  15   says it's related to patent area number 15 above that,

16   which discusses increasing network efficiency and

17   avoiding congestion.  That is the subject matter of the

18   '541 and '613 patents.

19             Those claims recite traffic control policies;

09:39AM  20   they recite foreground and/or background determinations

21   and making policy decisions based on that.  And so these

22   detailed patent briefs and IP portfolio reviews that

23   Headwater provided to ItsOn are direct -- or, I'm sorry,

24   that Headwater provided to Verizon are directly relevant

09:40AM  25   to the asserted claims.

1              THE COURT:  And where did the remaining

2    asserted patents stand in relation to the August 2011

3    date of this?

4              MR. DAVIS:  Oh, yes.  I see, Your Honor.  Those

09:40AM   5    patents were not issued at that time.  They claim

6    priority back to provisional applications -- or

7    actually, nonprovisional applications, I believe.  The

8    priority date here is May 25th, 2010.

9              And so I take the point, Your Honor, that maybe

09:40AM  10    you are making that we don't see here the Patent

11    Number '541, the Patent Number '613, but we are

12    describing the way these documents were structured,

13    Headwater was describing to Verizon in great detail all

14    these different areas of patents that it had.

09:41AM  15              And so, you know, I think it's certainly fair

16    from our perspective to say that these are supportive of

17    Headwater's willfulness claims and its copying

18    assertions that this is Headwater putting Verizon on

19    notice of its patent portfolio.

09:41AM  20              It's -- the standard for admissibility of

21    evidence of willfulness or copying does not require that

22    the specific patent number be included.  They show that

23    Verizon was well aware that Headwater had an extensive

24    patent portfolio, including in specific subject matter

09:41AM  25    areas that are relevant to the claims here.  It

1    demonstrates a willful blindness.

2            THE COURT:  And this is part of which exhibit

3    that you have on the screen as your Slide 6?

4            MR. DAVIS:  Oh, yes, Your Honor.  This is from

09:42AM  5    PTX93 in the Verizon case.

6            THE COURT:  What about 13 and 26?

7            MR. DAVIS:  Oh, yes.  So in the top left

8    corner, I have a screenshot of PTX26.  This is -- this

9    is an email from someone at ItsOn to folks at Verizon,

09:42AM  10   copying Dr. Raleigh at ItsOn.  The subject line is "IP

11   review."  This is from July 2011, and here the email is

12   saying -- and I'm sorry.  Maybe actually this is -- I'm

13   sorry.  This is PTX13, Your Honor.

14           PTX26 is the detailed patent brief.  That one

09:43AM  15   is a little bit earlier.  That's from October 2009.

16   That has some relevant IP disclosures as well.  But the

17   email that I was referring to, PTX13, that's talking

18   about here is a slide deck that discusses our IP.

19           And so, you know, taken together or

09:43AM  20   individually, Your Honor, what this is showing, all this

21   evidence, is that Headwater was consistently providing

22   information to Verizon about its patenting activities,

23   including with sufficient detail that it links to the

24   asserted claims.

09:43AM  25           We're not talking about just a presentation

1  where Headwater says we have 50 patents generically.

2  It's stepping through in detail these are subject matter

3  areas that we have patent applications or issued patents

4  in.

09:44AM  5          THE COURT:  And do you have similar documents

6  that cover the area after these asserted patents had

7  been issued?

8          MR. DAVIS:  No, Your Honor, I don't believe so.

9          Yes, the exhibits that we have here are from

09:44AM  10  this general time frame of 2009, 2011, before the

11  patents issued.

12          THE COURT:  Can you show me something in

13  Exhibit 26 that is relevant to the asserted patents in

14  the way that what you showed about Exhibit 93 was?

09:44AM  15          MR. DAVIS:  Yes, Your Honor.  Let's see here.

16  Oh, Your Honor, I'm sorry.  I think I was confused about

17  how this worked.  Okay.  I'm sorry.

18          So PTX26 is what you see on the upper left

19  corner.  That is the email attaching and describing that

09:45AM  20  there's an IP review that Headwater's providing.

21          PTX93 actually is a compilation exhibit and so

22  that includes both what you see on the right-hand side,

23  the August 2011 IP portfolio review; it also includes

24  what you see in the lower left corner, the detailed

09:45AM  25  patent brief that is another document within PTX93.

1      THE COURT:  So 26 is the email.  What is 13?

2      MR. DAVIS:  13, I have to check, Your Honor.

3  Give me just a minute here.

4      So 13 is a June 2009 email to Verizon, again

09:46AM   5  talking about IP of Headwater that ItsOn has licensed in

6  general, but again I recognize that that's June 2009.

7  That is before the priority date of the patents and so

8  we don't have as much detail as we do linking the

9  specific claim limitations with foreground and

09:46AM  10  background like we see in that August 2011.

11      THE COURT:  So what is the relevance of 13?

12      MR. DAVIS:  Well, I think, Your Honor, that

13  you're seeing some pieces of the IP that is going to

14  eventually materialize into the '541 and '613 claims.

09:47AM  15  You don't yet see all of it like the

16  foreground/background aspect, but you see the policies

17  and traffic policies start to be developed at that

18  point.

19      THE COURT:  All right.  And all of the exhibits

09:47AM  20  in this bucket were clearly provided to Verizon by

21  Headwater?

22      MR. DAVIS:  That's right, Your Honor.  I don't

23  believe there's any dispute about that aspect of it.

24      THE COURT:  Is there any discussion of the

09:48AM  25  investments that have been excluded by MIL?

1    MR. DAVIS:  I don't believe so, Your Honor, but

2    if there is a portion of the underlying documents, we'd

3    certainly be happy to redact that.

4    THE COURT:  All right.  Thank you, Mr. Davis.

09:48AM  5    MR. VINCENT:  Respond quickly, Your Honor.

6    I want to make an important response here, and

7    this -- I don't want to overemphasize the point here,

8    but it touches on so many issues.

9    Headwater has claimed that a 2009 patent brief,

09:48AM  10   as Headwater's counsel said, is somehow linked, has

11   elements of the '541 patent, has flavors, has --

12   Dr. Raleigh testified in this case that the conception

13   date, the conception date of the '541 patent is no

14   earlier than May 2010, and he did so -- he had to do

09:49AM  15   so -- because there was a standing issue.  Because if he

16   had conceived of it earlier, there was an issue about

17   whether he owned the patents, about whether Qualcomm

18   owned the patents.

19   He testified that the conception date of the

09:49AM  20   '541 patent is no earlier than May 2010.  How in the

21   world could a 2009 patent brief then be linked to claims

22   here that had not been conceived of.  That cannot make

23   sense, Your Honor.  It cannot, and it infects this

24   entire analysis because what Headwater's trying to do --

09:49AM  25   again, this touches on so many issues.  They are saying,

1    well, it has this kernel, this nugget of an idea that

2    then evolved.  That's not what the law requires.

3          The law requires a nexus to the claims.

4    Headwater does not have a claim on policies and

09:50AM    5    background data.  They don't have claims on those.  They

6    disclaimed Claim 1.  Claim 1 itself is a specific way of

7    blocking background data with policies, but they don't

8    have patent on that.

9          They have a patent on a very specific way of

09:50AM    10    doing -- applying a policy to protect background data

11    using intercepting API messages.  There is -- it is

12    logically impossible for a patent brief in 2009 or 2010,

13    it is impossible for that to give notice of these

14    patents when they haven't even been conceived of.  It's

09:50AM    15    impossible to give notice of patents where they don't

16    mention the patents, don't mention the applications, and

17    cite concepts like foreground and background that they

18    don't have a patent on.

19          It's not enough just to point, to pluck out

09:50AM    20    some abstract concept of the claims and say that

21    satisfies it.  That's not true, and that's an important

22    point that I, again, I don't want to emphasize too much

23    but it touches on so many issues, Your Honor.

24          That's why these are prejudicial, because they

09:51AM    25    are not linked to the claims, and allowing them in will

1    allow the jury to draw the false conclusion that they

2    are.

3            THE COURT:  All right.  I agree with your

4    statement that those documents are not sufficient to

09:51AM  5    establish what the Plaintiff is contending, but I

6    disagree that they are inadmissible just because they

7    are not sufficient.  And the question that I have to

8    decide is are they relevant in the sense that they make

9    the Plaintiff's argument more likely than it would be

09:51AM  10    without them.

11            And I guess a related question is:  Is that an

12    unfair inference.  And I don't think the jury's going to

13    have any trouble understanding arguments based on date,

14    which I know your side will very forcefully deliver.

09:52AM  15    But I do think that these documents are relevant to show

16    that Verizon and Headwater had the kind of relationship

17    where the claim that Verizon was aware of Headwater's

18    patents is more likely to be true than it would be

19    without these.  Certainly it differentiates from the

09:52AM  20    ordinary case where first notice of the patents is the

21    service of a lawsuit.

22            So I will obviously -- you can cross-examine

23    and make your point very forcefully about the date of

24    these things, but I don't think that the jury will be

09:52AM  25    misled when all of the relevant dates are put before

1    them.

2            So I'm going to overrule the objection based on

3    the assumption I'm not hearing disputed that all of

4    these documents were delivered to Verizon and,

09:53AM    5    therefore --

6            MR. VINCENT:  Your Honor, may I have just one

7    moment, please?

8            THE COURT:  You may.

9            MR. VINCENT:  Okay.  Your Honor, one,

09:53AM   10    there's -- I understand Your Honor's ruling.  One

11    addition to the exhibit here.  PX26 -- Mr. Robb just

12    reminded me -- is the email, Your Honor, remember we

13    were here a few months ago about production of a native

14    email that we have still not received?  That was the

09:54AM   15    email that supposedly attached -- Your Honor will

16    remember we had a hearing about a motion to compel where

17    they had mixed and matched exhibits, an email and a

18    presentation.

19            We asked for the native, and we have still not

09:54AM   20    received that actual native email showing what

21    attachment was actually made, what was actually attached

22    to that email.

23            So the presentations, I'm not -- I don't know

24    that the -- all of the presentations were not given to

09:54AM   25    Verizon, but this email that they've cited I think as

1    PX26, that was the email that was at issue that we still

2    don't have the native to know what was attached to that

3    email.

4            THE COURT:  So you're saying you received that

09:54AM  5    email, but you don't know what attachments to it you

6    received?

7            MR. VINCENT:  Yes.  Your Honor, we received a

8    version of the email that had no attachments.  And not

9    to relitigate that, to revisit that issue, we received a

09:55AM  10   version of that email that did not have attachments.

11           In a deposition, Headwater attempted to have a

12   witness link an exhibit, a presentation, to that email,

13   but that is not how they were kept.  As of today, I do

14   not believe we have received.

09:55AM  15           And Your Honor ordered them to produce a native

16   version of that email, and we still have not received a

17   native version of that email to know what attachments

18   were actually included on that native email.  And,

19   again, that is, I believe, PX26.

09:55AM  20           THE COURT:  All right.  Thank you, Mr. Vincent.

21           Mr. Davis, tell me about Exhibit 26.

22           MR. DAVIS:  So, Your Honor, my understanding is

23   we've produced to Verizon what we have and explained it

24   to them in correspondence that -- the document I'm

09:56AM  25   looking at, our correspondence with Verizon, and we say:

1   As to this document, it was produced; you should have

2   the metadata native; the metadata shows the file name as

3   X.

4           I'm not sure, beyond that, what the issue is,

09:56AM  5   if there's -- I don't believe there is anything more for

6   us to produce.

7           THE COURT:  Well, at this point I'm overruling

8   the objections to 13, 26, and 93; but after we have a

9   break, I will revisit that if Verizon is not successful

09:57AM  10   in conferring and confirming what you have said,

11   Mr. Davis.

12           MR. DAVIS:  All right.  Thank you, Your Honor.

13           THE COURT:  So we can move on to Exhibit 438,

14   which is Group 4.

09:57AM  15           MR. HOFFMAN:  Your Honor, this might be a good

16   place for Defendants to explain what their objections

17   are, since we're not really sure.

18           THE COURT:  All right.

19           MR. VINCENT:  Yes, Your Honor.

09:57AM  20           The exhibits in this bucket are all things that

21   were produced after the close of discovery for which

22   they are hearsay and which we believe they will be used

23   for -- to convey the truth of the matter, or at least

24   attempt interpretation of what those documents say.

09:58AM  25           So, for example, there is data that was

produced by Apple that Plaintiff's experts relied on in

a supplemental report.  We have motion practice on that

supplemental report, whether that should be allowed or

not.

09:58AM    But regardless of whether that report is

allowed, there is data for which they have no testimony

explaining, authenticating, providing the relevance to

these documents and that is the issue, Your Honor, is

that these were produced -- these were not just produced

09:58AM  late, but there is no testimony explaining the import of

these documents in the manner in which Plaintiff's

experts are relying on them.

THE COURT:  So it's nondisclosure and

relevance?  Is that what you're saying?

09:58AM    MR. VINCENT:  And hearsay, Your Honor.

THE COURT:  I don't see hearsay as one of the

objections listed on this.

MR. HOFFMAN:  Your Honor, there may be some

confusion in that I think Your Honor is looking at

09:58AM  bucket 4, but I believe counsel has addressed bucket 5.

MR. VINCENT:  I'm sorry.  Yes, you're right,

Your Honor.  So I apologize.  John, I jumped ahead.

I can keep on this bucket or I can go back to

the bucket Your Honor actually asked me to address.

09:59AM    THE COURT:  Why don't we take up 4 before we

1    take up 5.

2            MR. VINCENT:  Okay.  I apologize, Your Honor.

3    I apologize.

4            Yes, so the ItsOn MSA.  This is listed on --

09:59AM    5    this document is a master service agreement between

6    ItsOn and Sprint and, yet, Headwater is trying to

7    introduce that document in Verizon's case.

8            It is -- whether or not their experts cite it

9    for whatever purpose, it is a hearsay document.  It is a

09:59AM   10    document that's irrelevant to Verizon's interactions

11    with Headwater and ItsOn and is prejudicial because to

12    give Your Honor some background about the Sprint/ItsOn

13    interaction -- again, this is for the Verizon case they

14    are trying to introduce this exhibit.

10:00AM   15            The ItsOn interactions with Sprint, Sprint

16    obtained a ItsOn product called roaming reduction

17    because Sprint was a distant third at the time in

18    carriers, and they were paying Verizon whenever one of

19    their customers roamed onto Verizon's network.  So they

10:00AM   20    wanted to reduce the amount of roaming that happened and

21    so they reduced the amount of money they pay Verizon.

22            Those figures, those amounts are irrelevant to

23    the Veri- -- to both cases but especially the Verizon

24    case.  And the issue here with introducing it in Verizon

10:00AM   25    as an exhibit, introduce it to the jury, it has figures,

1    it has, you know, data regarding Sprint, a third party,

2    and regarding a context, roaming, which again is

3    irrelevant to what -- to the issues here in this case.

4         So whether or not it's relevant to Sprint,

10:01AM  5    which, again, we don't agree that the exhibit is

6    necessary for any purpose, it's definitely irrelevant to

7    any issues in Verizon such that it needs to be admitted

8    into the case.

9         Again, whether or not an expert wants to -- has

10:01AM  10    relied on it, that does not mean it needs to be admitted

11    into the case.

12         THE COURT:  All right.

13         MR. HOFFMAN:  Your Honor, taking up the

14    relevance issue first, as counsel indicated, both

10:02AM  15    experts, both damages experts for both sides are relying

16    on this agreement as direct inputs into their

17    calculation of damages.

18         Laura Stamm, Verizon's expert, uses the

19    share -- revenue share provisions within the agreement

10:02AM  20    as a direct input into calculating her reasonable

21    royalty.  Here is a paragraph where she does that.  And

22    similarly, Mr. Bergman relies on it as well.  So it's

23    clearly relevant, and Verizon essentially admitted that

24    it's relevant because its own experts, it's promulgated

10:02AM  25    in expert report that says it's relevant.

1          As to hearsay, again, ItsOn is Headwater's only

2    licensee and its primary channel for commercializing its

3    products.  This is the agreement under which almost all

4    of ItsOn's royalty payments to Headwaters were made.

10:03AM  5          So this isn't just some random agreement.  This

6    is the core agreement that -- by which the Headwater's

7    patents are commercialized, including the

8    patents-in-suit and, therefore, Headwater maintains this

9    agreement within its records because, again, it's the

10:03AM  10   source of its royalty income from ItsOn.

11              THE COURT:  All right.  Thank you, Mr. Hoffman.

12              MR. HOFFMAN:  Thank Your Honor.

13              THE COURT:  Mr. Vincent, if both experts use

14   this in their analysis, that is a pretty solid response

10:03AM  15   to the relevance objection.  Is there some portion of it

16   that you would contend is unfairly prejudicial?

17              MR. VINCENT:  So, yes, Your Honor.  That is the

18   issue in that the document as a whole refers to, again,

19   this roaming reduction scenario and has terms of an

10:04AM  20   agreement that, to my understanding, are not relied on

21   by any expert that, again, are relevant to both cases.

22          I mean, we're talking here about Verizon, not

23   T-Mobile.  They have this on Verizon's exhibit list.

24   And, again, what counsel just said is that this is about

10:04AM  25   commercialization of Headwater's patents.  So to the

1  extent that we can come to an agreement about, at least

2  those portions should not be included.

3        THE COURT:  I mean, licenses with third parties

4  come in all the time for the purpose of calculating

10:04AM  5  reasonable royalty, and there are licenses that don't

6  involve the Defendant in any way.

7        MR. VINCENT:  That's right, Your Honor, and the

8  predicate to allowing those licenses in is to show a

9  sufficient nexus to the asserted claims in the case.

10:05AM  10  The problem with the evidence here is that they have not

11  made a connection, again, introducing this evidence in

12  the Verizon case.

13        THE COURT:  It just has to be comparable

14  technology.  There's no nexus to the claims required for

10:05AM  15  a comparable license.

16        MR. VINCENT:  I understand, Your Honor.  It

17  doesn't require an analysis as would a practicing or

18  other types of inquiries, but there has to be a

19  connection, and the connection has to be such that, you

10:05AM  20  know, there is a relevance to the issue for which it's

21  presented.

22        And, again, from my understanding is that the

23  experts use this for a limited purpose, not for

24  everything in the master services agreement.  There are

10:05AM  25  issues; there are provisions in that agreement that no

1    party is viewing as relevant to the case.

2         THE COURT:  I understand that, but it's not

3    worth redacting things unless there is some prejudice

4    that can be shown to flow from them.  Can you point out

10:06AM    5    anything in PX438 that you can show has an unfair

6    prejudice?

7         MR. VINCENT:  Yes, Your Honor.  And that has to

8    do with one of our -- T-Mobile's motions in limine and

9    also relates to a Verizon motion in limine that we're

10:06AM    10    going to argue that later today in that, again, Your

11    Honor has ruled, and I think Headwater conceded, that

12    for -- in the Verizon case, payments to Verizon --

13    sorry.  Payments by Verizon to Headwater are irrelevant,

14    and Headwater agreed to keep those out because there is

10:06AM    15    not sufficient evidence to link those investments to

16    these patents.

17         The same thing applies in this case.  The

18    payments that Sprint made to ItsOn for this roaming

19    reduction product, either they didn't practice at all

10:07AM    20    and that's -- we believe there's no evidence that they

21    did practice at all, or they practiced all 88 patents

22    that were on the marking page, and there's no tie to

23    this, these asserted patents.

24         And so either way there's prejudice, Your

10:07AM    25    Honor.  Either there's no evidence that they are tied to

these patents, in which case these payments will give

the false impression and prejudicial impression that

Sprint was paying for these patents -- again, it's

prejudicial in the T-Mobile case; it's doubly

10:07AM    prejudicial in the Verizon case -- or if they say they

do practice, then they practice all of those patents.

        And, again, whether we practice -- whether

we're paying for one or 88 patents, again, for the same

reasons that the payments for Verizon's investments were

10:07AM    held irrelevant and agreed to be excluded, these

payments and the payment terms should also be excluded

in both cases.

        THE COURT:  The reason that the Verizon

payments were excluded is that they definitely create a

10:08AM    risk of unfair prejudice to Verizon and the jury reading

more into them than they should.  The payments to Sprint

don't seem to me to carry that risk.

        MR. VINCENT:  I understand, Your Honor.  I

think -- and from our perspective, I think the

10:08AM    underlying reasoning is the same or similar because

either there is no connection or there's a connection to

dozens and dozens of patents.

        In either case, the risk is the jury will draw

the connection saying that we're paying all -- they are

10:08AM    going to say that Sprint paid millions of dollars for

1    these two patents and that's simply not the case --

2    actually, one patent because there's only one patent

3    that is alleged to be practiced here and that's simply

4    not the case under any conceivable set of facts.

10:09AM    5         THE COURT:  I understand that.  I don't have

6    any evidence before me that the Plaintiff is saying

7    that; and obviously if they misstate the facts, that

8    will be your job to point out that that's not true.  But

9    let me just inquire from them as to the intended use of

10:09AM    10   this MSA.

11        MR. HOFFMAN:  Your Honor, the only intended use

12   is as evidence of the reasonable royalty as disclosed by

13   both experts.  So they will be bound by Rule 26 and

14   bound to the reports to use it only in that fashion, and

10:09AM    15   we have no intention of using it for any other purpose.

16        THE COURT:  So you do not contend that the

17   payments by Sprint under this MSA were tied particularly

18   to the asserted patents?

19        MR. HOFFMAN:  Your Honor, I don't actually know

10:10AM    20   the answer to that question.  I'm sorry.  I -- it

21   involves an analysis that I'm just not aware of having

22   been done.  I don't think we contend one way or another,

23   but I'm not sure.

24        THE COURT:  Well, you know whether you're going

10:10AM    25   to contend that to the jury?

1          MR. HOFFMAN:  Yes, Your Honor, and we -- we

2    don't intend to, I believe -- we don't intend to

3    represent to the jury that the specific -- this

4    agreement specifically covers or relates to the

5    patents-in-suit.

6          I mean, ItsOn is a licensee to all of

7    Headwater's patents.  It may well be that certainly some

8    portion of Headwater's patents are implicated within

9    this agreement, but as to whether -- I don't believe

10   either expert specifically makes representation as to

11   whether the agreement practices that, the

12   patents-in-suit.

13         But we would argue that Defendant has conceded

14   the relevance and the comparability, at least for the

15   purpose of profit split, and its own expert finding it

16   relevant in the direct input into her calculation of

17   damages and our expert doing same.  It's a third-party

18   agreement with a competitor, Verizon.

19         THE COURT:  It's one thing to contend that the

20   technology at issue in the MSA was comparable enough for

21   the damages experts to consider it in connection with

22   reasonable royalty on the asserted patents; it's another

23   thing to say that the asserted patents were what the MSA

24   was about.

25         MR. HOFFMAN:  Yes, Your Honor.  I don't --

again, I don't believe either expert makes that

representation, and we have no intention of making any

argument outside of their reports.

THE COURT:  All right.  That is probably the

most important is that what you are going to represent

about this MSA will be what is already disclosed in your

expert's report.

MR. HOFFMAN:  Yes, Your Honor.

THE COURT:  All right.  Well, I'm going to

overrule the objection to 438 with that understanding.

That takes us -- let me hear from Plaintiff first on

this next bucket they have produced because if there's

not an adequate response to that, we don't need to get

to anything else.

MR. DAVIS:  Thank Your Honor.

So on the late-produced issue, this was

produced by Apple in response to a May 2024 subpoena.

What happened with this, the representative exhibit

that's PTX1115, this is a -- it's a one-page daily

traffic data.  It's analytics information provided by

Apple.

So what transpired is Apple provided a couple

of depositions to us in response to the subpoena.  Those

depositions were timely taken, January 9th and 10th in

2025.  And during the course of that examination,

1   Headwater's attorney asked the witnesses:  What

2   analytics information do you have that's relevant to our

3   claims here?  Do you have analytics information for the

4   accused feature or data usage generally for cellular

10:14AM   5   versus Wi-Fi?

6        And what the witness testified is that Apple

7   does have a data analytics team, that they have such

8   information.  And so the next day after that deposition,

9   we wrote to Apple and said:  Please produce this to us.

10:14AM   10   This is responsive to our longstanding requests for this

11   sort of analytics information, and the witness just

12   confirmed that you have a repository or a system for

13   providing this.

14        That same day, another deposition of a Apple

10:14AM   15   witness was taken.  That witness also confirmed that

16   Apple has this information.  So Headwater corresponded

17   with Apple for a period of a few weeks, where Apple was

18   investigating this.  They said:  We have some

19   information that you're requesting but not all of it.

10:15AM   20        And ultimately what they produced, after having

21   said prior to the depositions that they didn't have this

22   information -- we had followed up with them but then it

23   was revealed in the depositions that they did have the

24   information -- ultimately Apple said on February 27th:

10:15AM   25   We completed the investigation; here's the information

1    we found; we'll produce it to you.

2         Once they did, we supplemented accordingly,

3    right away; let the other side know.

4         And so that explains the timeliness issue, Your

10:15AM   5    Honor.  This is -- the information was responsive to our

6    longstanding requests on a subpoena served long ago.

7    You know, we took the depositions in a timely fashion,

8    and it was only then that we had the definitive proof

9    that Apple had some of this analytics information we'd

10:16AM  10    been requesting.

11         THE COURT:  So what is the date that you

12    produced this to the Defendants?

13         MR. DAVIS:  We produced this -- and I'm sorry,

14    Your Honor.  I don't have the exact date, but it would

10:16AM  15    have been right after we received it.  We -- I know the

16    email that we -- I was just looking at the email that

17    was sent to us.  It was February 27th saying:  This is

18    when you'll receive it; you'll receive it shortly.

19         I believe it was another week or so after that

10:16AM  20    that we ultimately received the production and then

21    right away we provided it to the other side.

22         And I should add, Your Honor, that we were able

23    to provide this to the other side in advance of the

24    expert depositions so that, you know, any questioning

10:16AM  25    could take place on that.

1          THE COURT:  So mid-March, when?

2          MR. DAVIS:  Yes.  That's right.  Let me -- let

3    me see if we mention in our briefing exactly when we

4    received this.  This is our -- Docket 195 is our motion

10:17AM    5    for leave to supplement the expert reports.  It looks

6    like -- so the dates I have here, Your Honor, are

7    that -- oh, yes.  Okay.

8          Apple produced the document on March 12th,

9    2025, and then we provided the supplemental expert

10:17AM   10   report of Dr. Wesel on March 15th, and that addressed,

11   you know, very briefly the March 12 Apple production.

12         And so I think the timeline is relatively

13   clear, Your Honor, that we acted quickly once we

14   received the documents, and unfortunately we weren't in

10:18AM   15   a position where we could realistically even move to

16   compel this information from Apple because we had asked

17   for it, and Apple said "We don't have it."  And so it

18   was only through the deposition in January that we

19   understood, yes, Apple actually does have at least some

10:18AM   20   of the information we were requesting.

21         THE COURT:  And so you say you filed a motion

22   for leave to supplement Wesel's report, or how did that

23   happen?

24         MR. DAVIS:  Yes, that's right, Your Honor.

10:18AM   25         So we served the supplemental expert report of

1    Dr. Wesel on March 15th.  We also served a supplemental

2    report of Dr. Bazelon -- that's another Headwater

3    expert -- on March 19.  Both of those were in advance of

4    those experts' depositions.

10:18AM  5          THE COURT:  And was leave granted?

6          MR. DAVIS:  Leave was -- the motion's still

7    pending, Your Honor.

8          THE COURT:  All right.  Thank you, Mr. Davis.

9          MR. DAVIS:  Thank you.

10:19AM  10         MR. VINCENT:  Your Honor, if we could be

11    permitted.  Because these issues implicate the motion

12    for leave and Mr. Robb knows these issues much more than

13    I do, I'd like for Mr. Robb to address the statements by

14    counsel on this issue as it relates to this.

10:19AM  15         THE COURT:  Certainly.

16         MR. ROBB:  Thank Your Honor.

17         The -- both the timing and the prejudice

18    associated with the production and reliance on that

19    document is fully addressed in our opposition brief to

10:19AM  20    the motion for leave.

21         I don't want to repeat all the arguments there,

22    but to briefly recap, the problem is the Apple document

23    we believe, strong reason to believe, is not

24    representative of all Apple users, given the manner in

10:20AM  25    which it was collected.

10:20AM

1          The consequence if that data is used instead of

2     data that both parties, up until that moment, had agreed

3     was the correct data relating to how much users actually

4     consume in data per month would have the consequence of

5     essentially ████████ damages.

6          Their experts and our experts all know that

7     that evidence is not correct.  The Apple evidence is not

8     right.  Every document cited, produced in the case,

9     relied on by both experts shows that that evidence is

10:20AM

10     not correct and not representative of all users.

11          Their own experts effectively concede this

12     where they say "If I were to use this Apple data, then

13     this would have the following impact," where it

14     increases by ████████ the data savings, but they don't

10:20AM

15     actually come out and say it because, again, it's

16     contradictory to every piece of evidence in the case.

17          The extreme prejudice to us because of delayed

18     production is because it was produced months after the

19     close of fact discovery.  We did not have a chance to

10:21AM

20     take discovery against Apple on the manner in which the

21     data was collected and its lack of representativeness.

22          So we have a strong reason to believe why it's

23     not representative, but we didn't have a chance to test

24     that during discovery.  So given the fact that, if

10:21AM

25     credited, it would massively increase damages in a

1    manner that their own experts are not actually standing

2    behind and we didn't have the opportunity to test it

3    during discovery, it's prejudicial to us.

4         And then our brief, which I refer to Your

10:21AM  5    Honor, walks through the full history of the disputes

6    and communications between Apple and Headwater.

7         THE COURT:  And tell me.  Is that pending on a

8    motion for leave to supplement the report, or is this a

9    Daubert motion directed to the report?

10:21AM  10        MR. ROBB:  It's the former, Your Honor.  It's a

11   motion for leave to supplement Dr. Wesel's report and

12   Dr. Bazelon's report.

13        THE COURT:  All right.  Thank you, Mr. Robb.

14        MR. ROBB:  Thank Your Honor.

10:21AM  15        MR. DAVIS:  Your Honor, if I may just briefly

16   respond.

17        THE COURT:  Mr. Davis, is there any reason why

18   this, the admissibility of this Apple production,

19   shouldn't be determined along with the pending motion?

10:22AM  20        MR. DAVIS:  No, Your Honor.  I agree that the

21   determination on that motion would settle this.  The

22   only thing I wanted to clarify, Your Honor, is that --

23        THE COURT:  Did you disagree with the argument?

24        MR. DAVIS:  Well, something to that effect,

10:22AM  25   Your Honor.  I think I wanted to clarify a couple of

1    brief things.

