# Exhibit A

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF TEXAS

3                        MARSHALL DIVISION

4    HEADWATER RESEARCH LLC,        )
                                    )
5                   Plaintiff,      )        Civil Action
                                    )        No. 2:23-cv-00379-JRG-RSP
6         VS.                       )
                                    )
7    T-MOBILE US, INC., ET AL,      )
                                    )
8                   Defendants.     )
     _____)

9

10

         OFFICIAL TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
11                BEFORE THE HONORABLE ROY S. PAYNE
                  UNITED STATES DISTRICT JUDGE
12                 OCTOBER 15, 2025; 3:00 P.M.
                       MARSHALL, TEXAS
13

14

15

16

17

18

19

20
         Proceedings reported with realtime stenography; transcript
21            produced with computer-aided transcription.

22          KAREN TYLER, CCR(LA), CSR(TX), TCRR, CRR, CRC
                  REGISTERED DIPLOMATE REPORTER
23                    3050 THORNHILL AVENUE
                  SHREVEPORT, LOUISIANA  71104
24                       318.424.1707

25

2

```
 1    APPEARANCES:

 2          COUNSEL FOR PLAINTIFF:

 3        MILLER FAIR HENRY PLLC
          BY:      ANDREA L. FAIR, ESQUIRE
 4                 andrea@millerfairhenry.com
          1507 Bill Owens Parkway
 5        Longview, Texas  75604
          903.757.6400
 6
          RUSS, AUGUST & KABAT
 7        BY:      JASON WIETHOLTER, ESQUIRE
                   jwietholder@raklaw.com
 8                 KRISTOPHER R. DAVIS, ESQUIRE
                   kdavis@raklaw.com
 9        12424 Wilshire Boulevard, 12th Floor
          Los Angeles, California  90025
10        310.826.7474
          310.826.6991 - Facsimile
11
           COUNSEL FOR DEFENDANTS:
12
          GILLAM & SMITH LLP
13        BY:      ANDREW T. "TOM" GORHAM, ESQUIRE
                   tom@gillamsmithlaw.com
14        303 South Washington Avenue
          Marshall, Texas  75670
15        903.934.8450
          903.934.9257 - Facsimile
16

17        GIBSON DUNN & CRUTCHER, LLP
          BY:      BRIAN A. ROSENTHAL, ESQUIRE
18                 brosenthal@gibsondunn.com
                   CHARLES M. SIM, ESQUIRE
19                 csim@gibsondunn.com
                   KATHERINE DOMINGUEZ, ESQUIRE
20                 kdominguez@gibsondunn.com
          200 Park Avenue, 48th Floor
21        New York, New York  10166
          212.351.2339
22        212.817.9539 - Facsimile

23

24

25
```

3

1    GIBSON, DUNN & CRUTCHER LLP
     BY:      ROBERT VINCENT, ESQUIRE
2             rvincent@gibsondunn.com
     2001 Ross Avenue, Suite 2100
3    Dallas, Texas  75201
     214.698.3281
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          OCTOBER 15, 2025

2                          AFTERNOON SESSION

3    WHEREUPON. . .

4              the following proceedings were had:

5              THE COURT:  We are here for what may be the final

6    pretrial conference in Headwater Research versus T-Mobile,

7    which is our Case Number 2:23-379.

8          Would counsel state their appearances for the record.

9              MS. FAIR:  Good afternoon, Your Honor.  Andrea Fair

10   on behalf of Headwater.  I'm joined today by Mr. Kristopher

11   Davis and Mr. Jason Wietholter, and we're ready to proceed.

12             THE COURT:  All right.

13             MR. GORHAM:  Good afternoon, Your Honor.  Tom Gorham

14   on behalf of the defendants.  I'm Joined today by Mr. Brian

15   Rosenthal.

16             MR. ROSENTHAL:  Good afternoon.

17             MR. GORHAM:  Ms. Kate Dominguez.

18             MS. DOMINGUEZ:  Good afternoon.

19             MR. GORHAM:  Mr. Charlie Sim.

20             MR. SIM:  Good afternoon.

21             MR. GORHAM:  Mr. Rob Vincent.

22             MR. VINCENT:  Good afternoon.

23             MR. GORHAM:  And Defendants are ready, Your Honor.

24             THE COURT:  All right.  Thank you, Mr. Gorham.

25         As I understand it, this case is currently on the

5

1  October 27 trial docket.  It is -- also on that docket is the

2  Headwater/AT&T case, I think the 397.

3        Is it the understanding of counsel that there is an

4  agreement among the parties that the 379 is behind the 397 or

5  vice versa or has that just been a matter of how the order

6  comes out?

7            MR. ROSENTHAL:  Your Honor, I'll speak for the

8  defendants.  There has not been any agreement among the

9  parties.  I think it's just shaken out that way.  I think at

10  various times the T-Mobile case has been ahead.  In the last

11  few settings, the AT&T case has been ahead.

12        So, at present, our understanding is that the AT&T case

13  is ahead, but we haven't discussed that with Headwater.

14            THE COURT:  Is that something that is agreeable to --

15  and I'll just, Mr. Rosenthal, ask you -- to the defendants?  Do

16  you know?

17            MR. ROSENTHAL:  I know it is agreeable to T-Mobile.

18  I don't know what AT&T's position is on that.  We don't

19  represent them.

20            THE COURT:  Okay.

21            MR. ROSENTHAL:  But certainly it is for T-Mobile.

22            THE COURT:  I didn't know if there had been

23  discussions.

24            MR. ROSENTHAL:  There have been discussions but not

25  in the nature of -- we've always sort of taken the view that

6

1  whatever happens happens and we'll deal with it.  But, no.  I
2  don't know whether AT&T has a view.
3      I know that T-Mobile has sort of settled into the role of
4  being behind AT&T over the last few settings, and we don't have
5  an objection to continuing that.
6              THE COURT:  All right.
7              MR. ROSENTHAL:  But AT&T may have a different view.
8  I just don't know.
9              THE COURT:  All right.  Thank you, Mr. Rosenthal.
10       What about for Headwater?
11             MS. FAIR:  We also have kind of settled into that
12  being the view and have prepped accordingly:  that the AT&T
13  case could go first.  But like Mr. Rosenthal said, there hadn't
14  been any formal discussions between the parties.  That's just
15  been kind of how we've been operating based on information that
16  we've gotten from the Court, and we're happy for that to
17  continue.
18             THE COURT:  I just wanted to see if there was some
19  sense of it from the parties, I would try and see if the
20  schedule agreed with that.  But what I'm hearing is that nobody
21  is objecting to the idea of the AT&T case being ahead of this
22  one, and so I'll pass that along.
23             MS. FAIR:  Thank you, Your Honor.
24             MS. TRUELOVE:  And, Judge, Jennifer Truelove here.
25             THE COURT:  Yes, ma'am.  Ms. Truelove.

7

1        MS. TRUELOVE:  Jennifer Truelove on behalf of AT&T.

2   I just thought I would pop over and listen in, and I'll just

3   say, we're not opposed to the T-Mobile case going ahead of us.

4   We -- but I'll concur with everything that you've heard.

5   There's not been any communications between the parties

6   regarding which case goes before another and we've just been

7   relying on the communications that we get from Judge Gilstrap's

8   clerks as far as how he would like to T the cases up.

9        THE COURT:  All right.  Well, I think that you will

10  be hearing relatively shortly about progress on the docket in

11  terms of the order of trials.  I do think that everybody knows

12  about the number one case on that.

13        MS. TRUELOVE:  I'm familiar with that one as well.

14        THE COURT:  I have gotten no indication that that

15  case is nearing resolution, short of trial.

16        MS. TRUELOVE:  I can confirm that that's correct, at

17  least as I stand here today.

18        THE COURT:  All right.  Well, I can say that one of

19  the greatest disappointments in my life was when I heard that

20  this settlement was not complete; but --

21        MS. TRUELOVE:  I think a lot of people felt that way,

22  Your Honor.

23        THE COURT:  I am recovering though, I want you to

24  know.  Thank you, Ms. Truelove.

25        MS. TRUELOVE:  Thank you.

8

1      THE COURT:  I have the joint status report that
2  counsel filed earlier this week, and I am assuming that we're
3  going to proceed in the order that is set out there with taking
4  up the remaining issues on the defendants' MILs 3 and 4 and
5  then the exhibits that are identified and then see what other
6  exhibit issues there are.  And then, finally, if we have time
7  remaining, we'll turn to the two motions that the parties
8  identified in their report; so they are -- as I understand it,
9  we'll just start with the defendants' MILs 3 and 4.
10      Does anyone think that there is a different agenda that
11  we need to hear about?
12      MR. ROSENTHAL:  Your Honor, Brian Rosenthal.  No, but
13  I'm pleased to report that the parties have made yet further
14  progress on some of the exhibit buckets.
15      THE COURT:  All right.  All right.
16      MR. ROSENTHAL:  And I think maybe the best way to do
17  that is as it comes, rather than me laying it out now.  But as
18  we go through those items, I think you'll be pleased to hear
19  that at least on two or three of those buckets we've reached
20  agreement.
21      THE COURT:  Great.  Then let's go ahead and turn to
22  what's left of your motions in limine.
23      MR. VINCENT:  Good afternoon, Your Honor.  Robert
24  Vincent for Defendants.  I have a few slides that if I could
25  have Mr. Sim hand up to the Court.

9

1          THE COURT:  All right.

2          MR. VINCENT:  For Counsel as well.

3          As Mr. Sim is pulling up those slides, I can

4    appreciate Your Honor's feelings about this case not completely

5    going away, but as reflected in our joint status update to the

6    Court on Monday, the case has substantially narrowed, and some

7    of those narrowings have a direct effect on T-Mobile's MIL

8    Number 3 specifically.

9          T-Mobile's MIL Number 3 is directed to ███████████

10   ████████   product and specifically Headwater's intention to

11   allege at trial that Samsung copied ItsOn -- the Headwater

12   licensee with whom Sprint had dealings -- copied ItsOn in

13   producing that product.  And there have been -- set out in our

14   briefing, there's reasons why that should be excluded, but

15   three -- at least three developments since we last spoke, since

16   the briefing, render that even more irrelevant and prejudicial.

17         Number one, we're limited to Apple products.  The Apple

18   products are the accused products in the case.  The Samsung

19   product was an Android product.  Samsung products are no longer

20   accused.

21         Number two is, T-Mobile has elected for the next trial

22   setting not to pursue invalidity.  If there's no validity,

23   there's no secondary considerations of non-obviousness.

24         And, number three, there's no willfulness.  Headwater has

25   dropped its willfulness claim.

10

1      Those developments have further rendered irrelevant

2      ████████████████████████ and evidence regarding that should

3  not come into the trial because it's not relevant to any issue

4  and would be prejudicial to have T-Mobile have to respond to

5  that.

6      Specifically about number one, the copy not being

7  relevant.  Your Honor, we had a summary judgment motion on this

8  issue about no copying, and this is an excerpt from

9  Your Honor's order denying that part of our motion and saying,

10 well, Headwater cannot present evidence that T-Mobile or Sprint

11 copied.  Samsung's alleged copying was relevant to secondary

12 consideration of non-obviousness.  And for similar reasons,

13 Your Honor, we had arguments regarding MIL 2.  And for similar

14 reasons, Your Honor denied MIL 2, and that they could --

15 Headwater would could present evidence of Samsung's alleged

16 copying because it was relevant to secondary considerations of

17 non-obviousness.

18     That is no longer a part of the upcoming trial.  T-Mobile

19 has elected to not pursue invalidity at the upcoming trial

20 setting and, therefore, ██████████████████████ has lost

21 its -- lost its relevance.

22     The only other possible ground of relevance, willfulness,

23 has also been withdrawn by Headwater.  They've amended their

24 complaint to remove willfulness.

25     And so now we're in a situation where it's not relevant

PRETRIAL CONFERENCE                                    10/15/2025

11

1   to invalidity, it's not relevant to willfulness, and we're in a

2   situation where we are in the default world of this Court's

3   standing MILs.

4        This Court's standing MIL number 9 specifically talks

5   about precluding evidence, testimony, argument, that

6   characterizes any persons, actions, as stealing, as copying, as

7   misappropriating, or similar terms.  We are now in that world.

8        Because allowing Headwater to allege copying, allege that

9   Samsung, a third party, engaged in this illicit behavior, A, is

10  not relevant to any issue of the case.  It would be prejudicial

11  for T-Mobile to have to somehow defend that conduct.

12       So, again, how did this evidence come in at this point in

13  the trial -- at this point in the proceedings.

14  Mr. de la Iglesia is Headwater's validity expert.  Again,

15  secondary considerations are irrelevant.

16       Dr. Wesel is Headwater's infringement expert.  He didn't

17  provide any copying opinions.  There's no willful infringement

18  in the case -- Dr. Wesel couldn't opine as to that -- but

19  there's no willful infringement claim to be made and,

20  Your Honor, I believe, struck the portions of Dr. Wesel's

21  report that went to T-Mobile's or Sprint's state of mind and,

22  again, the only remaining accused products in this case are

23  Apple products.

24       So there's no relevant testimony for Mr. de la Iglesia to

25  give; there's no relevant testimony for Mr. Wesel to give.  The

12

1    only person left -- the only with Headwater witness left that

2    could possibly talk about this, is my understanding, is

3    Dr. Raleigh.

4         Dr. Raleigh certainly can't talk about ███████████

5    ████████ copying.  He's not competent to do so, but he never

6    did make a comparison between █████████████████████ and

7    the ItsOn product.  He's got no competent testimony to provide.

8         This is his testimony that he gave in his deposition in

9    this case, and you can see what he's talking about, when he

10   says copying, he says, well, Sprint had requirements that it

11   gave out to the world, to all its third-party vendors, and

12   ItsOn fulfilled those requirements and Samsung also fulfilled

13   those requirements and, because they both fulfilled those

14   requirements, that's copying.

15        Well, that's not copying.  That's not copying as it's

16   relevant to patent law.  And so Dr. Raleigh is not competent to

17   make those allegations that Samsung somehow copied or

18   duplicated, any of those types of pejorative terms that would

19   be covered by standing MIL 9.

20        So we're in a situation now where there is no additional

21   relevance to the ████████████████ product.  Again,

22   it's not relevant to copying, which was the basis that

23   Your Honor ruled against our summary judgment motion, it was

24   the basis that Your Honor ruled against this portion of our

25   MIL 2.  Again, that is now -- that basis has now been removed

13

1  by T-Mobile's withdrawal of its invalidity defense in the

2  upcoming trial setting.