2          Mr. Robb said that -- or suggested that

3    everyone knows the Apple data is correct.  I don't know

4    what he's referring to.  We certainly have not conceded

10:22AM   5    or suggested that the Apple data is incorrect.

6          What he's referring to when he says that our

7    own experts don't stand behind it, what happened, Your

8    Honor, is our experts' opening reports had already gone

9    in.  That's why it's a motion for leave to supplement

10:22AM   10    the expert reports.

11          And so when we received this additional Apple

12    data, what the experts said was, well, if you look at

13    the Apple data, it actually shows an even greater

14    benefit to the inventions.  And so the result of that --

10:23AM   15          THE COURT:  This is in your briefing, I assume?

16          MR. DAVIS:  It is, Your Honor.

17          THE COURT:  All right.  Well, I'll take it up

18    in that fashion.  Thank you, Mr. Davis.

19          MR. DAVIS:  All right.  Thank you.

10:23AM   20          THE COURT:  And we will take the morning recess

21    and come back and move on to the next bucket.  Thank

22    you, and take 15 minutes.

23          (Recess from 10:23 a.m. to 10:40 a.m.)

24          THE COURT:  And we're ready for the next

10:40AM   25    bucket.  Mr. Robb?

1          MR. ROBB:  Thank Your Honor.  We changed seats.

2          Mr. Sim, can you pull up PX797?

3          Your Honor, bucket 6 we're asking not be

4    admitted due to hearsay.  Exhibit 797 is representative

10:41AM  5    of the bucket.  This is a document prepared by a third

6    party called Strategy Analytics and, in particular,

7    individual at Strategy Analytics called Paul Brown.

8    That document was then provided to Samsung.  Samsung

9    then in this case cross-produced it to the parties in

10:41AM  10   this case.

11          Strategy Analytics and Samsung were working

12   together to do battery testing that was based on user

13   profiles as far as how they -- minutes of the day that

14   they might be on chat, that they might be on the

10:41AM  15   Internet, something like that.

16          On the left-hand column, there's the Wi-Fi

17   connected in the morning -- then Mr. Sim scrolls down --

18   Wi-Fi not connected -- scroll down farther -- Wi-Fi not

19   connected.

10:42AM  20          Dr. Wesel is relying on this document to

21   establish the hours per day that users are connected to

22   Wi-Fi or not connected to Wi-Fi.  The number of hours

23   per day a user is connected or not connected to Wi-Fi is

24   a hotly contested issue between the parties.  Dr. Wesel

10:42AM  25   has his opinions, and Defendants have put in opinions by

1    Ms. Sarah Butler.  There are Daubert motions pending

2    related to both of those individuals.

3            The question here, though, is whether this

4    document is admissible.  We would respectfully submit

10:42AM    5    the answer to that is no.  This is a hearsay document

6    that's being offered for the truth of the matter

7    asserted in the sense that, quite literally, Dr. Wesel's

8    looking at the left-hand column and seeing that

9    Strategy Analytics, when constructing the test, chose to

10:42AM    10    set the structure of the test as being here are the

11    hours of the day I'm going to have Wi-Fi off; here are

12    the hours of the day I'm going to have Wi-Fi on.

13            Because the document says this is what we're

14    testing, he is inferring from that that that is actually

10:43AM    15    how users use their devices.  So he's using it for the

16    truth of the matter asserted.  Setting aside the

17    methodological flaws with that, on the question of

18    admissibility, it's a third-party document.  It's

19    actually double-third-party document.  It is hearsay,

10:43AM    20    it's being offered for the truth of the matter asserted,

21    and it should be excluded for that reason.

22            There is a separate and independent reason why

23    this document should be excluded.  Strategy Analytics

24    also goes by UX Connect, and the individual who actually

10:43AM    25    did this testing, Paul Brown, were never disclosed on

the initial disclosures by Headwater.

About a week or two before the close of fact discovery, they presented us with the deposition that he took in the Samsung case and said:  Will you agree that this deposition can be applied in this case?

We said no.  We were given no notice of that deposition.  We had no opportunity to participate.  He's never been disclosed in this case.  It's not appropriate and too late.

And so for those two independent reasons, we think this document should not be an exhibit.

THE COURT:  And, Mr. Robb, apparently Google and Samsung had some relationship with Strategy Analytics.  Did either of the Defendants in this case have such a relationship?

MR. ROBB:  Certainly none that I'm aware of, Your Honor, and there's no evidence in the record that we've had any relationship with Strategy Analytics.

THE COURT:  All right.  Thank you, Mr. Robb.

MR. ROBB:  Thank Your Honor.

MR. DAVIS:  Your Honor, the document you saw from Mr. Robb, PTX797 in the Verizon case, I think as you explained, that's a Strategy Analytics average user profile.  That comes from a third party that Samsung and other companies like Google -- I believe Motorola has as

well -- hires to perform battery testing.

These profiles that Strategy Analytics creates
are reliable.  They are the OEM partners of the
Defendants who use them and use them to verify their
10:45AM  marketing claims about battery life.

These average user profiles are developed using
analytics taken from thousands of users' smartphones.
They are clearly business records of Samsung.  They are
plainly relevant to Dr. Wesel's opinions.

10:45AM  You know, it also just bears noting that
Samsung endorses, even claims to have participated in
the creation of the average user profile.  They say, for
example, in documents, together with Strategy Analytics,
Samsung has developed day-in-the-life usage models, and
10:45AM  they do so and they use Strategy Analytics in large part
because they have what's called the AppOptix telemetry
intelligence platform.

What that means, Your Honor, is that
Strategy Analytics uses real-world data from devices to
10:46AM  develop its profiles.  And so, Your Honor, from our
perspective, it's plainly admissible.  You know, the
Defendants can disagree with the conclusions being drawn
from it by Dr. Wesel and can challenge him on that.  I
certainly --

10:46AM  THE COURT:  Why isn't it hearsay?

1          MR. DAVIS:  Why isn't it hearsay, Your Honor?

2          THE COURT:  Yes.

3          MR. DAVIS:  Well, it's a business record of

4   Samsung, and the --

10:46AM   5          THE COURT:  That would perhaps make it an

6   exception, but it is hearsay, it seems to me, unless you

7   have some way you can point out that it's not being

8   offered for the truth of the matter.

9          MR. DAVIS:  Well, I think, Your Honor, that

10:46AM  10   it's being -- the way in which Dr. Wesel uses it is

11   simply for two purposes:  To look at what is, as a sort

12   of benchmark of what is applications that are downloaded

13   to a user's smartphone and approximately how long in a

14   given day are users connected to cellular data as

10:47AM  15   opposed to Wi-Fi.

16          Dr. Wesel didn't want to make that up on his

17   own.  That certainly would have been challenged by

18   Defendants and so we looked to a source.  We certainly

19   asked Defendants for any information they have about

10:47AM  20   this.  The best we have, Your Honor, is what their OEM

21   partner uses, Samsung, and other OEMs, to make these

22   relatively simple points.

23          THE COURT:  Well, you've indicated that you

24   want to rely on the business record exception.  What do

10:48AM  25   you have that establishes that this meets the

1    requirements of Rule 803(6)?

2         MR. DAVIS:  So, Your Honor, we have -- there is

3    evidence that the Strategy Analytics average user

4    profile is used by Samsung, that it changes over time,

5    that it is -- there's a 2015 version, a 2017, a 2019, a

6    2022 version, that Samsung has used this for a decade of

7    time to validate its battery testing.

8         Samsung's website even refers to the Strategy

9    Analytics, or now it's called UX Connect, as their

10   source of validating their battery claims.

11        THE COURT:  That might make it some adopted

12   admission as to Samsung.  How does that establish that

13   it meets the requirements of 803(6)?

14        MR. DAVIS:  So, Your Honor, I take the point

15   that, you know, Samsung is not the Defendant here.  I

16   note this was a admitted exhibit in the Samsung case,

17   but I take the point that, you know, Verizon did not

18   hire Strategy Analytics; T-Mobile did not hire Strategy

19   Analytics.

20        But the fact remains that, you know, these are

21   the OEM partners and, you know, it's also possible, Your

22   Honor, that this can be considered, you know, a type of

23   market report as well.  But it's compiled data that's

24   relied on by those in the industry, including

25   Defendants' OEM partners, for providing reliable

information about what users' typical behavior is.

   THE COURT:  How is it published to the industry?

   MR. DAVIS:  Well, it's certainly published to those who hire Strategy Analytics, so Strategy Analytics partners.  I don't believe the average user profile is, you know, publicly available on a website, for example, but the folks who hire Strategy Analytics use this average user profile and so it's available to the relevant industry participants.

   THE COURT:  For hire?

   MR. DAVIS:  For hire, yes.

   THE COURT:  I don't think that would make it a market report.  I'm not hearing anything that would be sufficient to qualify it as an exception to the hearsay rule.  And certainly your expert can rely upon it and can even talk about it, but that doesn't mean that it can be admitted as an exhibit.

   MR. DAVIS:  I understand, Your Honor.  I just wanted to add that, Your Honor, I think there is not specifically a requirement under the market report exception that it be free for use or not behind a pay wall or something like that.

   You know, a lot of market reports, persons or companies do need to pay for those reports because

 1  someone made a significant amount of effort and

 2  investment in compiling the data.

 3          THE COURT:  But they're published.  They may be

 4  published and require a subscription, but they're

 5  published.

 6          MR. DAVIS:  Yes, Your Honor.  Yeah, I'm not

 7  sure -- you know, here it's published in the sense that

 8  if you work with Strategy Analytics, you get the average

 9  user profile.

10          THE COURT:  That's true of your expert's report

11  as well.

12          MR. DAVIS:  Yes.

13          THE COURT:  It's also not an exception to the

14  hearsay rule.

15          MR. DAVIS:  I understand, Your Honor.  And

16  hopefully our expert report is not just a compilation of

17  data like the Strategy Analytics average user profile,

18  but I take your point.

19          THE COURT:  Well, I'm going to sustain the

20  objection to 797.

21          Are there other documents, other exhibits in

22  this bucket that you believe require a different

23  analysis?

24          MR. DAVIS:  Just a moment, Your Honor.

25          So not necessarily, Your Honor.  The other

1  exhibits in this bucket are produced by Google and

2  Samsung.  You know, certainly we believe the foundation

3  has been laid.

4         If the issue is hearsay, I don't believe

10:53AM  5  there's a different hearsay exception argument that

6  would be made with respect to those.  They are

7  analytical information that is provided by Samsung and

8  by Google based on their -- they certainly are

9  maintained as business records.

10:53AM  10        For example, there are Samsung presentations,

11  Your Honor.  That would be Exhibit Number 1188.  That is

12  a Samsung internal presentation that discusses an

13  analysis that Samsung had performed of what factors are

14  relevant to customers, including battery life.

10:54AM  15        THE COURT:  And do you have a custodian from

16  Samsung who establishes the requirements of 803(6)?

17        MR. DAVIS:  Certainly we rely on testimony in

18  our expert report.  I don't believe there's a plan to

19  produce a deposition designation from the Samsung case

10:54AM  20  for that specifically.

21        I guess the only other thing I would add, Your

22  Honor, is if -- that we would be granted that if we are

23  able to provide a business records declaration from

24  Samsung confirming that these are, in fact, you know,

10:55AM  25  business records of Samsung's, then, you know, that we

1    be able to revisit this.

2          THE COURT:  Well, I'm not going to rule on that

3    hypothetical, but certainly feel free to attempt that.

4          MR. DAVIS:  All right.  Thank you, Your Honor.

10:55AM  5          THE COURT:  I will sustain the hearsay

6    objection to Group 6.

7          MR. ROBB:  Your Honor, bucket 7 is essentially

8    identical, if Mr. Sim could please pull up 1070.

9          Your Honor, 1070 is an Ericsson Mobility Report

10:56AM  10   from 2013.  It is hearsay and that is the basis of our

11   objection.

12          If you scroll down to page 3, Mr. Sim.  Next

13   page.

14          And here we see the document, which is an

10:56AM  15   Ericsson document available on the Internet, reports on

16   various statistics about data usage, number of users in

17   the world, those sorts of things.  Those numbers are

18   used by Mr. Bergman in his background as he discusses

19   the wireless industry.

10:56AM  20          This document was not put in front of any fact

21   witness in the case.  No Ericsson witness, as far as I'm

22   aware, no Ericsson witness was deposed.  There is no

23   basis to establish this as a business records exception,

24   and Mr. Bergman relies on it.

10:57AM  25          The fact that it is reporting, for example, the

1    number of mobile subscriptions as we see on this page,

2    the fact that it reports that, he's using it to

3    establish the fact that it reports that, and it is

4    inadmissible for that reason.

10:57AM   5             THE COURT:  All right.

6             MR. ROBB:  Thank you.

7             THE COURT:  Thank you, Mr. Robb.

8             MR. HOFFMAN:  One moment, Your Honor, please.

9             Your Honor, the Ericsson Mobility Reports are

10:57AM  10   used by both Dr. Bazelon and Mr. Bergman for the

11   industry information within them.  These, in fact, do

12   fall under the market reports exception like, in the

13   case like shown here, *United States v. Olson*, the Gun

14   Trader's Guide, for example, that was used in testimony

10:58AM  15   there.  These are quite similar, and there's actually

16   quite a bit of evidence in the record that these are

17   market reports that are used and relied on in the

18   industry.

19            THE COURT:  How is this disseminated to the

10:58AM  20   industry?

21            MR. HOFFMAN:  Ericsson has a website, and much

22   of this information is available for free on the

23   website.  Some of it's available for pay, but it is

24   published on their website and then all the materials

10:58AM  25   here are published data.

1          THE COURT:  Does your expert refer to this as

2     some kind of market report or other similar publication?

3          MR. HOFFMAN:  I don't know if he uses the word

4     "market report" but, yes, Your Honor, he characterizes

10:59AM  5     it fairly as market report.  And I'll point out that

6     there's another case that, *Aerospace Lines*, of a similar

7     finding.

8          But in terms of the record here, so Steven

9     Rice, who is Verizon's VP of network planning, was asked

10:59AM  10     about the Ericsson Mobility Report.  He testified that,

11     in fact, people in his department do refer to that

12     report.

13          They do so because Ericsson -- specifically for

14     these Defendants, Ericsson is a major provider of

10:59AM  15     equipment to Verizon and that -- and more than that,

16     Your Honor, Verizon itself, on its website, has a number

17     of documents where it cites to the Ericsson Mobility

18     Report for exactly the kind of data that the experts

19     rely on.

10:59AM  20          So here's one example.  I have these articles

21     if you would like, Your Honor, and here's one example

22     where they are citing to statements in the report,

23     another example where they are providing specific

24     figures about exabytes per month in terms of global

11:00AM  25     mobile traffic.

1        Here's another example where Verizon's citing

2    to Ericsson Mobility Report regarding the number of

3    connections in the industry.  And so, Your Honor, we

4    would argue that this does fall under the 803(17)

11:00AM    5    exception and is admissible for that reason.

6        THE COURT:  Show me the part of Exhibit 1070

7    that you are seeking to rely on.

8        MR. HOFFMAN:  That may take me a moment, Your

9    Honor.  I don't have that in front of me in terms of

11:01AM    10    the number.

11        THE COURT:  Do you have anything that shows the

12    exhibit?

13        MR. HOFFMAN:  I'm sorry, Your Honor?

14        THE COURT:  Do you have anything that shows the

11:01AM    15    exhibit?  I'm just trying to get a feel for what the

16    format of this exhibit is.

17        MR. HOFFMAN:  Your Honor, may I approach with

18    the document?

19        THE COURT:  Yes.

11:01AM    20        MR. HOFFMAN:  This is actually a compilation

21    document.  It has three Ericsson reports under

22    Exhibit 1070.  This is the first one, but they are all

23    essentially of the same nature.

24        There's also another set of exhibits that

11:01AM    25    are -- Ericsson on its website has what's called the

1    Ericsson Mobility Visualizer, and it is essentially a

2    tool by which users can run queries against all the data

3    in the Ericsson Mobility Reports.

4            On screen now is a representation of what that

11:01AM   5    is.  So it's essentially the same data but in a format

6    where it can be queried.  But it's a publicly available

7    database of the data from the mobility report.

8            THE COURT:  And your expert is using this for

9    some of the usage numbers that are in it?

11:02AM   10            MR. HOFFMAN:  Yes, Your Honor.  Both

11    Dr. Bazelon -- particularly, Dr. Bazelon relies on the

12    Ericsson Mobility Reports for information about network

13    traffic and connections.

14            THE COURT:  All right.  Thank you, Mr. Hoffman.

11:02AM   15            MR. HOFFMAN:  Thank Your Honor.

16            THE COURT:  Mr. Robb, this looks and sounds

17    like it qualifies as a market report under, I think it's

18    17 -- 803(17).  Is there something in it that you're

19    concerned is not in the nature of a market report?

11:03AM   20    Certainly the whole document does not need to come in if

21    there's something in it that you're worried would be

22    misunderstood.

23            MR. ROBB:  Yes, Your Honor.  I can show -- if I

24    could please have this screen shown.  For some reason

11:03AM   25    the screen isn't showing properly.  With your patience,

Your Honor, then I will read in the passage that I meant
to refer to.

Usage of the spectrum has increased greatly as
a result of advancements in wireless technology.  An
Ericsson Mobility Report from November 2013 stated that
the number of mobile subscriptions worldwide had grown 7
percent from the prior year, while the number of mobile
broadband subscriptions grew even faster, at a rate of
40 percent, exceeding 2 billion.

There's then a citation to the Ericsson
Mobility Report.

Further, the amount of data usage per
subscription also continued to grow steadily, and around
55 percent of all mobile phones sold in Q3 2013 were
smartphones, compared to 40 percent in 2012.

There is, again, then a citation to the
Ericsson Mobility Report.

So the -- our point, Your Honor, is that this
is -- these are documents produced by Ericsson
that their expert is not -- he's not treating it or he's
not analyzing whether it's a report that's broadly
distributed and simply compiling data.

And, in fact, there's no evidence that I'm
aware of that indicates how it's a compilation of data,
what analyses they did to perform it, anything that

1    would establish it as a market report.  Certainly it

2    doesn't meet any of the other quotations lists

3    directly -- sorry, quotations lists or directories.

4              And without -- they took no deposition of an

11:05AM   5    Ericsson witness.  Their own experts didn't lay the

6    foundation of how it meets -- how it's compiled,

7    et cetera.  We just don't think there's an evidentiary

8    basis for that, Your Honor.

9              THE COURT:  All right.  I think that's part of

11:05AM  10    the reason that market reports are accepted, because

11    they are generally accepted in the industry, and

12    certainly I think this looks like one of those.  The

13    fact that your own client cites to it certainly leans in

14    the same direction.

11:05AM  15              I'll overrule the hearsay objection as to this

16    document, which is Exhibit 1070.

17              Is there anything else in this bucket,

18    Mr. Robb, that you would contend should be analyzed

19    differently?

11:06AM  20              MR. ROBB:  No, Your Honor.  They rise and fall.

21              THE COURT:  All right.  Thank you.  Then I'll

22    overrule the objection to this bucket.

23              MR. ROBB:  Turning to the next bucket, Your

24    Honor, bucket 8 are FCC documents.

11:06AM  25              Mr. Sim, if you could please pull up 1101.

1          Your Honor, this is a print-off from the FCC

2    website reporting on the results of an FCC auction.  If

3    Mr. Sim scrolls -- zooms in.  There's a gross bids --

4    thank you.  There's a gross bids and a net bids line

11:06AM  5    item of 44 and 41 billion dollars.

6          This ties to the large numbers MIL that was the

7    subject of argument last week.  The dispute between the

8    parties has nothing to do with the gross bids, the net

9    bids, or even the average price paid at this auction.

11:07AM  10   So no one disputes -- and I think I now can say that

11   without dispute because their expert and our expert used

12   literally the same number -- that the result of the

13   AWS-3 auction was $2.53 per unit.  Think of it as a

14   price per square unit for this auction.

11:07AM  15          The way that number is calculated, of course,

16   has to do with taking the total fees generated from the

17   auction divided by the number of units sold at the

18   auction, but there is no dispute about either of those

19   two numbers.

11:07AM  20          Instead, the dispute between the experts is

21   about which FCC auctions should inform the average price

22   of the company Spectrum Holdings.  So Dr. Bazelon relies

23   on this number and the $2.53, and Dr. -- which is

24   Headwater's expert.  Verizon's expert, Dr. Hazlett,

11:08AM  25   relies on this plus other auctions and averages those

1    numbers.

2    Reliance on -- sorry.  This document being used

3    to show the overall number is inherently prejudicial

4    because of the large numbers effect that we had raised

11:08AM  5    with Your Honor last week.

6    It is also not necessary to show this because,

7    again, there is no dispute between the parties that the

8    consequence, that the result of the auction 97 is a

9    $2.53 number.  Neither expert is going to dispute that.

11:08AM  10    It's just simply a matter of do you take the average of

11    all the auctions or do you focus on this auction.

12    And so for that reason, this document should

13    not come in because it is unduly prejudicial and it

14    doesn't go to any disputed issue in the case.

11:08AM  15    THE COURT:  All right.

16    MR. HOFFMAN:  So, Your Honor, I think we talked

17    a fair amount about this at last week's hearing.  Your

18    Honor may remember that Dr. Bazelon has a chart in which

19    he shows his calculations of what the price of the --

11:09AM  20    sorry, what the cost of spectrum is on a megahertz per

21    population basis; and you may recall in that chart, he

22    cites directly to the documents that we're talking about

23    as a direct input into how he calculates that.

24    You know, the Federal Circuit has ruled that

11:10AM  25    experts have to tie their opinions to real facts and to

real evidence, and what Verizon proposes is that Mr. --
or Dr. Bazelon be deprived of the underlying evidence in
his opinion, which both hurts, is prejudicial to us as a
party but also undermines his ability to explain to the
jury where these numbers come from and how they are
calculated.

And again, Your Honor, we talked about last
week the Court's prior ruling of *Finesse*, which was
right on this issue in terms of Dr. Bazelon relying on
price paid for in auction and that those be admissible,
as they were the underlying basis of his calculation.

I would also point out that there's some other
documents in this category.  For example, a couple of
them are what counsel showed, which is essentially what
he showed in another one for another auction exactly
like that.

There's a third document in this category,
which is a larger report from the FCC.  It's a
government document on a government website as part of
the normal actions of the FCC, and it provides industry
data and data specific to both -- well, anyway, it
provides industry data that is cited and relied on by
Dr. Bazelon.

So this is a page from that market report,
PX1092, another one and so we think that's -- if the

concern here is just the big number as it relates to the

auction, we believe that these are a different,

different category, Your Honor.

THE COURT:  All right.  Thank you, Mr. Hoffman.

11:12AM    I'm going to overrule the objection, which is

largely based on Rule 403.  This is not the sort of

number that I think *Uniloc* and *LaserDynamics* are worried

about.

The unnecessarily large revenue or profit

11:12AM   numbers have the consequence of making the jury thinking

that the Defendant can afford whatever this small amount

is that the Plaintiffs are seeking.  This is not a

number that relates to the Defendants' revenues.

I think it's reasonable for the Plaintiff's

11:13AM   expert to rely upon it, so I'll overrule the objection

to Exhibits 1092, 1101, 1103 in the Verizon and 1090,

1099, 1101 in T-Mobile.

Mr. Robb, what's next?

MR. ROBB:  Thank Your Honor.

11:13AM   Moving to bucket 9, 278 is identified as

representative.

Mr. Smith, if you could please pull up 278.

Your Honor, 278 is an excerpt, or a portion of

the errata with exhibits attached to Mr. Bergman's

11:13AM   report.  It is hearsay, and it is not properly

1    admissible as an exhibit.

2            THE COURT:  All right.  Sounds like hearsay.

3            What's the response, Mr. Hoffman?

4            MR. HOFFMAN:  Your Honor, may I approach and

11:14AM   5    give you an excerpt from 278?

6            THE COURT:  You may.  And I'll hand you back

7    1070 while you're at it.

8            MR. HOFFMAN:  Thank you, Your Honor.

9            THE COURT:  Mr. Hoffman, these may be good

11:14AM  10    demonstratives for when your expert is testifying, but

11    how can they not be hearsay?

12            MR. HOFFMAN:  Your Honor, our contention is

13    that these are 1006 summaries.  The spreadsheets that

14    these are based on are run to tens of thousands, in some

11:15AM  15    cases hundreds of thousands of lines.

16            Those spreadsheets themselves are in evidence,

17    or will be in evidence.  Those are agreed without

18    objection.  They are on T-Mobile and Verizon's list, the

19    underlying documents, but they are just too voluminous

11:15AM  20    to be of any value or any way for the jury to understand

21    it.  And that's what Schedule 3.3 and 3.4 are.  These

22    are 1006 summaries.

23            And I'll point out, Your Honor, these are

24    exactly the kind of summaries that Your Honor overruled

11:15AM  25    objections to in both the Samsung 422 and Samsung 103

1   case for exactly this reason.

2        THE COURT:  All right.  They may be --

3   Schedules 3.3 and 3.4 do not appear to reflect that

4   there's some judgment of the expert that goes into

11:16AM   5   categorizing the numbers.  The Schedule 4.1 is a part of

6   me to determine that regard, but let me put Mr. Robb to

7   that task.

8        MR. HOFFMAN:  If I could just add quickly, Your

9   Honor.  Instead of 4.1, we propose to the other side

11:16AM  10   that we redact essentially everything except the last

11   two lines.  Mr. Bergman relies, calculates profit margin

12   from this data, which is from a number of 10-Ks and so

13   voluminous, and we're fine with redacting essentially

14   everything except the outcome of his calculations as the

11:16AM  15   profit margin.

16        THE COURT:  And tell me which lines that would

17   leave?

18        MR. HOFFMAN:  So that would leave total

19   operating profit margin and then operating margin

11:17AM  20   excluding certain costs, those last two lines at the

21   bottom of Schedule 4.1.

22        THE COURT:  All right.  I'll hear the response

23   to that.

24        MR. ROBB:  Your Honor, I think it's clear from

11:17AM  25   our own expert's report that we don't dispute the total

operating profit margin where the operating margin

excluding certain costs that Mr. Bergman calculates.

We, of course, dispute the way in which he uses it,

which is the subject of a dispute between the parties.

11:17AM    As far as this document, a redacted version of

this document being an exhibit, it's a chart that their

expert created.  It's a visual aid.

THE COURT:  Well, if it is, in fact, a 1006

summary of your records, the 3.3, Schedule 3.3 and 3.4

11:18AM  look to be that.  Do you contend that they are anything

other than an aggregation of what's in the underlying

documents that your clients produced?

MR. ROBB:  No, Your Honor.  The primary dispute

is with respect to 4.1.

11:18AM  THE COURT:  All right.  Well, I'll overrule the

objection to 3.3 and 3.4.

Turning to 4.1, if it is redacted down to those

last two lines, if I heard you right, you just said you

are in agreement that that information is correct?

11:18AM  MR. ROBB:  Yes, Your Honor.  The issue that

we're struggling with is that it does not meet the 1006

exception because these are pulled straight from the

10-Ks and that's just a straight mathematical operation.

There's no more -- I don't believe at least

11:19AM  that there's any more numbers that he used to generate

1    these other than the numbers that appear.  So it's not a

2    summary of a voluminous record.

3         Not to step on the toes of my colleague who is

4    going to argue next, there's a separate issue with

11:19AM  5    showing the 10-K overall operating figures and those

6    things that actually are steps that result in the

7    operating margin.  So we don't think those should be

8    shown.

9         This is an issue where the parties don't

11:19AM 10    dispute the substance; it's just that this itself

11    doesn't meet the qualifications of an exhibit, and the

12    top line numbers are violative of the Court's notes.

13         I would -- in light of Your Honor's ruling on

14    the first two pages, if I can suggest, perhaps at the

11:19AM 15    lunch break, we and counsel can discuss whether to

16    either enter some sort of stipulation as to just these

17    numbers such that the 10-Ks and the rest of the chart

18    are not necessary, redacted version as counsel had

19    proposed or something along those lines.

11:20AM 20         THE COURT:  I can tell you that I'm not likely

21    to admit 10-Ks, maybe pages here and there from 10-Ks,

22    but they definitely are what I would call voluminous

23    records.

24         MR. ROBB:  Yes, Your Honor.  Again, I apologize

11:20AM 25    for stepping on the toes of my colleague's argument,

1    which is coming next.  Headwater has already -- we made

2    that point to Headwater; they agreed to limit them.  So

3    now it's in the realm of twenty or thirty pages per

4    10-K.

11:20AM    5            We still have a MIL problem with them in the

6    sense that the pages that are included still include the

7    top line revenue numbers, et cetera, that is the subject

8    of the court's standing MIL.  The issue we're trying to

9    navigate is, again, we don't dispute the actual profit

11:20AM    10    margin.  The big numbers can't be shown because of the

11    standing MIL.  This itself doesn't meet the definition

12    of the compilation, so that's the issue that I would

13    request to have an opportunity to negotiate with

14    counsel.

11:21AM    15            THE COURT:  Well, I am willing to admit the

16    bottom two lines, and I guess that would also include

17    the very top line that has the fiscal year.  Otherwise,

18    the bottom two lines don't have?

19            MR. HOFFMAN:  Yes, Your Honor.

11:21AM    20            THE COURT:  Okay.  Well, then I'll admit 3.3

21    and 3.4 as they are, and I will admit 4.1 with

22    everything redacted between the top line and the bottom

23    two lines.  I'm satisfied that those qualify under 1006.

24            MR. ROBB:  Yes, Your Honor.

11:21AM    25            And I think Your Honor already said that it's

1    an issue that's near and dear to our heart, so if I

2    could ask for clarification.  When you say the top line,

3    you mean the fiscal year line, not the services revenue

4    number line?

11:22AM  5          THE COURT:  That is what I mean.

6          MR. ROBB:  Thank you, Your Honor.

7          MR. HOFFMAN:  Your Honor, if I may, there's a

8    couple of other exhibits in this category that are

9    significantly different from the one we just addressed.

11:22AM  10          THE COURT:  All right.  Go ahead and address

11   those.

12          For the record, what is the exhibit number that

13   we were just talking about?  I don't see it on the

14   document.

11:22AM  15          MR. ROBB:  278, Your Honor.

16          MR. HOFFMAN:  And also, I believe the same

17   ruling reasonably applies to T-Mobile's PX89, which has

18   the same, essentially the same schedules.