3      So, again, there remains to be -- there is no further

4  relevance to this ██████████████ product.  It's a

5  separate product that's not -- it operates differently than the

6  Apple accused products.  Again, I don't see, sitting at this

7  stage of the case, given the narrowing that has occurred, what

8  relevance does ██████████████ product has.

9      So, with that, I will pause.  That's -- the first part of

10 this MIL is directed to that ██████████████

11     If Your Honor has any questions, I'm happy to answer

12 those questions.

13          THE COURT:  Not at this time.  Thank you.

14          MR. VINCENT:  The second part of this MIL is fairly

15 straightforward.  Headwater wants to introduce this copying

16 story by Samsung so that it can say, you know, or imply that

17 Samsung and Sprint somehow colluded or Samsung induced Sprint

18 to terminate its agreement with ItsOn.

19     This is the master services agreement between Sprint and

20 ItsOn and, as you can see, it has two separate termination

21 provisions:  a termination for a convenience provision and a

22 termination for cause provision.  These are terms of art in

23 contract law.

24     It's been a while, frankly, since I've taken contract

25 law, but these are terms of art that are -- that contract

14

1   drafters use for convenience.  Just means I can terminate for

2   any reason.  But what Headwater wants to do with this

3   document -- it's not the document itself that we object to,

4   it's -- what Dr. Raleigh wants to do with this document, this

5   is Sprint's termination letter where Sprint invokes the

6   termination-for-convenience provision.

7       Dr. Raleigh, this is Dr. Raleigh's testimony in the

8   Samsung litigation back in January, and this is what we

9   anticipate we -- Dr. Raleigh will want to testify in this case:

10  that they're cancelling for convenience means that they, "they"

11  being Sprint, don't have any problems with us, they just want

12  to get it, "it" being the product, from someone else.

13      He doesn't have any expertise to give opinions about what

14  the legal -- the legal import of those provisions mean.  So

15  those are the two portions of this MIL focused on ██████

16  █████████████, because that is the -- that is no longer

17  relevant for any issue in this case.  And also the second part

18  of this is Dr. Raleigh should not be able to testify as to the

19  meaning of these contract terms.

20      And, with that, I will, unless Your Honor has any

21  questions, I will pass to opposing counsel.

22          THE COURT:  Thank you, Mr. Vincent.

23          MR. WIETHOLTER:  Your Honor, Jason Wietholter on

24  behalf of Headwater Research.

25      Your Honor, with respect to copying, Defendants in this

15

1  case have repeatedly elected not to pursue invalidity in

2  advance of trial, but they've always reserved the right to

3  reassert invalidity.

4        This is the first time we're hearing that Defendants are

5  committing to not assert invalidity in any form or substance.

6  So if they're not going to pursue invalidity at trial, we would

7  agree that these facts aren't relevant to secondary

8  considerations because there is no need for secondary

9  considerations anymore.

10        It's also true that willfulness is not being pursued, so

11  these facts aren't relevant to willfulness.  However, all these

12  facts are relevant to rebut Defendants' assertion and planned

13  argument in this case that Headwater's '541 patent lacked value

14  because the ItsOn software had purported bugs or some security

15  concerns that Samsung and/or Defendants were worried about.

16        In the lead up to this PTC, Defendants said that the --

17  their plan for trial is to argue that because ItsOn had bugs

18  and had problems that they terminated their contract with

19  ItsOn, they plan to argue that that indicates that the '541

20  patent is worth less.  All these facts are relevant to rebut

21  you that argument.

22        For example, that Samsung replaced ItsOn's roaming

23  reduction software with its own because Sprint requested it

24  indicates that Sprint, T-Mobile, still needed and wanted the

25  same technology.  If they didn't get it from ItsOn and from

16

1    Headwater, they were going to get it from someone else.

2        They received the same benefits in terms of data savings,

3    which are core to the damages issues in this case, and all of

4    those facts about how Sprint decided to terminate the contract

5    with Headwater are also relevant to show -- sorry -- with

6    ItsOn, not Headwater, are also relevant to show the value and

7    to rebut the argument of a lack of value of Headwater's '541

8    patent, because ItsOn and T -- or T-Mobile did not terminate

9    for cause, and there's no need to interpret that contract term.

10   It's defined in the agreement, and no one's arguing over the

11   meaning of the term "for cause," and no one's also arguing over

12   the term meaning "for convenience."  It's defined within the

13   contract itself.

14       So all of those facts are relevant to rebut the argument

15   that the bugs were so bad or the security concerns were so

16   grave that they had to terminate.  If they thought that they

17   had to terminate, then they would have terminated for cause;

18   not for convenience.

19       So with respect to copying, Headwater can agree not to

20   raise copying with respect to invalidity if Defendants are not

21   going to run an invalidity theory, and we can agree not to

22   bring it up with respect to willfulness, but all of the facts

23   are relevant to rebut their allegations with respect to

24   damages.

25       And these facts are relevant to damages in terms of the

1  overall story that Dr. Raleigh will be telling at trial.  It's
2  also relevant to T-Mobile's own story about how they chose to
3  implement the technology from ItsOn and then replace it with
4  someone else's, and it's also relevant that these facts about
5  what software was replaced with what other software don't need
6  to be discussed in -- or couched in terms of copying.

7         Headwater's, you know, well aware of the Court's MIL on
8  not asserting copying absent, you know, some link to secondary
9  considerations, but Dr. Raleigh, for example, can certainly
10 testify that it was his understanding that because they,
11 Samsung, met the same requirements that ItsOn met, that they
12 fulfilled those same requirements.  I don't think that runs
13 afoul of any MIL.  He certainly doesn't say copying.  The
14 question is what elicits the word "copying."  Dr. Raleigh
15 doesn't actually say copying.  But I think he can testify as to
16 his understanding of what the events from his perspective were.

17        And then certainly Headwater should be entitled to,
18 again, rebut Defendants' planned strategy at trial by crossing
19 their witnesses on some of these documents and some of this
20 evidence.

21        So all of that is relevant to the copying issue.

22        Second, with respect to the termination issue, and I've
23 kind of touched on this already.  It doesn't require any
24 interpretation.  There's no interpretation being done here.
25 There was two options for T-Mobile:  One, terminate for cause,

18

1  which is defined in the very agreement; two is terminate for

2  convenience, which is also defined in the agreement.

3       And in this case T-Mobile decided to terminate for

4  convenience, not for cause.  And in this case Dr. Raleigh can

5  certainly testify as to his understanding of what that -- the

6  facts that led up to that termination and what he understood

7  that termination to mean.  Again, this doesn't require any

8  expertise, nothing -- nothing that Dr. Raleigh or any of us can

9  interpret in the contract.  It's there within the contract

10 itself, and it's also there within the document itself where

11 ItsOn is terminated for convenience because of Sprint's

12 decision.

13      THE COURT:  So you're distinguishing in your argument

14 between the evidence regarding the -- what went on in

15 connection with the termination of the ItsOn agreement and the

16 issue about copying.

17      MR. WIETHOLTER:  Yes, Your Honor.  I think as

18 Defendants laid out, copying is a -- it's called a discrete

19 issue that was -- specifically, that word, that phrase was

20 relevant to secondary considerations of copying.  But the facts

21 underlying that opinion or that secondary consideration of

22 copying are certainly relevant to a number of other issues in

23 this case.

24      THE COURT:  Well, are you suggesting that the

25 plaintiff should be able to inject the issue of copying by

1  Samsung in the case as it stands now without the invalidity

2  issue and the willfulness issue?

3           MR. WIETHOLTER:  Yes, Your Honor, but not as copying

4  per se.  As --

5           THE COURT:  So talk to me about that.  You're saying

6  you're going to be calling it copying but not per se?

7           MR. WIETHOLTER:  No.  Sorry, Your Honor.  We will

8  not -- Headwater will not be call it copying.  We can commit to

9  not call it copying.  Again, we're well aware of the Court's

10 MILS on not disparaging parties by saying something is copied.

11 We certainly won't be doing that.

12      But the facts and the sequence of events are still

13 relevant to describe how Sprint and T-Mobile, Sprint becoming

14 T-Mobile, needed and wanted that technology that ItsOn was

15 offering that was practiced -- that was practicing Headwater's

16 patent and that Sprint then terminated for convenience to get

17 the same technology from someone else that fulfilled the same

18 requirements that would also be practiced by the patent.

19           THE COURT:  And you're saying that evidence or

20 argument is relevant to rebut the claim that ItsOn was an

21 unsuccessful technology.

22           MR. WIETHOLTER:  It's two issues.  That's one of

23 them, Your Honor.  One of them is that it's relevant to rebut

24 that ItsOn's technology was worth less or worth something less

25 than what ItsOn believed it to be; and, secondly, it's also, as

20

1  part of that to rebut Defendants' planned allegation that ItsOn

2  and ItsOn's worthlessness is somehow indicative of the value of

3  the '541 patent at issue in this case.

4        Because the issue isn't whether or not Sprint, T-Mobile,

5  Samsung copied the ItsOn software.  The issue is whether or not

6  Sprint, T-Mobile, Samsung used and infringed Headwater's '541

7  patent.  So the evidence is relevant to rebut both of those --

8  both of those aspects of that coin -- two sides of the same

9  coin really.

10        THE COURT:  Uh-huh.  All right.  Thank you,

11  Mr. Wietholter.

12        MR. WIETHOLTER:  Thank you, Your Honor.

13        MR. VINCENT:  I'm going to respond to a couple of

14  points, Your Honor.  If I could have the slides pulled back up

15  for one moment.

16        It sounds to me that Mr. Wietholter said they will not

17  say that Samsung copied but they will do everything they can to

18  strongly imply that Samsung copied.  That is exactly why this

19  is -- why this is prejudicial.

20        MIL 9, standing MIL 9 is not limited to the word "copy."

21  It's limited to -- it's broad enough to cover all of those

22  issues.

23        THE COURT:  What part of Mr. Wietholter's

24  presentation do you think indicated that they're trying to

25  imply copying to the jury.  I will admit it's been a couple of

21

1   months since I was in the thick of this, and so I need your

2   help in understanding how what he said indicates that.

3              MR. VINCENT:  Well, because he -- several times he

4   said that Samsung was providing the same technology.  The same

5   technology.  That's simply not the case.  And, secondly, who is

6   Headwater going to put up to opine that it was the same

7   technology.

8         I heard Mr. Wietholter say that Dr. Raleigh is going to

9   testify about his knowledge of facts.  Dr. Raleigh cannot

10  testify that the ███████████████████ product, how it

11  operated at all.

12             THE COURT:  Mr. Vincent, doesn't every plaintiff

13  contend that an infringing defendant is using the same

14  technology?

15        Why does that imply copying in this case.

16             MR. VINCENT:  Because of the sequence of events, the

17  story that they want to tell.  Mr. Wietholter, several times

18  said it's part of this sequence of events.  He wants to tell

19  this story that Sprint had a relationship with Samsung.  Sprint

20  terminated the agreement with ItsOn and then got the same

21  technology from Samsung.  That -- that storytelling is designed

22  to imply to the jury that Samsung copied that -- they got that

23  technology from -- from ItsOn, from Headwater, and that's not

24  the case.

25        In fact, what we're talking about, what Dr. Raleigh was

PRETRIAL CONFERENCE                              10/15/2025

22

1    talking about here, if I could -- Dr. Raleigh was testifying

2    about meeting the same requirements.  These requirements were

3    Sprint requirements.  Sprint had a -- requirements for the

4    roaming reduction, whether it was offered by ItsOn or Samsung

5    or whomever, and there is no dispute in this case, it's

6    undisputed, that Sprint never had access to any ItsOn or

7    Headwater confidential information.  That was undisputed in the

8    MSJ briefing.

9         And so allowing Dr. Raleigh to try to connect these dots,

10   he's not -- he has no -- he has no knowledge to be able to

11   connect these dots.  He can't testify as to hearsay

12   interactions or conversations he may have had with Samsung.  He

13   didn't do any analysis of the Samsung product.  So how is

14   Dr. Raleigh going to testify that Samsung operated the same as

15   his ItsOn product.  He can't do it.

16            THE COURT:  Well, he's not going to be asked this

17   question about whether he believes that Samsung copied, and so

18   he's not going to be expressing that.

19         Why isn't the narrative that we're talking about here a

20   rebuttal to the defendants' position that the ItsOn technology

21   was inferior?

22            MR. VINCENT:  It's one thing to say that Sprint had

23   requirements that were fulfilled by different products.  It's

24   another thing completely to say in this timeline of events that

25   Headwater wants to provide at trial that Samsung duplicated or

23

1   somehow derived its product from ItsOn.  That is the reason why

2   this -- Headwater wants to tell this story.  Wants to imply

3   that to the jury:  that due to the timeline of events and

4   coupled with this termination provision, that there was some

5   type of collusion, some type of, you know, improper conduct

6   between Sprint and Samsung to cut out ItsOn from the -- you

7   know, from the contract.

8           THE COURT:  Well, that improperly or unfairly cutting

9   ItsOn out does not imply to me that Samsung copied ItsOn's

10  technology.  It implies to me that Samsung perhaps stole

11  ItsOn's customer, but how does that lead to a conclusion of

12  copying?

13          MR. VINCENT:  It very much depends on how

14  Dr. Raleigh -- and I don't -- I don't know whether Headwater

15  intends other witnesses to talk about this, but as of

16  Dr. Raleigh, again, it very much depends on how that story is

17  told.

18      But the way he has told it and every time he has told it

19  is as -- used these types of language, has led to this

20  conclusion, has inferred that there was improper conduct being

21  undertaken by Samsung and, again, we're talking about -- again,

22  we're talking about ███████████████████ product.

23      It's something that's not accused of in this case,

24  Android-based product, and we have a tenuous connection to any

25  relevance that has the potential of bringing in some highly

PRETRIAL CONFERENCE                                              10/15/2025

24

1  prejudicial testimony that, again, that is meant to imply,

2  meant to -- for the jury to infer that there was some improper

3  conduct being done here.

4            THE COURT:  I'm not hearing you say that you're not

5  going to make the argument that ItsOn's technology was

6  defective.