19          THE COURT:  All right.  And what is the exhibit

11:22AM  20   you are now wanting to address, Mr. Hoffman?

21          MR. HOFFMAN:  Your Honor, the exhibit we want

22   to address is PX1113 in the Verizon case and 1111 in the

23   T-Mobile case, and these are some relatively voluminous

24   spreadsheet.

11:23AM  25          And, Your Honor, if I may approach.

1    So this is the declaration from the records

2    custodian for Ceramic Software, which is also

3    commercially known as Airwave data -- I'm sorry, Airwave

4    Research.  Mr. Bazelon relies on the population data

11:24AM    5    from Airwave in his calculations.

6    As you can see in the custodian's declaration,

7    what this is is it's information that's compiled by the

8    FCC that Airwave essentially pulls out of the FCC

9    database and compiles it in the fashion you see here.

11:24AM    10    So the underlying data is government data, and

11    essentially the only way to, I guess, put that database

12    in front of the jury is through Airwave's analysis,

13    which, I don't know that I would say that everybody in

14    the industry uses it, but certainly Dr. Bazelon

11:24AM    15    typically uses it and testifies as to its reliability in

16    terms of the population data.  And, again, it's

17    essentially FCC data reorganized.

18    THE COURT:  Well, I assume you are offering

19    Mr. Weinberger's declaration in support of the business

11:25AM    20    records exception?

21    MR. HOFFMAN:  Yes, Your Honor.

22    THE COURT:  All right.

23    MR. HOFFMAN:  And I would argue that also the

24    exception applying, so it's government records, at least

11:25AM    25    arguably applies to this because, again, it's the

1    presentation of FCC data.

2           And then, Your Honor, there is one more, which

3    I don't have here for some reason.  So there's one other

4    exhibit, which is exhibit in the Verizon case, PX277.

11:25AM    5    That's essentially a chart from Mr. Bazelon's report

6    that summarizes or collates the data, which again is

7    voluminous, from Airwave into a single -- into a single

8    schedule.

9           THE COURT:  All right.

11:26AM    10           MR. HOFFMAN:  Thank Your Honor.

11           MR. ROBB:  In light of Your Honor's ruling with

12    respect to compilations, we will acknowledge that the

13    same ruling applies to 277, which is a chart prepared by

14    Dr. Bazelon relying on the Airwave materials.

11:26AM    15           With respect to the Airwave materials

16    themselves, though, there are a few issues.  So first is

17    disclosure.  Airwave Research was never disclosed in the

18    initial disclosures.  We have never heard of

19    Mr. Weinberger before.

11:26AM    20           This declaration was, on its face, executed on

21    May 2, 2025.  We did not receive a copy of it until

22    May 29, 2025.  It was, I believe, the day before the

23    pretrial conference from last week.  We've had no

24    opportunity to seek discovery on any of these issues, so

11:27AM    25    it's untimely in that regard, and the conclusory

1  language in paragraph 3 we don't think is sufficient in

2  light of the lack of discovery on that.

3      THE COURT:  The business records declarations I

4  don't think have to be disclosed during the discovery

11:27AM  5  period as long as the records that the declaration is

6  addressing were timely disclosed.  Were these underlying

7  records which are Exhibits 1111 and 1113, were those

8  timely disclosed?

9      MR. ROBB:  First time they were disclosed, Your

11:27AM  10  Honor, was in Dr. Bazelon's report.  So they were never

11  produced during fact discovery, and the company was

12  never disclosed during fact discovery, and Headwater

13  never disclosed that they were going to rely on this

14  theory of damages during fact discovery.

11:28AM  15      THE COURT:  All right.  And then so when --

16  Dr. Bazelon's opening report, when was that served?

17      MR. ROBB:  I believe it was January 29th, Your

18  Honor.

19      THE COURT:  The discovery cutoff, as I recall,

11:28AM  20  was February 7?

21      MR. ROBB:  Yes, Your Honor.  There was a quirk

22  in the schedule.  It was originally set for before then.

23  I believe it was, like, the parties had agreed on a

24  close of fact discovery, or the date was set in late

11:28AM  25  January.  We asked for it to be moved to February 7th.

1    That ruling had not yet been decided.  The parties then

2    served their opening reports, then discovery was pushed

3    about a week after that.

4        And so due to that essentially lag period, his

11:29AM  5    initial report was served approximately eight days

6    before the close of the final discovery, fact discovery

7    cutoff.

8        THE COURT:  And so tell me about the prejudice

9    to you from that.  What would you have done about

11:29AM  10    whatever is disclosed in these two exhibits?

11        MR. ROBB:  Our expert would have liked to have

12    more time to determine whether he agreed with the

13    analysis that Dr. Bazelon performed on these.

14        Our expert, given the limited time of

11:29AM  15    discovery, put in criticisms of the FCC auctions and of

16    some of the theories and models presented by

17    Dr. Bazelon.  He offered no criticisms of the Airwave

18    analyses that Dr. Bazelon had put in simply because he

19    didn't have time to perform those analyses.

11:30AM  20        THE COURT:  All right.  Mr. Robb, under the

21    circumstances, I think that the disclosure was

22    sufficiently timely, given the nature of the evidence

23    and the fact that I don't think the Plaintiffs had it

24    before their expert provided it to them.

11:30AM  25        So I don't think it was withheld, and anyway, I

          1   will overrule the objections to 1111 and 1113.

          2           MR. ROBB:  Thank Your Honor.

          3           With your permission, I'd like to just check

          4   one thing.  It will take ten seconds.

11:30AM   5           THE COURT:  Certainly.

          6           MR. HOFFMAN:  And, Your Honor, I believe

          7   counsel conceded that PX277 is a 1006 summary, and we

          8   would ask that the objection to that be overruled as

          9   well.

11:31AM  10           THE COURT:  It is.

         11           And perhaps, Mr. Robb, if I can interrupt you

         12   and ask the Plaintiff to identify for me in the next

         13   bucket what portions of these 10-Ks are they seeking to

         14   admit?

11:31AM  15           MR. HOFFMAN:  Your Honor, may I approach?

         16           THE COURT:  Yes.

         17           MR. HOFFMAN:  Your Honor, what I've handed you

         18   is -- I think counsel mentioned that we had put together

         19   a excerpted version of the 10-Ks to try to cut down, I

11:32AM  20   guess, the issues.  Even within these, you know, we're

         21   certainly willing to cut them down to just that

         22   information which is directly relied upon by the

         23   experts.

         24           I should say that both of the -- well,

11:32AM  25   Dr. Bazelon and Mr. Bergman rely on these, and some of

1    the issues are connected to Daubert issues as well.  But

2    there are essentially, within this document, there are

3    three categories of information that we ask be admitted.

4          It doesn't seem like the HDMI is connected.

11:32AM    5          But, Your Honor, if you could please look --

6    there it goes.  Sorry.

7          So within the data that you have here, if you

8    look at the screen or you look at PTX265, this is a

9    picture from essentially the third page of the document,

11:33AM   10    and this shows the information from -- so there's a

11    chart here that admittedly includes dollar numbers.

12    We're not using those and we're fine redacting them.

13          What the experts rely on is the connection data

14    shown on the screen.  We would find where the only issue

11:33AM   15    in the chart is connection data, redacting dollar

16    figures from that.

17          The second category is statements by Verizon in

18    their 10-Ks that the experts rely on as provided a

19    couple -- there's a number of them, so I provided just a

11:33AM   20    couple examples of how they are being used.

21          So this is Mr. Bergman's report where he's

22    citing to the 10-K regarding statements by Verizon as to

23    the importance of speed and coverage and other issues

24    going to the importance of capacity to Verizon and to

11:34AM   25    its competitive stature.

1           And then the third one, and admittedly I think

2   this is the controversial one, but counsel can correct

3   me if I'm wrong.  And this is detailed to more detail in

4   the Daubert motions both against Dr. Bazelon and

11:34AM  5   Mr. Bergman and go to their MIL 5, and which Your Honor

6   I think ruled this morning you would hold until you

7   ruled on the Daubert motions.

8           I think this particular issue with the 10-Ks,

9   this third category of data probably rises and falls on

11:34AM  10   that.  But as described in the briefing, it's

11   Defendants' position that they don't actually need

12   excess capacity and that they have enough capacity and,

13   therefore, the invention provided capacity savings has

14   no value to them.

11:35AM  15           Both Mr. Bergman and Dr. Bazelon point to their

16   continued investment in capacity as evidence that they

17   are not satisfied and that they are continuing to invest

18   because if they don't continue to invest at high levels,

19   they will quickly run out of excess capacity because

11:35AM  20   traffic is ever growing.  So this is a cite from

21   Mr. Bergman's report relying on that data from the

22   10-Ks.  It's essentially one line.

23           If you look, Your Honor -- well, anyway, I'm

24   sorry, Your Honor.  I don't have the direct cite.

11:35AM  25           So, again, there are three categories that we

would ask be found admissible, and we would work with

Verizon and T-Mobile to make sure we're on agreement

about which those are.

Again, it's within the 10-Ks, disclosed data by

11:36AM  the Defendants about connections and subscribers, pretty

much what you see on screen here, but also there's one

for different periods, statements about the importance

of capacity and narrative statements within the 10-Ks,

and third, information about the continued capital

11:36AM  investment in capacity by the Defendants, which is

really an issue that they themselves have created by

countering our case by arguing that they have all the

capacity they need and so our invention has no value.

Thank Your Honor.

11:36AM  THE COURT:  All right.  Thank you, Mr. Hoffman.

MS. BEDARD:  Good morning, Your Honor.  Hannah

Bedard on behalf of the Defendants.

THE COURT:  Good morning.

MS. BEDARD:  So I will quickly address the

11:37AM  10-Ks which are in bucket 10, and again, these are

Verizon Plaintiff's Exhibit 265 and T-Mobile Plaintiff's

Exhibit 75.  So these are both compilations of the SEC

filings.  We looked at, it sounds like from the

Plaintiff's side that there's three categories that they

11:37AM  want to keep in this case and that they are okay with

1    redacting the many large numbers.

2         I'll note that the Verizon exhibit has been

3    excerpted down to 32 pages.  Almost all of those pages

4    do have the large numbers on them.  So, for example,

11:38AM    5    they have Verizon's total operating revenues, total

6    expenses and so for that, we think that that runs afoul

7    of this Court's standing MIL 3 and also runs into the

8    same issues that the Court identified discussed in

9    bucket 8 in terms of the prejudice that that could cause

11:38AM   10    to the Defendants.

11         THE COURT:  It definitely does.  And so there

12    are obviously significant further redactions required.

13    The narrative statements that were the first two

14    categories, I think, that the Plaintiff is arguing for,

11:38AM   15    they don't appear problematic from the large figure

16    standpoint.  Do you have other objection to them?

17         MS. BEDARD:  We don't have other objections

18    to -- for the first two categories, the connection data

19    and the narrative, the narrative statements.  For those

11:39AM   20    we can discuss with the Plaintiff side whether we should

21    just entirely redact from the 10-K or if we should

22    perhaps excerpt from the 10-K and cite that the, you

23    know, source of that information is the Defendants'

24    10-K, and we're happy to discuss with the Plaintiff or

11:39AM   25    take Your Honor's direction on what would be the most

1    efficient way to present that information.

2         THE COURT:  If they want the cover sheet, in

3    effect, or parts of the cover sheet that show it's an

4    official filing, I would allow them that, and they can

11:39AM    5    redact down to the information in the first two

6    categories.

7         As far as the third category, I do expect that

8    that will be decided in connection with the Daubert

9    issue, and --

11:40AM    10         MS. BEDARD:  Understood, Your Honor.  We would

11    just point out that there is a disconnect in the

12    Plaintiff's argument here in terms of their willingness

13    to redact the big numbers but their intent to get in the

14    big numbers by proxy of how much billions of dollars

11:40AM    15    have been spent on spectrum.

16         And so we understand the distinction that Your

17    Honor may make in terms of a decision that is pending on

18    the MIL 5, but we do think that they are using these

19    numbers, the big, big numbers regarding spectrum in

11:40AM    20    order to point out the amount of money that the

21    Defendants may be able to pay, and it runs into the same

22    issue of making the jury believe that the Defendants

23    will be able to afford to pay whatever amount the

24    Plaintiff asks for because it will appear small in

11:41AM    25    comparison to the amount of money that has been spent on

```
 1   spectrum.

 2         THE COURT:  I know their argument is that by

 3   arguing that the Defendants have all the spectrum they

 4   need, they open the door to what the Plaintiff would

 5   regard as a rebuttal of that.

 6         I know that's an argument that will be taken up

 7   in connection with that Daubert motion to decide whether

 8   that is an admissible theory, and I will just make sure

 9   that this issue that you are raising here in connection

10   with whether those large numbers are the sort that are

11   only being put up to skew the damages arising or whether

12   they have a proper and necessary role in the analysis.

13         So I'm going to carry that part of it to be

14   decided with that Daubert motion, but I will rule that

15   the other parts of the 10-K that we just talked about

16   are the subject of a negotiated redaction, and we will

17   be sure to set a final hearing time before the 23rd so

18   that if there are issues about any redactions ordered in

19   this process that we can get back to them and decide

20   them.

21         MS. BEDARD:  Understood.  Thank you, Your

22   Honor.

23         THE COURT:  Thank you.

24         MR. SIM:  Good morning, Your Honor.  Charlie

25   Sim for the Defendants.
```

1          THE COURT:  Good morning.

2          MR. SIM:  When Your Honor's ready, I'd like to

3     move on to bucket 11, Android and Samsung technical

4     documents.

11:43AM    5          THE COURT:  All right.  Go ahead.

6          MR. SIM:  These are three PowerPoint

7     presentations that were produced by Samsung in

8     connection with Headwater's subpoena to Samsung in this

9     case.  All three of these documents are cited in

11:43AM   10    Headwater's infringement expert report for the truth of

11    the matter asserted in those documents, namely dozens

12    and dozens of citations that go to the operation of some

13    of the accused Android features in this case.

14         So I submit that these documents are hearsay in

11:43AM   15    that they were produced by a third party and are being

16    offered for the truth of the matter asserted and that no

17    exception applies to hearsay.

18         Samsung produced a representative for

19    deposition in this case.  He was shown one of these

11:44AM   20    three documents, the exemplary document Plaintiff's

21    Exhibit 806.  He expressed no familiarity with that

22    document, but Headwater did ask him one question that

23    goes to this issue.  They asked, quote:  Any reason to

24    believe that this is not a business record of Samsung?

11:44AM   25         Answer:  No.

1          Plainly, a lay witness such as Samsung's

2   representative, who is not familiar with requirements of

3   the business records exception or any other exception to

4   hearsay, and there was no other deposition testimony

11:44AM  5   going to whether or not these documents would constitute

6   business records.

7          THE COURT:  Mr. Sim, if these are along the

8   line of technical manuals or the like, typically I find

9   that those are nonhearsay in the sense that what is

11:45AM  10   important is what they describe about the technology,

11   not whether or not that's true.

12          Tell me more about whether these technical

13   documents are in that form or whether they are something

14   different than operating manuals or the like.

11:45AM  15          MR. SIM:  Certainly, Your Honor.  Maybe it

16   would be helpful if I show you our exemplary document,

17   if I may have the ELMO.

18          THE COURT:  All right.

19          COURTROOM DEPUTY:  Use the dial.

11:45AM  20          MR. SIM:  I'm sorry?

21          COURTROOM DEPUTY:  Use the dial.

22          MR. SIM:  I'm sorry.

23          So I can flip through a couple pages here, but

24   all three of these documents were PowerPoint

11:46AM  25   presentations prepared by Samsung.  They were all

designated confidential, attorneys' eyes only by Samsung

for production in this case.  And for all purposes for

all review of these documents, it appears they were

generated for internal use by Samsung in both English

11:46AM  and Korean in instances.  So I'll show you a few pages

of these documents.

            Now, while the pages of these documents refer

at times to some of the features accused in this case,

they are by no means technical manuals; in fact, have

11:46AM  very little explanation narratively on them.  They

appear to be used for some internal purpose at Samsung.

Samsung's representative at his deposition was not able

to provide any more information than that.  But they are

not documents produced for wide dissemination, or

11:46AM  apparently even dissemination outside a specific team at

Samsung, for the purpose of explaining the nuances of

some of these features.

            For instance -- I'm not sure you can see that

so well, Your Honor, but Headwater's expert in his

11:47AM  infringement report repeatedly replies on this page, in

addition to many other pages of this document, which

appears to reproduce source code, the origin of which is

unclear to us, but there is no narrative explanation as

to really what is going on on this slide.  It is, at

11:47AM  best, simply a description of -- you know, I recognize

some variables here from the public source, Android

code, and all of that documentation is already on the

parties' joint exhibit list.

So does that answer Your Honor's question?

11:47AM   THE COURT:  I think it does at this point.

Let me hear from Plaintiff as to why that

shouldn't be deemed hearsay.

MR. DAVIS:  Thank you, Your Honor.

I also wanted to add that in addition to the

11:48AM   testimony Mr. Sim talked about from Samsung's witness

Mr. Schiksnis, he was also asked:  Do you have any

reason to believe that any of the documents produced by

SEA -- that's Samsung Electronics America, who was

subpoenaed -- are not regular records of the company?

11:48AM   And, again, he said:  No.

So the witness was asked.  You know, we

attempted to establish he was not familiar with every

single document produced by Samsung.

I also wanted to raise this with respect to the

11:48AM   prior bucket that we addressed, Your Honor, because

those documents, those Samsung documents in bucket 6

like PTX797 in the Verizon case, those were also

produced by Samsung.  That's -- those are documents that

Mr. Schiksnis was testifying about that --

11:49AM   THE COURT:  I would have answered that question

the same way, though I don't think that establishes the

foundation you need.

        MR. DAVIS:  All right.  So, Your Honor, the --

I think to your point, you know, these are deeply

11:49AM   technical documents.  The network policy document that

is the exemplary PTX806, this has been testified about

extensively by Samsung's witnesses.  In fact, all of the

documents in this bucket were testified about by

Samsung's witnesses.

11:49AM   You know, Verizon and T-Mobile in this case,

they are selling Samsung products.  They point to

Samsung as the source of information about the technical

operation of Samsung products.  Samsung, they have

indemnification agreements because Samsung is so deeply

11:50AM   involved in this case.

        And so -- and I'll give you just another

example, Your Honor, that -- maybe two more.  So as you

may recall, the Defendants also have a motion for

summary judgment of noninfringement with respect to the

11:50AM   '613 patent.  That's based on a jury finding in the 422

case with respect to Samsung products.

        So Defendants are saying that these materials

which were the subject of that case are so relevant and

so tied up in how the accused products work that they

11:50AM   should be granted summary judgment and, yet, they are at

1    the same time saying, you know, well, these documents,

2    these are just unreliable documents; who knows what they

3    mean.  These are the documents from the Samsung 422

4    case.  They shouldn't be able to have it both ways.

5            I'll also add, Your Honor, that they are

6    pointing to internal Samsung features.  They are not

7    publicized as noninfringing alternatives.  Those are not

8    described in public documents.  They are from internal

9    Samsung documents like these.

10           Their expert report talks about this.

11   Paragraph 624 of Dr. Jeffay's opening report refers to

12   ██████████████████████  and other internal Samsung

13   features.  How does he know how these operate without

14   relying upon these types of Samsung documents.

15           So how is it that Defendants can use these

16   technical documents describing Samsung's features.  They

17   are not in publicly available user guides.  They are in

18   exactly documents like these, the internal Samsung

19   technical documents.  How can they use them and, yet,

20   claim these documents are unreliable hearsay; we

21   couldn't possibly use them to substantiate claims about

22   how the accused products work.

23           THE COURT:  Well, are you objecting to their

24   use of them?

25           MR. DAVIS:  No, Your Honor.

1          THE COURT:  Well, that's how they can use them.

2          MR. DAVIS:  I'm sorry?

3          THE COURT:  If you don't object, obviously I

4    can't address whether they are proper or not.

11:52AM  5          MR. DAVIS:  I understand, Your Honor.  I think

6    the point I'm just conveying is that this seems like a

7    disingenuous type of position from Defendants, that when

8    it suits their purposes, they think it's perfectly

9    permissible to use these technical documents to support

11:52AM 10   their claims, their assertions.  But when the Plaintiff

11   uses them, these documents from an indemnifying third

12   party, who the Defendants agree is the definitive source

13   on how the products that they sell work, they say that

14   these are unreliable documents.

11:53AM 15         THE COURT:  I assume that when you talk about

16   the Defendants are using them, you are saying that their

17   experts rely upon them in their reports?

18         MR. DAVIS:  That's right, Your Honor.

19         THE COURT:  And so do yours.  And they are not

11:53AM 20   trying to keep your expert from relying on them.  It's

21   just a question of are they admissible to the jury, and

22   that's the issue that we are currently exploring.

23         MR. DAVIS:  I understand, Your Honor.

24         I'll add as well that there are

11:53AM 25   SAM-THIRDPARTY -- that was the Bates number used by

1    Samsung in this case -- there are SAM-THIRDPARTY

2    documents on both the joint exhibit list and on

3    Defendants' exhibit lists.

4         THE COURT:  Well, I understand that.  I don't

11:54AM  5    know what you want me to make of that, though.  I need

6    an argument that's based on the rules of evidence.

7         MR. DAVIS:  I understand, Your Honor.  I think

8    the view that we took was I thought, in our view, a

9    principled stand that we are not going to try to have it

11:54AM  10   both ways like we think the Defendants are trying to do

11   and so that's why we didn't raise objections to the same

12   documents or the same types of documents that Defendants

13   are relying upon.

14        THE COURT:  Well, I guess to follow that line

11:54AM  15   of argument, are you saying that the Defendants are

16   seeking to admit Samsung internal presentations?

17        MR. DAVIS:  I'm not certain, Your Honor, what

18   the specific Sam third-party documents are on their

19   list.  I can check that.  I don't -- it's not these

11:55AM  20   documents, I can certainly tell you that much.

21        THE COURT:  Obviously these are multipage

22   presentations.  It is possible that as to some

23   presentations, the outcome would be differently, I mean

24   some pages.

11:55AM  25        What part of -- I think we're looking at 806.

|   | |
|---|---|
| 1 | What part of that are you specifically seeking to use |
| 2 | with the jury? |
| 3 | MR. DAVIS:  Yes.  Sure, I can explain that, |
| 4 | Your Honor.  If I may have the ELMO. |
| 11:55AM 5 | So the first slide I would point to is Slide 3. |
| 6 | This is simply a list of accused features.  These are |
| 7 | network access rules, and it's part of the network |
| 8 | policy.  The claim term is apply a policy.  And the |
| 9 | power saving mode is accused, doze mode is accused, app |
| 11:56AM 10 | standby, data saver, roaming reduction, all accused. |
| 11 | On Slide 4, what we would point to, Your |
| 12 | Honor -- and I won't belabor the point because it's very |
| 13 | small type -- but what we see here is there are certain |
| 14 | elements of the Samsung system that existed prior to the |
| 11:56AM 15 | claimed inventions, but there are other aspects, |
| 16 | especially including this middle aspect here, that |
| 17 | existed after the claimed inventions. |
| 18 | And so much like in the Samsung cases, the |
| 19 | Defendants here, their lead prior art reference is a |
| 11:56AM 20 | prior art Android device.  And so we would point out |
| 21 | that, well, these pieces, or aspects of those pieces, |
| 22 | did exist before, as you're suggesting, but then later |
| 23 | the network policy was added and that's what was accused |
| 24 | of infringing. |
| 11:57AM 25 | From there, Your Honor, it's -- you know, there |

1  may be little bits that we would point to, including the

2  excerpt that Mr. Sim pointed out, where we have, for

3  example, some code variables that are reflected in

4  Android code and also Samsung code.

11:57AM  5       I'll add for the record, Your Honor, that

6  Samsung did make available, albeit a bit belated, did

7  make available source code for inspection.  Headwater

8  inspected it; Defendants did not.  They chose not to,

9  for whatever reason.  But, you know, pointing to sort of

11:58AM  10  variables about how the accused products work, the

11  firewall rules that are set that show the blocking of

12  network access.

13       I don't know if that answers your question,

14  Your Honor, if that gives you a sense of the specifics

11:58AM  15  of how we would use a document like this.

16       THE COURT:  And do you have physical copies of

17  the -- of 806 and 804, or are they the same?

18       MR. DAVIS:  We do.  I'm sorry.  804 is the --

19       THE COURT:  The T-Mobile version?

11:58AM  20       MR. DAVIS:  Yes.  It's the exact same, Your

21  Honor.

22       THE COURT:  All right.

23       MR. DAVIS:  So, and we do have physical copies

24  of all three documents in this bucket, which, each of

11:58AM  25  which has a Verizon number and a T-Mobile number.

1        THE COURT:  All right.  If you would hand those

2   up, I'm going to look at those over the lunch hour, and

3   we'll resume with this after the lunch.

4        MR. DAVIS:  Certainly.  Thank Your Honor.

11:59AM   5        THE COURT:  And we'll be in recess until

6   1 o'clock.  And if you would just pass those to

7   Mr. Saltz, he'll bring them.

8        MR. DAVIS:  Thank Your Honor.

9        (Recess from 11:59 a.m. to 1:06 p.m.)

01:06PM  10        THE COURT:  I believe we are on bucket 11 of

11   the Plaintiff's exhibits.  And over the lunch hour, I

12   looked more closely at PTX806, 808, and 717, which are

13   the exhibits in the Verizon bucket.

14        Mr. Davis, could I ask you a few questions

01:07PM  15   about those?

16        MR. DAVIS:  Yes, Your Honor.

17        THE COURT:  The 806 document, is that one that

18   you can confirm comes from Samsung?

19        MR. DAVIS:  Yes, Your Honor.  All three of them

01:07PM  20   do.

21        THE COURT:  Well, and by "comes from," I mean

22   was created by?

23        MR. DAVIS:  Oh.  Yes, that is true for all

24   three of them.

01:07PM  25        THE COURT:  Well, it does not appear to be the

```
  1   case for -- 717 says it's from communications research
  2   team?
  3           MR. DAVIS:  Oh, let me take a closer look at
  4   that one, Your Honor.
01:07PM  5           THE COURT:  All right.
  6           MR. DAVIS:  I see.  Your question, Your Honor,
  7   is:  Is communications research team something within
  8   Samsung --
  9           THE COURT:  Yes.
01:08PM 10           MR. DAVIS:  -- as opposed a third party?
 11           THE COURT:  That is my question.
 12           MR. DAVIS:  I believe that's within Samsung,
 13   Your Honor.  And where I come up with that is the -- in
 14   the lower left corner of --
01:08PM 15           THE COURT:  I do see that now.  In the fine
 16   print, at the bottom of each slide, it says:  Samsung
 17   DMC R&D communications research team.
 18           MR. DAVIS:  That's right, Your Honor.  Yes, so
 19   that's our understanding that this is a team within
01:09PM 20   Samsung.
 21           THE COURT:  Quite a lot of 717 is not in
 22   English?
 23           MR. DAVIS:  Yes, that's right.
 24           THE COURT:  What would you propose that the
01:09PM 25   jury do with that?
```

01:09PM

01:10PM

01:10PM

01:10PM

01:11PM

 1          MR. DAVIS:  So I think, Your Honor, we've

 2   handled that in a variety of different ways.  We could

 3   provide a translated version.  We could also provide a

 4   version that slims down this document, since it does

 5   span 17 pages and just focuses on particular portions

 6   that either have no Korean on them or a much longer

 7   amount of Korean on them and then provide translation of

 8   that if needed.

 9          THE COURT:  What is your understanding of what

10   717 was created for?

11          MR. DAVIS:  I believe this is -- so this is

12   explaining two different features, doze and app standby,

13   that were released in Android version M, or Marshmallow.

14   So my understanding is that this sort of explains

15   internally within Samsung what these features do, how

16   they are implemented and what they provide, when we see

17   various state diagrams and explanations and the like for

18   it.

19          THE COURT:  And have you obtained any testimony

20   from anyone with Samsung about 717?

21          MR. DAVIS:  Yes.  There was some testimony.  I

22   have the citation I need to pull up the testimony.  That

23   is from -- let's see -- the February 29, 2024 deposition

24   of Mr. HongJung Son, who was Samsung's 30(b)(6)

25   designee.  This was Exhibit 12 to that deposition.  I

don't believe this was a document he personally created.

He did create the PTX808, so he was able to explain

that.  I don't believe he created PTX717.

THE COURT:  Frankly, 808 appears to me to be an

01:12PM  evaluative document.  It is, in large part, comparing

Google and Samsung as opposed to a technical document

about the performance characteristics of Samsung, which

806 appears to me to be.

MR. DAVIS:  I see.  Yeah.  Your Honor, I can

01:12PM  explain 808 a little bit as well.  I think the primary

portion of 808 is the timeline that begins on page 17 of

the document, where -- this may be what Your Honor's

referring to where there's a timeline up above for

Samsung and a timeline below for Google, and they were

01:13PM  sort of proceeding on these parallel tracks of providing

power-saving functionality, and over time, we see that

some of it blends together as well.

There are enhancements made.  There are ████████

████████ that appear on the Google side and also on the

01:13PM  Samsung side.  And so I think what Mr. Son was

explaining there is how in Android S oS -- that's the

name of the presentation -- the Android S operating

system release, how different power-saving features

operate, some of those being Samsung-created, like

01:13PM  ████████████, and others being created by Google for

purposes of Android generally.  And so they are all

features that are part of the Samsung products by virtue

of Samsung practicing Android and then additionally

having some of their own power-saving features like

01:14PM  5  ███████████ .

THE COURT:  Both 717 and 808 appear to me to

have large components that are in a classic hearsay use

where the relevance would be the truth of the matter

asserted.  806 appears to me to be more of just a

01:14PM  10  technical performance manual or explanation.  So I think

in order to get 717 and 808 in, you would need to have a

business record foundation.

MR. DAVIS:  I see, Your Honor.  Yeah, that --

understood.  To that point, the deposition testimony I

01:15PM  15  was referring to on PTX717, Mr. Son was asked -- the

exhibit was introduced with him.  We asked:  This was

also a confidential document produced from Samsung's

records?

He says:  I see it starts with a Sam Bates

01:15PM  20  number.  I would gather that it is a Samsung document.

We asked:  What is the DMC R&D center?

He says:  That group no longer exists, but it's

a research center.

So he testified about this document.  He did

01:15PM  25  not write this document like he did the other PTX808.