7        And are you going to make that argument.

8            MR. VINCENT:  We do plan to make that argument,

9  Your Honor.

10            THE COURT:  Then why isn't it rebuttal to that

11  argument to say:  Here's a counter argument about why ItsOn's

12  agreement was terminated.

13            MR. VINCENT:  Well, again, I guess what I'm

14  struggling with is how is Headwater intending to tell that

15  story at trial.  Through what witness.  Because, again,

16  Dr. Raleigh doesn't have any knowledge to make that allegation,

17  and Dr. Wesel -- I mean, Mr. de la Iglesia didn't make that

18  allegation.

19        Dr. Wesel's report, I looked at the exhibit list, the

20  revised exhibit list, that Headwater provided this week.  Its

21  revised exhibit list, and I'm thinking in preparation for this

22  hearing what is -- what evidence is still in the case that

23  Headwater intends to provide, to introduce, and it has this

24  document.  It's a spreadsheet produced by Samsung in this case,

25  not cited in any interrogatory response.  We asked

25

1  interrogatory responses on infringement, on copying, never

2  cited in this case a single time except in Dr. Wesel's report,

3  and this is the sum total of his analysis of this document.

4  He's got no analysis of this document.

5       And we can address that in exhibit objections, but my

6  question is, how or through what witness and through what

7  evidence are they going to try to tell this roaming reduction

8  story.

9       I think we're all agreed that they cannot in any way

10  imply any type of copying or illicit conduct, but how are they

11  going to tell that story at all.

12           THE COURT:  And I guess if this was a motion for

13  summary judgment, that would be the issue.

14           MR. VINCENT:  Well, the briefing on this MIL before

15  the narrowing that occurred focused on this type of issue.

16  Focused on the fact that the documents on which Dr. Wesel cites

17  in his report, these documents on which he relies, you'll see

18  also he talks -- he has these quotations from a

19  Mr. Durig (phonetic), a Samsung employee.  His entire analysis

20  relies on documents and testimony from Samsung.  Samsung

21  testimony taken in the Samsung case.

22       That was never made part of this case.  We didn't get to

23  attend that deposition.  Why should Dr. Wesel get to rely on

24  evidence that was not identified -- again, not identified in

25  any contention, not identified in any rog response.  These

26

1  witnesses he relies on were never identified in their Rule 26

2  disclosures.

3       The first time he -- the first time Headwater cited these

4  documents to support their roaming reduction story was in

5  Dr. Wesel's report.  We cannot rebut Dr. Wesel -- if they want

6  Dr. Wesel to talk about ██████████████████████  again,

7  his -- the evidence on which he relies is this type of

8  evidence.  He's got no analysis of the only exhibit on their

9  exhibit list.  He's got nothing.  That's no analysis, and he

10 certainly should not be able to testify beyond what's in his

11 report.

12      And in addition to that, what else is in his report,

13 again, was not properly disclosed during -- during fact

14 discovery.  You know, we have no ability to cross-examine

15 Mr. Durig or the other Samsung witnesses who were deposed in

16 the Samsung case.

17      So, again, I think it's agreed that the -- there will be

18 no implication of any wrongdoing as it relates to ████████

19 ███████████████.

20      My separate question is how or through what evidence and

21 through what witnesses are they able to talk ████████████████

22 ██████████  at all for any purpose.

23          THE COURT:  And why is that an issue on a motion in

24 limine?

25          MR. VINCENT:  Because it's -- it's the fairness issue

27

 1   of the evidence on which Dr. Wesel relies and the fact that

 2   Dr. Raleigh is not competent to make those -- to provide any

 3   such opinions.  Again, Dr. Raleigh's not an expert.  He did not

 4   analyze ███████████████████████████  He can't testify as to

 5   hearsay conversations he had with a third party.

 6        I don't see what admissible evidence Dr. Raleigh has to

 7   provide on this point.  And the same with Dr. Wesel.  Again,

 8   Dr. Wesel has no analysis of, again, the documents that's on

 9   their exhibit list and, again, the evidence that he does rely

10   on was, again, not disclosed.  It's a fairness issue for us not

11   being able to test this evidence.

12             THE COURT:  All right.

13             MR. VINCENT:  Just one -- sorry -- last point.

14        I will say, I think Mr. Wietholter said there was no

15   dispute on what those "for convenience" and "for cause" terms

16   mean.  There absolutely is a dispute because Dr. Raleigh

17   provided testimony in the Samsung case.  He gave a wrong

18   definition of what "for convenience" means, and we -- that's an

19   erroneous legal interpretation of that.  He's not competent to

20   do that as well.

21        So I want to make that point as well.

22             THE COURT:  All right.  Thank you, Mr. Vincent.

23             MR. WIETHOLTER:  Couple of quick points, Your Honor.

24        First of all, trying to preclude this evidence at this

25   point, as we'll in some of the other aspects of the next motion

1    in limine, T-Mobile's attempt to just tell a one-sided story
2    and not allow Headwater to rebut with additional facts and
3    evidence that actually do tell the opposite side of the story.
4            With respect to who can testify about these documents and
5    who's competent to testify about them, Dr. Raleigh can
6    certainly testify as to his own knowledge and understanding.
7    He can certainly testify as to what his -- what he understood
8    and the -- from the communications and conversations and
9    discussions and termination that he received as part of this
10   back story and relationship between T-Mobile, ItsOn, and
11   Headwater; but, similarly, Ms. Sifuentes, who is T-Mobile's
12   corporate representative, who was T-Mobile's corporate
13   representative who testified in the 422 trial against Samsung,
14   who was T-Mobile's corporate representative that was set to
15   testify in the 103 case against Samsung, who has been involved
16   in this case since the beginning of Headwater's litigations,
17   she certainly can testify and I believe did testify in one of
18   the trials about similar requirements documents, because the
19   requirements documents that Mr. Vincent was showing on screen
20   are requirements documents that T-Mobile provided to Samsung,
21   and those requirements documents are strikingly similar to the
22   requirements documents that were previously negotiated,
23   discussed, and agreed to between Sprint and ItsOn.
24           So those requirements documents are relevant and they can
25   be addressed by multiple witnesses, even if Dr. Raleigh doesn't

29

1   have personal knowledge of the requirements document in

2   particular that we were looking at with ending Bates number

3   12720.

4        Sprint's corporate representative can certainly testify

5   or be cross-examined about those, as well as any other Sprint

6   or T-Mobile witness that comes to trial that has knowledge of

7   those documents.  Additionally, Dr. Wesel, in multiple places

8   in his report reference a number of the other documents and

9   pieces of evidence that we've been talking about.

10       In particular, in paragraph 83 of his report, he says

11  between 2013 and 2016 ItsOn worked with Sprint and also Samsung

12  to implement Headwater's patented technology, including

13  millions of Samsung devices running on Sprint's network.

14       ItsOn, Sprint, and Samsung, and in some cases Apple,

15  frequently met regarding the implementation of the Headwater

16  patented technologies, but despite receiving significant

17  benefits from its deployment of ItsOn software, Sprint

18  terminated its contract with ItsOn for convenience, not cause,

19  in late October 2015, and that termination took effect in late

20  January 2016.

21       While Defendants may suggest that there were issues with

22  the ItsOn software that prompted the termination, the evidence

23  shows that the bugs with new software are extremely common, and

24  ItsOn promptly resolved issues as they arose.

25       The evidence also shows that Sprint was motivated to cut

30

1    costs by terminating ItsOn, a fee-based solution, and replacing

2    it with a native solution from Samsung provided to Sprint at no

3    cost, which Samsung then called ███████████████.  The same

4    name as the ItsOn software.

5        He says, see, e.g., and cites a number of documents,

6    including a number of the documents we discussed here.

7        Now, admittedly he doesn't cite the one document that

8    Mr. Vincent pointed to, SAM Third Party 12720, but he does cite

9    a number of other documents, including the termination notice

10   that we've been discussing here today.

11       Now, with respect to the word "copying."  I think

12   Your Honor is exactly right.  Headwater can elicit facts

13   relevant to rebut Defendants' story about some perceived or

14   purported lack of value of the ItsOn software and the '541

15   patent without running afoul of the Court's MILs, and we

16   certainly can do that without saying copying or implying

17   copying or any of the other terms that the Court has deemed

18   excluded in Court MIL 9.

19       And I don't think in any sense of the word saying

20   replaced runs afoul of that MIL, because that is exactly what

21   happened here, even if Sprint and Samsung --

22           THE COURT:  Saying replaced probably wouldn't.

23   Saying duplicated, I think would suggest copying.

24           MR. WIETHOLTER:  Understood, Your Honor.  And with

25   respect to that specific question and answer that Dr. Raleigh

PRETRIAL CONFERENCE                                    10/15/2025

31

1  gave, that specific question and answer were elicited by the

2  defendants in this case when copying was still in the case.

3  They asked whether Samsung copied, quote, unquote, and

4  Dr. Raleigh explained why he believes Samsung copied.

5        Now, if copying is out, all those facts are still

6  relevant and can be discussed in front of a jury without

7  running afoul or implying copying.

8             THE COURT:  Well, that would be the challenge.  I

9  agree.

10             MR. WIETHOLTER:  And, Your Honor, Headwater can

11  commit to not -- as I've said multiple times now, not implying,

12  arguing, or characterizing Defendants' actions as, quote,

13  stealing, copying, misappropriating, pirating, trespassing, or

14  any similar terms.  That's the Court's MIL 9.

15             THE COURT:  The one thing that would be, I guess,

16  added to that would be that we're not just talking about the

17  defendant.  It -- you would also be ordered not to imply that

18  Samsung copied, even though even though they're not the subject

19  of the Court's standing MIL.

20             MR. WIETHOLTER:  Understood, Your Honor.  And I

21  believe -- in that instance I'll just raise one point, that

22  Your Honor denied their MIL on copying for third parties,

23  specifically Samsung, when copying as a secondary consideration

24  was in the case.  Setting aside secondary considerations,

25  Headwater can certainly commit to the same with Court's MIL 9,

32

1  and instead described the stream of events, if you will,

2  ultimately ended up in replacing ItsOn's patent-practicing

3  technology with something else.

4              THE COURT:  All right.  Thank you, Mr. Wietholter.

5              MR. VINCENT:  One point, Your Honor.  Just quickly.

6         Again, what -- Mr. Wietholter got up and read a long

7  paragraph from Dr. Wesel's report.  I didn't hear any actual

8  expert opinions in that paragraph.  That was Dr. Wesel

9  recounting facts that occurred and, Your Honor, he specifically

10  said things like motivated to cut costs.  That's not an expert

11  opinion, and Your Honor granted our motion to strike

12  Dr. Wesel's discussion of ItsOn and Sprint as it goes to state

13  of mind, knowledge, willfulness, et cetera.

14         Again, this is the problem I'm having, Your Honor, is

15  that I'm hearing we're not going to argue, we're not going to

16  imply this, and then he -- Mr. Wietholter stands up and reads a

17  paragraph from Dr. Wesel that goes exactly to what Your Honor

18  struck and strongly implies that there was impropriety

19  happening.

20         And so I guess I don't think there's anything relevant

21  for Dr. Wesel to say in this case as it relates to roaming

22  reduction.  He hasn't provided an analysis based on any

23  competent testimony -- or competent evidence in this case that

24  was disclosed.

25         And Dr. Raleigh is certainly able to tell his side of the

33

1    story.  He's done it in prior trials.  He's talked about the

2    bugs are common.  Bugs -- that bugs happen.  These weren't a

3    big deal.  We worked with Sprint every step of the way.  We

4    resolved these issues.  He's provided all of that story, and

5    he's able to do that.  We're not trying to prevent him from

6    doing that.

7         What we're trying to prevent is the implication that

8    there was, again, there was bad action happening with Sprint or

9    with Samsung or both.  That's what we're trying to avoid.

10        And I will just -- one clarification for the record.  It

11   is -- we are not presenting invalidity in the next trial

12   setting.  I have not been authorized to say that we're not

13   going to do that ever, but we made that election, given

14   Your Honor's rulings on the motion in limine and the motion for

15   summary judgment.  And I think if -- it is not our intent at

16   this point in the next trial setting to put in invalidity, and

17   I think the parties are agreed.  If there's no invalidity case,

18   there's no -- secondary considerations are irrelevant and

19   copying should be out.

20           THE COURT:  All right.  Thank you, Mr. Vincent.  I'm

21   going to look further at the record and the briefing on this,

22   and I'll issue a written ruling on Motion in Limine Number 3.

23        So we can move to Number 4.

24           MR. WIETHOLTER:  Your Honor, just one point --

25   clarification, just for the Court's benefit.  I read from that

1  paragraph of Dr. Wesel report to evidence that Dr. Wesel does
2  recite those documents and that evidence but not in any way to
3  suggest that we would violate the Court's order on any motion
4  to strike.  Just to be clear.
5            THE COURT:  All right.
6            MR. WIETHOLTER:  Headwater is well aware of the
7  Court's order but does not intend to elicit evidence or
8  testimony that would violate that order.
9            THE COURT:  I'm not worried about that,
10  Mr. Wietholter.  So thank you.
11            MR. WIETHOLTER:  Thank you, Your Honor.
12            MS. DOMINGUEZ:  Good afternoon, Your Honor.  Kate
13  Dominguez for the defendants.  We have some slides, if we may
14  hand them up, please.
15            THE COURT:  Yes.
16            MS. DOMINGUEZ:  Okay, Your Honor.  So I'll be
17  addressing T-Mobile's MIL Number 4, and just to reorient
18  Your Honor, because it has been a while since the briefing was
19  done and there was some initial argument on this that I think
20  the second of the three pretrial conferences had already
21  happened, but that was a while ago.
22        So T-Mobile's MIL 4 was originally broader in scope as
23  initially drafted.  In our reply we narrowed it to focus in
24  really on two issues:  One was payments made to ItsOn or
25  Headwater.  The briefing focused in particular on payment

35

1   Sprint made to ItsOn, but we intended that to cover payments,

2   generally including investments, and I know we brought that up

3   with Your Honor several times that -- at the prior hearings,

4   and Your Honor said you would circle back to that when we

5   reached the T-Mo-specific issues.  So that's the first part of

6   what we focused in on for MIL 4.

7        And then the second part was generalized references to

8   IP, ItsOn's IP, or patents generally without specifying the

9   asserted patents in this case.