1          THE COURT:  A critical part of 803(6) is

2    evidence that the contents were added by a person with

3    knowledge at or about the time described as opposed to a

4    historical record, and I'm afraid that that testimony

01:16PM    5    that you refer to so far is not relatively close to an

6    803(6) declaration, especially if what you're after is a

7    timeline and one that compares it to another product.

8          So do you have anything else on the business

9    records side?

01:17PM   10          MR. DAVIS:  On 808, give me just a moment.  Or

11    I don't know if it would be most efficient for me to

12    sort of revisit this once I can locate it in the -- in

13    Mr. Sun's deposition transcript.

14          THE COURT:  If you want to come back to this at

01:17PM   15    the end of the day, I'll give you that opportunity; but

16    at this point, I'm going to sustain the hearsay

17    objection to 717 and 808 and overrule the objection to

18    806.

19          MR. DAVIS:  Understood, Your Honor.  Thank you.

01:18PM   20          MR. VINCENT:  Your Honor, with respect to

21    buckets 12 and 13, those are wholly T-Mobile exhibits,

22    for the T-Mobile case, and at least the last bucket is

23    directly relevant to one of the T-Mobile MILs that will

24    be argued that will go a long way, if not completely

01:18PM   25    resolve the objections that are for that bucket of

1    exhibits.

2          If it's all right with Your Honor -- I've

3    cleared with counsel -- we would propose to postpone

4    argument on those exhibit buckets for T-Mobile until

01:18PM   5    after the argument of the T-Mobile MILs because it's --

6    at least for the last bucket, those arguments will

7    largely overlap.

8          THE COURT:  All right.  Then we'll move on to

9    the Defendants' exhibits.

01:19PM  10          MR. DAVIS:  Thank Your Honor.

11          This takes us to bucket 1 that's applicable to

12    both Verizon and T-Mobile.  The representative exhibit

13    here is DTX113 in the Verizon case.  And the issue that

14    we have here, how this bucket got its name "ItsOn bugs"

01:19PM  15    is there are a number of documents -- this is one of

16    them on Defendants' exhibit list -- where they want to

17    portray the ItsOn software as sort of defective in some

18    way, and we think this is just totally irrelevant

19    because the bugs that they are pointing to have nothing

01:20PM  20    to do with the accused functionality, program background

21    determinations, interaction of users, et cetera.  They

22    have to do with things like what we see here on the

23    slide.

24          This is Slide 12 in our presentation.  We have

01:20PM  25    an email from Dr. Raleigh to someone else at ItsOn, and

what he's saying is:  My father is a Virgin DDR

subscriber.  That means data done right.  That was a

program using the ItsOn software.  And he's saying that

the device is hung up in activation process.  He says

01:20PM  there are fatal bugs that he encountered in trying to

activate a phone that he was demonstrating to customers

as well.  What Defendants like about a document like

this is, see, it says fatal bugs; these are a big

problem; the ItsOn software was bad.

01:21PM      Well, at the end of the day, Your Honor, these

are -- we think these are just normal software

development bugs; but even if they are a serious

problem, it has to do with an activation process that

has nothing to do with the claimed functionality.

01:21PM      And so we think these sorts of documents are

just being introduced purely to prejudice the jury into

making an improper comparison of the accused products to

the ItsOn software or something to that effect.  We

think it's just not relevant.

01:21PM      THE COURT:  All right.  And everything in this

bucket is of that nature?

     MR. DAVIS:  That's right, Your Honor.  The only

thing I would add is that Defendants also, they can't

use this material for secondary considerations.  They

01:22PM  have no expert opinions on that.  Their damages experts

1    don't rely on these materials and so it's unclear how

2    they would even use them at trial.

3             THE COURT:  I assume Dr. Raleigh will testify?

4             MR. DAVIS:  Yes, they -- that's right, Your

01:22PM   5    Honor.  They could certainly use them, you know,

6    cross-examination-wise and that's essentially what we

7    have seen in prior Headwater cases.

8             THE COURT:  All right.  Did we address this in

9    prior Headwater cases?

01:22PM   10             MR. DAVIS:  This did come up, I believe, in the

11    103 case.  I don't believe it did in the 422 case, if

12    memory serves.

13             THE COURT:  And I assume it was admitted?

14             MR. DAVIS:  Yes, Your Honor.  This was -- I

01:23PM   15    don't believe this specific document, but things of this

16    nature about the subject of ItsOn bugs were allowed.

17             THE COURT:  And if I'm recalling correctly, it

18    was on the theory that the Plaintiff will be bolstering

19    ItsOn, and the Defendant sees this as rebuttal to that?

01:23PM   20             MR. DAVIS:  I'm not sure if that was exactly

21    Samsung's argument, but -- and I'm not sure that that's

22    Defendants' argument here exactly.  But to that point,

23    you know, I think our issue is just we want to prove for

24    marketing and other purposes that the ItsOn software

01:23PM   25    practiced the '541 patent.  Practicing the patent

1    doesn't have anything to do with being successful

2    through an activation process or anything like that.

3            So I think where we are drawing the line, Your

4    Honor, is -- and trying to do it in a principled way is

01:24PM  5    that ItsOn is relevant, but this type of thing is not

6    relevant because it's sort of poisoning the well about

7    ItsOn on something entirely unrelated to the accused

8    functionality.

9            If Defendants had evidence of problems with the

01:24PM 10    ItsOn software with something related to the patent

11    claims, like determining foreground versus background or

12    something to that effect, I think we would see that as

13    relevant, but what we see in these ItsOn bugs documents

14    is just unrelated.

01:24PM 15            THE COURT:  All right.  And so 403 is the

16    primary rule you're relying on?

17            MR. DAVIS:  That's right, Your Honor.

18            THE COURT:  All right.  Thank you, Mr. Davis.

19            MS. DOMINGUEZ:  Good afternoon, Your Honor.

01:25PM 20    Kate Dominguez for Defendants.

21            The first thing I want to do is clarify the

22    record on whether this was raised only in the 103

23    Samsung matter or also in the 422.  It was actually

24    raised and addressed in the objection.  Headwater's

01:25PM 25    objection overruled in both cases.

01:25PM

01:26PM

01:26PM

01:26PM

01:27PM

1    I would refer you to, in the 422 case, Docket

2  Number 351.  That's the pretrial hearing transcript.  At

3  page 221, lines 17 through 18 was Your Honor's ruling

4  allowing these types of exhibits over the exact same

5  objections that the Plaintiff is making here.  And then

6  in the 103 case, I would refer Your Honor to Docket 360

7  at page 2.  That was the order denying Plaintiff's

8  MIL 2.

9    For the same reasons for the Court's ruling in

10  both of those cases, Defendants submit that these are

11  incredibly important documents to counter the one-sided

12  narrative that Headwater wants to present.

13    So over Defendants' objections, which we've

14  been arguing since last week and in many, many different

15  papers across our SJs, our Dauberts, our MILs, Headwater

16  insists on injecting ItsOn and its products and its

17  business into every aspect of this case.

18    Every one of Headwater's experts uses ItsOn's

19  products and its business to bolster the asserted

20  patents and claim they are valuable, that they provide

21  benefits.  As Your Honor, I'm sure, knows, we have

22  Dauberts on much of those discussions because, as set

23  forth in our papers, they are using their experts as

24  nothing more than mouthpieces for facts, or Headwater's

25  view of the facts.  But if Headwater is going to be

01:27PM

talking about ItsOn, and we know that they are, and
showing one half of the story and claiming that because
ItsOn used the patents, it provided all these benefits,
in fairness, we need to be able to present the other
side of the story.  And what these products show is that
the same products that Headwater is waving around as
evidence of benefits of using the Headwater patents,
those products were actually a massive failure.  They
caused serious problems rather than delivering benefits.

01:27PM

        And I would just note:  I don't think that the
document that has been selected here, which is DX113 in
the Verizon case and DX115 in the T-Mobile case, is
representative on that, on that front because I think --
we think that's relevant anyway because it goes to some
of the reasons for the failure of ItsOn, and that's also
an issue in the case, which I'll get to.

        But as to being focused on the activation
process, many, many other documents -- and they are in
this bucket, and we can pull them up and look at them if
Your Honor would like -- they are not specific to the
activation process, and they do go to the functionality
that Headwater is attempting to connect to the patents
in this case.

        THE COURT:  Ms. Dominguez, I'm satisfied that
I'm going to overrule the objection to this bucket, as

1  in the past, and I'll give Plaintiff an opportunity to

2  tell me if the next bucket should be distinguished.

3          MS. DOMINGUEZ:  Thank Your Honor.

4          THE COURT:  Thank you.

01:28PM  5          MR. DAVIS:  Your Honor, so the next bucket is

6  also related to ItsOn.  I -- there are distinguishable

7  in the sense that they don't focus on bugs, but I think

8  given Your Honor's ruling on bucket 1, I don't think you

9  are going to be persuaded by our position on bucket 2.

01:29PM  10          THE COURT:  I suspect you're right.

11          MR. DAVIS:  So --

12          THE COURT:  I don't really know bucket 2,

13  but --

14          MR. DAVIS:  So let me just very briefly talk

01:29PM  15  about one of those documents.

16          THE COURT:  All right.

17          MR. DAVIS:  So one of those documents that I'll

18  show up on the screen, Your Honor, is the assignment.

19  We see this on the left side of the screen, the

01:29PM  20  assignment from ItsOn to ItsOn ABC.

21          We think this is just confusing to a juror that

22  we're introducing this idea of an entity for an

23  assignment for the benefit of creditors.  We see no

24  reason for something like this in the case in that it

01:30PM  25  has nothing to do with the relevant issues for ItsOn,

1    certainly nothing about the technical merits or anything

2    like that.

3              THE COURT:  The subject of that document I

4    don't think is problematic.  There may be details in it

01:30PM  5    that are.  Part of the ruling on the issue about

6    spoliation is that the parties are permitted to tell the

7    jury that certain documents are not available following

8    the liquidation of ItsOn.  So the fact that there was a

9    liquidation I don't think is problematic.

01:31PM  10             If there's something in here that the

11   Defendants would rely on to suggest that Headwater is

12   responsible for the absence of those documents, then

13   that's something that I think should not be allowed.

14   But I don't have enough understanding of this general

01:31PM  15   assignment, as I sit here, to know whether that's true.

16             Do you?

17             MR. DAVIS:  No, I don't believe so, Your Honor.

18   I don't believe there's anything in particular in that

19   document that is along the lines of what you're

01:31PM  20   describing.

21             THE COURT:  I don't see a problem with the jury

22   knowing that ItsOn failed.  I think that is something

23   that is unavoidable.  So if that is the nature of your

24   objection to the assignment, I'll overrule that.

01:31PM  25             MR. DAVIS:  Understood, Your Honor.

1        And the reason I'm still standing here is just

2   that I'm handling the next bucket.

3        THE COURT:  Okay.  If I want you to sit down, I

4   will tell you.

01:32PM  5        MR. DAVIS:  Okay.  Thank you.

6        THE COURT:  All right.  So I'll overrule the

7   objections in the second bucket.

8        MR. DAVIS:  All right.  So there was previously

9   a bucket 3 that's been withdrawn in light of a MIL

01:32PM  10  ruling, so that takes us to bucket 4.  That is called

11  unelected prior art.  There is just one exhibit in this

12  bucket.  We see it on the screen here at our Slide 14.

13  It's a user guide.  It's about 200 pages long.  It's a

14  user guide for a product called the T-Mobile myTouch 3G

01:32PM  15  slide.

16        This is not a prior art reference that is being

17  used as part of an invalidity mapping in this case, so

18  it's unelected prior art.  Introducing that evidence

19  would directly violate court MIL Number 4, which

01:33PM  20  obviously Your Honor's familiar with.  So the user

21  guide's not relevant; the product it describes is not

22  relevant.

23        I think what we heard through the

24  meet-and-confer process with Defendants is that they

01:33PM  25  believe it's relevant to discuss state of the art.  I

think the problem there, Your Honor, you know, it's

especially a slippery slope in this particular instance

because their prior art reference is a different

T-Mobile device.  It's called the T-Mobile G1, entirely

01:33PM    different smartphone.  But I think especially because of

that fact that they are relying on a different T-Mobile

smartphone, I think it would be particularly confusing

to the jury and they may blend this together with the

T-Mobile G1 when that's not something that Defendants'

01:34PM    expert has analyzed.

And, again, just reiterating that this is a

very substantial document.  It's around 200 pages.  It

has a whole lot of detail in it and so we don't see this

as just a basic document to show something, you know,

01:34PM    generic about the state of the art.

THE COURT:  All right.  Let me hear the

response.

MR. VINCENT:  Yes, Your Honor.

The response is straightforward.  It's not just

01:34PM    state of the art, and it's -- I think Plaintiff's

counsel has a misunderstanding of what our elected art

is.  The election of art is the Android system art.

It's the Android 1.6 operating system running on these

prior art devices.

01:34PM    We have an exemplary device, the T-Mobile G1

device by HTC.  This user manual is from another HTC

device, and it's cited in our expert reports to describe

the functionality of the very feature that we are seeing

renders obvious the asserted claims.

01:35PM    It is the Android feature that is we are

asserting renders obvious the patents, and he is using

this user guide to explain how that feature worked on

devices at the time.  And so it's not unelected.  It's

not simply state of the art.  It goes directly to our

01:35PM theory of an invalidity and how this Android system art

works, whether it's on a T-Mobile HTC G1 phone or an HTC

myTouch phone.

The functionality -- I think he talks about

this in his report that the functionality is the Android

01:35PM 1.6 functionality that was at issue.

THE COURT:  Do you have another phone that is

elected prior art?

MR. VINCENT:  We have a physical T-Mobile G1

phone, and the purpose of using this myTouch user guide

01:36PM is it has descriptions of the exact same Android feature

that is at issue that will help the jury understand how

it worked.

It's a contemporaneous document.  There's no

question about whether it was -- whether it's an

01:36PM authentic document, whether it actually applies to the

1    correct Android version, and it explains how this

2    functionality works.

3            There's no dispute, as far as I'm aware, that

4    the Android, at least at this -- for admissibility

01:36PM  5    purposes that the Android 1.6 somehow worked differently

6    on the T-Mobile G1, the HTC G1 versus the HTC myTouch.

7    The description of the Android feature is what's

8    important.

9            We also have a myTouch phone as well.  We have

01:37PM  10   a physical phone of the myTouch as well.  So, again, we

11   are not limiting ourselves to a particular device.  The

12   point is the Android features and the Android source

13   code 1.6, that is what is rendering it obvious.  We have

14   phones that we can demonstrate had that version of the

01:37PM  15   software on it to prove up that it was, you know,

16   released and on phones and in customers' hands.

17            THE COURT:  But this HTC myTouch 3G phone is

18   not any art that you are relying on for invalidity?

19            MR. VINCENT:  I'm sorry.  No, the myTouch phone

01:37PM  20   is something.  We have -- we have the physical device.

21            THE COURT:  This myTouch 3G phone, that's what

22   the exhibit is about, right?

23            MR. VINCENT:  Yes, Your Honor.

24            THE COURT:  And are you relying on that phone

01:37PM  25   as prior art?

1          MR. VINCENT:  Yes, Your Honor, that's -- it's

2     explained in our expert report.  Now, which particular

3     phone we bring to trial, well, that's to be determined,

4     but we are going to use -- we have made this phys- --

01:38PM   5     this device was mentioned in our expert reports, relied

6     on, running Android 1.6 for this feature that we're

7     relying on this manual for.

8          So, again, it is the Android system that is in

9     our reports that we are relying on.

01:38PM  10          THE COURT:  And you listed it as one of your

11     priority art references in your disclosure?

12          MR. VINCENT:  Yes, Your Honor.  We elected --

13     again, it's the Android system art is how we described

14     it, and I don't -- I'm not aware of any objection to our

01:38PM  15     articulation of how we described that art.

16          The Android system art again is, this is the

17     same art that was at issue in the Samsung 422 case.  It

18     is the same operating system, Android Version 1.6.  We

19     are relying on that version of Android as it appeared on

01:38PM  20     devices before the priority date of the patents.

21          THE COURT:  And so what I'm getting at is are

22     you separately listing the devices as prior art, or just

23     the Android operating system?

24          MR. VINCENT:  I think the way we articulate

01:39PM  25     it -- again, this is, I think, my view, a ministerial

1    matter of proving up the availability of the prior art.

2    We are relying on the Android operating system, but we

3    have to show it was on phones that were sold before the

4    priority date and so that is why the physical devices

01:39PM  5    come into play.  There's nothing unique about them.

6    It's just that --

7                THE COURT:  I understand.  It's a simple

8    question.  Have you listed the devices on your election

9    of prior art, or are you just relying on the Android

01:39PM  10   operating system?

11               MR. VINCENT:  The answer is yes, Your Honor.  I

12   apologize for misunderstanding your question.

13               THE COURT:  Okay.  And so the initial objection

14   I heard was that this particular phone is not listed;

01:39PM  15   you're telling me it is?

16               MR. VINCENT:  That's my understanding it is

17   listed in our election.

18               THE COURT:  Okay.  Thank you, Mr. Vincent.

19               Mr. Davis, tell me why you disagree.

01:40PM  20               MR. DAVIS:  So, Your Honor, we'll talk more

21   about this when we get to bucket 6 as well, but the

22   Defendants' exhibit list has a physical T-Mobile G1

23   device.  It has as another exhibit screenshots of a

24   physical T-Mobile G1 device.

01:40PM  25               I don't -- I didn't see on their exhibit list.

1    Is there a particular exhibit number for the T-Mobile

2    myTouch 3G Slide phone?  I don't believe it's on their

3    exhibit list.

4              THE COURT:  Well, right now I'm not asking

01:40PM   5    whether it's on their exhibit list.  I'm asking whether

6    it's on their list of elected prior art.

7              MR. DAVIS:  On their 282 notice, Your Honor?

8              THE COURT:  I guess.

9              MR. DAVIS:  It may be, Your Honor.  I haven't

01:41PM  10    had time to check just now.

11              THE COURT:  Well, isn't that the objection

12    you're making?

13              MR. DAVIS:  Well, the objection is our

14    understanding has been that they are relying upon the

01:41PM  15    T-Mobile G1 physical device.  They need a system.  The

16    system is the T-Mobile G1 running a particular version

17    of Android.

18              If they want to make -- if their prior art

19    argument is just here's what the Android code said, then

01:41PM  20    that to me would be a different argument.  It sounds

21    like what they are saying now is they have arguments

22    about a T-Mobile G1 system and arguments about a

23    T-Mobile myTouch 3G Slide system and that we can sort of

24    mix and match any documents about any of those.  And

01:41PM  25    that's potentially the problem that we see.

1          THE COURT:  What is your basis for arguing that

2   this particular phone is not elected prior art?

3          MR. DAVIS:  We didn't see that mapped.  It's

4   briefly mentioned in Dr. Jeffay's opening report on

01:42PM   5   invalidity.  It's mentioned in passing as, you know, an

6   example of a prior art device that had Android software

7   on it, but we did not see that as part of the mapping

8   and I think probably got the indication from their

9   exhibit list as well that the system they are intending

01:42PM   10   to run at trial is a T-Mobile G1.

11          I'll add, Your Honor, that none of this came up

12   during the meet-and-confer process as well.  This sort

13   of idea that, "Oh, we're just using it as another

14   example of the same Android read," that's news to me as

01:43PM   15   of when Mr. Robb just stood up now.

16          THE COURT:  All right.  What's wrong with their

17   position?

18          MR. DAVIS:  So I think, Your Honor, it's simply

19   that my understanding is they need to show a prior

01:43PM   20   art -- if they want to run system prior art, they need

21   to choose a system, show that it was available, and then

22   map it to the claims.  I believe they have attempted to

23   do that with the T-Mobile G1.  They produced evidence

24   that they believe shows that it was publicly available

01:43PM   25   and sold.  I don't know that they have established all

         1   of that, and I don't think Mr. Robb tried to say that he

         2   has with respect to the T-Mobile myTouch 3G Slide.

         3          THE COURT:  These are not documents that are

         4   filed in the record, at least customarily, so I don't

01:44PM  5   have access to them.  Do you want to show me where you

         6   think this should have been and it's not?

         7          MR. DAVIS:  I can try to do that, Your Honor.

         8          THE COURT:  Well, I don't see how else I'm

         9   going to resolve this dispute.

01:44PM 10          MR. DAVIS:  So, Your Honor, I apologize.  I may

        11   not be able to provide exactly what you're looking for.

        12   I know their invalidity report mentions the G1 114

        13   times.  It mentions the myTouch 3G Slide five times in

        14   sort of incidental introductory paragraphs, just saying

01:45PM 15   that there are prior art cellular phones.

        16          They talk about a Samsung phone, an HTC Nexus

        17   One phone.  But in the actual stepping through claim

        18   mapping, they talk about the T-Mobile G1 throughout

        19   their report many, many times and so that I think is

01:45PM 20   what gave us the impression.

        21          I mean, for example, Your Honor, I'm reading

        22   directly from Claim 1 is rendered obvious by the

        23   T-Mobile G1 running Android 1.6.  For the reasons set

        24   forth below, it is my opinion that Claim 1 of the '541

01:45PM 25   patent is invalid as being at least rendered obvious by

the T-Mobile G1 running Android 1.6.

That sounds very different from what Mr. Rob was just saying.  I would expect the expert report to read, if that were the theory, it would say something more like:  It's my opinion that Claim 1 is rendered obvious by any number of prior art phones running Android 1.6.  Instead, they specifically call out the T-Mobile G1.  That's why we think that the myTouch is unelected, because they don't have a claim mapping for it.

THE COURT:  All right.  Thank you, Mr. Davis.

Mr. Vincent, would you show me where you have identified the HTC myTouch 3G, the one that's described in this exhibit, please?

MR. VINCENT:  Yes, sir.  It is on our 282 statement.  It is listed specifically, and --

THE COURT:  Can you show me that?

MR. VINCENT:  Yes, Your Honor.

If I could have the ELMO, please.

This is our 282 statement -- well, here you have both the G1 and the myTouch, if it will stay on long enough.  Both of those devices are listed, along with the relevant Android prior art -- sorry, the prior art code versions.  Again, that is the basis of Dr. Jeffay's opinions is that it's -- there's nothing

device-specific about the theory.  It is the device

running Android 1.6, which he explains.

They have not moved to strike -- they have not

moved to strike those opinions, nor is there any

01:47PM  indication by any expert that the description of the

accused -- of the prior art feature in this user guide

that's the issue of this discussion is inaccurately

describing how the feature worked in the prior art.

THE COURT:  All right.  I do see that listed in

01:48PM  what's in the record as Document 285 on page -- let me

see.

MR. VINCENT:  I have page 4.  I don't have the

docket number on this copy that I have, but it's on

page 4 of my version.

01:48PM  THE COURT:  All right.  Well, I see it there as

the T-Mobile myTouch 3G Slide manual?

MR. VINCENT:  Yes, Your Honor.

THE COURT:  All right.  Thank you.

MR. VINCENT:  Thank Your Honor.

01:48PM  THE COURT:  Mr. Davis, is your complaint just

that you don't think it was adequately charted in the

expert report?

MR. VINCENT:  Yes, Your Honor.  I mean, I think

that is right.  That they don't even have Rule 26

01:49PM  support for a mapping with the myTouch 3G Slide.

1          We can look at -- maybe the easiest thing to

2     look at, I was reading an example in the claim mapping.

3     Maybe the easiest thing to look at would be the table of

4     contents.  I can show you on the ELMO, just briefly.

01:49PM    5          So you can see there is mapping of the

6     T-Mobile G1.  There are sections dedicated to the

7     T-Mobile G1.  The myTouch slide is not mentioned in

8     those mappings of the G1.  It's a different system.

9          THE COURT:  I think they have adequately

01:49PM   10     disclosed it as prior art and, therefore, I will

11     overrule the objection to its admission.

12          We can go to bucket 5, which is DX1.

13          MR. DAVIS:  Yes, Your Honor.

14          So this one, bucket 5 we've titled

01:50PM   15     unauthenticated and hearsay prior art documents.  That

16     kind of gives you the basis for our objection.  The

17     representative exhibit here, all of this has to do with

18     a prior art system called JuiceDefender, and

19     JuiceDefender is a third-party software product.  It's

01:50PM   20     used in some of Defendants' obviousness combinations.

21     The documents are unauthenticated/hearsay.  There's no

22     testimony, no leaking information to overcome those

23     objections.

24          This is -- what you see on the screen, Your

01:51PM   25     Honor, on Slide 15 is an exemplary excerpt of one of

1  these.  It's a Lifehacker website that says:

2  JuiceDefender saves batteries by automating Android

3  data.

4        This is clear hearsay, and we would submit much

01:51PM  5  more so objectionable hearsay than something from an OEM

6  partner.  JuiceDefender is not something that's produced

7  by anyone related to this case.  There's no deposition

8  to support it, et cetera.

9        THE COURT:  All right.

01:52PM  10       MR. VINCENT:  Your Honor, I guess we were

11  surprised to hear this objection given that these

12  exhibits were originally on the filed joint list and

13  didn't realize there was an issue to be had here.

14        These JuiceDefender articles, at least the vast

01:52PM  15  majority of them subject to this objection, were at

16  issue in the Samsung litigation.  Samsung had a

17  declaration from the archive custodian explaining,

18  authenticating at least the versions on the Internet

19  archive, showing how that's done and authenticating

01:52PM  20  them.

21        They were admitted in the Samsung litigation,

22  and we were under the impression that we had an

23  agreement that they would be -- that we didn't need to

24  go through and get an identical or nearly identical

01:52PM  25  declaration to admit them here.

01:52PM

01:53PM

01:53PM

01:53PM

01:53PM

1    We can do so.  It seems to me that's -- seems

2  unnecessary busywork to get, again, identical or nearly

3  identical declaration to show that these articles were,

4  in fact, on the Web at the time, before the priority

5  date.  I mean, that's essentially, I understand, what

6  the objection is.

7    So, again, Plaintiff is continually giving, and

8  today handed Your Honor a declaration from a third party

9  authenticating documents.  If that's what Your Honor

10  rules is necessary, we can do that.  We can again get an

11  identical declaration from Mr. Wright, or near-identical

12  as what was produced in Samsung, if that's what Your

13  Honor rules.  But, again, I think the issue is simply we

14  were under the impression we had an agreement here.

15  Obviously we don't.  If we need to authenticate them, we

16  can do that, but again, I think that's what the issue is

17  here.

18    THE COURT:  You know, it's not just my rule,

19  Mr. Vincent.  It's the Federal Rules of Evidence.

20    MR. VINCENT:  Understood, Your Honor.

21    THE COURT:  Okay.  Well --

22    MR. VINCENT:  The issue is, again, it was our

23  understanding that these materials were produced and

24  made available in not just Samsung, and we disclosed the

25  JuiceDefender as part of our prior art disclosures

1    throughout the case.  And, again, like, we were under

2    the understanding that there was an agreement that we

3    would have to go through the hoops to do this.  But we

4    have the declaration here from the Samsung case that

01:54PM    5    applies to some of these very articles we're talking

6    about, and to the extent we need to do that for any

7    remaining stragglers, we can do that as well.

8            THE COURT:  Do you have anything in writing

9    about the agreement you're referring to?

01:54PM   10            MR. VINCENT:  That I'm not aware of, Your

11    Honor.  I wasn't part of those negotiations.  It was on

12    the joint list that we filed with the court as an agreed

13    exhibit.  So obviously it got on the joint list that was

14    filed in this case.  These exhibits were on that list.

01:54PM   15    So I think at least we have that evidence to at least

16    show that we understood there was an agreement there for

17    these exhibits.

18            Now, again, there was miscommunication,

19    whatever the disconnect was, but that's where we have a

01:55PM   20    disconnect is that we thought there was an agreement

21    here.  It was on the agreed list that was filed with the

22    Court, I think it was just last week that they said, no,

23    we actually don't have an agreement on these.  Despite

24    the fact that, again, these were the subject of -- this

01:55PM   25    evidence was admitted -- at least large portions of

1    these websites were admitted in the Samsung case.

2            THE COURT:  All right.  Thank you, Mr. Vincent.

3            MR. DAVIS:  Your Honor, if I may, I can address

4    that supposed agreement.

01:55PM    5            THE COURT:  All right.

6            MR. DAVIS:  Okay.  So we received Defendants'

7    exhibit list.  We objected.  Seven different grounds for

8    objections for these JuiceDefender materials.  Our

9    May 7th objections, for example.

01:55PM    10            What happened after that, Your Honor, and we

11    appreciated them doing this, but the folks from the

12    T-Mobile/Verizon team sent us a draft of what they

13    deemed a potential joint exhibit list.  What they said

14    in their email was this proposed joint exhibit list

01:56PM    15    includes the materials that both sides have on their

16    respective lists and also materials that either side did

17    not object to.

18            In addition -- as it turns out, that was not

19    the case.  In addition, the Verizon/T-Mobile team added

01:56PM    20    another handful of documents, including this Exhibit 1.

21    They added some additional documents that apparently

22    they were proposing as joint exhibits, but those had

23    objections associated with them.  We never waived any

24    objections.

01:56PM    25            We didn't discover that discrepancy between

what they described the proposed joint list being and

what it actually was until a little bit later.  We, of

course, pointed that out to them and said:  Consistent

with our prior objections, we're not waiving our

01:56PM  objections.  What you said in your email was this list

was only supposed to include things we did not object

to.

So that's the disconnect.  There's no

agreement, Your Honor.  It was just a miscommunication.

01:57PM  You know, maybe we should have checked more closely with

what they had put on this proposed joint list, instead

of taking at face value their description of how it was

created.  And so once we discovered that, we told them,

cleared it up and said, no, these are still objected to,

01:57PM  for the same reasons we've objected to them all along.

THE COURT:  All right.  The documents need

authentication.  That's what is missing.  And they would

be nonhearsay if they are authenticated because they are

not being offered for the truth; they are being offered

01:57PM  to show that they existed before the priority date.

Isn't that the case?

MR. DAVIS:  Not exactly, Your Honor.  I think

some of them may be being used -- and maybe Mr. Rob can

speak to it.  Some of them are being used to convey

01:58PM  something about timing of JuiceDefender, but I believe

1   they are also relying upon these materials for the

2   substance of JuiceDefender.

3           In other words, there is no additional -- this

4   exhibit is the sum total of everything they have on

01:58PM  5   JuiceDefender.  They don't have, for example, another

6   exhibit that is the software itself or some user guide

7   or something like that that's outside of this bucket.

8           THE COURT:  Well, in any event, they will

9   require a declaration to satisfy that.  At this point

01:58PM  10   I'm going to sustain the objection to the documents in

11   bucket 5, but if they produce a declaration, I'll

12   consider that, if and when.