10       So those are the two issues I'm going to be addressing.

11       I will note on the issue of investments, we previously

12  had some argument about the inappropriateness of introducing

13  Verizon investments in the T-Mo case.  We've now reached an

14  agreement with Headwater, a bilateral agreement.

15       Would you like me to read that in or we can also email it

16  to Your Honor, whatever is most efficient for Your Honor.

17            THE COURT:  If it is reasonably concise, go ahead and

18  read it.

19            MS. DOMINGUEZ:  It is, and I think it's the exact

20  language that Your Honor entered in the Verizon case, but here

21  it is.

22            THE COURT:  Well, then, it's beautiful.

23            MS. DOMINGUEZ:  No party will make any reference to

24  the existence or amount of any investment in or payment to

25  Headwater or ItsOn by Verizon and no party will make any

36

1    reference to the existence or amounts of solicitations or

2    offers for Verizon to invest in Headwater or ItsOn.

3         So that's great progress, I think.  But when we asked

4    Headwater to confirm that they would make that applicable to

5    any investments, not specific to Verizon, they couldn't agree

6    to that, and so that still needs to be argued as part of this

7    MIL.  And they also could not agree as to the Sprint -- the

8    dollar amounts of the Sprint payments.  So those are the two

9    issues I'd like to address.

10        On the first one, Your Honor has made clear many times

11   that investments into the company generally, and we would

12   include payments, for instance, that Sprint made into -- you

13   know, to ItsOn generally, have no nexus to the asserted

14   patents.  The investments into Headwater, for instance, would

15   have covered at least dozens of patents, no matter when they

16   were made.  Early in the investment history, it was something

17   like 30 patents.  Later on, it was at least 80 or more.  So

18   that is -- has no nexus at all, no tie to this case and the

19   patents that are at issue in this case, and it really doesn't

20   bear on any issue.

21        Similarly, investments in or payments made to ItsOn

22   covered even more, because it was not only the technology that

23   allegedly, according to Headwater, practiced 88 of their

24   patents, but also the implementing software, the related

25   services.  So there was a lot more there, and there just isn't

37

1   a connection or an adequate nexus to any issue in this case.

2        There's no evidence at all that says the investments were

3   driven by anything to do with the technology, specifically the

4   patents, the '613 and the '541 patent, that are asserted here.

5        There is evidence pointing in the opposite direction.

6   Now, I'm not going to bring that up because the particular

7   evidence that we had talked about before was as relates to

8   Verizon and that's now been resolved by the parties' agreement,

9   so we won't be arguing that exhibit bucket, but what we know is

10  that, at a minimum, there's nothing at all that connects these

11  investments to the particular asserted patents.

12       It's also extremely unfair for Headwater to try to inject

13  third-party investments.  At trial, when we were denied

14  discovery into those very same investments, Your Honor might

15  recall that months ago we brought a motion to compel, and we

16  asked for all their corporate documents on all of their

17  investment history, and I've highlighted on the screen.  We

18  said we wanted everything, including all actual or attempted

19  funding rounds.  So investments that actually happened,

20  investments that they solicited, everything.

21       We note -- because we knew, we could tell from the record

22  that there were massive gaps.  I have that highlighted.  There

23  were massive gaps in the production.  We knew we had some

24  information about the investments, some idea about who invested

25  and when, but not the whole story.  So we asked for that to be

38

1  produced immediately.

2       Your Honor denied that motion to compel and,

3  specifically, in the order, I have it highlighted on the bottom

4  of the screen here, and that, in particular, was Docket

5  Number 154, the order on our motion to compel, that was

6  T-Mobile's motion to compel, which was Docket Number 126.

7       In denying the motion for discovery into investments, the

8  Court said it was insufficiently tied to any relevant issue in

9  the case.  So if it was not relevant enough for T-Mobile to get

10 discovery on, I don't know how it could be relevant enough to

11 be discussed at trial.

12      Headwater has itself also told the Court that investments

13 are irrelevant.  This was Headwater's MIL 4.  Now, they were

14 requesting specific relief about Verizon, and that's been

15 resolved with the parties' agreement, but the point stands.

16 They told the Court, this is their brief, Docket Number 236 at

17 pages 8 to 9, they said this Court has ruled on three separate

18 occasions that investments are irrelevant to the issues in this

19 case.

20      So for some reason they are okay agreeing to get the

21 Verizon investments out, but they want to hold open the

22 possibility of referring to other investments, and there's just

23 no basis for it.  It's not relevant, as Your Honor has ruled,

24 and it's not fair because we didn't get discovery into it when

25 we asked for it.

39

1         It's also -- this is just to kind of put a pin on the
2     unfairness of it.  As Your Honor may recall, Ms. Stamm
3     attempted to offer an opinion based on an investment document
4     that was specifically an offer, and I have that on the left
5     side of the screen here.  This was a letter from Headwater, and
6     it told the recipients of the letter that the company,
7     Headwater, had received a term sheet from an investor group
8     that included the two founders, that language is highlighted in
9     the top call out, and was attached as Exhibit A.  So the two
10    founders would include Dr. Raleigh himself and another
11    significant investor.
12         And in that Exhibit A, here's what Dr. Raleigh, along
13    with his cofounder, and Sippl Investments, they said they were
14    valuing the company at ███████████ .
15         Now, Ms. Stamm was not allowed to rely on that.
16    Your Honor granted the motion to strike that Headwater brought
17    saying Ms. Stamm could not introduce that document, could not
18    rely on it in any way.  And we respect Your Honor's ruling.  We
19    understand that.  But that was a written down, actual
20    documentation of what Dr. Raleigh actually thought the
21    valuation of Headwater was.
22         What they want to do instead -- that now has been
23    excluded.  Ms. Stamm is not allowed to talk about that.  They
24    want Dr. Raleigh to get on the stand and be able to speculate,
25    oh, the investments valued the company very highly.  He -- in

40

1  his Samsung deposition he testified that one of the investment

2  rounds, you know, would have put the valuation of ItsOn at

3  around ███████.

4       So they don't want the jury to know that he actually

5  wrote down in a paper to his fellow investors that he thought

6  Headwater and all its patents was worth ████████, but they

7  want him to get on the stand and be able to speculate about how

8  investments from others would have valued his companies at, you

9  know, astronomical numbers.  And so, bottom line, it's not fair

10 and it's not relevant.

11      Let me pause there, because I was going to move on to the

12 other issue unless Your Honor has questions on the payments and

13 investments piece of it.

14          THE COURT:  And how does your MIL relate to the

15 testimony of Dr. Raleigh that you just had up on the screen?

16          MS. DOMINGUEZ:  Sure.  So because our understanding

17 is the reason they're refusing to agree, we tried this morning

18 to see if we could agree that nobody would talk about

19 investments period, they're not going to do that.  We

20 understand that they intend -- this testimony in particular, I

21 think, was spurred by a question about Verizon, but the answer,

22 as you can see, was just about the investment round generally.

23      This is the sort of thing that Mr. Bergman refers to in

24 his expert report.  He has a sort of collection in one of his

25 schedules, I think it's Schedule 6.1, where he kind of collects

41

1  allegations about third-party investments.

2       And so the fact that they won't agree and the fact that

3  they've signaled through Mr. Bergman that they intend to inject

4  as a general matter the idea of investments, even though

5  they're now agreeing they won't talk about Verizon's

6  investments, indicates that they are trying to inject this

7  issue at trial.

8       And, again, it's not fair because we expressly moved to

9  compel discovery into all their investments and were denied,

10 and so we don't have the appropriate discovery.  We don't know

11 what they're going to come up with.  They had many different

12 investors, and we did not get discovery into the circumstances

13 and details about those investments.  So we're really at a loss

14 as to what they might say, but we know they intend to say

15 something because they've not agreed to an agreement on the MIL

16 and because there's indications in Mr. Bergman's report, for

17 example, that they intend to introduce this sort of thing.

18           THE COURT:  Your argument I follow about investments.

19 I'm trying to tie that to what I have here as your MIL 4.

20           MS. DOMINGUEZ:  So, Your Honor, in our reply, I think

21 the heading that we put on the reply was payments.  I can -- if

22 Your Honor -- if you want me to pull up our reply brief, I can

23 probably get that on the screen.

24           THE COURT:  What I'm looking at here is the briefing

25 on the MIL.  What would your reply be on?

PRETRIAL CONFERENCE                    10/15/2025

42

1          MS. DOMINGUEZ:  So our reply focused the MIL in on

2    two particular issues, and would it be helpful for me to pull

3    up the reply brief, Your Honor?

4          THE COURT:  It might be.  I'm just -- we don't have

5    replies on MILs.

6          MS. DOMINGUEZ:  In this case we did serve a reply for

7    the specific issue, among others, of narrowing down, because

8    there was some back-and-forth about the breadth of the MIL, and

9    we decided to narrow down the focus of the MIL.

10         THE COURT:  Do you happen to have the docket number?

11         MR. VINCENT:  Your Honor, Docket Number 269 is

12   T-Mobile's reply.

13         THE COURT:  All right.  Thank you.

14         MS. DOMINGUEZ:  So on page 4, we explained that we

15   were narrowing down the MIL to two issues.  The first heading

16   there is Payments and Alleged Savings.  I'll concede,

17   Your Honor, that under that heading, which is broader, the

18   discussion really focused in on the payments that Sprint in

19   particular made, but I think we were very clear, at least the

20   last two -- or day one and day two of the pretrial conference,

21   that we intended to cover investments as well.

22        And so that is the category -- the first category that we

23   narrowed to in our briefing, payments and alleged savings, and

24   those would be payments made to ItsOn or Headwater, including

25   investments, and then the dollar amounts with reference to

43

1    Sprint.  So dollar amounts that Sprint paid or dollar amounts

2    of alleged savings, all of that was tied to ItsOn generally.

3         So going back to the issue of there being no nexus to the

4    asserted patents in this case, that was into a company, that

5    was into a product, the payments, and also any investments, as

6    we've been discussing, were nothing tied to these particular

7    patents and so can't be relied on to show the value of the

8    patents that are actually in suit in this case.

9              THE COURT:  All right.

10             MS. DOMINGUEZ:  If we could just briefly, Mr. Sim, go

11   to the last slide.

12        So in that same document, Your Honor, the other heading

13   we had was evidence of Headwater or ItsOn, quote, patents, or,

14   quote, IP, and we mean that generally.  So not a reference to

15   the '613 patent or a reference to the '541 patent but

16   discussions about ItsOn's IP or Headwater's patents.

17        So I just want to preview this issue.  We did brief it in

18   the MIL, but I think it's some basic points I'd like to make,

19   but then I think it actually crystalizes best in the context of

20   particular documents where you can see this language used.

21        The MIL, of course, isn't specific to any one document

22   and would include these references.

23        But similar to what we just discussed with the payments

24   and investments, IP generally, whether ItsOn had IP, that could

25   be their source code, that could be any number of things that

44

1   are not the patents.  To the extent it includes patents or

2   references to patents generally, again, that's dozens upon

3   dozens of patents.  So there's no particular connection to this

4   case.

5        As Mr. Vincent said, willfulness is no longer at issue

6   here, so it's not probative, you know, to know that there were

7   discussions of IP generally or discussions of patents generally

8   is no longer probative of any live issue in the case because

9   willfulness is no longer at issue and secondary considerations

10  of non-obviousness are no longer at issue.

11       I'm going to pause there, because Mr. Vincent is going to

12  get into this issue in some detail in the exhibit bucket that

13  he is going to be arguing that really kind of crystalizes how

14  some of these things appear.

15       So I'm happy to answer any questions from Your Honor on

16  this part of the MIL, but it might be helpful or productive for

17  Your Honor to see how these issues actually show up in some of

18  the exhibit disputes.

19            THE COURT:  All right.  Thank you, Ms. Dominguez.

20            MS. DOMINGUEZ:  Thank you, Your Honor.

21            MR. WIETHOLTER:  Your Honor, Jason Wietholter again

22  for Headwater Research.

23       First of all, everything that Ms. Dominguez said about

24  investments is nowhere to be found in their MIL Number 4.

25       MIL Number 4 is, in their reply in Docket 269, narrowed

PRETRIAL CONFERENCE                          10/15/2025

45

1  to two issues:  payments and savings and evidence of Headwater

2  and ItsOn patents or IP.  The sentence right after payments and

3  alleged savings says, Evidence regarding payments Sprint made

4  to ItsOn or alleged savings ItsOn claimed to achieve have no

5  relevance to any issue.

6        This MIL has nothing to do with the broader scope of

7  investments generally and Headwater or ItsOn.  This MIL is

8  directed only towards the payments or alleged savings Sprint

9  made or received from ItsOn as part of the patent-practicing

10 technology in this case.  And all of that evidence is relevant,

11 again, to rebut the same arguments they're going to make to

12 make with respect MIL 3, which is that somehow ItsOn's

13 technology was bad and, therefore, Headwater's '541 patent is

14 less valuable.

15       So all this evidence -- all this discussion today about

16 investments is coming up for the first time.

17       Ms. Dominguez and T-Mobile's briefing and the reply don't

18 mention investments-related damages.  They don't mention

19 Mr. Bergman's report regarding investments.  They don't mention

20 Mr. Bergman's Schedule 6.1, which was the schedule that she was

21 referring to.

22       Even though secondary considerations is out,

23 Mr. de la Iglesia relied on investments for -- totally

24 separately from Mr. Bergman, and that's still not an issue with

25 respect to this MIL.  This MIL is only about those payments.

46

1          And one thing that I do want to note is that I believe

2    Defendants argue that the investments that are listed in

3    Schedule 6.1 should be out, but I don't believe that they have

4    agreed not to refer to the InterDigital offer to purchase.  And

5    that is one of the investments or prospective investments or

6    potential acquisitions listed on Schedule 6.1.

7          So if Defendants want to drop InterDigital and not talk

8    about any investments at all, Headwater would be willing to

9    consider the offer, but we haven't been made that offer.

10   Today's the first time we're hearing about investments being an

11   issue in this MIL.

12             THE COURT:  Mr. Wietholter, in your meet-and-confer

13   process with Defendants, was there discussion of this

14   investments issue?

15             MR. WIETHOLTER:  No, Your Honor.  We received an

16   email for the first time today from Ms. Dominguez at

17   approximately 1:05 p.m., and she says for the first time, Our

18   MIL 4 is broader, however, dot, dot, dot.  It also covers any

19   and all investments Headwater may seek to reference at trial,

20   including, for example, what is collected in Schedule 6.1 to

21   Mr. Bergman's report.

22         That's the first time we learned about this MIL

23   potentially having anything to do with investments.