13           Let's go to the next bucket.

14           MR. DAVIS:  So the next bucket, Your Honor, I

01:59PM  15   alluded to a little bit earlier.  This is bucket 6, the

16   T-Mobile G1 images and physical exhibit, and there's

17   actually two more exhibits under here which are Android

18   source code.

19           To be clear, we are not disputing that Android

01:59PM  20   source code obtained from Google Android is -- Google

21   Android is a legitimate source for Android source code.

22   We agree with that.  The problem is none of this is all

23   linked together.

24           What they have are some screenshots.  This is

02:00PM  25   DTX108 in the Verizon case.  These are screenshots that

1    were -- or photos that were taken by Samsung's counsel

2    in the 422 case a long time ago of a particular

3    T-Mobile G1 device that they had.

4         No expert, no person, as far as I know,

02:00PM   5    associated with the Defendants has ever handled the

6    physical device.  They had no role in the screenshots.

7    They don't know what that physical device was.

8         They have a different T-Mobile G1, same model

9    but not the same physical exhibit, on their exhibit

02:00PM  10    list.  That's not what appears in the photographs.

11    There's also no evidence linking the Android source code

12    that they point to to these devices.

13         In other words, they have a physical Android G1

14    device on their exhibit list, but they can't show, you

02:01PM  15    know, by virtue of going to the settings or something

16    like that, here's the version of Android that this

17    device is running.  So they are just sort of pulling

18    these disparate sources of information and saying they

19    are all one consistent system.  That's essentially the

02:01PM  20    objection there, Your Honor.

21         THE COURT:  All right.

22         MR. VINCENT:  And just so the record's clear,

23    it's Mr. Vincent that's arguing on behalf of Defendants.

24         MR. DAVIS:  Oh, I'm sorry.

02:01PM  25         MR. VINCENT:  I'm Rob Vincent, so we sometimes

1    get mixed up.  That's perfectly fine.

2            So let me clear another thing up.  I think

3    Mr. Davis said there's no one from Defendants who can

4    link these together.  That's not true.  Ms. Hannah

02:02PM   5    Sifuentes was a witness.  She has now testified in three

6    separate legal proceedings on these exact screenshots

7    that are the representative exhibit in this case.

8            She testified in her Samsung deposition.  She

9    handled the phone at issue in these screenshots and said

02:02PM  10    and testified that, from her personal experience, she

11    knows what the phone is, knows what the accused --

12    sorry, the accused -- the prior art features look like,

13    and she walked through all those and authenticated them

14    and provided testimony about these screenshots.

02:02PM  15            She testified about these screenshots in the

16    Samsung trial, and she testified about these exact same

17    screenshots that I'm holding in my hand in her

18    deposition in this case.  She said under oath:  I know

19    what these are; I know where they came from; I am

02:02PM  20    familiar based on my experience with this Android

21    system, this Android prior art system.

22            That's the testimony.  And she's prepared to

23    say those things -- just as she said in the Samsung

24    case, she's prepared to say those exact same things at

02:03PM  25    this trial.

1     I believe the -- if I understand the objection

2     is because there is, on our physical exhibit list, a

3     different physical unit.  Again, our prior art

4     invalidity theory is not that a -- my specific phone

02:03PM   5     renders obvious the claims.  It is this model of phone,

6     or the model of phones running Android 1.6 renders

7     obvious the claims.  And we have evidence from several

8     witnesses.  Ms. Sifuentes, our experts.  We have Google

9     witnesses that testified about Android 1.6 and

02:03PM   10    authenticated that.

11    And the linkage is there, Your Honor, to link

12    phones that were sold, including the G1, including the

13    myTouch with Android 1.6, and we have the source code of

14    Android 1.6 to describe exactly how it worked.  We have

02:04PM   15    the screenshots from the phone to show how it worked.

16    So all of these are linked through several witnesses.

17    THE COURT:  All right.  Thank you, Mr. Vincent.

18    MR. DAVIS:  Your Honor, another thing I would

19    add on this is that Ms. Sifuentes is a T-Mobile

02:04PM   20    employee.  She indeed testified in the Samsung case and

21    testified in the T-Mobile case.  She's not testified in

22    a Verizon case.  I don't know if -- what Mr. Vincent's

23    referring to exactly that Ms. Sifuentes is -- her

24    testimony is applicable to the Verizon case.  So maybe

02:04PM   25    there's different treatment that this requires here, but

I'm very familiar with Ms. Sifuentes.

What happened was that Samsung's counsel took these screenshots, showed her screenshots.  She recalled, having been at T-Mobile for quite some time, that ten years prior, she had used a T-Mobile G1 device and that the screenshots were generally consistent with her recollection.  She handled the physical device that Samsung's counsel had, had brought to the deposition, and I'm not aware of -- I can be corrected on it certainly, but I'm not aware of Ms. Sifuentes testifying in a Verizon case, though.

MR. VINCENT:  I can pull that up, Your Honor, if I could.

THE COURT:  All right.

MR. VINCENT:  Verizon issued a notice of subpoena to Ms. Sifuentes.  In this case she was deposed, and she was asked questions on behalf of Verizon on this exact issue.  This was an exhibit to her deposition noticed by Verizon in which these were discussed.

So she was noticed by Headwater in the T-Mobile case, and simultaneously with that deposition, she was also noticed by Verizon, also AT&T, but she was noticed by other parties, not just T-Mobile.  So she testified in all the carrier cases, and part of that testimony

1    relates exactly to these screenshots and other exhibits.

2         THE COURT:  All right.  I'll overrule the

3    objections to bucket 6, and that takes us to bucket 8.

4         MR. HOFFMAN:  Your Honor, bucket 8 only relates

02:06PM  5    to T-Mobile and the likely earlier bucket involving only

6    T-Mobile.  It's closely related to a motion in limine

7    for T-Mobile that's to be argued, so we would argue that

8    we should address the motion in limine first.

9         THE COURT:  All right.  That leaves us with

02:06PM  10   bucket 9.

11        MR. DAVIS:  Bucket 9, Your Honor, is specific

12   to the Verizon case.  It's only one exhibit, DTX96.

13   This is a Verizon patent that what Verizon says it's

14   relevant to supporting apportionment arguments, I

02:07PM  15   believe.  The problem we see is that this is going to be

16   confusing to the jury.

17        This is a -- it's a Verizon patent that refers

18   to PCO values, and the problem here, Your Honor, is that

19   the -- it's a -- Headwater's infringement read for the

02:08PM  20   '042 patent, which I understand your Honor has ruled on

21   but also for at least one dependent claim of surviving

22   patents makes reference to PCO values.

23        And so the confusion here, I think, Your Honor,

24   is that a juror may be misled into thinking that, well,

02:08PM  25   Verizon has this patent that talks about PCO and that's

accused; so, therefore, the patent office giving them a

patent discussing that must mean they have an ability to

practice that and not infringe Headwater's patent.

So that, I think, is the confusion.

02:08PM    THE COURT:  This is not a patent that Verizon's

relying on for invalidity?

MR. DAVIS:  No, Your Honor.

THE COURT:  All right.  Thank you, Mr. Davis.

MR. ROBB:  Your Honor, the patent at issue is

02:09PM    primarily related to the '042 disputes, which are

largely resolved by Your Honor's ruling.  We can address

that issue in more detail.

The one lingering issue to the extent, assuming

Your Honor's ruling on the '042 sticks, is that they

02:09PM    are -- there's an issue that I believe one of my

colleagues will discuss relating to allegations about

Thomas Russell and the connection between what Verizon

was doing with its own internal development, *vis-a-vis*

the asserted patents and the device-side technologies.

02:09PM    THE COURT:  Well, if you're arguing that it has

some relevance, that's fine.  But the problem is under

Rule 403, I just don't believe that it's improper to

admit exhibits patents that look confusingly similar to

the patents that you are relying on for invalidity.  And

02:10PM    so you can have your expert talk about it, but it will

1    not be admitted as an exhibit.

2          MR. ROBB:  Your Honor, can I just clarify

3    something?

4          THE COURT:  You can.

02:10PM  5          MR. ROBB:  We don't have any prior art that

6    looks like the patent at issue in this bucket.  The

7    reason this patent is being proffered as an exhibit is

8    it goes to apportionment.  There's no dispute that it

9    comes after the priority date.  Their expert essentially

02:10PM  10   compared the value of the accused feature and attributed

11   all of that to the asserted patent.

12         THE COURT:  You don't have patents that you are

13   relying on as prior art for invalidity?

14         MR. ROBB:  Specific to the PCO technologies

02:11PM  15   that --

16         THE COURT:  I'm just talking about patents.

17         MR. ROBB:  Your Honor, I'm actually somewhat

18   embarrassed.  I'm the member of my team who knows the

19   least about our device side.

02:11PM  20         Yes, we do.

21         THE COURT:  I saw a bunch of them on the

22   listing there.  That's the problem.  If this patent is

23   allowed to come in as an exhibit and the jury remembers,

24   well, the Plaintiffs didn't say anything about why that

02:11PM  25   patent doesn't invalidate, it must invalidate.

1    And so the Plaintiff's left in the position of

2    either spending the time to point out what's missing

3    from that or explain it and hope the jury remembers that

4    that's not being offered for invalidity, or just taking

02:11PM  5    the risk.  And, frankly, it has very little probative

6    value that, as an exhibit, I mean, your expert can

7    certainly talk about what he sees in it that he's

8    relying on.  But that's the basis for the Court's policy

9    of not having unelected patents be admitted as exhibits.

02:12PM  10    MR. ROBB:  Yes, Your Honor.  Thank you.

11    THE COURT:  I'll sustain the objection to DX96.

12    All right.  There are a couple of exhibits that

13    we have not addressed, but what I want to make sure we

14    do is to get final exhibit lists that address all the

02:12PM  15    exhibits that have either been agreed as admissible or

16    have been ruled to be admissible.

17    And one thing I want to point out is I think

18    it's important that you keep the same exhibit numbers

19    that we've been using, even though there's large gaps in

02:13PM  20    them.  The record's impossible to follow if you change

21    up the exhibit numbers after this hearing.

22    So what I'll do is ask counsel to review their

23    lists and submit to each other by, say, Tuesday of next

24    week what each side believes to be their own final

02:13PM  25    exhibit list of preadmitted exhibits and then confer

about them if you have any disputes and file them into

the record as final exhibit lists by Friday of next week

and then we'll try and give you a date.

        And I know we've got more to go today, but

before we leave here, we'll try and give you a date

where we'll take up any disputes that the parties cannot

agree on the way we've handled them and take up any

redactions that the parties may disagree about.

        Is there any clarification of that that either

side needs?

        MS. FAIR:  Not from the Plaintiff, Your Honor.

        MR. DACUS:  Not from us, either, Your Honor.

        THE COURT:  All right.  Then let me see.  What

else do we need to take up in the Verizon matter before

we go back to T-Mobile matter?

        There was an objection that was talked about at

last week's pretrial conference concerning certain

Verizon witnesses.  I think they were largely deposition

issues.  Have those been resolved by the Plaintiff?

        MR. DACUS:  Are these the first-day designation

issues, Your Honor, or something different?

        THE COURT:  I recall that when we were going

over the agenda, the Plaintiff indicated that they had

objections that they wanted the Court to take up.  The

use of deposition testimony of Verizon witnesses, and it

1    sounds like that's no longer a major thing.

2         MR. HOFFMAN:  Your Honor, I think the issue was

3    there were several witnesses, and unfortunately I don't

4    remember who they were, but they were late disclosed and

02:16PM  5    that was our objection.  And Defendants responded that

6    they probably were all appearing by deposition, I

7    believe, and that would resolve the issue of the

8    specific objection there.

9         And I don't know if that, in fact, ultimately

02:16PM  10   was the case.  We can look back at the transcript and

11   find the list, and if we can confirm that they are

12   appearing -- not appearing live, I think that resolves

13   the issue.

14        THE COURT:  I take it then that at the moment,

02:16PM  15   there's no issue there for me to take up?

16        MR. HOFFMAN:  I think we need to clarify it,

17   yes, Your Honor, before we could.  There may -- it may

18   have been resolved.

19        THE COURT:  All right.

02:16PM  20        While you're up there, Mr. Hoffman, are there

21   any depositions with objections that you intend to offer

22   as evidence on the first day?

23        MR. HOFFMAN:  There are, Your Honor.

24        THE COURT:  Which ones?

02:17PM  25        MR. DAVIS:  Yes, Your Honor.  We have

identified some first-day deposition designations.  The

parties have conferred and managed to narrow that a bit.

Headwater identified eight potential witnesses as

first-day deposition plays.  For two of those witnesses

02:17PM  so far, the parties have agreed to drop one another's

objections to their respective designations.  Those

witnesses are Mr. Chan of third-party Apple and

Mr. Venkatraman of third-party Apple.  We do have

some --

02:18PM             THE COURT:  What was the second Apple witness's

name?

             MR. DAVIS:  Oh, yes.  It's Venkatraman,

V-e-n-k-a-t-r-a-m-a-n.

             THE COURT:  All right.  And you're saying those

02:18PM  two are now without objections?

             MR. DAVIS:  That's right, Your Honor.

             THE COURT:  And you said there are eight?

             MR. DAVIS:  There were eight total identified,

that's right.  So I'll show on screen a little bit how

02:18PM  we --

             THE COURT:  You're going to start your trial

with eight depositions?

             MR. DAVIS:  I know.  It's -- I think as

Mr. Fenster alluded to, this is a bit of a challenging

02:18PM  cases in that there are party witnesses and third-party

1   OEM witnesses that make it a real challenge, but

2   certainly take a point that the odds of us actually

3   being able to play eight is highly low -- is very, very

4   low.

02:19PM   5           So there's another witness, Mr. Russell.

6   There's an outstanding MIL, no longer an outstanding

7   MSJ, but we do think that could impact the designations

8   as well.  So it probably makes sense to not go line by

9   line through Mr. Russell's designations.

02:19PM   10          There's another witness, a Verizon witness,

11  Mr. Umamaheswaran.  The parties -- Headwater provided

12  some designations and asked for Verizon to provide

13  narrowed counterdesignations.  Both parties have

14  designated quite a lot of his testimony.

02:19PM   15          We haven't yet received the narrowed

16  counterdesignations, I don't believe, but we think it

17  makes sense to talk about the other four witnesses at

18  least at this point.  And the parties have done, I

19  think, a good job of narrowing to a small number of

02:20PM   20  objections that you'll see here on Slide 19.

21          If it would be helpful to Your Honor, we have a

22  binder for you that has the deposition transcripts, if

23  you'd like to page through as we go.

24          THE COURT:  All right.

02:20PM   25          MR. DAVIS:  And I believe, Your Honor, the tabs

1  should be in order of how we'll discuss these witnesses,

2  beginning with the Sharkey trial testimony.

3          So for context, Your Honor, Mr. Sharkey

4  testified in the 422 case.  Headwater's remaining

02:21PM  5  objections are targeted at two particular issues.

6          The first issue, Your Honor, is that

7  Mr. Sharkey had some particular testimony about plain

8  language that was at issue in the 422 case but is not at

9  issue here and so this goes along the lines of

02:21PM  10  Headwater's MIL 3 that you ruled upon.  It's essentially

11  the same issue.

12          If we -- in the 422 case, the relevant claim

13  language recited interacting in the device display

14  foreground, and here the relevant claim language is

02:21PM  15  interacting with the user in a user interface

16  foreground.  There's no display cited, and notably

17  Samsung's noninfringement argument at trial was tied to

18  that display limitation.

19          So what we see in -- at 496:25, as a first

02:22PM  20  example, Your Honor -- I'll give you a few of them so

21  that you can get a sense of this.  At Page 496, Line 25,

22  we see the quote -- I believe it's in the question --

23  "interaction in the display."

24          The same quotation we see on Page 497, Line 6.

02:22PM  25  The same quotation we see on Page 498, Line 19.

1    Similarly at Page 498, Lines 24 to 25, we see, quote,

2    "screen turns off."  That's again tied to the display

3    limitation in that 422 case.

4              THE COURT:  Where is that now?

02:23PM  5              MR. DAVIS:  Oh, yes.  I'm sorry.  That's at

6    498, lines 24 to 25.

7              THE COURT:  All right.

8              MR. DAVIS:  We see at Page 501, Lines 13

9    through 14, there is, quote "interacting in the device

02:23PM 10   display foreground," and we see that same language at

11   Page 501, Lines 22 to 23.

12             And so, you know, I think for the same reasons

13   we discussed with respect to MIL 3, we think it's

14   improper to have testimony be introduced where it was

02:23PM 15   focused especially on the claim language that was at

16   issue in the 422 case, that's not at issue here.

17             THE COURT:  So the designation that the

18   Defendant wants to use regarding, let's start with Pages

19   496 and 97.  Where -- what portion are they seeking to

02:24PM 20   use?

21             MR. DAVIS:  They are seeking to use 496 through

22   497:8 -- oh, I'm sorry.  I think I missed a line number.

23   They are seeking to use 496, Line 16 through 497, Line

24   8.

02:24PM 25             THE COURT:  All right.  Let's just focus on

1    that, and your argument is that the phrase there

2    "interaction in the display" in the questions is a

3    reference to a limitation that's not present in the

4    asserted claims?

02:25PM    5         MR. DAVIS:  That's exactly right, Your Honor.

6         THE COURT:  All right.  Then let me hear from

7    the Defendant on that.

8         MR. DAVIS:  If you don't mind, I'll just leave

9    this up for reference.  I don't know if you mind.

02:25PM   10         MR. VINCENT:  I don't mind.

11         MR. DAVIS:  Okay.

12         MR. VINCENT:  So, Your Honor, I had a lovely

13    printout with a highlight that I cannot seem to locate,

14    but what Mr. Sharkey was asked in that testimony and

02:25PM   15    explicitly testified -- and if I can get the cite, I

16    will provide it to Your Honor -- he was explicitly

17    asked:  Are we talking about any patents here?

18         He said no.  There is no evidence that

19    Mr. Sharkey ever saw the patent at issue in the Samsung

02:25PM   20    case.  He certainly wasn't asked questions about claim

21    language about that patent.  He was opining about the

22    functionality of the accused features, the same

23    functionality and same accused features that are accused

24    in this case.  That is what Mr. Sharkey's testimony goes

02:26PM   25    to.

1          Just because there is overlap in language

2    doesn't mean that it goes to one patent and not another.

3    Like, for example, Headwater is designating testimony

4    from Mr. Sharkey about background, how Android handles

02:26PM  5    background data.  It was relevant to that case; it's

6    also relevant to this case.  It doesn't mean it was

7    about a specific patent.  It's about the functionality

8    of Android.

9          That's what Mr. Sharkey was testifying about.

02:26PM  10   He explicitly said in his testimony "I'm not talking

11   about any patents.  I'm talking about the functionality

12   of Android."  All of his testimony is about the

13   functionality of Android, not -- he wasn't asked any

14   questions about claim language.

02:26PM  15        THE COURT:  All right.  Thank you, Mr. Vincent.

16        MR. DAVIS:  So, Your Honor, I think this is

17   squarely within the ruling on MIL 3.  Mr. Vincent

18   pointed to --

19        THE COURT:  Mr. Davis, the intent of the ruling

02:27PM  20   on MIL 3 was that if prior testimony was dealing

21   expressly with a limitation that was asserted in that

22   case and is not asserted in this case, then the

23   testimony would not be admissible.  How is this

24   testimony talking about a claim limitation?

02:27PM  25        MR. DAVIS:  Because this is not a coincidence

1    that Samsung's counsel used the language "interaction in

2    the display" and "interaction in the device display

3    foreground."  That is explicitly the language from the

4    '976 patent in the 422 case.  That language is not at

02:27PM    5    issue here.

6         The reason Samsung was asking the questions

7    with that language was because their noninfringement

8    argument was based on there being no interaction in the

9    display.

02:28PM    10         Mr. Sharkey, can -- they can have elicited the

11    self-serving testimony that Mr. Sharkey didn't look at

12    the patent or what have you, but the reason that

13    question was asked with the words "display" in it was

14    because that was a claim limitation there and it's not

02:28PM    15    here, unlike what Mr. Vincent said a moment ago where he

16    said, "Well, we designated language about background."

17         Well, the difference is, Your Honor, the word

18    "background" was in the claims in that prior case, but

19    it's also in the claims in this case.  That's the

02:28PM    20    difference.  We don't think it's appropriate for someone

21    who was testifying about claim language that is

22    different from what is here to be admitted.

23         THE COURT:  Is your argument that Mr. Sharkey

24    was talking about a particular claim limitation in this

02:29PM    25    testimony?

1          MR. DAVIS:  Yes.

2          THE COURT:  And do you disagree with the

3     statement that Mr. Vincent made that Mr. Sharkey

4     indicated in his deposition that he was not talking

02:29PM  5     about the claims?

6          MR. DAVIS:  I do, Your Honor.  I don't think it

7     could possibly be a coincidence that there are questions

8     after questions after questions that have "device

9     display foreground," display, display, display in it and

02:29PM 10     that was the claim limitation in that case.

11          THE COURT:  Well, I'm not really concerned what

12     the motivation of the lawyer's question was.  I'm

13     concerned with whether the jury would be getting a

14     misrepresentation of the witness's testimony.

02:29PM 15          So my concern is not what the lawyer asking the

16     question was after but whether the witness was talking

17     only about or expressly about a claim limitation that

18     this jury will never hear about.

19          MR. DAVIS:  I understand, Your Honor, yes.  And

02:30PM 20     to that concern, the issue is if Mr. Sharkey said, no,

21     the Android functionality did not detect interaction in

22     the display, that sounds very similar.  There's

23     overlapping language like the word "interact" with the

24     claim language at issue here.

02:30PM 25          And so what Defendants are -- what the jury is

going to conclude from that potentially, Your Honor, is
that, well, Mr. Sharkey, he's the authoritative source
from Google.  He said no interacting, and the claim
limitation here says interacting; therefore, there's no
02:30PM  interacting.

But he didn't say there's no interacting at
all, and he didn't say there's no interacting in the
user interface foreground, the actual terminology here.
He said there's no interacting in the device display
02:31PM  foreground, which is different.

And so that's the confusing part for the jury,
Your Honor.  And unfortunately we don't have any reason
to believe that Mr. Sharkey will be there at trial live,
so he can't clear it up during his testimony, either.

02:31PM  THE COURT:  Well, this is a deposition that
you're offering.

MR. DAVIS:  Yes, this was his trial testimony.
I think both sides have designated from his deposition.

THE COURT:  I understand that, but you know
02:31PM  he's not going to be there.  You're offering his prior
testimony.

MR. DAVIS:  Yes.

THE COURT:  So how is it that you didn't expect
to be stuck with his prior testimony?

02:31PM  MR. DAVIS:  Well, I think, Your Honor, it's

1    just the simple fact that much of his prior testimony is

2    relevant to the issues here, but we were very specific

3    in what we identified as our remaining objections.  Only

4    the portions where he's specifically saying "device

02:32PM  5    display foreground" or "display."

6         THE COURT:  Well, what I'm concerned about and

7    what the MIL was going after is an effort to portray his

8    testimony as something it wasn't, and this does not

9    appear to me to be that.  He's not being asked about

02:32PM  10   some specific term that's going to be greatly at issue

11   to the jury and -- or would be.

12        MR. DAVIS:  I think the issue is that it's

13   confusingly similar to a jury, that it's talking about

14   interacting and interacting with the user.  And that has

02:33PM  15   some overlap in language with claim terms at issue here.

16        THE COURT:  Well, isn't it relevant?

17        MR. DAVIS:  No, I don't believe so, Your Honor.

18   As just one example, I think there is testimony from

19   various sources that a display is a subset of a user

02:33PM  20   interface.  For example, user interface could include a

21   speaker, something like that.

22        And so if Mr. Sharkey is saying there's no

23   interacting in the device display, that does not mean

24   that even he believes that there is no interacting in

02:33PM  25   the device user interface foreground because that could

1    be broader.

2              THE COURT:  Yeah.  I understand that, but it's

3    not -- it doesn't make it irrelevant.  It's less likely

4    that there's interaction in the device display

02:34PM   5    foreground if there's no interaction in the device

6    display.

7              MR. DAVIS:  I see your point is if it's a

8    subset, then that is one possibility within the subset

9    and so, therefore, it's relevant.  I think the problem

02:34PM   10   is it's unfairly prejudicial and that outweighs the

11   potential relevance that it might have.  Because the

12   jury may draw these improper conclusions that he was

13   actually testifying about the claim language at issue

14   here because it is similar in some respects.

02:34PM   15             The jury is not going to be told, "Well,

16   Mr. Sharkey, just for context, he was testifying in

17   another lawsuit that involved a different patent."  And

18   so they would assume he's testifying about the subject

19   matter of this case.

02:34PM   20             THE COURT:  I'd be more sympathetic to your

21   objection if you were not the one calling the witness.

22             MR. DAVIS:  We're not the only one calling the

23   witness, and these are not -- Mr. Sharkey is their prior

24   art witness as well, Your Honor.  So I assume that

02:35PM   25   Defendants are not going to sit here today and say that

1    they would agree not to call Mr. Sharkey.

2          THE COURT:  You took his deposition also?

3          MR. DAVIS:  We did, Your Honor.  Yes, there's

4    questioning from -- in the Sharkey deposition, there's

02:35PM  5    questioning from Samsung's lawyers and Headwater's

6    lawyers.

7          THE COURT:  So I assume in that deposition, the

8    parties only addressed the relevant claim terms?

9          MR. DAVIS:  Yes.  Yes, I think that's right,

02:35PM  10   Your Honor.  I don't know if you had something in mind

11   beyond the relevant claims, but --

12         THE COURT:  My question is why are you using

13   the trial testimony if it didn't deal with the relevant

14   features?

02:36PM  15         MR. DAVIS:  Oh.  Well, because Mr. Sharkey's

16   testimony was not solely about things like interacting

17   in the display.  He testified about other aspects as

18   well, including subject matter that overlaps with what's

19   at issue here.  As just one example, Your Honor,

02:36PM  20   something like blocking, that was at issue in both

21   cases.

22         THE COURT:  Well, let me hear from Mr. Vincent

23   as to what the relevance of the answer to this question

24   is that we're talking about here that asks whether there

02:36PM  25   is user interaction in the display.  How is that

1   relevant to the issues in this case?

2          MR. VINCENT:  Your Honor, the specific

3   question, if I understand, how the specific question and

4   answer, the question to Mr. Sharkey about the

02:37PM  5   functionality of Android and interaction in the device

6   display foreground?

7          THE COURT:  Well, the two questions that I'm

8   looking at, both ask about whether there's user

9   interaction in the display.

02:37PM  10          MR. VINCENT:  Your Honor, that's directly

11  relevant to our -- one of our fundamental

12  noninfringement defenses that we have moved for summary

13  judgment on.  Counsel wants to parse whether a user

14  interface is a broader term than "display."

02:37PM  15          Our experts have been -- have testified that in

16  the context of these patents, that is the display.

17  Mr. Sharkey, though, was not testifying about any claim

18  terms, and I have that testimony finally.

19          If I could have the ELMO, please.

02:38PM  20          This is at the -- at the top, this is his trial

21  testimony.  Line 2:  "You have not been asked to look at

22  the patent or compare the patent -- the claim to either

23  the accused products or the prior art.  Correct?"

24          "I have not been asked to do that."

02:38PM  25          "And you have rendered no opinions and have no

1    opinions as -- on those subjects.  Correct?"

2         "That's correct."

3         Mr. Sharkey -- Headwater's counsel said the

4    jury might think that Mr. Sharkey's talking about the

02:38PM  5    functionality of the accused feature.  That's exactly

6    what he's talking about.  If they want to cross our

7    expert and say that, "Well, you know, he said 'device'

8    and that's not 'user interface,'" they can do that.

9         But Mr. Sharkey wasn't opining about any claim

02:38PM 10    term of any patent.  He was giving testimony about the

11    functionality of the accused features, the exact same

12    accused features as are present here, and he was

13    using -- he was on this very issue.

14         There is a limitation in the '613 patent

02:39PM 15    whether there is interaction with the user and the user

16    interface, device user interface foreground.  That is --

17    his testimony is directly relevant to that point.

18         Whether it's dispositive, whether it is

19    conclusive, it is definitely probative of that issue, of

02:39PM 20    the functionality and how these accused features

21    operate.

22         And Headwater can cross our experts.  They can

23    explain why they don't think that matters.  It's

24    definitely relevant.  And as Your Honor put it, it

02:39PM 25    definitely makes it more probative, more likely than not

1    that -- and the Android features do not interact with

2    the user in the user interface foreground.

3              THE COURT:  All right.  Thank you, Mr. Vincent.

4              Mr. Davis, I agree with Mr. Vincent in this

02:39PM  5    case.  I know what the intent of MIL 3 was, and this is

6    not it.  If you have other examples, feel free to go

7    there.

8              MR. DAVIS:  So no further examples on this

9    point, Your Honor.  I think as I started, I mentioned

02:40PM  10   that we have two issues with respect to the Sharkey

11   trial designations.

12             THE COURT:  All right.

13             MR. DAVIS:  Separately, we have an objection

14   that we wanted to preserve for the record to the

02:40PM  15   designations, any designations from 507:20 through

16   510:18, 520:12 through 19, or 525:1 through 12.

17             The objection there is a different issue,

18   specifically that Mr. Sharkey was testifying about the

19   operation of certain first-party Google applications

02:40PM  20   like Gmail, and he had no personal knowledge to support

21   that testimony.

22             This issue, Your Honor, was something that was

23   discussed extensively with you in the 422 case, so I

24   think we understand your view on that and so I'm just

02:41PM  25   preserving that objection for the record.  We understand

1  the ruling there, and I think it is applicable here as

2  well.

3          THE COURT:  I remember it like it was

4  yesterday.

02:41PM   5          MR. DAVIS:  Better than me, I'm sure you do,

6  actually.

7          And so with that, I think that addresses the

8  issues with the Sharkey trial testimony.  The Sharkey

9  deposition testimony, this one's a little bit different.

02:41PM  10  These ones are actually Defendants' objections to our

11  designations, I believe.  So I should probably yield the

12  floor.

13          THE COURT:  All right.

14          MR. SIM:  Good afternoon, Your Honor.  Charlie

02:42PM  15  Sim for the Defendants.

16          This should be relatively straightforward.  So

17  for Mr. Sharkey's deposition designations, the parties

18  have gotten together and dropped almost all of the

19  objections mutually.  This is the only one that remains.