24             THE COURT:  All right.  Did the plaintiff file any

25   response to the reply brief that is in the record at

PRETRIAL CONFERENCE                                          10/15/2025

47

1   Document 269?

2            MR. WIETHOLTER:  Yes, Your Honor, we did.  It's at

3   Docket 275.

4            THE COURT:  All right.

5            MR. WIETHOLTER:  And at Docket 275 we addressed the

6   two issues that they narrowed to in Docket 269, which were the

7   payments made by Sprint, the alleged savings ItsOn received,

8   and also the IP or patent issue that Ms. Dominguez referenced.

9   Those are the only two issues that we made a reply to.  And as

10  I stated before, that evidence is, again, similar to MIL 3,

11  relevant to rebut their argument that the technology was

12  somehow not valuable to T-Mobile and Sprint and, therefore, the

13  '541 patent was not valuable to T-Mobile or Sprint.

14           THE COURT:  All right.  Thank you Mr. Wietholter.

15           MR. WIETHOLTER:  Thank you, Your Honor.

16           THE COURT:  Ms. Dominguez, it took me a while to get

17  to the reply brief because we don't customarily have reply

18  briefs on MILs, but I found it now, and I don't see anything in

19  it that's even close to the discussion that you've been

20  offering about investments.

21           MS. DOMINGUEZ:  Your Honor, I think that's because

22  the original pretrial conferences were scheduled as a unit with

23  Verizon and we addressed the issues in tandem with them.  I

24  think that the briefing on the Verizon issues did call out more

25  specifically the investments, and the briefing that we did on

48

1    the T-Mobile issue did focus on the Sprint payments, but we

2    certainly intended it to be inclusive of all those sorts of

3    payments.  And we were very clear about that at the pretrial

4    conference.  I know Mr. Rosenthal spoke to it, Mr. Vincent

5    spoke to it, I spoke to it.

6          I'm looking at page 144 of Docket 281.  That was the

7    May 30th pretrial conference where we, once again, brought up

8    the inappropriateness of bringing in -- and that was about

9    Verizon investments, put the Verizon investments into the

10   T-Mobile case, and Your Honor said that you would circle back

11   to that when we took up the T-Mobile case.

12         So it may be that because we were briefing these issues

13   together with the Verizon case for a joint pretrial conference

14   that we were not a model of clarity in including that in the

15   T-Mobile-specific briefing, but we certainly have been very

16   clear since at least May when we had the first pretrial

17   conference that this was an issue that we understood that they

18   were trying to the inject third-party investments in the

19   T-Mobile case, and we brought that up a number of times.

20         So I don't think it's accurate to say that this is out of

21   the blue.  That's as to the procedural point.  As to the

22   argument that it's relevant to rebut arguments on the value of

23   the '541 patent, my question would be, well, then, why didn't

24   they give us the discovery we asked for on investments.

25         We asked for the discovery.  We were denied the

49

1    discovery.  We moved to compel the discovery into their

2    investments, and our motion was denied as having no relevance

3    to the issues in the case.

4         So it -- I just -- I don't see how at this point in time

5    they can be injecting these issues into trial.

6              THE COURT:  I understand your argument about the link

7    between discovery and the evidence, but I don't see the word

8    "investment" in this MIL, and that's what I'm struggling with.

9    But I'll look back at the transcript and Document 281 and look

10   further at the briefing on this and take up MIL 4 in that

11   connection.

12             MS. DOMINGUEZ:  Thank you, Your Honor.

13             THE COURT:  Thank you, Ms. Dominguez.

14             MR. WIETHOLTER:  Your Honor, if I may.

15             THE COURT:  Briefly.

16             MR. WIETHOLTER:  Yes, Your Honor.  Verizon's MILs 3

17   and 4 and T-Mobile's MILs 3 and 4 were separate.  That's the

18   reason we're here today on T-Mobile's MIL's 3 and 4.  They were

19   on discrete issues specific to T-Mobile and Verizon's MILs 3

20   and 4 were on discrete issues specific to Verizon.

21        And Ms. Dominguez is right, I believe, in that case.  In

22   Verizon's case, Verizon MIL 3 and 4 were relevant to Verizon's

23   investments, not investments generally, and, here, T-Mobile's

24   MIL 4 is not even discussing Verizon's investments.  That was

25   an agreement that the parties came to separately.  So I just

PRETRIAL CONFERENCE                              10/15/2025

50

1  wanted to flag that for Your Honor.

2          THE COURT:  All right.  Thank you.

3      Let's turn to the issues that the parties want to take up

4  regarding exhibits.

5          MR. WIETHOLTER:  Your Honor, I may have been

6  confused.  I heard Ms. Dominguez say that Mr. Vincent was going

7  to address the second part of T-Mobile's MIL 4.  Maybe -- I'm

8  sorry.  And I apologize.  If he isn't, I would like to address

9  the second part.  If he is, I'm happy to wait.  But I just

10  wanted to be heard on that briefly.

11          THE COURT:  All right.

12          MR. VINCENT:  Your Honor, I believe, there is a

13  document that is in Bucket 13 that will be discussed that will,

14  I guess, highlight the issues that are overlapped with MIL 4,

15  and so as Ms. Dominguez said, I could put a concrete example of

16  that, and those issues are intertwined.  So I will address that

17  document and it will address those issues as to the second part

18  of MIL 4.

19          THE COURT:  All right.  The email that I received,

20  and I will ask the clerk to attach a copy of it to the minutes

21  of this hearing, but I do have buckets or groups 8, 12, 13, 14,

22  and 15, and we can take those up starting, I guess, with 8.

23          MR. VINCENT:  So, Your Honor, good news.  I believe

24  the parties have resolved Bucket 8.  Those were dealing with

25  the Verizon investments and with the agreement that

PRETRIAL CONFERENCE                                10/15/2025

51

1   Ms. Dominguez read into the record.  I believe that resolves

2   Headwater's objections to Group 8.

3            THE COURT:  All right.  And so are those exhibits to

4   be admitted or not?

5            MR. VINCENT:  I believe they are -- the exhibits are

6   not to be admitted.  The agreement is that there will be no

7   discussion of Verizon investments by either party, and so we

8   agree that we will not include those -- not attempt to

9   introduce those exhibits.

10           THE COURT:  So those exhibits are withdrawn.

11           MR. VINCENT:  Correct, Your Honor.

12       More good news.  Bucket 12, the parties have, I believe,

13   resolved their differences on that document.  Headwater has

14   provided a redacted version of that document, that exhibit, and

15   we have no problem with the redacted version.  And so we are

16   fine with admitting at least PX83 and the redacted version that

17   Headwater provided today.

18           THE COURT:  And I guess I'll state for the record

19   that the last bucket that has been withdrawn was DTX126, 127,

20   and 128.

21           MR. VINCENT:  Correct, Your Honor.

22           THE COURT:  And now the objection to PX83 is

23   withdrawn.

24           MR. VINCENT:  Is withdrawn, given the redacted

25   version of that exhibit we received today.

52

1          THE COURT:  Based on redactions.  All right.

2          MR. VINCENT:  All right.  So now we're at Bucket 13.

3    This, again, has issues -- as a bucket that has issues that

4    overlap with both MILs 3 and 4.

5          The first representative document there in the email, I

6    just want to discuss briefly.  This is an email -- this is a

7    document that relates to roaming reduction, Sprint's roaming

8    reduction requirements.  And we had discussions about that.

9    I'm not going to revisit that.

10         But this is an email that post-dates the Sprint-ItsOn

11   relationship by several years.  That relationship ended in

12   2016.  This document has been used by Headwater to indicate

13   that Sprint, in 2020, deprecated their Android roaming

14   reduction specification requirements in favor of other native

15   Android technology that's not accused in this case.

16         So even to the extent roaming reduction is relevant, we

17   don't think it is, this document here is, again, post-dates

18   that relationship.  It's not part of that story, and it

19   references other Android functionality that's no longer accused

20   in this case.  So I don't see the relevance of this email,

21   again, that's dated years later.

22         The more important, I guess, part of this bucket is the

23   email that Ms. Dominguez referenced that relates to our MIL 4.

24   And that is PX45.  This is an email that, again, goes to --

25   it's an internal Sprint email, and it's in the context of

53

1   Sprint's terminating its contract with ItsOn and investigating
2   native Android solutions.
3        What is particularly problematic about this document is
4   that it talks about -- again, these are Sprint engineers
5   talking about the -- potentially getting advice of counsel,
6   having counsel investigate, you know, whether or not there is
7   any cause of action that ItsOn could provide for -- it's
8   talking about IP litigation by IO, or ItsOn.
9        What this document references -- there's several reasons
10  why this document is, A, irrelevant; but, more importantly,
11  highly prejudicial.
12       First of all, this document doesn't say a word about
13  Headwater.  It doesn't say a word about the -- about our
14  patents in general, let alone the asserted patents in this
15  case.  This document talks about ItsOn.  ItsOn IP.
16       Your Honor, when we moved to, you know, moved to preclude
17  Headwater from introducing evidence about the ItsOn products,
18  Your Honor denied our motion and Your Honor said that Headwater
19  Research did not have an ability to control ItsOn.  ItsOn had
20  its own intellectual property, source code.  That was the basis
21  of Your Honor's denial of our motion to preclude Headwater from
22  introducing evidence about ItsOn because ItsOn had its own IP
23  that Headwater didn't have control over.
24       This document doesn't say anything about Headwater,
25  patents, or the asserted patents.  This document talks about,

54

1    at the most, ItsOn IP.  There's no link, there's no connection

2    to, again, to Headwater at all.  I believe Mr. Sullivan who

3    drafted this email, or who was on this chain, testified he

4    didn't remember ever hearing of Headwater or any patents.  This

5    email is limited to ItsOn IP and not the asserted patents.

6    There's no link to it.

7         And, again, more concerning is this -- the attempt to

8    provide half the story here.  This email discusses, again, the

9    potential of getting an investigation by counsel, which

10   occurred.  We have produced redacted versions of other emails

11   in this chain that reflect that there was an investigation

12   done.

13        The fact of an investigation that's reflected in this

14   email is irrelevant to the case.  They've withdrawn

15   willfulness.  This -- this document has nothing to do with what

16   Mr. Wietholter said:  the value of the asserted patents.  The

17   attempts to tell half the story here, to inject in the case

18   that there was -- there was an investigation by counsel into

19   ItsOn IP can only confuse the jury, A, confuse them into

20   thinking that this had anything to do with the asserted

21   patents; and, B, provide only half the story.

22        Because if they are able to introduce this exhibit and

23   talk about this exhibit, we are in a position where we would be

24   forced potentially to waive to be able to give the complete

25   story.  And likely would have to waive to be able to explain

PRETRIAL CONFERENCE                                    10/15/2025

55

 1  what that advice of counsel was.

 2       Again, we're talking about a document that refers to

 3  advice of counsel in a case with no willfulness.  In a case --

 4  this is limited to Android-based products or Android-based

 5  products are not accused.

 6       So the document itself is irrelevant to issues in the

 7  case and any relevance is dwarfed by the prejudice that

 8  Headwater would conflict on T-Mobile by introducing it to,

 9  again, tell half the story of some investigation by legal

10  counsel that occurred.

11       And so, for those reasons, this is kind of the second

12  document we highlighted in this bucket, this document should be

13  excluded as to all discussions about ItsOn IP or Headwater IP

14  by Sprint, which have no nexus, have no connection, to the

15  asserted patents.

16            THE COURT:  Thank you, Mr. Vincent.

17            MR. WIETHOLTER:  Your Honor, first of all, this is

18  relevant to issues that are still alive in the case, including

19  T-Mobile's marking defense.  Whether or not T-Mobile knew of

20  Headwater's patents and whether or not Headwater adequately

21  marked or failed to mark or made reasonable efforts to mark or

22  put T-Mobile on notice of Headwater's patents is relevant to

23  rebut their marking defense.

24       So all these issues about IP or patents and what was

25  discussed and what was disclosed, that's relevant to rebut

56

1    those arguments.

2              THE COURT:  Tell me again how this would rebut a

3    marking claim?

4              MR. WIETHOLTER:  Certainly, Your Honor.  So in this

5    case there was a long history between these parties:  Sprint

6    and ItsOn.

7         Over the course of approximately a year, as ItsOn was

8    implementing software for Sprint, ItsOn also asked and/or

9    demanded that Sprint mark the products that implemented its own

10   software with Headwater's patents, and it did so by asking

11   Sprint to add a link to the ItsOn marking page, which included

12   a list of Headwater's patents, including one of the asserted

13   patents here, into the products that Sprint was going to sell

14   and service on its network.

15        Sprint ultimately refused to do so, but all of the

16   evidence about what patents Sprint knew about or what

17   information Sprint knew about with respect to looking at the

18   ItsOn marking page to learn about those patents is relevant and

19   goes to Headwater's reasonable efforts to attempt to get Sprint

20   to mark, and it goes to whether or not Sprint knew or should

21   have known about Headwater's patents based on Headwater

22   giving -- or ItsOn as part of -- working with Headwater giving

23   T-Mobile access to ItsOn's marking page.

24             THE COURT:  Well, so there's a marking page and

25   you're saying there's something in these documents that would

PRETRIAL CONFERENCE                                    10/15/2025

57

1    indicate that T-Mobile had access to that marking page?

2            MR. WIETHOLTER:  Yes, Your Honor.

3            THE COURT:  Show me.

4            MR. WIETHOLTER:  In PTX29.  So in PTX29, this lower

5    email here is an email between Sprint and ItsOn where Sprint is

6    responding to ItsOn and explaining that they're refusing to

7    mark Sprint's products with the patents, with ItsOn's marking

8    page that included Headwater's patents.

9        This email goes on to explain right here that if you

10   included what ItsOn was requesting there would be a link in the

11   product that took you directly to the ItsOn patent marking web

12   page.

13           THE COURT:  What does that have to do with T-Mobile?

14           MR. WIETHOLTER:  Sprint was acquired by T-Mobile.

15   Sprint is T-Mobile now.

16           THE COURT:  All right.  And is this before the

17   acquisition or after?