02:42PM  20  It is three sections of testimony.  I'm happy to read

21  them in the record if you would like.  They are all

22  directed to a brief line of questioning where

23  Mr. Sharkey was asked about a patent on which he is an

24  inventor.  That patent is not asserted in this case.  It

02:42PM  25  is not and cannot be prior art to the two remaining

1    patents in this case, and as such, we think that there

2    is a substantial enough risk of jury confusion by

3    introduction of questioning on an essentially irrelevant

4    patent -- they are not relevant to any issue in this

02:42PM    5    case -- that these discrete sections of testimony should

6    be excluded on that basis.

7    THE COURT:  What's the page and line?

8    MR. SIM:  So the three designations will be 125

9    from 17 to 24, 129:14 to 23, and 135 from 7 to 17 in

02:43PM   10    Mr. Sharkey's deposition from the Samsung 422 case.

11    THE COURT:  And I guess, frankly, it would be

12    helpful if I hear from the Plaintiff about what they

13    intend is the purpose of this testimony.  I'll give you

14    a chance to respond.

02:44PM   15    MR. DAVIS:  Yes, Your Honor.

16    So Mr. Sharkey, he's testifying about his own

17    patent.  These are his own words from his own patent.

18    Mr. Sharkey, it's -- he's being used to support

19    Defendants' prior art case.  He's their primary lead

02:44PM   20    prior art witness on invalidity.  These statements in

21    his patent, which are his words as the prior art

22    witness, discuss the state of the art as of the time of

23    his patent, which came after Headwater's.  And so

24    he's --

02:44PM   25    THE COURT:  Where is that testimony?

1    MR. DAVIS:  Yes.  So we can find that on Page

2    125:17 through 24.

3    THE COURT:  I don't see --

4    MR. DAVIS:  That's just introducing the patent.

02:45PM  5    THE COURT:  Yeah.  Where is the language that

6    you think is relevant?

7    MR. DAVIS:  Oh, yes.  So 129, the designation

8    of 14 through 23 says that, you know, as of the time of

9    his patent, current computing devices do not provide

02:45PM  10   fine-grained visibility and control of network usage

11   patterns on individuals' computing devices where the

12   network data flows originate.

13   And he says in the next designation, which

14   occurs on Page 135:7 through 17, that there is a need

02:45PM  15   for determining, controlling, adapting, reporting data

16   usage for specific applications and features of

17   applications that are running on devices and exchanging

18   data with networks.

19   And so our point there, Your Honor, is just

02:46PM  20   that Mr. Sharkey is suggesting that there is this need

21   that exists as of the time of his patent that seems to

22   be in tension in our view with their view on invalidity.

23   THE COURT:  All right, Mr. Davis.  I understand

24   that position.  I don't think that the jury is going to

02:46PM  25   be confused by that use of the patent, and it seems to

me to be within the broad understanding of relevance.

So I'm going to overrule those objections to

Mr. Sharkey's deposition.

          MR. DAVIS:  Thank Your Honor.

          And I believe the next one also will begin with

Defendants.

          THE COURT:  All right.  Well, I have -- I've

gone beyond when I should have taken the afternoon

recess for the court reporter, so I apologize to her,

and we'll take a 15-minute recess.

          (Recess from 2:47 p.m. to 3:03 p.m.)

          THE COURT:  Let's move on to the next

deposition or prior testimony issue.

          MS. BEDARD:  Good afternoon, Your Honor.

          THE COURT:  Hello, Ms. Bedard.

          MS. BEDARD:  I'm going to address the

Defendants' remaining objections to the deposition

designations of the Samsung Electronics America witness

named Michael Schiksnis.  I apologize for my

pronunciation there.

          As we've done for several of the other

witnesses that we're discussing today, the parties were

able to negotiate down to just a few remaining

objections.  So we have two remaining designations in

Defendants' objections that I will discuss today.  And

they are separate topics, so I'll just address them one

after the other.

      The first one is a designation to Page 84,

Line 22 to Page 85, Line 4.  And the line of questioning

03:04PM  here is a question by Plaintiff's counsel to Samsung's

corporate witness that asks:  Are you familiar with the

term ███████████████████?

      And the witness answers:  Yes.

      Plaintiff's counsel asks:  What is that?

03:05PM       And the witness answers:  ████████████████

██████████████████████████████████████

███████████

      Defendants' objections here are primarily for

the reason of prejudice.  Introducing testimony from a

03:05PM  Samsung witness on the issue of █████████████████

would do nothing but prejudice Defendants.  The Samsung

employee's understanding of what the term means has no

relevance here.  And the later testimony from the

witness, as you can see from Line 5 to Line 25 on

03:05PM  Page 85, states that the witness has never

████████████████ something.

      When asked, "████████████████████████

██████████████," he says, "█████████████."

      "█████████████████████████████████

03:06PM  ████████████████████?"

1    "███████████."

2    "████████████████████

3    ████?"

4    "███████████."

03:06PM 5    "████████████████

6    ████████████?"

7    Answer:  "███████████."

8    And so the lines that are designated by

9    Headwater would do nothing but prejudice Defendants in

03:06PM 10   this case.  There's no legitimate purpose to introduce

11   this to the jury except to confuse them and incite them

12   with testimony from a corporate representative of one of

13   the OEMs at issue in this case.

14   THE COURT:  All right.

03:06PM 15   MS. BEDARD:  And would you like me to address

16   the second, or have Headwater's counsel address this and

17   then stand back up?

18   THE COURT:  Go ahead and tell me about the

19   second.

03:06PM 20   MS. BEDARD:  Sure.

21   So the second set of testimony that we are

22   objecting to is on Page 91.  It starts at Line 17 and

23   goes through Page 92 at Line 8, and the questions and

24   answers here relate to whether a video is, quote,

03:07PM 25   interacting with a user in the foreground.

```
 1              Headwater's counsel's questions here directly
 2      track the language of the asserted claims in the '613
 3      patent.  Mr. Schiksnis is a third-party corporate
 4      witness.  He's not an expert witness in this case.  He
03:07PM  5      has no qualifications to provide a technical opinion to
 6      the claim terms in this case and whether some activity
 7      meets those claim limitations and so his testimony, he
 8      doesn't have the personal knowledge to testify to this
 9      issue.
03:07PM 10              And then it would be unduly prejudicial to the
11      Defendants to allow, again, a Samsung corporate witness
12      to testify whether or not he believes, based on no
13      expertise, whether a claim limitation is met.
14              THE COURT:  All right.
03:08PM 15              MS. BEDARD:  Thank you, Your Honor.
16              THE COURT:  Thank you, Ms. Bedard.
17              MR. DAVIS:  Your Honor, so going back to the
18      first disputed designation, the issue there is just this
19      is the witness, who is a Samsung engineer, experienced,
03:08PM 20      and the POSITA, for that matter, a senior director of
21      engineering at Samsung, with an electrical engineering
22      background.  He's worked for ten years at Samsung and
23      worked as an engineer at Motorola before that, and he's
24      just providing his understanding of the term "██████
03:08PM 25      █████████."
```



1          THE COURT:  Is there evidence that you will be

2    presenting that Samsung ███████████████████████?

3          MR. DAVIS:  Yes.  So there's -- there is

4    evidence of ███████████████.  So in -- for example,

03:09PM  5    there's Mr. de la Iglesia, our validity expert, has live

6    opinions on secondary considerations of long-felt need,

7    failures of others, and copying that explicitly refer to

8    ████████████████████████████████████████████

9    ██████████████████████████████████████████████

03:09PM 10    ██████████████████████.  That's found in

11    Paragraphs 455 and 464 of his validity report.  He

12    refers to ████████████████████████████

13    ██████████████████████████████████████ and

14    so that's -- that's really the relationship there, Your

03:09PM 15    Honor.

16          THE COURT:  And are you saying that Mr. de la

17    Iglesia represents that there was ████████████  by

18    Samsung?

19          MR. DAVIS:  Yes, that there's ████████████

03:10PM 20    ████████████████████████████████████████

21    ██████████████████████████████████████████████

22    ████████████████████████████████████

23    ████████████████████████████.

24          THE COURT:  I know that there's a MIL against

03:10PM 25    any argument that Verizon reverse engineered anything.

1          MR. DAVIS:  That's right, Your Honor.

2          THE COURT:  And you're steering clear of that

3    in these questions?

4          MR. DAVIS:  Yes, Your Honor.

03:10PM  5          So, yes, I am glad you clarified.  So there are

6    ███████████████████████████████████████████

7    ████████████   ██████████████████  what you just referred

8    to, the assertion of reverse engineering by Verizon, and

9    as of the last pretrial conference -- and this was part

03:11PM  10   of one of the MILs that we agreed to -- we would not

11   refer to the whistleblower complaint or allegations of

12   reverse engineering by Verizon.

13         THE COURT:  All right.  And on this second

14   issue, why isn't this an opinion that you're asking for

03:11PM  15   about whether something constitutes that particular

16   claim limitation?

17         MR. DAVIS:  Yes.  So, Your Honor, this is,

18   again, a person of ordinary skill in the art who is

19   being asked a sort of hypothetical scenario, and he

03:11PM  20   explains what he believes interacting with the user in

21   the foreground.  He sort of responds to the

22   hypothetical.  And so it's at least evidence of what

23   this claim term means to one of ordinary skill in the

24   art.

03:12PM  25         I think, Your Honor, especially with the

1  rulings on, for example, the Sharkey testimony that, you

2  know, also relates to, you know, claim language or

3  something akin to claim language, we don't see why there

4  would be a distinction here to say this is not okay for

03:12PM  5  the Samsung witness to be saying this but is okay for

6  Defendants to introduce about Mr. Sharkey.

7  THE COURT:  Mr. Sharkey's questions were not

8  claim language.  Your question -- your objection was

9  that that was not the claim limitation.

03:12PM  10  MR. DAVIS:  I can clarify that too, Your Honor.

11  So there are other questions that Mr. Sharkey fielded

12  that would get at claim language that is relevant to

13  this case, even in our view.  Those were not subject to

14  objections.

03:13PM  15  Now, what Defendants objected to -- or, I'm

16  sorry.  What we objected to was Defendants identifying

17  Sharkey testimony about claim language that was only at

18  issue in the 422 case.  This is different testimony here

19  for Mr. Schiksnis because, intentional, Your Honor, we

03:13PM  20  do not ask him about the display.  We ask him about the

21  interacting with the user in the foreground.  That

22  tracks the claim language at issue here.

23  And so I guess all my point was, Your Honor, is

24  that if we're going to permit Mr. Sharkey's testimony

03:13PM  25  about overlapping claim language between the two cases

1  and we're going to permit Mr. Sharkey's testimony about

2  claim language that was only at issue in the 422 case

3  like "display," then certainly it should be permissible

4  for Mr. Schiksnis's testimony about claim language that

03:14PM  5  is at issue here.

6          THE COURT:  You don't dispute that you're

7  asking him for an opinion?

8          MR. DAVIS:  I'm asking him about a hypothetical

9  that I'll certainly admit, Your Honor, that I am using

03:14PM  10  claim language in the questioning.  This was one of my

11  depositions, and I say "interacting with the user in the

12  foreground."

13          I think like Samsung's counsel before, I chose

14  those words intentionally, sort of following the claim

03:14PM  15  language, and Mr. Schiksnis is giving his impression of

16  what, in this hypothetical scenario, would that be

17  interacting with the user in the foreground from the

18  perspective of a person of ordinary skill, like

19  Mr. Sharkey.

03:15PM  20          THE COURT:  Where would you say the basis is to

21  consider him a person of ordinary skill?

22          MR. DAVIS:  Sure, Your Honor.  I'll be able to

23  provide you citations in a moment.  I know I took down

24  in my notes.  I asked him his educational background; he

03:15PM  25  said electrical engineering.  We established that he's a

senior director of engineering at Samsung.  He's worked
there for ten years and that he was an engineer at
Motorola, an electrical engineer before that.

THE COURT:  All right.

MR. DAVIS:  Would you like me to provide
citations to the background?  I don't think there is a
dispute about that, but it's all sort of early on in the
deposition, his background.

THE COURT:  Was there an objection at the time
to asking the witness for an opinion as opposed to
something that he would have personal knowledge of?

MR. DAVIS:  The -- so Samsung's counsel raised,
in the testimony that we talked about with the
hypothetical, the first question that they raised
"objection, form"; and after that I sort of reiterate
the question, and Samsung's counsel objects, "Form,
scope, legal conclusion."

THE COURT:  It's clearly calling for an
opinion.

MR. DAVIS:  I think, Your Honor, it's not
calling for an opinion any more than lots of testimony
from Mr. Sharkey.

THE COURT:  You know, you yourself said it was
a hypothetical question.

MR. DAVIS:  Yes.  I mean, I'm giving him an

```
  1   example of if a user's watching a video.

  2            THE COURT:  That's an opinion.

  3            MR. DAVIS:  I would submit no more so than any

  4   other question, or plenty of other questions to

  5   Mr. Sharkey.  It seems very difficult to distinguish

  6   those, Your Honor.  These are third-party technical

  7   witnesses.  Neither is an admitted expert.  It seems

  8   like those would rise and fall together.

  9            THE COURT:  And they might.  I didn't have that

 10   objection before.

 11            Well, I will overrule the objection to the

 12   passage on Page 84 to 85 about ███████████████

 13   █████.  I think there is sufficient relevance of that.

 14            I will sustain the objection to the question at

 15   Page 91 to 92 on the grounds that it's calling for the

 16   witness's opinion about the claim limitation.  It's not

 17   asking about the functionality of the device.

 18            What else?

 19            MR. DAVIS:  I believe, Your Honor, that takes

 20   us to Mr. Yamasani's deposition designations.  There, I

 21   think there is a mix.  This is -- we have an objection

 22   to one of Defendants' designations and then they have

 23   some objections to some of our designations.

 24            With respect to our objection, this is

 25   Page 212, Lines 19 through 25 of Mr. Yamasani's
```

testimony, and the issue here is I think not totally

unlike what you were just discussing, Your Honor, that

Defendants are using the claim term "intercepting" in

their questioning of Mr. Yamasani.

03:20PM    He's testifying on behalf of Google.  That's a

financially interested third party.  So this is

Defendants questioning their own financially interested

witness.  That's kind of the distinction I would draw,

Your Honor, between what I was just talking about with

03:20PM  Mr. Schiksnis and so, you know, we would say this is

improperly eliciting a legal conclusion from a biased

fact witness.

And so I can appreciate, Your Honor, if the

thought as well, didn't you just take the opposite

03:20PM  position in the last one.  And, Your Honor, I think how

I'm distinguishing it, Your Honor, is that it's the

state of the parties and the counsel.

I was questioning Mr. Schiksnis, who is a

financially interested witness, Samsung, and he's giving

03:21PM  testimony.  I'm not eliciting such testimony from my own

witness.

THE COURT:  You don't have to explain yourself.

MR. DAVIS:  No, I appreciate it, Your Honor.

THE COURT:  So the objection to the question of

03:21PM  the witness at Line 19 is based on it calling for an

1    opinion?

2            MR. DAVIS:  That's right, Your Honor.

3            THE COURT:  All right.

4            MR. DAVIS:  It would probably make sense for me

03:22PM    5    to cede the floor to Defendants to address this one and

6    then you can stay up and address yours.

7            THE COURT:  All right.

8            MR. SIM:  So thank you, Your Honor.  On the

9    point Mr. Davis was just discussing, I'll just make a

03:22PM    10   few quick points.

11           THE COURT:  And it would help me out if you

12   tell me what is the designated part?  Where does the

13   designation begin and end?

14           MR. SIM:  Your Honor, excuse me just one moment

03:22PM    15   while I grab it.

16           THE COURT:  All right.

17           MR. SIM:  So the designation in question here,

18   at least I understand the extent of Plaintiff's

19   objections to it, is just going to be Lines 19 through

03:23PM    20   25 on Page 212.

21           THE COURT:  That's the part that's objected to.

22   What part is being offered?  Is it just that question

23   and answer?

24           MR. SIM:  Give me one moment, Your Honor.

03:23PM    25           THE COURT:  I'm just trying to get the context.

1        MR. SIM:  For Verizon's affirmative

2    designations, it actually precedes several pages before

3    this, omitting objections and other attorneys speaking.

4    So it includes, for instance, subject matter throughout

03:24PM  5    Page 212, 211, and 210, which Defendants would submit

6    sort of lead up to the point that Plaintiff's counsel

7    highlighted, which is in a sense a summation of the line

8    of questioning.

9        THE COURT:  All right.  So give me what you

03:24PM  10    consider the relevance of this question.

11        MR. SIM:  This question in fact goes to a

12    centrally relevant issue in this case as is laid out in

13    relatively great detail in the parties' briefing on the

14    '541 patent motion for summary judgment.

03:25PM  15        As Your Honor's certainly aware, intercepting

16    is a key claim element in the two remaining asserted

17    claims from that patent and testimony from Google's

18    representative here, Mr. Yamasani, going to whether or

19    not some of the accused products that perform

03:25PM  20    intercepting or related verbs is, thus, directly

21    relevant to that noninfringement position.

22        THE COURT:  And has the witness at some point

23    here indicated that he's using "intercepting" and

24    "cancelling" the same way, interchangeably, or is he

03:25PM  25    trying to contrast those?

```
 1            MR. SIM:  If you'll give me one minute, Your

 2    Honor.  There was no instance in which the witness

 3    equated those terms as synonymous in the course of his

 4    testimony.

 5            THE COURT:  So what we're talking about, I

 6    guess, is the question and why does the question say

 7    "intercepting or cancelling."

 8            MR. SIM:  Perhaps it was just a clumsily worded

 9    question.  But the purpose of this line of questioning

10    was to arrive at a point where, you know, there was --

11    the witness was explaining that there was certain API

12    transactions, as he was calling them, that occur in the

13    course of the accused products and that those are

14    received at certain -- without delving too deeply into

15    the disputed issues surrounding the '541 patent motion

16    for summary judgment, that those API transactions are

17    received by certain components.

18            And the question, questioning leading up to the

19    objected question was establishing that there is no

20    instance in which an API transaction does not, in fact,

21    reach where it's going.

22            THE COURT:  So this relates to the issue of

23    whether something can be intercepted and still be

24    received?

25            MR. SIM:  Correct.  It certainly touches on
```

1    that issue, Your Honor.

2            THE COURT:  All right.

3            MR. SIM:  I should clarify, Your Honor, if

4    you'll permit me, that while this does go to that legal

03:27PM  5    issue which is in the summary judgment brief and the

6    parties have submitted, this questioning is just on the

7    operation of the accused product.  So it does not touch

8    the legal issue of what the definition of "intercepting"

9    is.  It's whether, from the witness's perspective, a

03:27PM  10    witness who has not seen the patents, believes that, you

11    know, how the products operate could be described or not

12    described as intercepting.

13            THE COURT:  All right.  Thank you, Mr. Sim.

14            MR. SIM:  Your Honor, Defendants also have

03:28PM  15    objections to Plaintiff's designations from this

16    deposition transcript.  Would it be helpful for you to

17    hear from Mr. Davis next, or should I remain up here and

18    address that second set of designations?

19            THE COURT:  Why don't you identify for me the

03:28PM  20    issue.

21            MR. SIM:  Certainly.  So this is -- this will

22    sound familiar to Your Honor.  This is the same

23    objection I discussed a moment ago with respect to

24    Mr. Sharkey's testimony.  And understanding that -- Your

03:28PM  25    Honor's finding on that issue, this is a similar issue

where a third-party witness, again a Google witness, was

shown a patent on which that witness was an inventor and

was asked questions as to that patent.  And I'm happy,

if it's helpful for the Court, to read into the record

03:28PM  the exact portions on which Defendants object, but the

thrust is the same.

This is that there was a chance for confusion

here and that the relevance of this patent is even lower

in the sense that it was filed in 2016, so long after

03:29PM  all the patents we've been discussing in this case.

And once I've read into the record, I'll direct

the Court's attention to a specific portion of the

testimony here where terms having to do with the accused

features and, in fact, the asserted patents are

03:29PM  intermingled in with some questioning on this entirely

unrelated patent upon which Mr. Yamasani happens to be

an inventor.

THE COURT:  All right.  Where does this occur?

MR. SIM:  So I'll skip to the end.  The point

03:29PM  which I just referenced begins at 135 in Mr. Yamasani's

transcript at Line 17, begins with a discussion of doze

mode, an accused feature in this case.

And then on 136 beginning at Line 4, all of a

sudden in that same line of questioning, we're back to

03:30PM  discussing Mr. Yamasani's prior art patent, which -- or,

I'm sorry, not prior patent.  Entirely unrelated patent.

Excuse me, Your Honor.

And for reference, this was introduced as

Exhibit 7 to Mr. Yamasani's deposition on Page 126 of

03:30PM    this transcript.

THE COURT:  And the part that you find

objectionable is what starts at Line 17 on Page 135?

MR. SIM:  That is correct.  So at this point in

the questioning, Mr. Yamasani's patent has been

03:30PM    introduced as Exhibit 7, and he's been asked some

questions on it.  Then when this designation begins at

135, Line 17, there are a couple questions about the

accused features.

Then you'll see "Let me ask you this," starting

03:31PM    on Page 136 at Line 4:  If you go to Column 7, Line 31,

for example -- and then the questioning attorney reads

in a sentence from Mr. Yamasani's patent and begins

asking him about the meaning of the word "inactive" in

his patent.

03:31PM    Now, if the Court goes back to Page 135, there

is some discussion about the accused features and that

they may trigger when a device has or has not been

active or inactive for some period of time.

So we submit that there is prejudice here in

03:31PM    the sense, or at least the possibility of jury confusion

in a sense that this entire -- this patent from 2016

that is unrelated to the issues in this case is suddenly

being used to somehow define or discuss the context of

the accused features.

03:31PM    THE COURT:  And the issue of an inactive state

is presented in this case; is that it?

MR. SIM:  Yes, Your Honor, to the extent that

doze mode, and which is referenced slightly further down

on Page 135, application standby, are accused features.

03:32PM    And the times at which they become active play into some

of Headwater's infringement theories.

I think I'm happy to discuss that in great

detail, but it becomes quite complex after that point.

THE COURT:  All right.  Thank you, Mr. Sim.

03:32PM    Let me hear the response.

MR. SIM:  Thank you, Your Honor.

MR. DAVIS:  So, Your Honor, I think the issue

here is essentially the same thing that we dealt with

with Mr. Sharkey's patent, so I think our points would

03:32PM    be the same there.

The only thing I would add, Your Honor, is the

designation, the 135, Line 17, the designation that

begins with 135:17, I think at least the portion running

from 135:17 to 23 is not tied to Mr. Yamasani's patent

03:33PM    and so I don't think this objection really is applicable

1    here, to that portion at least.

2           The subsequent portion we see at Line 24,

3    Headwater's counsel asks:  And app standby considers

4    whether an application has been active or inactive for

03:33PM   5    some period of time as well?

6           And that point, the witness says:  Well, what

7    do you mean by active?

8           And then Headwater's counsel goes back into

9    Mr. Yamasani's patent, where he uses the term "inactive"

03:33PM  10    to provide context of, you know, "Well, what did you

11    mean by inactive when you wrote that in the patent."

12           So I think that first portion running from

13    Lines 17 to 23 on Page 135 is just -- that should not be

14    objectionable.

03:34PM  15           THE COURT:  That's not talking about

16    Mr. Yamasani's patent?

17           MR. DAVIS:  It is not.  That is a question --

18    my understanding is that's just a standalone question.

19           The next question, Headwater's question asks

03:34PM  20    about app standby and whether an application is

21    considered active or inactive, and at that point the

22    witness, you know, asks about the -- you know, what do

23    you mean, and we dive back into the patent.

24           But I think Mr. Sim said that as well, that

03:34PM  25    this first portion is not specifically about

1    Mr. Yamasani's patent.

2          THE COURT:  All right.

3          MR. DAVIS:  So otherwise, I think just the

4    points we made earlier about Mr. Sharkey's own patent as

03:35PM 5   well and sort of providing context for terminology.

6          THE COURT:  Mr. Davis, why isn't the

7    questioning on Page 212 just talking about the

8    functioning of the product, the Android system?

9          MR. DAVIS:  I mean, I do think he is talking

03:35PM 10  about Android.  He does say that.  He refers to

11   connectivity manager.  I think it's just a matter of he

12   is talking about it in the context of claim language and

13   so we think it's sufficiently comparable to the other

14   types of testimony along those lines that use

03:36PM 15  terminology that come from claims.

16          THE COURT:  I think that the question at

17   Page 212 is sufficiently tied to the function of the

18   system as opposed to the claim language particularly, so

19   I'll overrule the objection to Page 212, also overrule

03:36PM 20  the objection to Page 135.  I don't think that will be

21   confusing to the jury.  I think it's fair

22   cross-examination of the witness.

23          MR. DAVIS:  Thank Your Honor.

24          MR. SIM:  Thank Your Honor.

03:36PM 25          THE COURT:  What's next?

03:37PM

03:37PM

03:37PM

03:37PM

03:38PM

03:38PM

 1          MR. DAVIS:  So at this point, Your Honor, we

 2   have two more witnesses left.  The one of those

 3   witnesses is Mr. Russell.  I think what I mentioned

 4   earlier and what we suggested to Defendants is that

 5   Mr. Russell, some of his designations are tied up in

 6   issues that the parties have resolved with respect to

 7   MILs and the like.  We can argue those at this point.  I

 8   don't know if Defendants have a different thought on how

 9   to address that.

10          Oh, I can clarify.  I think what I'm hearing

11   from Defendant counsel is that they had thought we were

12   going to table these designations.  That's what we

13   proposed, Your Honor.  That's fine from our perspective.

14   I didn't know if we had agreement on that.  If we do,

15   that's fine.

16          MR. KREVITT:  Your Honor, may I be heard?

17          THE COURT:  Yes, Mr. Krevitt.  Go ahead.

18          MR. KREVITT:  Your Honor, we're fine tabling

19   those particular designations, but this goes to an issue

20   that I raised this morning we want to address at the

21   Court's convenience, which, you'll recall Motion in

22   Limine Number 4 was to exclude Russell testimony for a

23   variety of reasons.  This was dealing with whistleblower

24   allegations, and it related entirely and explicitly to

25   the '042 patent.

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | With the '042 patent out of the case now, Your               |
| 2   | Honor, there's no conceivable relevance to any of            |
| 3   | Russell's testimony.  This is the issue, as I say, that      |
| 4   | I flagged earlier today, the issue about which the Court     |
| 5   | had extensive discussion with Mr. Chang, who explicitly      |
| 6   | and entirely tied it to the '042 patent.                     |
| 7   | And Your Honor will recall that when Your Honor              |
| 8   | denied the motion in limine, at least in part, Your          |
| 9   | Honor said that you had been satisfied that there was a      |
| 10  | connection to the '042 patent.                               |
| 11  | So as I said, that's the issue that we want to              |
| 12  | discuss with Your Honor, which we could do now, we could     |
| 13  | do later, we can do in writing with respect to              |
| 14  | revisiting MIL Number 4, Russell, in light of Your           |
| 15  | Honor's summary judgment ruling with respect to the '042     |
| 16  | patent.                                                       |
| 17  | THE COURT:  All right.  And I am fine with                   |
| 18  | taking that up now or whenever.  We have a variety of        |
| 19  | issues yet to finish.                                         |
| 20  | I see that I've got a day Wednesday, the 18th.              |
| 21  | So that's the Wednesday before trial.  It's set aside        |
| 22  | now for a hearing in the Headwater/Samsung case, the 641     |
| 23  | case, and I could use that day, or some part of it, as       |
| 24  | the final event in this case if we have things that we       |
| 25  | don't finish.                                                 |

03:38PM — line 5
03:39PM — line 10
03:39PM — line 15
03:39PM — line 20
03:40PM — line 25

                    Does that make sense?

1                   MS. FAIR:  We're obviously available to be here

2    for that.

3                   THE COURT:  Okay.

4  03:40PM  5      MR. KREVITT:  Yes, Your Honor, the same for

6    Defendants.

7                   THE COURT:  All right.

8                   MR. KREVITT:  It may be that there are certain

9    issues that could benefit with some additional

03:40PM  10  discussion, some of the designations, for example, and

11   the parties can continue to work on those.

12                  THE COURT:  Well, I don't mind leaving Russell

13   and you until later if we have a date set for that.  So

14   that's what I'm understanding the parties want to do?

03:41PM  15      MR. KREVITT:  That's fine as to the

16   designations, Your Honor.  The issue I have is

17   different.  So if Your Honor would indulge, it is a

18   different issue.  It goes to a more threshold

19   fundamental question and in some sense is just a

03:41PM  20  revisiting of Motion in Limine Number 4.

21                  THE COURT:  What you're doing is saying that

22   now that there is at least a recommendation that the

23   '042 not remain in the case that that would change the

24   outcome of MIL 4 with respect to other testimony by

03:41PM  25  Mr. Russell?

1          MR. KREVITT:  That's correct, Your Honor.  And

2     I can, if you'd like, briefly explain why and then can

3     address any questions Your Honor may have.

4          THE COURT:  All right.

03:41PM  5          MR. KREVITT:  So again -- and I don't want to

6     plow old ground.  Your Honor had extensive discussion on

7     MIL 4 a week ago, but this is the motion in limine that

8     Defendants filed with respect to a Mr. Russell.  He was

9     somebody who had allegations that Verizon had copied a

03:42PM 10     PowerPoint.  And Mr. Fenster, in connection with a

11     different motion, the sanctions motion we argued, made

12     clear that the Russell -- the relevance of the Russell

13     testimony was to this April 2010 PowerPoint presentation

14     and that the relevance of that was limited entirely to

03:42PM 15     the '042 patent.

16          We then did argument on the Russell motion in

17     limine, and Mr. Rosenthal, my partner, tried to convince

18     Your Honor that there was no connection with that

19     PowerPoint and that testimony to the '042 patent.  But

03:42PM 20     that was the sole discussion, whether the PowerPoint on

21     which -- regarding which Mr. Russell had testified, that

22     2010 April PowerPoint had any relevance to any issues in

23     this case.  We argued that it didn't because it wasn't

24     tied to the '042 patent.

03:43PM 25          Mr. Chang, on behalf of Headwater, stood here

and argued to Your Honor that there was a connection to
the '042 patent.

         And Your Honor may recall he walked you through
paragraphs starting at Paragraph 90 and then into the
hundreds, I think concluding at about 116, and marched,
Your Honor, through every paragraph and connected -- or
endeavored to, and ultimately did so to Your Honor's
satisfaction, connected that to the '042 patent.