18           MR. WIETHOLTER:  This is before.

19           THE COURT:  Okay.  So does the later acquisition of

20   Sprint somehow constitute notice of infringement to T-Mobile?

21           MR. WIETHOLTER:  Yes, Your Honor.  Yes, Your Honor,

22   it does.  When Sprint acquired -- or, I'm sorry -- when

23   T-Mobile acquired Sprint, it also inquired all of its

24   employees, to my knowledge, and there's been no dispute about

25   that fact in this case.

PRETRIAL CONFERENCE                          10/15/2025

58

1      Also, one of the defendants in this case is Sprint

2   Corporation.  It's not just T-Mobile.  So this knowledge is

3   relevant to Sprint Corp. as well as T-Mobile.

4            THE COURT:  All right.  So what you've shown me is

5   something on PTX29.  What I was hearing about from Mr. Vincent

6   was PTX45.

7            MR. WIETHOLTER:  Yes, Your Honor.  I can move to

8   PTX42 and 45.  I just wanted to lay one piece of groundwork

9   that anything related to Headwater's patents is relevant, at

10  least to the marking issues in this case, even if willfulness

11  is not at issue.

12     So PTX45 is an email, internal email, where Mr. Sullivan,

13  who worked at Sprint at the time, is indicating that he wants

14  to do some investigation into IP owned by ItsOn.  And according

15  to his terminology he asks, have we had our IP lawyers review

16  this.  There's no indication that there was an investigation

17  going on with lawyers at that moment in time.  He's asking the

18  question.  He doesn't know apparently.

19     So whether or not this ultimately becomes a privileged

20  conversation, at this moment in time it appears that

21  Mr. Sullivan isn't communicating with lawyers and hasn't

22  communicated with lawyers about this, or at least has not

23  gotten an answer about this.

24     T-Mobile and Sprint have not made any privilege claim

25  over this document; they haven't attempted to claw it back.

59

1          This document refers to IP.  First it refers to IP

2    litigation by IO, ItsOn.  And then, up above, it says, we need

3    to make sure we're covered here and that there is no reason for

4    ItsOn to seek legal recourse for anything in the way of

5    requirements we may have provided to the OEMs to control

6    roaming data usage and behavior.

7          And, again, this goes back to the requirements that we

8    were talking about earlier that were covered by -- or that

9    practiced Headwater's patents.

10         Now, the question that Mr. Vincent offered the Court is

11   how do we know this has anything to do with Headwater's patents

12   and not something that ItsOn owns.

13         Well, we know that from another Sprint employee who met

14   with ItsOn prior to this time and testified about this exact

15   issue, and this was a Mr. Yarkosky, and he testified at

16   page 11, lines 9 through 16 of his deposition.

17         Question.  And what is the relationship between ItsOn and

18   Headwater, as far as you know.

19         Answer.  As far as I understand, ItsOn is a company

20   formed to implement technologies and solutions of which

21   Headwater owned IP, intellectual property.

22         Question.  Do you know whether ItsOn had any of its own

23   patents separate and apart from Headwater's patents?

24         Answer.  I'm not aware of that.

25         So in terms of what Sprint knew, Sprint knew Headwater

PRETRIAL CONFERENCE                          10/15/2025

60

1    had patents.  It wasn't aware of any patents owned by ItsOn.

2    And as we can see from Mr. Sullivan's email, Mr. Sullivan is

3    concerned about intellectual property litigation, IP

4    litigation, related to ItsOn, but Mr. Yarkosky confirms that

5    that must be related to patents owned by Headwater, not ItsOn.

6         And to the extent that Defendants want to argue at trial

7    that this could be referring to ItsOn patents, not Headwater

8    patents, they're free to make that argument.  They're free to

9    cross-examine witnesses and bring that evidence in, but I think

10   Headwater is also free to lay this groundwork and explain how

11   T-Mobile and Sprint were well aware of Headwater's intellectual

12   property, specifically for the marking issues in the case.

13            THE COURT:  Are you representing that ItsOn did not

14   have patents?

15            MR. WIETHOLTER:  No, Your Honor.  ItsOn did have

16   patents.  It had three.

17            THE COURT:  So why would this indicate that they're

18   talking about Headwater?

19            MR. WIETHOLTER:  Well --

20            THE COURT:  The testimony you mentioned of

21   Mr. Yarkosky.

22            MR. WIETHOLTER:  Yes, Your Honor.

23            THE COURT:  Is he the person that was asking about

24   ItsOn IP?

25            MR. WIETHOLTER:  In this email chain that's in PTX45,

61

1    I don't believe he is the one asking, but he is the one that

2    is -- that Mr. Sullivan is asking.  Or he is one of the people

3    that Mr. Sullivan is asking about ItsOn intellectual property.

4                THE COURT:  Other than the link that you're hoping to

5    make there to Headwater, what other indication is there that

6    this involves Headwater?

7                MR. WIETHOLTER:  The other indication this involves

8    Headwater is that this is talking about IP used by ItsOn that

9    covers requirements, and, as we saw previously, in PTX29,

10   Sprint is telling Headwater personnel through ItsOn

11   personnel -- or apologies -- Sprint is telling ItsOn personnel

12   that they are not going to mark Sprint products with ItsOn's

13   marking page.  And the ItsOn marking page is what has

14   Headwater's patents listed on it.

15        There are many more patents than just the three -- and,

16   frankly, I don't know if ItsOn's patents were listed on the

17   ItsOn marking page.  I don't know that answer.  But there are

18   many more than three patents on the ItsOn marking page,

19   including the '541 patent that is at issue in this case.

20                THE COURT:  What do you say to the argument that

21   introducing PX45 would put in play the investigation by

22   counsel?

23                MR. WIETHOLTER:  I would say, Your Honor, that they

24   haven't -- they haven't attempted to claw back this document or

25   make any offers or try to reach an agreement on how we can

62

1   address this issue.

2           THE COURT:  It's not a question of whether the

3   document is privileged, it's a question of whether use of the

4   document would require them to assert a privilege or waive a

5   privilege.

6           MR. WIETHOLTER:  And I don't -- Your Honor, it

7   wouldn't require them to assert or waive a privilege because

8   this is a question that's posed, apparently, by Mr. Sullivan

9   prior to or without the involvement of lawyers, and it's based

10  on his own knowledge and concerns about intellectual property.

11  Not some lawyer's concerns.

12      And he was inquiring about his team, which included

13  Mr. Yarkosky, about IP related to ItsOn, and specifically in

14  relation to the requirements regarding roaming data usage,

15  which was the roaming reduction project that was the basis of

16  all of the work between ItsOn and Sprint.

17      So this goes to Sprint's state of mind about intellectual

18  property before there was any investigation into intellectual

19  property claims, at least according to Mr. Sullivan's

20  knowledge.

21          THE COURT:  All right.

22          MR. WIETHOLTER:  If Your Honor has nothing further on

23  45, I'd like to address 42 briefly.

24          THE COURT:  All right.

25          MR. WIETHOLTER:  42 is an email chain discussing the

63

1    roaming reduction requirement and Sprint's ultimate decision to

2    deprecate or remove the roaming reduction requirement and

3    replace it with something else.

4           This, again, goes to rebut their arguments about the

5    roaming reduction functionality or functionality that supported

6    or provided roaming reduction being not valuable, because in

7    the 2014, '15, '16 timeframe, ItsOn implements a roaming

8    reduction solution for Sprint.  Then Sprint has Samsung replace

9    that roaming reduction solution, and then in 2020, the date of

10   this email, in PTX42, Sprint is removing the roaming reduction

11   requirement because something else -- actually, let me find the

12   page -- because something else still provides some other

13   functionality, still provides that benefit -- that

14   functionality, that benefit.

15          So this goes to show that this wasn't a one-off solution

16   that Sprint needed for a short period of time or that

17   benefitted Sprint for a short -- Sprint and T-Mobile for a

18   short period of time but rather continued through 2020 and

19   beyond.

20              THE COURT:  All right.

21              MR. VINCENT:  Your Honor, what I think we heard as it

22   relates specifically to PX45 is a tenuous connection of dots

23   trying to explain how PX45 is relevant.  The author of PX45,

24   the email chain, at least the author of all of the relevant

25   text, is Mr. Sullivan, not Mr. Yarkosky.  And Mr. Sullivan

64

1    testified he had never heard of Headwater, had no idea whether

2    Headwater had any patents.

3        He was -- his discussion was limited to ItsOn, which

4    everyone agrees had separate IP, source code, patents, had

5    separate IP than Headwater.  That's -- there is not a

6    connection with this email from Mr. Sullivan to the asserted

7    patents in this case.

8        Mr. Wietholter brought up marking.  There's another

9    exhibit he showed Your Honor about marking.  If he wants to

10   talk about marking, this email, PX45, is irrelevant to marking.

11   It doesn't mention the marking page.  Doesn't mention ItsOn or

12   Headwater's attempts to get Sprint to mark with a page.  This

13   email, PX45, is irrelevant to the marking issue.

14       Again, and willfulness is out of the case.  And so the

15   knowledge and investigation that Sprint did as instigated by

16   Mr. Sullivan is also not relevant.  And, again, Mr. Wietholter

17   talked about whether this document itself, whether this email

18   chain reflects opinions of counsel.

19       That's not the question.  The question is it talks about

20   the need to do so.  And that occurred and Mr. Sullivan

21   testified that it occurred.

22       The problem we have, Your Honor, is introducing this

23   exhibit necessarily requires -- will put us in the position

24   where they're able -- they introduce this document saying that

25   an investigation may be necessary and will force us, then, to

1   potentially waive privilege to explain what that -- what that

2   investigation entailed, that it took place, what the basis of

3   that investigation was and the results.  And that's the problem

4   we have with this document.

5        If it's relevant to the marking issue -- it has no

6   relevance to that.  It's got no relevance to other issues in

7   the case because, again, willful infringement is out.  That's

8   the problem with this document.  It's any connection they tried

9   to make with Mr. Yarkosky, who didn't author any of these

10  emails, with Mr. Sullivan to -- that connection is not there

11  between this document and having relevance to Headwater, to the

12  asserted patents and, more importantly, any tenuous connection

13  there would be, there's a serious 403 problem because of the

14  discussion of engaging counsel to look into these issues.

15       That's the biggest problem with this email is that there

16  is -- that there's that discussion there which would open up

17  the necessity for us to respond to that, to combat that

18  allegation, to prevent the jury from getting the impression

19  that either no investigation was done or it wasn't -- wasn't

20  proper.

21            THE COURT:  All right.

22            MR. VINCENT:  And, again, I heard Mr. Wietholter talk

23  about the issue of marking.  I heard him talk about the

24  investigation -- I don't know what other issue this could be

25  relevant to, given that willfulness is out of the case.  Again,

PRETRIAL CONFERENCE                                    10/15/2025

66

1   I think it's not relevant to any issue in the case that still

2   is live and, again, whatever -- whatever discussion they want

3   to have about ItsOn IP and knowledge that ItsOn or Headwater

4   had IP, that can be achieved other ways.  There's testimony

5   that they've designated.  They can talk to our witnesses.  That

6   can be achieved other ways, but it should not be achieved with

7   a document that talks about an engaging a counsel to

8   investigate these issues.

9           THE COURT:  All right.  Do you have further argument

10  regarding PX42?

11          MR. VINCENT:  No, Your Honor.  I think my arguments

12  are -- arguments are stated there.  Again, I think it's the

13  tenuous connection, given the time period and the unaccused

14  products that it references.

15          THE COURT:  All right.  Thank you.

16      Mr. Wietholter, I am concerned about the reference to

17  possible referral of this to counsel for investigation.

18      Why shouldn't I be worried about that?

19          MR. WIETHOLTER:  Well, Your Honor, I believe today is

20  the first time we've heard that T-Mobile had investigated this.

21  I apologize.  I was trying to do some research into their

22  privilege log to see if there are any communications, emails,

23  around the time that would reflect that.

24          THE COURT:  Do you need that part of the document?

25  If that was redacted, would that impair the relevance of the

1  document as far as you're concerned?

2          MR. WIETHOLTER:  I'm sorry, Your Honor.  Which

3  paragraph of the document?

4          THE COURT:  If the reference to whether IP counsel

5  should be contacted.

6          MR. WIETHOLTER:  Your Honor, if I may have a moment

7  to consider that with my colleagues.  There's a question I have

8  about that following sentence.

9          THE COURT:  All right.

10         MR. WIETHOLTER:  Your Honor, Headwater proposed

11  redacting in the email from January 12, 2016, at 3:51 p.m., and

12  I'll just put this on the ELMO for Your Honor's benefit,

13  redacting the phrase "have we had our IP lawyers review our

14  situation."  That would be an acceptable redaction in

15  Headwater's view.

16         THE COURT:  How is the rest of the sentence

17  understandable then?

18         MR. WIETHOLTER:  So, Your Honor, looking at that

19  again, if we also struck or redacted the word "with," I think

20  the sentence would make slightly more sense.

21      Question, looking to go native on roaming controls with

22  an OEM solution to make sure we're not providing grounds for

23  any IP litigation by ItsOn.

24      It's not perfect, admittedly, Your Honor.  It's not a

25  full sentence, but I think that's the -- that's probably the

68

1   best resolution possible, given the way this email is phrased.

2          THE COURT:  And what is the relevance of the "making

3   sure we're not providing grounds for IP litigation"?

4          MR. WIETHOLTER:  Your Honor, it ties together the

5   roaming reduction controls, and those -- and the email further

6   up in the chain, the requirements related to those roaming

7   reduction controls, and intellectual property, in particular,

8   the '541 patent that was the basis for Headwater requesting

9   that Sprint mark or at least one of the bases for requesting

10  Sprint mark its products that had the ItsOn functionality in

11  it.

12         THE COURT:  All right.

13         MR. VINCENT:  Your Honor, I will say, on the marking

14  issue, if they want to introduce an exhibit that talks about

15  marking, they're free to do so.  This is not talking about

16  marking.  I don't see how anything but a redaction of the top

17  three emails in this chain would prevent the issue that I'm

18  referencing that I'm concerned about.

19         I don't think the redacting part of -- in the

20  January 12th email at 3:51, the question is, it's a question.

21  Have our IP lawyers reviewed this so that we're not providing

22  grounds of any litigation by ItsOn.

23         The next email on the chain, not to my knowledge, and

24  then we have the final email, "and I am open to that," "that"

25  being looking -- having our IP lawyers look into it.  Why?  So

69

1   we can make sure we're covered here.