         The Paragraph 90, the first paragraph to which
Mr. Chang referred, the paragraph on which the analysis
was entirely based was -- this is in Mr. Cooklev's
report -- was tying this information and Russell
testimony to the '042 patent.

         Dr. Cooklev was an expert only on the '042
patent, and that was the only testimony, of course, that
Mr. Chang cited because that's the only relevance.

         Your Honor ultimately, after argument,
concluded that looking at that document, which was the
Dr. Cooklev expert report, 185-3, Your Honor ruled,
quote:  I am satisfied that it shows that there is an
expert who is connecting the presentation at issue and
Mr. Russell's testimony with the technology in the '042
patent.

         We obviously, we had tried to persuade Your
Honor otherwise, but Your Honor was satisfied that

1    Dr. Cooklev had sufficiently tied it to the '042 patent.

2         With the '042 patent out of the case, Your

3    Honor, there is no conceivable relevance for

4    Mr. Russell's testimony.  It is salacious.  Your Honor

03:44PM    5    has already found that there is no allegation of copying

6    as to Verizon.  The allegations with respect to the '042

7    patent, what the testimony related to was things that

8    happened on Verizon's network.

9         The '541 and '613 patent have nothing

03:45PM    10    whatsoever to do with anything on Verizon's network.

11    It's all features on the phones.  And that presentation

12    summer of 2010 was years before the '541 patent came

13    out, years before the '613, before there was even a

14    marking page that was even alleged to be relevant to

03:45PM    15    either of those two patents.

16         So, Your Honor, given that the entire basis for

17    arguing against our motion in limine as to Mr. Russell

18    was the '042 patent, and the '042 patent being out of

19    the case now, we would respectfully submit that there's

03:45PM    20    no conceivable relevance or basis for that testimony to

21    be admitted.

22         And finally, Your Honor, it's highly

23    prejudicial.  It's salacious testimony that it was in

24    connection with the whistleblower litigation, as Your

03:46PM    25    Honor is aware, that was settled.  It dealt with

allegations of copying, which aren't in the case, and

dealt with allegations of copying on technology that has

no relevance, of even alleged relevance, to any of the

patents in this case.

03:46PM    And so for all of those reasons, Your Honor, as

I said, we would request that Your Honor grant MIL

Number 4 with respect to Mr. Russell's testimony.

THE COURT:  All right.

MR. KREVITT:  Thank you, Your Honor.

03:46PM    THE COURT:  Thank you, Mr. Krevitt.

MR. DAVIS:  Your Honor, just right off the bat,

I want to dispel what we just heard from Mr. Krevitt

that Mr. Chang's presentation focused entirely on the

'042 patent, that he did not suggest in any way that

03:47PM    there was something beyond the '042 patent that was

relevant to these allegations about Verizon and

Mr. Russell.

This is from the PTC transcript.  This will be

Page 154, Lines 7 through 15.  Mr. Chang is addressing

03:47PM    exactly this issue.  And what he says here beginning at

Line 13, he says:  "That is the infringing, the accused

infringing technology for the '042 patent, as well as

the '541 patent and the dependent claim of the '613

patent."

03:47PM    That's -- we explicitly said that, and I can

1  show Your Honor some portions from the -- just change

2  out my laptop.

3       I can direct Your Honor to portions of

4  Dr. Wesel's testimony.  In this case, his expert report

03:48PM  5  here, Your Honor, paragraph 4, you'll see at the bottom

6  of this slide.  Dr. Wesel is saying:  "Based on the

7  events discussed above, the similarities between the

8  ItsOn DAS system (which practiced the '541 patent) and

9  Verizon's DAS system.  That's the subject of what we're

03:48PM  10  talking about with Mr. Russell (which infringes the '541

11  patent, see e.g., '541 Claim 1[e]), it is my opinion

12  that Verizon would have been aware of, or at least

13  willfully blinded itself to, the '541 patent in the 2016

14  time frame, which I understand was when Verizon defined

03:48PM  15  its LTE PCO requirements."

16       There is a particular claim element, Your

17  Honor -- apologies.  I have slides I can hand up

18  actually, if I may.

19       The Slide 3 that I'm referring to, the excerpt

03:49PM  20  I just read from Dr. Wesel's Appendix A to his opening

21  report, that's filed on the docket at Docket 176-7.  The

22  '541 Claim 1[e] element that's being referenced here is

23  a limitation that says "or based on information from a

24  network element," that's what we point to as PCO being

03:49PM  25  an example of how that network element limitation is

infringed.  That is explicitly what Dr. Wesel, the

infringement expert who did not opine on the '042

patent.  He opined on the '541 and '613 patent.  He

links PCO and the Verizon DAS system that is relevant to

03:50PM  Mr. Russell to the '541 patent.

And so I think to that point, Your Honor, I

think we would fundamentally disagree with Defendants'

suggestion that the -- everything related to Mr. Russell

and everything related to MIL 4 falls away by virtue of

03:50PM  the '042 noninfringement report and recommendation.

THE COURT:  All right.  Thank you, Mr. Davis.

MR. KREVITT:  Very briefly, Your Honor.

First, the testimony that was put on the page

just now that purports to be testimony was, in fact,

03:51PM  questions put to Mr. Russell by counsel.  None of that

is his actual testimony.

But more importantly, the portions of the Wesel

report that you just saw that were taken as snippets,

what Mr. Davis did not point out is that what Mr. Wesel

03:51PM  did -- and we can show Your Honor if it's helpful; at a

break we'll hand up the report -- is he reproduced,

literally reproduced out of Dr. Cooklev's report.  He

said Dr. Cooklev made all these allegations; Dr. Cooklev

did all of this analysis.  That's why Mr. Chang talked

03:51PM  about Dr. Cooklev and only Dr. Cooklev.

1          Then Mr. Wesel said at the end, and this had

2     some relevance to the '514 -- excuse me -- '541 patent

3     too.  That's why we spent an hour or so on the

4     Mr. Russell MIL 4 when we were here last, Your Honor,

03:52PM  5     because Your Honor asked where does an expert tie this

6     document, this testimony, to a patent.

7          Mr. Wesel never does that, Your Honor.  We

8     don't think Dr. Cooklev did it, but at least he made

9     some effort to.  He supplied paragraphs relating to it.

03:52PM  10    There is no conceivable allegation, Your Honor, none

11    that the reference that had to do with how Verizon's

12    network would work relates to the '514 patent in which

13    all of the accused features are on the phones.

14         Dr. Wesel doesn't say anything beyond this

03:52PM  15    conclusory *ipse dixit* sentence after reproducing

16    literally, wholesale, Dr. Cooklev's opinion.  There is

17    nothing in this record, Your Honor, that ties

18    Mr. Russell's testimony to any other patent in this

19    case.  It would be brought into this case purely for its

03:53PM  20    salacious, its prejudicial, its atmospheric effect.

21    There is no connection to the presentation to

22    Mr. Russell's testimony and to the patents that remain

23    in this case.

24         And in fact, Your Honor, as I said,

03:53PM  25    Mr. Russell's testimony related to something that

1    happened in 2010 that would be on the network.  The

2    patents issued in this case years later.

3           We heard that this might be relevant to

4    willfulness for the other patents.  We have a summary

03:53PM  5    judgment motion.  Obviously Your Honor is aware.

6    Willfulness requires identification of patents.  There

7    is no identification of patents in Mr. Russell's

8    testimony or that document.  The patents wouldn't issue

9    for years.

03:53PM  10    Mr. Davis said it relates to copying.  There's

11    no allegation of copying as to Verizon.  Your Honor has

12    already ruled that out in connection with Motion in

13    Limine Number 2.

14           So the only possible relevance, or purpose --

03:54PM  15    excuse me -- of this testimony that is untethered

16    substantively to any patent is to bring somebody, some

17    testimony in that says, "Hey, Verizon got some

18    presentations, Verizon looked at the presentations and

19    then Verizon did some things."  It's totally unfair and

03:54PM  20    untethered to any patent.

21           And that's why finally, Your Honor -- and I

22    know counsel sits at the podium and tells you all the

23    evidence is this way and someone else tells you all the

24    evidence is this way, and it's hard for anybody to sort

03:54PM  25    that out.  And this is what makes this so unfair.

1    We are in this situation where Mr. Chang

2    defended this motion in limine entirely on the '042

3    because that's its only possible relevance.  And now we

4    show up today, in light of the '042 out, and Mr. Davis

03:54PM    5    shows you a snippet of an expert report in which

6    Dr. Wesel said, oh, by the way, the '541 also.

7    So for all those reasons, Your Honor,

8    Mr. Russell's testimony has no relevance.  It's not tied

9    to any expert, and no expert has tied it substantively

03:55PM    10    to any patent in this case.

11    THE COURT:  All right.

12    MR. KREVITT:  Thank Your Honor.

13    THE COURT:  Mr. Krevitt, I will look further at

14    that issue.

03:55PM    15    MR. KREVITT:  Thank Your Honor.

16    THE COURT:  Mr. Davis, if you want to address

17    the issue that you've referred to a couple times about

18    financial interest of a Google witness, I know it was

19    last time, and the related issues, I'll take those up.

03:56PM    20    MR. DAVIS:  Thank Your Honor.

21    THE COURT:  I guess the first thing I wanted to

22    know is that one of the most important issues last time

23    was the fact that everyone agreed there was

24    indemnification involved in that case, which is

03:56PM    25    something that is not going to be made known to the jury

1    for various reasons.

2         Also, everyone agreed that the witness from

3    Google -- I think it was Mr. Hanson -- was one of the

4    primary technical witnesses who would be testifying for

03:57PM  5    the Defendant.  He had no knowledge of the

6    indemnification issue.  In any event, we didn't want

7    that coming out in front of a jury.

8         Are those basic facts present in this case with

9    respect to a witness?

03:57PM  10        MR. DAVIS:  Yes, I believe so, Your Honor.  The

11   lead technical witnesses in these cases, especially now

12   that the two remaining patents if '042 doesn't go

13   forward, is those are primarily device-side patents.  Of

14   course, I just talked with you about an order from a

03:57PM  15   network element piece of the '541 claim.

16        But the Defendants have pointed to the

17   witnesses from Apple and from Google as providing the

18   relevant testimony on the accused functionality, which

19   operates on the Android operating system or the iOS

03:58PM  20   operating system.

21        The witness lists that Defendants have

22   submitted is extensive.  It includes numerous witnesses

23   from Apple and witnesses from Google as well.  I think

24   that they certainly intend to rely upon them.  And much

03:58PM  25   like in the 103 case, they intend to rely upon, I think,

 1    witnesses to support their prior art case as well.  They

 2    have made end noninfringing alternatives.  I'll add as

 3    well, Your Honor, they have noninfringing alternatives

 4    related to Apple functionality.  So I do think we have

03:58PM   5    that same issue of these are important technical

 6    witnesses.  I think the parties agree on that point.

 7        On the indemnification issue, we do have -- we

 8    know that the Defendants have purchase and sale

 9    agreements with their OEM suppliers, and those purchase

03:59PM  10    agreements, at least what we've seen, include

11    indemnification provisions.

12        It's possible that we don't have perfect and

13    complete information for everyone, but that's certainly

14    our view of it, and we've tried to obtain that

03:59PM  15    information.  Much like in the Samsung case, to the

16    extent we haven't gotten the information or a complete

17    picture of the information, it's not for lack of trying

18    and that's something that Defendants should be providing

19    to us much like we finally eventually got at the

03:59PM  20    pretrial conference in the 103 case.

21        So, Your Honor, really all we're asking for is

22    essentially the same treatment as before, that if we're

23    going to have these witnesses come from a party, or a

24    third party that has a financial interest in this case,

04:00PM  25    that we just introduce them as such.

1         I have the language that Judge Gilstrap used

2    before Mr. Hanson testified, and he introduced him as

3    Mr. Hanson being a Google employee, that Google -- and

4    clarifying that Google has a financial interest in this

04:00PM    5    case through its relationship with Samsung.  No mention

6    of indemnification, as Your Honor pointed out.

7         THE COURT:  And who are the third parties whose

8    employees will be testifying that you believe fall into

9    this category?

04:00PM    10         MR. DAVIS:  Yes.  So certainly Google and

11    Apple.  So that would be from Google, they have

12    Mr. Yamasani.  Mr. Sharkey is a former Google employee.

13    He now is no longer employed by Google.

14         On the Apple side, they have Mr. Chan, they

04:01PM    15    have Mr. Venkatraman, and they have a prior art witness

16    as well from Apple, Mr. Begeman.  I believe that's

17    B-e-g-e-m-a-n.

18         And on the Samsung side, Defendants can correct

19    me if I'm wrong, but I don't believe they have

04:01PM    20    identified Samsung witnesses as potential live

21    witnesses.  We would need to do an introduction before.

22    So as long as that's the case, then I believe it would

23    be those Apple and Google witnesses.

24         THE COURT:  And which of those entities are you

04:01PM    25    contending have indemnification agreements with Verizon?

1          MR. DAVIS:  We believe Apple, Google, and

2    Samsung as well, but it sounds like Samsung may not be

3    an issue if Samsung witnesses are not being relied upon

4    by Defendants.

04:02PM  5          THE COURT:  All right.

6          MR. DAVIS:  If they are, then we would include

7    Samsung as well, of course.

8          THE COURT:  And with respect to Apple, you

9    mentioned Chan, and then who was the second one?

04:02PM 10          MR. DAVIS:  Yes, the second one is

11    Mr. Venkatraman, and that's V-e-n-k-a-t-r-a-m-a-n.

12          THE COURT:  And a Mr. Begeman?

13          MR. DAVIS:  Yes.  I believe it's Begeman,

14    B-e-g-e-m-a-n.

04:02PM 15          THE COURT:  All right.

16          MR. DAVIS:  And he was a -- focused on the

17    prior art, Apple prior art that Defendants have

18    identified.

19          THE COURT:  All right.  Let me hear from

04:03PM 20    Verizon.

21          MR. DACUS:  Thank Your Honor.  Deron Dacus on

22    behalf of Verizon.

23          As the Court well knows, Your Honor, the Court

24    upstairs is very strict on announcements related to

04:03PM 25    video depositions and what can be said before that video

deposition.  From our perspective, as of today, we don't

think that the Court should deviate from that practice.

But having said that, I want to say one additional thing

to the Court.

04:03PM      We've really not had a chance to confer with

the other side on this issue.  This is not something

we've had a chance to even talk to our clients about and

so we would ask for that opportunity to do that.

I will say at first blush and just facially, we

04:04PM  do have some pretty significant concern about the judge

saying to the jury, you know, that the witness has a

financial interest in the case.

Certainly in the Samsung case, apparently they

had certain agreements that led that to be the most

04:04PM  expeditious and efficient way to handle that.  I'm not

sure we're similarly positioned; but given that it looks

like we're going to have an additional pretrial in the

days preceding this, we would ask the Court to defer

this and allow us an opportunity to confer with the

04:04PM  other side about it.

THE COURT:  All right.  Well, I'm fine with

that.  I will tell you that to the extent that you call

witnesses whose employers have indemnification

agreements with the Defendant, I think that the jury

04:05PM  needs to be informed of that because they are otherwise

1    not going to know that the witness they are listening to

2    is not just a disinterested witness.

3         MR. DACUS:  I've stood at this podium and made

4    that argument, too, Your Honor, many times.  So I

04:05PM   5    understand exactly what the Court is saying.  I will

6    say -- this will be no surprise to, Your Honor, I'm

7    sure -- indemnification is not always a black-and-white

8    issue.

9         THE COURT:  I know.

04:05PM  10         MR. DACUS:  And that's certainly -- almost

11    certainly the case here.  And so that's part of, I

12    think, the meet-and-conferring that needs to go on.  And

13    I certainly recognize and acknowledge that a witness who

14    has financial interest and/or bias, that's fair game in

04:06PM  15    some respects.

16         THE COURT:  And there are a variety of ways to

17    communicate it.  And the Court shares your concern that

18    it not be overemphasized, but I think, you know, there

19    needs to be a way to do it.  And it's not going to be

04:06PM  20    repeated over and over, I can tell you that.  But in any

21    event, hopefully there won't be that many different

22    witnesses that it will apply to.

23         I'm happy to pass that until the next time

24    we're here, with the understanding that if we don't hear

04:06PM  25    anything better, it's going to happen very similarly to

1    the way it happened in the last case.

2         MR. DACUS:  Understand all that, Your Honor,

3    and appreciate the Court giving us a little time on this

4    issue.

04:06PM  5         THE COURT:  All right.  That is not a problem.

6    We'll get back to this then on the next hearing.

7         MR. DACUS:  Thank Your Honor.

8         THE COURT:  Thank you, Mr. Dacus.

9         MR. HOFFMAN:  Your Honor, can we return for

04:07PM 10   just a moment to the other objections to Verizon

11   witnesses that we addressed a little earlier in the

12   hearing?

13        THE COURT:  Has someone refreshed their

14   recollection?

04:07PM 15        MR. HOFFMAN:  They have.  Someone has refreshed

16   their recollection.

17        So maybe most importantly, I want to clarify

18   the record because I misremembered things a little bit.

19   It was the case that we had objections for untimely

04:07PM 20   disclosed Verizon witnesses.  I think the way -- I

21   misremembered how that would possibly resolve.

22        Looking at the pretrial hearing from last week

23   at Page 28, counsel for Defendant represented -- or

24   Verizon represented that, if possible, that they

04:07PM 25   wouldn't be calling the particular witnesses, the five

1    witnesses at issue, which would resolve the issue.

2         We haven't heard back from the last week and

3    tried to do -- anyway, we haven't heard back on those

4    witnesses and whether, in fact, the issue is resolved

04:08PM    5    and so it remains, as far as we know, a live issue until

6    we hear different.

7         THE COURT:  All right.  Is there anyone on

8    behalf of Verizon who is currently able to speak to that

9    issue?

04:08PM   10         MR. VINCENT:  Your Honor, I think the answer to

11    that is we don't yet have an answer because the witness

12    lineup will be somewhat dependent on the rulings that

13    Your Honor will issue on the various motions and so to

14    finalize that to be able to answer the question and

04:08PM   15    resolve the issue I think depends on the resolution of

16    those.

17         So we would propose working together to give

18    some time and, at that additional hearing date, to be

19    able to have an answer at that point.

04:08PM   20         THE COURT:  I'm not sure exactly what the

21    nondisclosure issue is, but if the situation is that the

22    names of these witnesses were not disclosed to the

23    Plaintiff during the discovery period, it's likely that

24    they would be excluded.  If it's a different issue, then

04:09PM   25    it could be a different situation.

1    MR. VINCENT:  My understanding, it's a

2    different issue, Your Honor.

3    THE COURT:  Well, is there any objection to

4    just passing this until the next hearing?

04:09PM    5    MR. HOFFMAN:  No, Your Honor.  We would request

6    that we receive an answer to the question prior to the

7    hearing so that we know if that's an issue.

8    MR. VINCENT:  That's not a problem, Your Honor.

9    THE COURT:  All right.  Thank you.

04:09PM    10    There's also an issue that we have not resolved

11    about Plaintiff's Exhibit 26, the email, and --

12    MR. ROBB:  Your Honor, I would ask the --

13    THE COURT:  Mr. Robb, if you want to be heard,

14    please come up.

04:10PM    15    MR. ROBB:  Thank you, Your Honor.

16    We received the proper email about two hours

17    ago, so that's now resolved.

18    THE COURT:  All right.  Obviously I continue to

19    feel that we're not likely to get to the T-Mobile case

04:10PM    20    on this trial setting, but we have time now.  If the

21    counsel want to switch to issues that are solely

22    T-Mobile issues, we can take those up, or not.

23    MR. HOFFMAN:  At least from Plaintiff's point

24    of view, we would like to address those if possible,

04:11PM    25    Your Honor.

1          MR. KREVITT:  Your Honor, we're happy to -- at

2    the risk of being a broken record, we would also like a

3    short period of time just to tee up some of the issues

4    that remain in summary judgment and Daubert.  I think we

04:11PM   5    can do that without full argument.  There's just a few

6    issues that we thought might be helpful to direct your

7    attention to.

8          THE COURT:  All right.  Are these matters that

9    are also addressed in your current briefing?

04:11PM  10          MR. KREVITT:  Oh, yes, Your Honor.

11          THE COURT:  Okay.

12          MR. KREVITT:  Excuse me.  But they could

13    benefit from some explanation.  Yes, Your Honor, they

14    are.

04:11PM  15          THE COURT:  So you want to read them with

16    emphasis?

17          MR. KREVITT:  That's actually almost precisely

18    what I'd like to do, Your Honor.  May I?

19          THE COURT:  I will give you the next few

04:12PM  20    minutes.

21          MR. KREVITT:  Okay.  How many, Your Honor?

22          THE COURT:  A few.

23          MR. KREVITT:  A few.  Okay.

24          Your Honor, one of the items that I had

04:12PM  25    mentioned that we -- and all kidding aside, this is

addressed in the briefing, but it did seem that it would

be helpful, given that it's a claim construction issue,

just to address it briefly with Your Honor.  It's the

'541 patent.

04:12PM

There is an independent claim, Claim 1, for

which we have noninfringement arguments.  Those are set

out fully in the briefing.  I don't intend to raise

those with Your Honor unless, of course, Your Honor has

any questions.  And then there is Claim 79.  That is

04:12PM

a -- and Claim 83.  Those are depending issues.

The issue in those claims, particularly with

respect to Claim 79, is intercepting, interception.

There really seems to be very little dispute that the

API message that has to be intercepted is, in fact, not

04:13PM

intercepted in the accused products.  It gets where it's

supposed to go.

And the noninfringe -- excuse me.  The

infringement read, the position that the Plaintiff has

taken is that interception actually includes reception,

04:13PM

that interception and reception are the same;

specifically, that receiving and responding constitutes

interception.  And the sole basis for that -- there's no

argument that that's the plain and ordinary meaning.

The sole basis for that is statements that Defendants in

04:13PM

the IPR took that position and that an expert -- AT&T's

expert, not T-Mobile, not Verizon -- AT&T's expert took

that position and so, therefore Your Honor should adopt

that position.  And it seemed worth just addressing that

briefly.

04:14PM  Even if the Defendants had taken that position,

it obviously would not amount to judicial estoppel.  We

lost the IPR.  But more importantly, Your Honor, and

this is really the point I wanted to rise and make

clear:  Nothing that the Plaintiffs say happened at the

04:14PM  IPR actually happened, meaning the experts in the IPR

never took the position that reception is the same as

interception, or interception can be satisfied when

something actually arrives where it was intended to go.

That's why there are statements in the briefing

04:14PM  over and over again in the text from the Plaintiffs that

say Defendants took this position that interception can

include receiving and responding.  And then they will

quote from the IPRs.

But what Your Honor will notice when looking at

04:15PM  the IPRs is that those statements don't say that.  At no

time in the IPR did Defendants ever take the position

that interception means anything other than what we all

know it means, which is to not get to the intended

recipient.

04:15PM  THE COURT:  Is the argument against that that

interception can include something that does end up

being received if it is also obtained by an unintended

third party on the way?

MR. KREVITT:  No, Your Honor.  That isn't --

there is some ambiguity in the briefing as to whether it

has to ultimately get where it's intended.  That's not

actually the issue.  The issue is whether the message

gets intercepted first, even if it ultimately winds up

where it was ultimately intended to go.  I hope that

answers Your Honor's question.

There's two ways to think about interception.

One is it never gets where it was supposed to go, and

another is that it gets stopped, there's -- it

intervened with before it arrives at the recipient that

it was originally intended.

Our view, we're not looking for a narrow

definition of interception at all.  The Plaintiffs, at

Page 10 of their brief, set out two definitions of

interception.  The first is based on this supposed

statements in the IPR that did not happen.  That is

receiving and responding to an API request constitutes

interception.  This is at Page 10 of -- and maybe,

Mr. Sim, if we could pull up just that page.  And you

will see that there are two definitions given.  That's

the first.

1          You see here, Your Honor, number 1.  This is

2     from the Plaintiff's opposition brief, and they say the

3     Court should confirm that "intercepting" an API request

4     or application message includes the full scope of the

04:17PM  5     term, including, one, receiving and responding to an API

6     request consistent with Defendants' own admitted

7     understanding of the term and supported by the testimony

8     of numerous POSITAs, including Defendants' experts; and,

9     two, receiving or observing a message intended for

04:17PM 10     another as confirmed by general purpose dictionaries.

11          The first, this notion of receiving and

12     responding, which is, I think it is fair to say,

13     literally the opposite of interception.  The only basis

14     they have in their briefing is supposed statements by

04:17PM 15     Defendants in the IPR and AT&T's expert.

16          I should note with respect to AT&T's expert, he

17     explici- -- of course, it shouldn't count against us in

18     this case and it's not sufficient to change the plain

19     and ordinary meaning of the term, but I should note that

04:18PM 20     he explicitly said in his report that he understands

21     this is how the Plaintiff is interpreting the term.  And

22     applying that definition, he then applied that

23     definition to certain prior art.

24          Nobody on the Defendants' side, any defendant

04:18PM 25     side, has ever taken the position that "interception"

1    means anything than what we all know "interception"

2    means.

3              The reference that was being discussed in the

4    IPR, the Rao reference, was -- used "interception"

04:18PM  5    exactly the way "interception" is used everywhere else.

6              So the reason I wanted to stand, Your Honor, is

7    two things.  One, once "interception" gets its plain and

8    ordinary meaning, there is no infringement of Claims 79

9    and 83 and that's why they have come up with a

04:19PM  10   definition where reception equals interception.

11             And two, because they repeated it again in the

12   sur-reply, I wanted to make clear to the Court, and I'm

13   happy to walk through every single one of the statements

14   from the IPR.  Not one of them actually says that

04:19PM  15   "interception" means anything other than not being

16   received by the intended recipient.  Every single one of

17   the statements is consistent that -- sorry.  I'm just

18   reading a note while trying to talk to you.  Every

19   single one of those statements is consistent with the

04:19PM  20   plain and ordinary meaning of "interception."

21             I also would note, Your Honor, that when

22   Dr. Raleigh was deposed, he said that the word

23   "interception" in the patent should have its plain and

24   ordinary meaning.  So that's why, Your Honor, we thought

04:19PM  25   it might be helpful to address this briefly because the

only basis that is articulated in the briefs is what

Defendants supposedly said, and they said no such thing;

and at a minimum, it's not sufficient for disavowal.

It's not a lexicographer; it's not judicial estoppel.

04:20PM    It can't change the plain and ordinary meaning of the

term.

          The only other thing to which they point is

that their expert now says it and, of course, that's not

sufficient to change the meaning of a term, an expert

04:20PM    just saying it.  You need either intrinsic evidence, of

which there is none, or extrinsic evidence.  Some

dictionary, some technical paper, some anything that has

ever used the word "interception" in the way they are

using it now.  There is nothing.  The sole basis is

04:20PM    these alleged statements by Defendants which don't say

it and would be insufficient in any event.

          THE COURT:  All right.

          MR. KREVITT:  Thank you, Your Honor.

          THE COURT:  Thank you, Mr. Krevitt.

04:21PM    MS. FAIR:  Good afternoon, Your Honor.

          THE COURT:  Good afternoon.

          MS. FAIR:  I am not about to argue about

noninfringement, as the Court can probably guess.  We

had asked them for an identification in terms of what

04:21PM    they wanted to address in terms of substantive motions

1    before the last pretrial conference and this was not on

2    that list, so we don't have the right person here to

3    address that.

4          My request would be if, within two days of

04:21PM    5    getting the transcript of what Mr. Krevitt just argued,

6    if we could have leave, if we think there's something

7    more that needs to be addressed for a two-page response

8    to the argument we just heard.  I'm just concerned

9    because we --

04:21PM    10         THE COURT:  I think that all of this is in the

11   briefs.  I really do.

12         MS. FAIR:  Okay.

13         THE COURT:  I guarantee you I will request a

14   supplement if I determine it's not.

04:21PM    15         MS. FAIR:  Thank you, Your Honor.  We're not

16   interested in writing any more than we need to.  I just

17   felt --

18         THE COURT:  Okay.

19         MS. FAIR:  -- like we needed to make sure we

04:21PM    20   could be heard on what Mr. Krevitt just said if it

21   wasn't already addressed.

22         THE COURT:  All right.  Certainly.

23         Let me ask both sides.  Is either side aware of

24   something that is in the Headwater/T-Mobile pretrial

04:22PM    25   order that we didn't address initially?  In other words,

1    something to do with the protocol or the issues that are

2    laid out that we need to address?  Otherwise, I can move

3    on to, I know there's some slight differences in the

4    MILs, and maybe we can take those up.  Is there anything

04:22PM   5    in the pretrial order that we need to address?

6              MR. VINCENT:  I believe from Defendants'

7    perspective, we don't believe there's anything unique to

8    T-Mobile in the pretrial order that wasn't resolved, or

9    similar issues in the Verizon pretrial order.  I don't

04:23PM   10   know if Plaintiffs have a different view.

11             MR. DAVIS:  Same view for Plaintiff, Your

12   Honor.

13             THE COURT:  All right.  Well, then let me turn

14   to the MILs and ask first.  I can't recall.  I know I

04:23PM   15   looked and there wasn't much difference in the

16   Plaintiff's MILs regarding the two cases, but there may

17   be.

18             MR. HOFFMAN:  Your Honor, the only difference

19   is that in regard to Headwater's MIL 4, that was

04:23PM   20   resolved by agreement between Verizon and Headwater.

21             And then we had hoped to continue to talk and

22   reach some agreement as to T-Mobile.  We have not and so

23   Headwater's MIL 4 in the T-Mobile case is still at

24   issue, Your Honor.

04:23PM   25             THE COURT:  All right.  And is the difference

that T-Mobile did not make any investments as Verizon

may have?

      MR. VINCENT:  I'll speak to that.

      So I think T-Mobile did not make investments in

Headwater.  T-Mobile paid ItsOn for different ItsOn

products, software.  And so we have it on MIL 4 that is

on that issue particularly for similar reasons.

      And also the Verizon investments because

Headwater has said that they intend to introduce the

Verizon investments in the T-Mobile case; and from our

perspective, again, that's doubly prejudicial.  If they

are not coming in in Verizon, for the reasons we've

said, they are not tied to patents, they are not tied to

the asserted patents.  They began before the asserted

patents were even filed.  They are certainly not -- they

are certainly prejudicial for T-Mobile such that if they

come in in T-Mobile, all of the things that Verizon said

would have to happen.