2        This entire chain is talking about investigation by IP

3   counsel, and I will say to Mr. Wietholter's question, we did

4   produce documents, redacted documents, that -- about --

5   additional documents in this chain and we had testimony that an

6   investigation occurred.  Our problem is is that we have not

7   waived privilege as to that investigation.

8        And this email sets it up to where there is an indication

9   that investigation should happen but not the second half of the

10  story, which would require us to waive privilege.

11       Again, this is not relevant to marking.  If they want to

12  discuss that we had knowledge that ItsOn had IP, they've

13  designated testimony in that regard.  They don't need this

14  document to do that.

15       The problem with this document is that it goes beyond the

16  relevance that Mr. Wietholter has identified.  It talks about

17  irrelevant and highly prejudicial content, namely achieving

18  advice of counsel, obtaining advice of counsel, on this issue.

19  Again, they have -- they have the ability -- their ability to

20  introduce evidence that Sprint was aware that Headwater or

21  ItsOn had IP is not changed.  They won't be able to do that.

22            THE COURT:  And, Mr. Vincent, you are representing

23  that this did result in an investigation by counsel into the

24  ItsOn IP issue.

25            MR. VINCENT:  Yes, Your Honor, I am.

70

1          THE COURT:  And is that somewhere reflected on your

2   privilege logs?

3          MR. VINCENT:  I believe so, Your Honor, and I have a

4   copy.  This is at least one of the documents that were

5   produced.  This is Bates number -- let me get the number

6   there -- TMO_Headwater_00646323.  This is not an exhibit

7   because we weren't anticipating -- but this is -- here we have

8   IP legal counsel, this is the same -- the same chain, it's the

9   same email chain.  It's on contract termination issues and,

10  again, we have an email -- redacted email produced.

11      So Headwater -- and also, witnesses testified that an

12  investigation occurred.  That testimony happened in this case.

13  So Headwater is aware that an investigation did occur.  Our

14  problem is that this email is prejudicial because it will force

15  us into a corner where we're forced to decide whether we have

16  to waive privilege to give the complete story, a complete story

17  that's not necessary because there's no willfulness in the

18  case.

19          THE COURT:  All right.  Does this issue affect any of

20  the other exhibits in this bucket?

21          MR. VINCENT:  I believe this is the only document

22  that affects this issue.  That's why we called it out as a

23  separate exhibit.

24          THE COURT:  All right.  Thank you.

25      As to the other issues, it's just the relevance objection

1  that we've already heard as to the other exhibits?

2            MR. VINCENT:  Yes, Your Honor.

3            THE COURT:  All right.  Well, I'm going to sustain

4  the objection to PX45 on the basis that we've been discussing,

5  but I do find that there's been a sufficient showing of

6  relevance as to the other exhibits in this bucket, which are

7  PX29, 42, 46, 92, and 362.

8        And the objections to those exhibits will be overruled.

9            MR. VINCENT:  Thank you, Your Honor.

10           THE COURT:  All right.  Which takes us to Number 14.

11           MR. SIM:  Yes.  Good afternoon, Your Honor.  With the

12  Court's permission, I'd actually like to address Buckets 14 and

13  15 collectively to expedite the process, because Defendants'

14  objection to these exhibits is the same.

15           THE COURT:  It's just two exhibits, PX389, and I'm

16  not sure what an objection to a joint exhibit means.

17           MR. SIM:  Right.  Allow me to address that, Your

18  Honor.

19           THE COURT:  All right.

20           MR. SIM:  So the reason both of these exhibits are in

21  dispute today is because they were part of a process between

22  the parties to remove some exhibits from all three lists

23  following the case narrowing, now that Android products are no

24  longer accused of infringement.

25        So exhibits have come off of all three lists, but these

PRETRIAL CONFERENCE                                  10/15/2025

72

1  are two which Defendants contend should have come off the list

2  but which Headwater disagrees.

3       And so our objection today here is that both of these

4  documents are no longer relevant, notwithstanding the fact that

5  one of the documents was initially on the joint exhibit list,

6  are no longer relevant because of the Android -- the removal of

7  the accusations against the Android products in this case.

8       So just to orient the Court, the joint exhibit, listed as

9  Battery Historian, in Bucket 15 is an image of a Google Github,

10 so a file repository website that describes and has files

11 related to an Android-oriented tool called Battery Historian.

12 And, similarly, the Plaintiff's Exhibit 389, in Bucket 14,

13 purports to be outputs from Dr. Wesel's testing of Android

14 devices in connection with his -- the inputs to the damages

15 analysis in Headwater's case.

16      So the only relevance, the only point at which these two

17 concepts, Battery Historian and Battery Stats, show up in

18 Headwater's case is with respect Dr. Wesel's Android testing.

19 He used both of these tools as part of his input into the

20 damages case.

21      Now --

22          THE COURT:  And is your objection one of relevance?

23          MR. SIM:  That's correct, Your Honor.  We are making

24 a relevance objection on the basis that the Android products

25 are no longer accused and thus these documents are not

73

1    relevant.  Additionally, we are objecting on the basis that the

2    prejudice in introducing these documents outweighs any

3    probative value they have.

4            THE COURT:  Well, then let me interrupt you and call

5    on the plaintiff to identify what they say is the relevance and

6    then I'll let you discuss whether that is outweighed by the

7    prejudice.

8            MR. SIM:  Thank you, Your Honor.

9            THE COURT:  Good evening, Mr. Davis.

10           MR. DAVIS:  Thank you, Your Honor.  Chris Davis for

11   Plaintiff, Headwater.

12       So the relevance issue, Your Honor, Dr. Wesel's opinion,

13   he gave a technical benefits opinion that then was an input to

14   the damages analysis.  What he did was quantified data savings

15   for both Android and Apple accused products, and he determined

16   that they saved approximately 32 megabytes of background data

17   per app per month.

18       More specifically, he determined that, based on Apple

19   testing, that it saved at least 31 megabytes per app per month

20   and up to 46.25 megabytes per app per month and that the

21   Android savings were 32 megabytes per app per month.

22       So for the next phase of his calculations, he used

23   32 megabytes per app per month, and he ultimately concluded

24   that there was a certain percentage of data savings of

25   3.5 percent.

PRETRIAL CONFERENCE                                    10/15/2025

74

1          Now, Android products are licensed under settlement

2     agreements, but that doesn't mean that Dr. Wesel's calculation

3     and his process of reaching his input to the damages model

4     needs to fall out.

5          T-Mobile is asserting that Dr. Wesel's calculations of

6     data savings for Apple is inflated and that it's not accurate,

7     but, actually, the Android data savings fully corroborates it.

8     And so it shows that they're consistent.

9          So they want to say, well, these Apple -- the Apple data

10    is inaccurate, but Dr. Wesel tested both Android and Apple and

11    got very, very similar results.  And so it lends credence to

12    his Apple results.

13         And so nothing in the parties' confidential settlement

14    agreement prohibits Headwater from mentioning Android at trial.

15    We're not allowed to allege infringement of Android products

16    and we aren't alleging infringement of Android products.

17              THE COURT:  You know, Mr. Davis, if -- I look at this

18    from the standpoint of if the Android products had not been

19    sued at all and your expert wanted to test Android products and

20    offer evidence about Android products because he felt it would

21    reinforce his arguments against the asserted products, I

22    probably would have said that's -- that's not relevant.  And

23    I'm -- and, frankly, it is somewhat confusing to the jury.

24         It also puts the defendant in the position of having to

25    defend products that aren't theirs and how do they

PRETRIAL CONFERENCE                              10/15/2025

75

1  cross-examine the expert on his testing of products that they

2  don't control?

3           MR. DAVIS:  Well, I think the problem, Your Honor, is

4  that because Dr. Wesel used the 32 megabytes per app per month,

5  and that was entirely reasonable to use because it was in line

6  with the Apple number.  What I don't want to happen is that at

7  trial someone says, hey, this -- this number that you're using,

8  32.4, that's not what you calculated for Apple.  We need to

9  throw all of this out.

10          And then what is Dr. Wesel to say in that situation.  He

11 has to be able to say, the 32.4 that I used is fully consistent

12 with my Apple testing.  It's just that I was testing more

13 products, and 32 was very consistent with 31.  I mean, I

14 haven't heard from the other side.  I think we would be open to

15 discussing it.

16          If they were to represent they were not going to try to

17 make that kind of an argument.  We're not going to say that

18 there's a problem with you using 32 because it's not the 31

19 that you calculated in one of your Apple examples.

20          THE COURT:  All right.  That is an issue I would like

21 to hear about from the other side.  There are various ways to

22 address that.

23          MR. DAVIS:  Thank you, Your Honor.

24          THE COURT:  Thank you, Mr. Davis.

25          MR. ROSENTHAL:  Your Honor, I'd let Mr. Sim respond

76

1  to anything that he is going to with respect to that.  Just to

2  make it very clear.  We are not going to make that argument.

3       If they rely on the testing data that they rely on to get

4  to the Apple damages number that they're going to, we're not

5  going to say, well, whoa, whoa, whoa.  That's not the numbers

6  you tested for Apple and somehow put them in a bind in that

7  respect.

8       So that concern that Mr. Davis was articulating is a

9  concern that I think I can allay right now.  We're not going to

10  do that.

11            THE COURT:  All right.  Thank you, Mr. Rosenthal.

12       Mr. Davis, why doesn't that answer the concern?

13            MR. DAVIS:  So I think that does go a long way to

14  allaying the concern, Your Honor.  You know, I think we're not

15  especially interested in spending a lot of our valuable trial

16  time on things that we don't necessarily have to cover.

17       If that's not an issue that they're going to raise, that,

18  you know, hey, these numbers don't match exactly because you're

19  using the Android testing number instead of the Apple testing

20  number, I think that -- I think that would address our concern.

21            THE COURT:  All right.  Well, then, what I'll do is

22  sustain the objections to PX389 and JX56 based on relevance and

23  just have the record note that the defendant has stipulated

24  that they're not going to raise that issue, the difference

25  between the 32 and the 31, as a defense on the -- well, what --

77

1           MR. DAVIS:  Data savings.

2           THE COURT:  The data savings.

3           MR. DAVIS:  Thank you, Your Honor.

4           THE COURT:  All right.  Thank you.

5      All right.  Much as I would love to hear the argument on

6  the two motions, it -- I mean, I can offer you five minutes

7  apiece if that does anything for you.

8           MR. ROSENTHAL:  Well, in that case Your Honor, I'm

9  not going to do the argument.

10          MS. DOMINGUEZ:  Yes, please.

11          THE COURT:  All right.

12          MS. DOMINGUEZ:  If it's okay with Your Honor, could

13  we start with the motion regarding Ms. Stamm and the Motorola

14  issue.  That was Docket Number 180.

15          THE COURT:  We can start with that and we may finish

16  with it.  Yes.

17          MS. DOMINGUEZ:  We have some slides.

18      So, Your Honor, I think this one is really pretty

19  straightforward.  Defendants don't think either party should be

20  mentioning in any way the Motorola settlement agreement or

21  saying that Motorola is licensed.

22      Just to remind Your Honor, Your Honor dealt with this in

23  Docket Number 361 when Your Honor denied Headwater's motion for

24  leave to amend its exhibit list to add the Motorola term sheet

25  and also to supplement their damages expert, Mr. Bergman's,

78

1  opinions.  And just to remind Your Honor, some of the key

2  points that were included in Your Honor's order was the fact

3  that T-Mobile has had no meaningful opportunity to conduct

4  discovery related to the settlement.  That we are complete

5  strangers to the Motorola agreement, so whereas they have a

6  witness, Dr. Raleigh, who can speak to it, we don't.  We don't

7  know anything about it.

8       And there's a fairness issue of injecting that term sheet

9  and that agreement into the case at this juncture when we're on

10 the eve of trial and have had no meaningful opportunity to

11 explore it.

12      All of those points remain true.  It would be unfairly

13 prejudicial to allow Headwater's witness to testify on a

14 subject for which T-Mobile has had no opportunity to discover

15 the facts.  Any fact testimony would necessarily be entirely

16 one-sided.  Dr. Raleigh knows things about that agreement; we

17 don't.

18      So then that takes us to Ms. Stamm.  Why did Ms. Stamm

19 put in these conditional opinions and, to be clear, she was

20 absolutely straightforward in her report that these were solely

21 conditional.  That T-Mobile's position is that neither party

22 should be discussing the Headwater/Motorola term sheet or

23 saying that Motorola was licensed.

24      But what we know is that at the Verizon trial, even

25 though Your Honor had similarly, before the trial, denied

79

1    Headwater's attempts to get the term sheet onto the exhibit

2    list and to have their witnesses talk about it, what happened

3    was, at the end of trial, on the morning Ms. Stamm was about to

4    take the stand and give her totally unrelated market analysis

5    about Apple licenses and transactions, they made the argument,

6    well, if Ms. Stamm is going to give her opinions on Apple,

7    Dr. Raleigh should be called as a rebuttal witness to tell the

8    jury that Motorola took a license.

9         That put Verizon in a terrible bind because they were

10    essentially -- there was a threat, you know, sword hanging over

11    Verizon's head of the possibility that now Dr. Raleigh would be

12    called to give this testimony that we would have no ability to

13    rebut.

14         So Verizon made the choice that Ms. Stamm actually did

15    not put in her Apple analysis.  We felt that that was not fair

16    and not right.

17         In response to our emotion, Headwater has said, well, you

18    know, we -- anyone can open the door and we can't take away

19    from Judge Gilstrap the ability to decide if someone's opened

20    the door.

21         I don't think that's fair with respect to Ms. Stamm.  She

22    served her opinions months and months ago.  So we all know what

23    her opinions are, what her market analysis is.  To say that

24    it's going to be some sort of surprise as to whether that opens

25    the door is not fair.  We know what her opinions are.  We don't

80

1  think any of them open the door to the Motorola settlement

2  coming in.

3        But if they're going to make that argument, we should --

4  we should know now.  Because if Headwater is going to be

5  permitted over T-Mobile's objection to say anything about the

6  Motorola agreement, again, we don't think that's fair because

7  of the discovery issue, but, at a minimum, then, the most we

8  could do is for Ms. Stamm to be able to, you know, give her

9  opinions that she was able to form based on the agreement and

10  her own research itself.