      In other words, we would have to call -- have a

mini trial calling Verizon witnesses explaining that

these invest- -- Verizon investments are irrelevant to

the asserted patents, and we just don't think that's

necessary in the T-Mobile trial, just as it was not

necessary in the Verizon trial.

      THE COURT:  I guess the Plaintiff's MIL 4 is

1    not really about that.  That just ended up being part of

2    the compromise?

3            MR. HOFFMAN:  Yes, Your Honor.

4            MR. VINCENT:  I'm sorry.  That goes to

04:25PM  5    T-Mobile's MIL 4, yes.

6            THE COURT:  Okay.  I guess at this point, if

7    there's an -- if Plaintiff's MIL 4 in the T-Mobile case

8    has not been resolved, then let's resolve it.

9            MR. HOFFMAN:  Your Honor, I have a couple of

04:26PM  10   slides, if you wouldn't -- if I could approach.

11           THE COURT:  All right.

12           MR. HOFFMAN:  Your Honor, this is a pretty

13   straightforward issue.  You've already ruled three times

14   at least that in particular, the 2018 Series B offer to

04:26PM  15   Verizon is not relevant, that it's not evidence that --

16   it's not evidence of the value of the company, and even

17   if it was, the value of the company is not relevant to

18   the determination of damages.

19           However, both -- however, T-Mobile in DX127

04:27PM  20   seeks to enter into evidence that 2018 offer.  Its

21   expert, Ms. Stamm, relies on that 2018 offer in exactly

22   the way Your Honor found was inappropriate.  She uses it

23   to opine on the value of the company and to say that

24   that is essentially a cap on damages.

04:27PM  25           In their briefing, Defendants claim that

1    Mrs. Stamm does not actually rely on it, in sort of a

2    strange way.  She's relying on InterDigital.  And they

3    say, well, she's relying on InterDigital, which is in

4    2020; but because this offer was made in 2018 and we can

04:27PM   5    make up a valuation from that offer, we get to push the

6    InterDigital number back two years, from 2020 to 2018.

7    They say, therefore, she's not relying on it.

8          I don't really understand that.  She is relying

9    on it, and if it's not relevant -- if the determination

04:28PM  10    of -- if the valuation is not relevant, then it's not

11    relevant.  And merely saying that it's sort of a backup

12    to InterDigital doesn't change the fact about that.

13          Your Honor, there's nothing inconsistent

14    with -- the other point they raised in their opposition

04:28PM  15    is that they say it's inconsistent that we want to

16    introduce the fact of the investment without talking

17    about or offering as an investment without talking about

18    the particular numbers and, Your Honor, we don't see

19    that it's inconsistent.

04:28PM  20          Dr. de la Iglesia, our validity expert,

21    addresses some of the investment information, some of

22    the investment evidence.  He addresses it as evidence of

23    industry praise and commercial success.  He doesn't --

24    for that, he doesn't rely on the numbers.  And, Your

04:29PM  25    Honor, it's not really any different than, for example,

1    Your Honor's ruling about the Qualcomm and Fortress

2    offers where Your Honor in previous cases has allowed

3    the Defendants to introduce those as to the fact of the

4    offer but has ordered that the amount be redacted

04:29PM    5    because it, just as an offer, is not in itself evidence

6    of a reasonable royalty and would be prejudicial.

7                So that's -- all we ask is that essentially the

8    Court make the same order here as the 2018 offer as it

9    has in prior cases.

04:29PM   10                If I could have the ELMO for a second.

11                Your Honor, there's two other documents in this

12    category.  One is DX126.  This is a 2009 investment

13    discussion.  It's a very similar issue.  Again, it's

14    talking about a potential investment and the particular

04:30PM   15    valuation related to that investment.  Again, under Your

16    Honor's prior rulings, that's just not relevant and it's

17    clearly prejudicial.

18                And finally, as the DX128 from 2016, again it's

19    kind of the same thing.  Here again, there's discussion

04:30PM   20    of investment and of a valuation attached to that

21    investment.  We would argue that all three of these

22    exhibits fall under the same category and all three

23    should be excluded.

24                THE COURT:  All right.

04:31PM   25                MS. DOMINGUEZ:  Hello again, Judge Payne.  So a

1    couple of things here.  I think this MIL, as Mr. Hoffman

2    just showed, is broader than just the 2018 Series B, so

3    I want to talk more broadly about what the MIL is

4    requesting.

04:31PM  5         What the MIL is really requesting is that

6    Plaintiff have it both ways.  They get to talk about the

7    investments to bolster the patents.  So they get to

8    introduce facts about Verizon investing to bolster in

9    terms of, he mentioned Mr. de la Iglesia on

04:31PM  10   nonobviousness to bolster on damages.  That's in their

11   damages expert report.  But they don't want Defendants

12   to be able to introduce context.

13        Now, as Mr. Robb will discuss with respect to

14   T-Mobile's MILs, we don't think anything about Verizon's

04:32PM  15   investments should be coming into the T-Mobile case at

16   all.  So that's our position, and you'll hear from

17   Mr. Robb on that.  But to the extent that anything about

18   Verizon's investments comes in, then we should certainly

19   be able to put those in context.

04:32PM  20        So, for example, Mr. Sim, if you could please

21   pull up T-Mobile's DTX128, please.

22        So if Your Honor can read that other, or we

23   could zoom in a little bit.  But what Defendant's

24   Exhibit 128 shows is how Verizon viewed the reasons for

04:32PM  25   investing.  And, for instance, it says -- and this is

1    not a *post hoc* justification by Verizon now as to what

2    the investment was about.  This is in June of 2016, at

3    the time it was making its largest investment, what did

4    it view the technology -- what did it view as the

5    technology it was investing in.

6           Well, it says directly that it's for a pricing

7    and billing technology platform.  That's all.  It may be

8    we'll hear Plaintiff say that they had other

9    technologies and try to say that some of the

10   technologies they were offering were relevant to these

11   patents.  But from Verizon's perspective, Verizon had no

12   knowledge of those technologies, no thought that they

13   were investing in anything related to what's now accused

14   and asserted in this case from Verizon's perspective.

15   It was an investment in billing and pricing technology.

16          And so, again, T-Mobile's position is none of

17   this should be coming into the T-Mobile case.  The

18   Verizon investments are not relevant and are highly

19   prejudicial in the T-Mobile case.  They create a

20   sideshow about what Verizon's investments were about.

21   But if anything is to be said about them, they should be

22   put in context, and the jury should be allowed to know

23   that Verizon certainly did not think it was investing in

24   anything about blocking background data or anything to

25   do with any aspect of the two patents that are now

1    asserted in this case.  Verizon --

2         THE COURT:  How would the offers by Headwater

3    or equity shares provide context for the investment?

4         MS. DOMINGUEZ:  Sure.  So I think Your Honor's

04:34PM  5    asking about the 2018 Series B letter.

6         So, Mr. Sim, if we could pull up T-Mobile

7    DTX127, please.  Okay.  And if we could scroll down to

8    the pre-money valuation.  There we go.

9         Okay.  So what this provides context for is

04:35PM  10   when Headwater was seeking investments, how was it

11   positioning its own company.  I know Your Honor has seen

12   this document and so I don't want to say more than is

13   necessary if Your Honor's already well familiar.

14        But what happened here is that a group of

04:35PM  15   investors including Dr. Raleigh, his cofounder, and

16   Sippl Investments made an offer in suggested terms for a

17   Series B round to the other investors.  And what they

18   said at that time as they were positioning this outreach

19   to other investors and trying to get other investors to

04:35PM  20   sign onto a Series B, they said:  We, the cofounders and

21   Sippl, are viewing the company at a pre-money valuation

22   as being ▮▮▮▮▮▮▮, and based on that, here's what we

23   are proposing as the terms of this investment.

24        Now, that puts in context how the cofounders

04:36PM  25   and major investor were viewing the company at that

1  point in time and what that outreach, how they were

2  framing those offers to other investors.

3          Ms. Stamm -- and this is all addressed in the

4  Daubert briefing on the Stamm Daubert.  Ms. Stamm also

04:36PM  5  uses it in a way that is fully consistent with Your

6  Honor's prior rulings.  She does not use it to say

7  ██████████████ is the valuation of the patent.  She does

8  not use it to establish a royalty in this case.

9          What she uses it for, and she explained this in

04:36PM  10  her deposition -- and that's Exhibit G to T-Mobile's

11  opposition to this MIL -- at Page 74, Lines 8 through

12  19, Ms. Stamm explained she is properly, and as the

13  Court has already allowed, using a different set of

14  information related to InterDigital to help support her

04:37PM  15  damages opinion.

16          But it is pertinent as a check to know --

17  because that transaction that Your Honor has already

18  allowed in was in 2020.  It is pertinent to know that

19  two years earlier, so closer in time to the hypothetical

04:37PM  20  negotiation, the cofounders and major investor in

21  Headwater were not viewing the value of the company as

22  higher, right?

23          So she uses it as a check that her number,

24  which she gets from other sources, is accurate and that

04:37PM  25  the number wouldn't have been higher at an earlier point

1    in time.  So I think it's relevant both just to

2    contextualize -- and, again, we don't think Verizon's

3    investment should be coming into the T-Mobile case at

4    all.  But if anything is said about them, it does

04:38PM    5    contextualize how the cofounders and the major investor

6    in Headwater were viewing the company, how Headwater was

7    framing its investment outreach to other investors.  And

8    then Ms. Stamm also uses it in the appropriate way that

9    she explained at her deposition.

04:38PM    10            THE COURT:  And show me one more time the slide

11    you started with about the Verizon investment?

12            MS. DOMINGUEZ:  Oh, sure.  And that was -- I

13    didn't have slides, but I do have the exhibit itself.

14    So that's one example.  There's an -- there's the

04:38PM    15    example I showed is T-Mobile's DTX128.  That was -- and

16    we can -- Mr. Sim is pulling that up if you'll just give

17    us just a minute.

18            So this is a letter, internal in Verizon dated

19    June 23rd, 2016, and it is signed -- if you could scroll

04:39PM    20    down just a little bit further, Mr. Sim -- by

21    individuals who were at Verizon Ventures who were

22    analyzing this investment, and it's their view on what

23    the investment was for.  So they say, the "Re" line is

24    Verizon Venture Investment, ItsOn.  And they say:  We

04:39PM    25    have reviewed Verizon Venture's proposal to make an

1    investment in ItsOn.  And they say that ItsOn is a

2    company that has developed a pricing and billing

3    technology platform for emerging wireless technologies

4    such as 5G, and then it goes on.  So it's saying exactly

04:39PM   5    what Verizon thought it was investing in.

6              So to the extent that the Plaintiff is going to

7    try and use Verizon's investments to bolster the patents

8    in this case, this letter shows, as far as Verizon was

9    concerned, its investment had nothing to do with the

04:39PM  10    patents in this case, with any of the technologies that

11    are accused in this case, with anything to do with

12    background data or blocking data at all.  They viewed it

13    as a investment into a pricing and billing technology

14    platform.

04:40PM  15              And there's one more exhibit, if Your Honor

16    would like to see it, that similarly puts in context the

17    2009 investment if Your Honor has questions about that.

18    But these documents would be to contextualize the

19    Verizon investments if those investments were to come

04:40PM  20    into the T-Mobile case at all.

21              THE COURT:  All right.  Thank you,

22    Ms. Dominguez.

23              MR. HOFFMAN:  Your Honor, very quickly.

24              In terms of the argument about context, counsel

04:40PM  25    showed very clearly that there's no need to present to

the jury the valuation terms in these documents in order

to make the point.  We do not seek to exclude all

evidence of the investments.  We seek only to exclude

the, in particular, the valuations that have been, and

04:41PM  most importantly the 2018 one, being used for an

improper purpose, but the valuations in the earlier ones

as well.

We just looked at a document where counsel

pointed out that there was context for that, for at

04:41PM  least the context they want to focus on for those

investments.  The document can be redacted to remove the

financial terms and still provide all of that context.

In fact, none of the documents you showed were

the financial terms really relevant to any of the

04:41PM  context.  The only reason to present the financial terms

is to misuse the valuations therein.

In terms of whether it's relevant that Verizon

made an investment in ItsOn and Headwater, there aren't

that many carriers.  Verizon is a major competitor of

04:42PM  T-Mobile.  It's a major force in the industry.  It's

hard to think of a better example of industry

recognition than an investment by one of T-Mobile's

competitors.

THE COURT:  What do you have that indicates

04:42PM  that the investment was in any way based on the asserted

1    patents and their technology?

2    MR. HOFFMAN:  What we have, Your Honor, is --

3    this is only one of the documents that were exchanged.

4    There is a series of communications and presentations

04:42PM    5    provided to Verizon.  In those presentations and

6    information provided to Verizon, there is information

7    about the patents or both the -- before they were issued

8    in terms of the technology that was covered by the

9    patents and after they were issued.

04:42PM    10    So these are only some of the documents of that

11    ongoing conversation between Verizon and T-Mobile.  But

12    the -- in terms of the -- the valuation terms are not

13    necessary to that argument between experts or even

14    between the parties about the relevance of these

04:43PM    15    documents.  The jury can make that determination without

16    being exposed to these numbers.

17    And finally, Your Honor, calling something a

18    check is not a "get out of jail free" card.  Clearly

19    it's being used, the valuation of 2018 is being used as

04:43PM    20    evidence of the value of the patent and supporting

21    reasonable royalty.  And so it's not -- calling it a

22    check is just admitting that in fact it is being used

23    for an improper purpose, and it's not a check because

24    it's not just being used to say, well, this is a similar

04:43PM    25    number.  It's actually literally being used to pull the

2020 number from the 2018, pull it back two years

earlier to say that same valuation, the same improper

valu- -- the use of the valuation that applied in 2018

actually applies in -- sorry, in 2020, actually applies

04:44PM 5 in 2018 as well.

THE COURT:  All right.  Mr. Hoffman, are there

other differences between the Plaintiff's MILs in

Verizon and in T-Mobile other than this MIL 4?

MR. HOFFMAN:  There are, Your Honor.  Those are

04:44PM 10 Defendants' MILs.

THE COURT:  Right.  But as far as the

Plaintiff's MILs go?

MR. HOFFMAN:  No other differences as

Plaintiff's MILs.

04:44PM 15 THE COURT:  All right.  Thank you.  I will look

further at the difference and get out an order on

Plaintiff's MIL 4 in the T-Mobile case.

MS. DOMINGUEZ:  Your Honor, if I could just

very briefly respond to two of the items that came up in

04:44PM 20 your discussion with Mr. Hoffman just now.

THE COURT:  All right.

MS. DOMINGUEZ:  Okay.  So the actual investment

amounts, the amounts that Verizon actually did invest,

we agree those can and should be redacted.  Again, we

04:45PM 25 think none of this should come in at all, but those

1    numbers can and should be redacted.

2         As to the ███████████ number that's in the

3    Series B, the 2018, that number can't be redacted

4    because Ms. Stamm actually uses that as a check in her

04:45PM   5    analysis.  Again, it's not the basis of any number she

6    derives.  She doesn't use it to determine damages.  But

7    what she uses it as is the cofounders and major investor

8    saying we did this work.  We valued the company and our

9    pre-money valuation is ███████████.

04:45PM  10         Just briefly, Your Honor correctly noted that

11    for industry recognition, there must be nexus to the

12    patents, and here there is nothing, zero, tying any of

13    these investments to the asserted patents.

14         THE COURT:  All right.

04:45PM  15         MS. DOMINGUEZ:  Thank you.

16         THE COURT:  Thank you.

17         Which of the Defendants' MILs in T-Mobile is

18    different than in Verizon?

19         MR. VINCENT:  Let me focus on T-Mobile's MILs

04:46PM  20    Number 3 and 4.

21         THE COURT:  All right.

22         MR. VINCENT:  Thank Your Honor.

23         So T-Mobile MIL 3 is focused on Samsung's

24    roaming reduction, which we've heard some about, and we

04:46PM  25    have several of their motions on this issue.  We have

04:46PM

04:47PM

1  noninfringement.  We have -- sorry -- a motion to strike

2  Dr. Wesel's opinions on Samsung's roaming reduction as

3  not timely disclosed as an accused product.  We have

4  summary judgment motions on copying.  And some of the

5  issues that are intertwined with these motions, just to

6  repeat the point that Ms. Dominguez just made and that

7  I've made earlier today and you heard last week is the

8  point about nexus.  And I'll just repeat this point

9  briefly before getting into the specific T-Mobile,

10  really the aspects of Samsung's roaming reduction.

11  We all agree, everyone agrees that there must

12  be, for secondary considerations, copying, all of this

13  must be a nexus to the asserted claims.  And when the

14  dispute crystalized last week is that Headwater's

15  counsel got up and said there doesn't have to be an

16  element-by-element analysis that these ItsOn products

17  practice the claims, all right?  We have not said that

18  there needs to be a claim chart.

19  And I believe Headwater's counsel got up and

20  cited a case that they had not cited in their briefing,

21  and that case is *WBIP versus Kohler*.  That's 829 F.3d --

22  I'm sorry; I think that's 1317.  If that's not right,

23  I'll correct that.

24  But Headwater's counsel cited that case with a

25  proposition that you don't have to cite -- you don't

1    have to tie a nexus to all the elements; you just have

2    to tie in one element, and that's flatly wrong.  That's

3    not the law.  The law is, in fact, the opposite.

4            The WPI -- sorry, WBIP case, in that case there

04:48PM  5    was a presumption of nexus because the Plaintiff did

6    tie -- did have evidence explaining that a product

7    embodied the patent and that necessarily required an

8    expert analysis proving that a product embodied the

9    patent.  And in that case, then the evidence of

04:48PM 10    secondary considerations was allowed to be admitted.

11            There is no such presumption here because

12    Headwater has not had -- doesn't have any evidence

13    whatsoever that any of the ItsOn products practice the

14    asserted claims.

04:49PM 15            What the Federal Circuit has said in the

16    absence of that presumption is this, and this is *In Re:*

17    *Kao*, and it says 639 F.3d 1057, Federal Circuit.  Where

18    the offered secondary consideration actually results

19    from something other than what is both claimed and novel

04:49PM 20    in the claim, there is no nexus to the merits of the

21    claimed invention, meaning that there must be a nexus to

22    some aspect of the claim not already in the prior art.

23    And that case cites other cases for this same

24    proposition.

04:49PM 25            The point, what is the point?  The point is

1    this, the point that I made earlier:  Is that for there

2    to be a nexus, there has to be something, some evidence

3    tying this evidence of secondary considerations to what

4    is novel about the patent, novel about the claims.  Not

04:50PM  5    any element.  That's what Headwater's counsel said.  Any

6    element, background, for example.  No.

7          Background is in Claim 1 of the '541, which was

8    disclaimed.  To the extent there can be any novelty, it

9    has to be tied to the asserted claims that are not

04:50PM  10   disclaimed, which involve intercepting an API message.

11   And you will not see a single mention of that claim

12   element in any of the evidence that Headwater's expert

13   uses to establish nexus.  Now, that's the overlapping, I

14   guess, legal principle.  There is no nexus.

04:50PM  15         Even if the Court were to deny all of our

16   motions, okay, Dr. Wesel's -- our motion to strike

17   Dr. Wesel's infringement analysis on roaming reduction

18   and our motion, for summary judgment motion on copying,

19   even if the Court were to deny those motions, Headwater

04:51PM  20   should still not be allowed to discuss roaming reduction

21   in this case and that's because of the nature and timing

22   of the evidence that it uses to rely, to bolster, to

23   support this claim.

24         What's Headwater's story?  Headwater's story

04:51PM  25   that it wants to tell is this.  It wants to say that

ItsOn was so great, it gave -- it made this product for

Sprint called roaming reduction.  No problems.  Any bugs

were just minor.  But Sprint and Samsung colluded to

terminate the Sprint contract and have Samsung copy

04:51PM    ItsOn's product.  That's the story they want to tell,

right?

The evidence on which they rely to do that is

not only prejudicial, was never timely identified in any

disclosure in this case.  Let me talk to the first point

04:51PM    about the termination of the Sprint/ItsOn agreement.

Can I have the ELMO, please?

This is the master services agreement on which

Sprint terminated the ItsOn contract, and you see that

it's got two termination provisions:  A termination for

04:52PM    convenience and a termination for cause.  And Sprint,

when terminating the agreement, invoked the termination

for convenience clause.

What Headwater wants to do -- and we know this

because they tried to do it; they tried to do it in the

04:52PM    Samsung case -- is to have their witnesses testify that

because Sprint terminated the agreement under the

termination for convenience clause, that means, as a

legal matter, that there was no problems with the ItsOn

software.  That if there were problems with the ItsOn

04:52PM    software, then they would have terminated for cause.

1          Again, no witness in this case is qualified to

2    make opinions about the legal import of the termination

3    provision, the legal clause under which Sprint

4    terminated the contract.  So no witness, lay or expert,

04:53PM  5    should be making -- should be invoking the particular

6    clause of the contract by which Sprint terminated the

7    agreement in order to make insinuations about the

8    reasons for which Sprint terminated.

9          There's simply no basis for that.  There's no

04:53PM  10   expertise.  There's no evidence to support that, but we

11   know that's what they will try to do is invoke this

12   clause and make a legal argument without qualifications.

13   That's the Sprint side of it.

14         Next they want to turn to the ███████████████

04:53PM  15   ████████████████████████████████████████████████████

16   ███████████████████████████████.  And I want to

17   point out, again, whether or not we should-- we believe

18   that should not be in the case at all.

19         But what is uniquely problematic here is that

04:54PM  20   Headwater and the evidence on which it relies was never

21   once identified in any disclosure in this case.  So take

22   Dr. Wesel's infringement analysis.  There are

23   infringement contentions.  We have interrogatories that

24   go to infringement.  We have interrogatories that go to

04:54PM  25   copying.

1          Asking Headwater to identify the bases for its

2     contentions, identify the evidence on which it relies,

3     and this point -- I can't underscore it-- is undisputed.

4     They did not cite a single one of these documents or a

04:54PM  5     single one of the witnesses on which they rely.

6          They rely on depositions of Samsung employees

7     taken in the Samsung case for the patent at issue in

8     that Samsung case.  We were not involved in that case.

9     We had no notice of those depositions.  We did not have

04:55PM 10     a chance to participate in those depositions.

11          Dr. Wesel, for example, cites Mr. Dan Durig,

12     again, a Samsung employee deposed in the Samsung case.

13     He cites the deposition of Mr. Kim.  He cites that

14     deposition 119 times in his analysis of roaming

04:55PM 15     reduction, to explain how roaming reduction worked.

16          Headwater never identified Mr. Durig, never

17     identified Mr. Kim in any of their Rule 26 disclosures,

18     in any interrogatory response, never identified this

19     evidence as relevant to any issue in this case.  You

04:55PM 20     won't find it.  It won't be disclosed.  You can look,

21     and it'll -- the evidence will not be identified in any

22     disclosure, interrogatory response, et cetera.

23          And I want to point Your Honor's attention

24     to -- that's Dr. Wesel.  I want to show Your Honor

04:56PM 25     Dr. -- or, sorry, Mr. de la Iglesia's report.

1          THE COURT:  Mr. Vincent, how is this a motion

2     in limine?

3          MR. VINCENT:  Because the evidence -- and among

4     the evidence is hearsay.  Because it was evidence taken

04:56PM   5     by a nonbias -- by a third party, which we did not

6     participate in, had no ability to ask these witnesses

7     questions and, given the timing of the disclosure, have

8     no -- now no remedy.

9          We have no ability to go ask Samsung these

04:56PM  10     questions about how this product supposedly worked.  We

11     have no ability to ask Samsung's engineers questions

12     about whether or not it meets the limitations of the

13     claims in this case versus the claims at issue in the

14     Samsung case.  The first time they ever mentioned

04:56PM  15     Mr. Durig's name or ever mentioned Mr. Kim's name or

16     ever identified these documents as relevant to any issue

17     is in their expert reports.

18          Mr. de la Iglesia, the entire basis, the entire

19     basis of Mr. de la Iglesia's argument about Samsung,

04:57PM  20     about the copying is based on an email that was not

21     produced to Defendants until after the expert reports

22     were served and deposition testimony by Mr. Durig that

23     Headwater did -- sorry, that Headwater took in the

24     Samsung case that Defendants did not have a chance to

04:57PM  25     participate in or respond to.

 1          I can show Your Honor, if I could have the

 2     ELMO.

 3          And this is just a portion of Mr. de la

 4     Iglesia's report.  This is about secondary

 5     considerations.  I believe this is about specifically

 6     copying, but he cites similar testimony for most of

 7     these secondary considerations.  And what does he cite?

 8     You see he cites to the Samsung third-party 36477.  That

 9     was not given to us until Headwater served its opening

10     reports.  And then he cites the testimony of Mr. Durig.

11     And again, this is why it's a MIL issue, Your Honor,

12     because of the nature of the allegations.

13          What does Mr. de la Iglesia say here?  What

14     does he -- what is his opinion?  His opinion is that

15     ███████████████████████████    ████████████████

16     ████████████████████████████████████████████

17     ████████████████████████████████████████

18     ██████████████████████████████████.

19          And again, the only evidence he cites is an

20     email that was not produced in this case until after

21     Plaintiffs served their opening reports, at least by

22     according to the Bates number, and deposition testimony.

23     Again, they never cited any of that testimony, any of

24     those documents.

25          We have an interrogatory asking them for their

basis for secondary considerations.  You will not find

this in the -- identified in that.  And the prejudice to

us is that -- the 403 basis of the MIL is that how are

we supposed to defend ourselves against this, this

04:59PM  testimony, and it was not even given in this case.

If they -- this is the backwards approach that

Headwater has taken in their MIL briefing.  They said if

we wanted -- if we wanted this evidence, we could have

gotten it.  Well, if they had ever disclosed this as

04:59PM  relevant, that would be a different question, but they

never did.

THE COURT:  I will try to give this matter full

consideration on your briefing.  I've got to tell you

it's hard for me to follow the issue now, and I don't

04:59PM  know if it's because we're seven hours into this hearing

or because of the nature of it, but it's not going to be

a successful MIL if I can't understand the point of it.

So I'm going to try and give it a fair reading tomorrow

and --

05:00PM  MR. VINCENT:  Your Honor, appreciate that, and

I -- probably in the presentation had something to do

with it and so I apologize for that.  Hopefully we can

remedy that at a different time, but I appreciate Your

Honor's consideration.

05:00PM  THE COURT:  All right.  So where we stand now,

1  I think that with respect to Verizon, other than the

2  motions that are briefed and pending -- and those, we'll

3  try and get rulings out promptly -- I think it's

4  otherwise ready to go.  All it requires is for one case

05:00PM   5  to settle, which is a distinct possibility.

6          Is there something else that -- you know, we'll

7  gather back on that Wednesday before trial.  If there

8  are issues that -- regarding the exhibits that have not

9  been taken care of and, for that matter, any other

05:01PM  10  issues that we've left open, I'll probably get an email

11  sent out asking you to file a joint notice to identify

12  what issues there are, that we need to take up at that

13  time.

14          Mr. Davis, is there anything else that you want

05:01PM  15  on the record for the Plaintiff?

16          MR. DAVIS:  No, Your Honor.  I think that makes

17  perfect sense.  That, you know, a lot has transpired at

18  these two PTCs and that it would be helpful for the

19  parties to confer about, you know, what issues remain

05:01PM  20  and make sure we're all clear on that for the PTC.

21          THE COURT:  And obviously we're going to need

22  more time for the T-Mobile case, and that time will be

23  provided before trial.  And we'll also have a trial date

24  provided.

05:01PM  25          MR. DAVIS:  Oh, can I ask one question, Your

1    Honor?

2              Is it the case that we'll return to T-Mobile

3    MILs, the remaining T-Mobile issues on the 18th if

4    there's time, or do we want to make that just dedicated

05:02PM    5    to Verizon and we'll take up T-Mobile issues at another

6    time?

7              THE COURT:  I'm open to suggestion.  Frankly, I

8    think that we could do that.  We also have the

9    Headwater/Samsung 641 case set on that day, so we don't

05:02PM    10    have a full day to do it.  But I don't know.

11              Does counsel for T-Mobile have an opinion on

12    that?

13              MR. VINCENT:  Your Honor, I think we should, I

14    guess, finalize Verizon, as Your Honor said.  And if we

05:02PM    15    can start the T-Mobile MILs before 4:15, probably can do

16    that.  If it gets to be a point we're not going to be

17    able to give those arguments the attention they deserve,

18    we can potentially reserve another day.

19              But hopefully we can get all that done in one

05:03PM    20    day.  That's aspirational, but it just depends on -- I

21    think it partly depends on how much the parties can

22    resolve between now and that date.

23              THE COURT:  Well, there's currently a hearing

24    set in the Headwater/Samsung matter for that day, and am

05:03PM    25    I remembering right?  Was that a hearing that related to

the spoliation issue?

MR. DAVIS:  It does, Your Honor, and we -- I
don't know the current state, but I think we intend to
talk with Samsung about, you know, the ruling on the
05:03PM    sort of similar motion that was issued in the Verizon
case and the impact of that on the spoliation.

THE COURT:  I understand that Samsung was not
heard in connection with the recent ruling and may have
a belief that they can point out things that would alter
05:04PM    it.  But in any event, all that is by way of saying,
Mr. Vincent, I don't know how much time we do have.  But
anyway, between now and then, we'll straighten out
whether we're going to address other issues in T-Mobile
as well.

05:04PM    MR. VINCENT:  I think that we'll be prepared to
do so, to the extent time allows, but we'll need to make
sure we finalize the Verizon issues first.  Those will
take precedent.

THE COURT:  All right.  Anything else that
05:04PM    counsel for either Verizon or T-Mobile wants to put on
the record?

MR. KREVITT:  No, Your Honor.  We thank you
very much for your time and consideration on all these
issues.

05:04PM    THE COURT:  All right.  Well, I appreciate the

1    arguments.  They've been helpful.  Thank you.

2            MR. DAVIS:  Thank Your Honor.

3            (Proceedings adjourned at 5:04 p.m.)

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3            I, Dana Hayden, Deputy Official Realtime Court

 4    Reporter, in and for the United States District Court

 5    for the Eastern District of Texas, do hereby certify

 6    that pursuant to Section 753, Title 28, United States

 7    Code that the foregoing is a true and correct transcript

 8    of the stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page

10    format is in conformance with the regulations of the

11    Judicial Conference of the United States.

12            Dated this 7th of June, 2025.

13

14

15    _____

16         Dana Hayden, CCR, RMR, CRR, CRC
          Dana@ArkansasRealtimeReporting.com
17

18

19

20

21

22

23

24

25
```