11        Again, we don't want any of this to come in.  We don't

12  want Ms. Stamm to have to give these opinions, but she served

13  the report conditionally only because of what transpired in the

14  Verizon case with respect to Motorola.

15          THE COURT:  So are you asking for relief here?

16          MS. DOMINGUEZ:  We are.  In our paper, we asked for

17  a -- I'm sorry -- we asked for a ruling that neither side

18  should mention in any way the Motorola settlement.  I think

19  that was -- you know, Your Honor went almost all the way there

20  in the order regarding amending the exhibit list and

21  supplementing Mr. Bergman's opinions, but I guess what we're

22  asking for is actually a MIL that neither side shall mention

23  the Motorola license.

24        Now, I understand the nature of a MIL is it's possible

25  that someone can open the door and there can be an argument

                                                              81

1  about whether a party has opened the door on a MIL.  But the

2  other part of what we said in our paper is that's not fair as

3  to Ms. Stamm's opinions.  That's not some sort of surprise or

4  something that somebody couldn't have known and resolved before

5  trial.  They have known since she served her report, I believe

6  in March, it was many months ago, what her opinions are.  And

7  so if there's going to be an argument that they want to put

8  forward about opening the door, that shouldn't be something

9  that got sprung on us at trial.  That's something we should

10  know in advance and resolve in advance.

11          THE COURT:  Okay.  And you said that the prior ruling

12  on the Motorola agreement went almost all the way?  What did it

13  not do?

14          MS. DOMINGUEZ:  So I guess -- we had read your order,

15  honestly, as resolving the issue.  In the Verizon trial, we

16  didn't think Motorola was coming in.  We thought it was pretty

17  clear.  It's not on the exhibit list, Mr. Bergman can't talk

18  about it, it's not coming in.

19      But then we got surprised, as I said, on the morning of

20  Ms. Stamm -- the morning she was going to take the stand, they

21  said, oh, well, if she gives her Apple opinions then we get to

22  bring up Motorola.  That was surprising to us, but it happened.

23  And so we're just trying to guard against a similar situation

24  happening here.

25          THE COURT:  It sounds like it would be creating a

82

1  similar situation.  I ruled that the Motorola license was not

2  admissible and Judge Gilstrap agreed with that.  Then the

3  plaintiff apparently indicated that it wanted to seek

4  reconsideration of that.

5      How will that be any different with this.  I am not going

6  to enjoin them from asking for some relief from Judge Gilstrap.

7      MS. DOMINGUEZ:  Understood, Your Honor.  And I don't

8  think it was in the nature of a reconsideration.  I think they

9  were drawing in a fine line that we hadn't anticipated between

10  the exhibit actually being an exhibit and being on the exhibit

11  list and Mr. Bergman offering opinions, which were the two

12  things that they had asked for and that Your Honor had

13  expressly ruled on and denied.

14      They, I guess, came up with a third category that wasn't

15  within the scope as they understood it of Your Honor's ruling:

16  that a fact witness could talk about it, could say Motorola

17  took a license, and not be in violation of Your Honor's order,

18  because the exhibit wouldn't come in, it wouldn't be on the

19  exhibit list, and Mr. Bergman, the expert, wouldn't talk about

20  it.

21      So I don't think it was a reconsideration.  I think they

22  found a third space that wasn't covered by the order, and the

23  problem with that is it's the worst of all possible worlds.  If

24  they get a fact witness, we don't have any fact witness who can

25  talk about it.

83

1          THE COURT:  Why in the world would you think

2   Judge Gilstrap would do that:  Allow a fact witness to talk

3   about something that the experts were not permitted to talk

4   about.

5          MS. DOMINGUEZ:  So, because it came up at the last

6   minute, I think it was sprung on Judge Gilstrap equally as it

7   was sprung on us, and he said it was something he would

8   consider.  We don't know what he would have done with that,

9   but, as litigants, we couldn't take the risk.  We had to put

10  our damages expert on the stand and couldn't, then, wait to

11  find out afterwards -- I think the -- part of the problem is

12  the people in this room all know what Ms. Stamm's opinions are,

13  and so we should know in advance, either it opens the door or

14  it doesn't.

15      It was an issue that was raised with the Court the first

16  time on the morning of her testimony, and so I think

17  Judge Gilstrap was put in a position where he would have to

18  hear the testimony to know whether it would open the door.

19      We all know what her report says and can close that loop

20  now.  We don't need to wait until the morning of her testimony

21  or even getting close to trial to be able to resolve this.  So

22  at bottom, what we really want to do is close the loophole they

23  identified at the Verizon trial and just have a clear ruling

24  that there shall be no testimony about the Motorola license.

25          THE COURT:  All right.  Thank you, Ms. Dominguez.

PRETRIAL CONFERENCE                                    10/15/2025

84

1           MS. DOMINGUEZ:  Thank you.

2           MR. DAVIS:  Just to clarify off the bat, Your Honor,

3    we offered Dr. Raleigh for deposition on the Motorola agreement

4    on July 28th, several months ago.  T-Mobile has never taken us

5    up on the offer.

6           Ms. Stamm served her opinions before the Motorola

7    agreement.  So I understand she offered her opinions, but they

8    don't factor in that there was a subsequent Motorola agreement.

9           Now, what happened, Your Honor, is that, you know, this

10   wasn't ambush, this was us raising an issue with Judge Gilstrap

11   in chambers.  He said he recognized that there was a concern

12   that this could open the door, and T-Mobile -- or, I'm sorry --

13   Verizon made the decision that they didn't want to risk opening

14   the door.

15          I don't see why we should be doing anything different

16   now.  I think we do exactly what we did before.  We make our

17   case to Judge Gilstrap, they can make their case to

18   Judge Gilstrap, and that -- that's how it works out.  I don't

19   understand why we would be revisiting this now when the Court

20   has considered it and, if anything, T-Mobile has further notice

21   of it now.  They've given it further thought.  It's certainly

22   not something that's being sprung the day of trial.

23          THE COURT:  All of the issues that are presented

24   before trial are supposed to be addressed in the pretrial

25   process.  So now that this issue has been raised, I think that

85

1  I have an obligation to address it and not leave it to a, you

2  know, Wednesday morning dispute during trial.

3        So do you contend that you currently have the right to

4  raise the Motorola license agreement through a fact witness?

5            MR. DAVIS:  Yes, Your Honor.  I think it's our view

6  that we should be able to if T-Mobile is permitted to present a

7  comparable licenses theory and suggest that these are

8  comparable licenses that would be truly representative of what

9  the parties would agree to in a -- in a hypothetical

10 negotiation, the jury should hear that that is not the only --

11 there's a far more comparable license.

12       Obviously Dr. Raleigh would never be able to say anything

13 like that.  He can only testify to the existence of a license.

14           THE COURT:  And have you served an executed license

15 on the defendants?

16           MR. DAVIS:  Yes.  They've seen a copy of that.

17           THE COURT:  When I dealt with it, it was just a term

18 sheet.

19           MR. DAVIS:  Oh, no, Your Honor.  Yeah.  They've had

20 the license for a long time.

21           THE COURT:  All right.  And, Mr. Davis, it is

22 concerning to me that you would think, after a ruling in this

23 case that the Motorola agreement is not admissible and the

24 experts' opinions on it are not admissible, that you would

25 think that testimony by Dr. Raleigh about it, lay testimony, is

PRETRIAL CONFERENCE                                    10/15/2025

86

1    admissible.

2          MR. DAVIS:  And that's exactly why, Your Honor, we

3    raised this in chambers.  We did not do anything in the

4    presence of the jury.  We made our case to Judge Gilstrap, and

5    that's how things proceeded.

6          THE COURT:  But you haven't raised it in this case.

7          MR. DAVIS:  Sorry.  You mean we haven't presented

8    this to Judge Gilstrap in this case.

9          THE COURT:  Well...

10          MR. DAVIS:  Yes.  I think I understand what you mean,

11   Your Honor, that we made our case to Judge Gilstrap in the

12   Verizon case.

13          THE COURT:  Yeah.

14          MR. DAVIS:  But that's different from this case.

15          THE COURT:  I think so.

16          MR. DAVIS:  Yes.  Understood.

17          THE COURT:  I'm confused as -- why would you think

18   that this wasn't an issue that needed to be addressed during

19   the pretrial process in this, the T-Mobile case?

20          MR. DAVIS:  I think our view, Your Honor, is simply

21   that we thought the same thing would happen in the T-Mobile

22   trial.  We would make our case to Judge Gilstrap.  He would

23   make whatever determination or give whatever guidance he would

24   give, and that would be that.

25          But certainly we'd be happy to brief that here.  That

87

1  would be no problem for us.  We didn't know that T-Mobile would

2  be raising this either.  This is very new to us, which is why

3  Your Honor received briefing in the last 48 hours on it because

4  T-Mobile's just raising this now, despite the Verizon trial

5  occurring quite some time ago.

6              THE COURT:  I'm just concerned about whether there's

7  even a good-faith argument that you can seek to introduce

8  something through your lay witness that has been specifically

9  excluded from introduction and from expert testimony.

10      I understand that when you're in the middle of a trial,

11  you can raise it.  You have no choice at that point if you're

12  going to; but I don't understand how you could think, going

13  through the pretrial process in this case, that you can just

14  hold on to that to raise that during trial.

15              MR. DAVIS:  I see your point, Your Honor, and, you

16  know, that's -- that's certainly something -- you know, I

17  apologize for that misunderstanding.  But we'd be happy to

18  develop that through briefing.  We just, like I said, received

19  this -- you know, T-Mobile submitted their brief 48 hours ago

20  and we did our responsive brief 24 hours later, and so this is

21  a very new issue to us.

22              THE COURT:  I can tell you I consider it a failure of

23  my pretrial management that this issue in the Verizon case came

24  up as a dispute that had to be resolved by Judge Gilstrap on a

25  moment's notice when it's an issue that I assume the plaintiff

PRETRIAL CONFERENCE                                    10/15/2025

88

1    had been contemplating for some time.

2        I mean, I don't recall that ever being raised when we

3    were dealing with the significant arguments about whether the

4    Motorola license was admissible and whether or not the expert

5    would be allowed to testify about it.  I don't recall any

6    statement by Headwater that, well, we can just let Dr. Raleigh

7    bring it up.

8            MR. DAVIS:  Yeah.  I'm not sure about that,

9    Your Honor.  I'm not -- nothing comes to my mind.  It wasn't

10   something I particularly worked on.  I'm not --

11           THE COURT:  I absolutely guarantee that never was

12   said to me.

13           MR. DAVIS:  Understood.

14           THE COURT:  Well, we are going to have to -- I

15   understand now we're in a different position in this case, at

16   least time-wise, than we were when I addressed that issue

17   before, and, frankly, the Motorola agreement wasn't even final

18   at that point.  So it was a relatively easy call.

19       But don't ever think that it is the goal of the Court

20   that issues of any significance be held to be raised on the

21   morning of a trial day.

22           MR. DAVIS:  Uh-huh.

23           THE COURT:  The whole purpose of this is to resolve

24   these issues when calm reflection is available; but, anyway.

25       Do you have -- have you addressed this to the extent you

89

1   want to in the briefing that's been done?

2          MR. DAVIS:  No, Your Honor.  The -- no.  We've --

3   we've really just addressed, I think, the parties submitted

4   either one-page or two-page briefs on this, and I don't

5   think -- we've certainly not pled our case as to why we think

6   this should be permissible.

7          THE COURT:  Well, you know, I mean, you were going to

8   just live with the rulings that have been made:  that the

9   expert can't opine on it and that it's not admissible but go

10  with the theory that Dr. Raleigh can just tell the jury, by the

11  way, we have a ███████  license.  Deal with it.

12          MR. DAVIS:  Well, I guess it's a question of what

13  they might say at trial.  We don't know exactly what they would

14  say at trial.  And I understand Ms. Stamm has an expert report,

15  but we don't know specifically what testimony she would give or

16  arguments that counsel would make or what have you.

17          THE COURT:  Well, we are, once again, close to trial

18  when this issue comes up.  We're here on the, I guess this is

19  the 15th, and the trial is 12 days away.  Not a lot of time for

20  briefing.

21          MR. DAVIS:  Uh-huh.

22          THE COURT:  You know, if you are wanting to preserve

23  some ability to make this argument, you need to make it now and

24  put it before the Court, because I'm going to rule that

25  Dr. Raleigh is not allowed to testify about the Motorola

PRETRIAL CONFERENCE                                    10/15/2025

90

1   agreement unless you get some other ruling from the Court.

2           MR. DAVIS:  Uh-huh.

3           THE COURT:  That was certainly never my expectation

4   that that would be the course that would be chosen in response

5   to the earlier rulings.

6           MR. DAVIS:  I understand, Your Honor.

7           THE COURT:  Okay.

8           MR. DAVIS:  Thank you for the guidance on that.

9           THE COURT:  All right.  And I know there was another

10  motion that was talked about in the briefing.  Given the hour,

11  we'll take that up on the papers.

12          And I would ask each side to file a final exhibit list

13  that reflects the agreements and rulings.  If you can exchange

14  them by -- exchange them by Friday and file them by Tuesday,

15  then if there's any issues the parties are not able to agree on

16  as far as what has been ruled on or agreed to, then file the

17  joint notice reflecting that on Tuesday, and I'll get everybody

18  back together.

19          What else do we need to put on the record for Plaintiff,

20  Mr. Davis?

21          MR. DAVIS:  Nothing for Plaintiff, Your Honor.

22          THE COURT:  What about for the defendant,

23  Mr. Rosenthal?

24          MR. ROSENTHAL:  Nothing for Defendant.  Thank you,

25  Your Honor.

91

1        THE COURT:  All right.  Then we're adjourned.  Thank

2   you.

3        (Whereupon, the proceedings were concluded at 5:24 p.m.)

4

5                        Certificate

6   I hereby certify this 20th day of October, 2025, that the
    foregoing is, to the best of my ability and understanding, a
7   true and correct transcript from the record of proceedings in
    the above-entitled matter.

8

9                    /s/ Karen L. Tyler
                     CCR(LA), CSR(TX), TCRR, CRR, CRC
10                   Registered Diplomate Reporter
                     karen@karentylerreporting.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PRETRIAL CONFERENCE                                    10/15/2025

PRETRIAL CONFERENCE                                          10/15/2025

PRETRIAL CONFERENCE                                    10/15/2025

PRETRIAL CONFERENCE                                    10/15/2025

PRETRIAL CONFERENCE                                        10/15/2025